No. 23-1078

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiffs-Appellants*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON
COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY
SCHOOL ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his
official capacity as State Superintendent; DORA STUTLER, in her of-
ficial capacity as Harrison County Superintendent,

*Defendants-Appellees*,

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

*Intervenors-Appellees*.

On Appeal from the United States District Court
for the Southern District of West Virginia (Charleston)
Case No. 2:21-cv-00316

**APPELLEES WEST VIRGINIA STATE BOARD OF
EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIV-
ITIES COMMISSION, W. CLAYTON BURCH, STATE OF WEST
VIRGINIA AND LAINEY ARMISTEAD'S JOINT RESPONSE TO
MOTION FOR INJUNCTION PENDING APPEAL**

JOHANNES S. WIDMALM-DELPHONSE
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jwidmalmdelphonse@ADFlegal.org

JOHN J. BURSCH
CHRISTIANA M. KIEFER
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org
ckiefer@ADFlegal.org

JONATHAN A. SCRUGGS
JACOB P. WARNER
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
jwarner@ADFlegal.org

*Attorneys for Intervenor-Appellee Lainey Armistead*

KRISTEN V. HAMMOND
KELLY C. MORGAN
MICHAEL W. TAYLOR
BAILEY & WYANT, PLLC
500 Virginia St. E., Suite 600
Charleston, WV 25301
(303) 345-4222
khammond@baileywyant.com
kmorgan@baileywyant.com
mtaylor@baileywyant.com

*Attorneys for Appellee West Virginia State Board of Education and W.
Clayton Burch, State Superintendent*

SHANNON M. ROGERS
KIMBERLY M. BANDY
ROBERTA F. GREEN
SHUMAN MCCUSKEY SLICER
1411 Virginia Street East
Suite 200
Charleston, WV 25301
(304) 345-1400
srogers@shumanlaw.com
kbandy@shumanlaw.com
rgreen@shumanlaw.com

*Attorneys for Appellee West Virginia Secondary School Activities
Commission*

CURTIS R. A. CAPEHART,
*DEPUTY ATTORNEY GENERAL*
WEST VIRGINIA ATTORNEY
GENERAL'S OFFICE
1900 Kanawha Blvd. E.
Bldg 1, Room 26E
Charleston, WV 25305
(304) 558-2021
curtis.r.a.capehart@wvago.gov

LINDSAY S. SEE
*SOLICITOR GENERAL*
MICHAEL R. WILLIAMS
*SR. DEPUTY SOLICITOR GENERAL*
WEST VIRGINIA ATTORNEY
GENERAL'S OFFICE
1900 Kanawha Blvd. E
Bldg 1, Room 26E
Charleston, WV 25305-0220
(304) 558-2021
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Attorneys for Intervenor-Appellee State of West Virginia*

# TABLE OF CONTENTS

Table of Authorities ...................................................................ii

Introduction ........................................................................... 1

Background ............................................................................ 3

Legal Standard ....................................................................... 6

Argument ............................................................................... 8

I.    B.P.J. is unlikely to prevail on the merits. ..................................... 8

    A.    B.P.J. is unlikely to prevail under equal protection............... 8

        1.    The Sports Act designates sports teams based on biological sex, not gender identity.................................. 8

        2.    The Sports Act validly distinguishes based on biology because sex matters in sports......................... 10

    B.    B.P.J. is unlikely to prevail under Title IX........................... 14

        1.    Title IX deals with sex, not gender identity. ............... 14

        2.    Title IX sometimes requires sex distinctions. ............. 14

        3.    *Bostock* and *Grimm* do not forbid the Sports Act........ 18

II.    The remaining factors favor protecting female athletes. .............. 20

Conclusion............................................................................ 22

Certificate Of Compliance ...................................................... 25

Certificate Of Service ........................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Adams ex rel. Kasper v. School Board of St. Johns County*,
    57 F.4th 791 (11th Cir. 2022).................................................... passim

*Andino v. Middleton*,
    141 S. Ct. 9 (2020) ........................................................................ 22

*Bauer v. Lynch*,
    812 F.3d 340 (4th Cir. 2016) ...................................................... 8, 12

*Blackwelder Furniture Co. of Statesville, Inc. v. Seilig*
    *Manufacturing Co., Inc.*,
    550 F.2d 189 (4th Cir. 1977) ...................................................... 6, 7

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020) .............................................................. 18, 19

*Brown v. Gilmore*,
    533 U.S. 1301 (2001) ...................................................................... 6

*Bucklew v. Precythe*,
    139 S. Ct. 1112 (2019) .................................................................. 10

*Califano v. Boles*,
    443 U.S. 282 (1979) ........................................................................ 8

*Cannon v. University of Chicago*,
    441 U.S. 677 (1979) ...................................................................... 16

*Cape v. Tennessee Secondary School Athletic Association*,
    563 F.2d 793 (6th Cir. 1977) ........................................................ 12

*Capital Associated Industries, Inc. v. Stein*,
    922 F.3d 198 (4th Cir. 2019) ........................................................ 10

*City of Cleburne v. Cleburne Living Center*,
    473 U.S. 432 (1985) ...................................................................... 10

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) ............................................................... 4

*Clark ex rel. Clark v. Arizizona Interscholastic Association*,
886 F.2d 1191 (9th Cir. 1989) ...................................... 19, 20

*Clark v. Arizona Interscholastic Association*,
695 F.2d 1126 (9th Cir. 1982) ....................... 4, 11, 12, 13

*Cohen v. Brown University*,
101 F.3d 155 (1st Cir. 1996) .......................................... 19

*Cohen v. Brown University*,
991 F.2d 888 (1st Cir. 1993) ........................................... 17

*Dobbs v. Jackson Women's Health Organization*,
142 S. Ct. 2228 (2022) ..................................................... 9

*Geduldig v. Aiello*,
417 U.S. 484 (1974) ......................................................... 9

*Grimm v. Gloucester County School Board*,
972 F.3d 586 (4th Cir. 2020) ............................. 9, 12, 14, 19

*Harley v. Wilkinson*,
988 F.3d 766 (4th Cir. 2021) ..................................... 10, 13

*Imaginary Images, Inc. v. Evans*,
612 F.3d 736 (4th Cir. 2010) ........................................... 4

*Jackson v. Birmingham Board of Education*,
544 U.S. 167 (2005) ......................................................... 18

*Long v. Robinson*,
432 F.2d 977 (4th Cir. 1970) ........................................... 7

*Lux v. Rodrigues*,
561 U.S. 1306 (2010) ....................................................... 6

*McCormick ex rel. McCormick v. School District of Mamaroneck*,
370 F.3d 275 (2d Cir. 2004)................................. 15, 16, 17

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ........................................................ 18

*Michael M. v. Superior Court of Sonoma County*,
  450 U.S. 464 (1981) .................................................................... 11

*Neese v. Becerra*,
  2022 WL 1265925 (N.D. Tex. Apr. 26, 2022) ........................... 14, 16

*Neese v. Becerra*,
  2022 WL 16902425 (N.D. Tex. Nov. 11, 2022) ........................ 17, 18

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................... 6

*O'Connor v. Board of Education of School District 23*,
  449 U.S. 1301 (1980) ................................................................... 21

*Personnel Administrator of Massachusetts v. Feeney*,
  442 U.S. 256 (1979) .................................................................. 9, 10

*Real Truth About Obama, Inc. v. FEC*,
  575 F.3d 342 (4th Cir. 2009) ......................................................... 7

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  141 S. Ct. 63 (2020) ...................................................................... 7

*Telvest, Inc. v. Bradshaw*,
  618 F.2d 1029 (4th Cir. 1980) ...................................................... 22

*Tuan Anh Nguyen v. INS*,
  533 U.S. 53 (2001) ............................................................. 10, 11, 13

*United States v. Champlin Refining Co.*,
  341 U.S. 290 (1951) ..................................................................... 16

*United States v. Edge Broadcasting Co.*,
  509 U.S. 418 (1993) ..................................................................... 11

*United States v. Staten*,
  666 F.3d 154 (4th Cir. 2011) ........................................................ 10

*United States v. Virginia*,
  518 U.S. 515 (1996) ............................................................ passim

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ....................................................... 11

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008) .......................................................... 6

*Wise v. Circosta*,
  978 F.3d 93 (4th Cir. 2020) ............................................ 6

## Statutes

20 U.S.C. § 1681........................................................... 14, 15

20 U.S.C. § 1686........................................................... 16

20 U.S.C. § 1687........................................................... 17

Pub. L. No. 93-380, 88 Stat. 484 (Aug. 21, 1974) ................... 17

W. Va. Code § 18-2-25d(c)(1) ............................................ 3, 4, 8

## Other Authorities

118 Cong. Rec. 5807 (1972) ............................................... 15

Lidewij Sophia Boogers et al., *Transgender Girls Grow Tall: Adult
  Height Is Unaffected by GnRH Analogue and Estradiol
  Treatment*, The Journal of Clinical Endocrinology &
  Metabolism (June 6, 2022), https://bit.ly/3jW1PRK ................... 21

Webster's Third New International Dictionary (1966) .................... 15

## Regulations

34 C.F.R. § 106.41......................................................... 16, 17

40 Fed. Reg. 24128 (1975) ................................................ 17

## INTRODUCTION

West Virginia passed House Bill 3293 (Sports Act) to ensure equal opportunities and fair play for female athletes. The Act was one vote in an ongoing national debate. On one side, some states' policymakers have allowed males who identify as female to compete in female sports. That has led to female athletes losing championships, medals, and opportunities to compete in the sports they love. On the other, West Virginia lawmakers acted to ensure women can fairly compete for scholarships, recognition, and the chance to be champions. The Sports Act does this by requiring males to compete on teams consistent with their sex. This path is legal, logical, and longstanding. And the court below upheld it.

Appellant B.P.J. seeks an injunction pending appeal. That request should be denied. On the merits, B.P.J. agrees that West Virginia can exclude males from female sports—*if they identify as males*. But B.P.J. then demands a distinction based on gender identity instead of sex. So B.P.J.'s theory would allow males to compete on female teams (no matter their hormone levels); require males who identify as men to be excluded from these teams; and force females to compete against bigger, faster, and stronger males anytime they identify as female. More broadly, this legal theory will require courts to engage in an athlete-by-athlete adjudication whenever anyone alleges (by birth or intervention) to have the same athletic ability or hormone levels as females.

That theory doesn't work. It would require the state to discriminate based on gender identity by making gender identity (and not sex) the criteria for designating school sports teams. It upends countless precedents upholding classifications based on sex in prisons, physical fitness tests, and elsewhere. And it cannot justify B.P.J.'s requested relief because the Act properly applies in nearly all cases, requiring males who identify as males to compete in male sports. In the end, the Sports Act makes a common-sense judgment rooted in real-world experience: biological differences between males and females matter in sports. Title IX and the Fourteenth Amendment allow that judgment.

On the equities, B.P.J. displaced scores of girls when allowed to compete against them before the judgment below. Those girls were harmed, and more girls will be. Their harms should not be forgotten, erased, or dismissed. It has happened too often in our history. When males displace females—even one—the goal of equal participation by females in interscholastic athletics is set back, not advanced. An injunction on appeal would perpetuate this harm. This Court should deny the requested injunction and, like the court below, allow the Act to continue protecting West Virginia girls this spring and beyond.

## BACKGROUND

Two years ago, West Virginia passed the Sports Act, which requires public schools to designate sports teams "based on biological sex" and so ensures that males cannot compete against females in contact or competitive sports. W. Va. Code § 18-2-25d(c)(1). This Act seeks to "promote equal athletic opportunities for the female sex" because there are "inherent differences" that make it unfair or even dangerous for females to compete against male athletes. *Id.* § 18-2-25d(a)(1)-(5); App. in Supp. of Appellee's Joint Resp. to Mot. for Inj. Pending Appeal (App.) 1714, 1720.

In recent years, males have been increasingly competing against— and beating—females in female sports events. App.1714, 1720. In Connecticut alone, for example, two males recently took 15 women's track championship titles that would have belonged to nine different females. App.195, 201. Chelsea Mitchell, for example, lost to these males more than 20 times. App.170. Alanna Smith lost to them three times. App.194-95. And Selina Soule lost to them at least four times. App.200-01. For Selina, the experience was "demoralizing." App.201. And Alanna "felt defeated before [she] even got set in [her] blocks." App.194.

College women have have fared no better. Consider Lia Thomas, a male swimmer on the University of Pennsylvania women's swim team. App.322 (¶137); 703-04 (212:14-214:6). Thomas recently set two Ivy League records, App.255, 261, and became an NCAA champion in the

500-yard freestyle, App.268. Thomas beat two Olympic champions in the same race and bumped 15 women down the scoreboard that day.

Such defeat and "displace[ment]" worried West Virginia lawmakers. W. Va. Code § 18-2-25d(a)(3). Relying on these troubling "experiences of other jurisdictions," *Imaginary Images, Inc. v. Evans*, 612 F.3d 736, 742 (4th Cir. 2010); *see City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986), the West Virginia Legislature passed the Sports Act to ensure that sports were as "safe" and "fair as possible." App.85.

B.P.J. sued. B.P.J. is a 12-year-old biological male who identifies as female and seeks to designate sports based on gender identity. App.1706, 1722-23. But, as the court below held, biology is what affects athletic performance—not gender identity. And another court explained, "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" against each other. *Clark v. Ariz. Interscholastic Ass'n (Clark I)*, 695 F.2d 1126, 1131 (9th Cir. 1982); App.285, 317-334. So, consistent with history, sex-specific sports are allowed to ensure both equality and safety for female athletes.

B.P.J. seeks to benefit from this sex-based system—claiming to be similarly situated to a female. But while B.P.J. takes puberty-suppressing drugs that (according to B.P.J.) will allow B.P.J. to "develop physiological characteristics consistent with a typical female," Appellant's Mot. for Stay Pending Appeal (Mot.) 5, scientists disagree on "whether and to what extent" taking such drugs will reduce male physiological

advantages. App.1723. And not all males who identify as female take these drugs; some "choose to only transition socially." App.1723.

The court below entered a preliminary injunction based on an early and incomplete record. Afterward, B.P.J. competed on the Bridgeport Middle School girls' cross-country and track-and-field teams, routinely defeating and displacing many female athletes. App.1729-1746.

Last month, after reviewing a complete record, the court below granted summary judgment to defendants. The court held—as B.P.J. concedes—that males have physiological advantages over females because of their higher average testosterone levels. App.1722. And these "inherent" advantages make "biological males [ ] not similarly situated to biological females" in athletics. App.1722, 1724, 1727. That one male—whether due to naturally low testosterone or intervention—lacks typical testosterone levels does not negate the State's substantial interest in advancing equality for female athletes by designating sex-specific sports teams. App.1722, 1724. So the court held that the Sports Act was lawful, dissolved its prior injunction, and entered judgment. App.1724, 1727.

B.J.P. now seeks an injunction pending appeal.

## LEGAL STANDARD

B.P.J. seeks an injunction pending appeal—not a stay. A stay "suspend[s] judicial alteration of the status quo;" an injunction requires it. *Nken v. Holder*, 556 U.S. 418, 429 (2009). While B.P.J. says the requested injunction "seeks to preserve the status quo," Mot. 1, 14, the preliminary injunction below *did not set the status quo*. State law did. As this Court recently affirmed, "it is the state's action—not any intervening federal court decision—that [sets] the status quo." *Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020) (en banc).

B.P.J. seeks to enjoin the Sports Act, which requires "judicial intervention that [was] withheld below." *Nken*, 556 U.S. at 429. Such intervention is "an extraordinary remedy that may only be awarded upon *a clear showing* that the plaintiff is entitled" to it. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added). This is especially true when the plaintiff seeks to enjoin the "enforcement of a presumptively valid state statute." *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers). Such a request "demands a significantly higher justification" than a stay request. *Lux v. Rodrigues*, 561 U.S. 1306, 1307 (2010) (Roberts, C.J., in chambers) (cleaned up).

For over 50 years, this Court has held that the preliminary-injunction standard sets the floor for issuing injunctions on appeal. *See Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 194 (4th Cir. 1977); *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir.

1970). For good reason. A preliminary injunction offers plaintiffs relief while the facts and arguments are still developing, but an injunction on appeal offers plaintiffs relief after a court has ruled against them on the merits based on a complete record. In such a situation, plaintiffs bear a "substantially greater" "burden." *Blackwelder*, 550 F.2d at 194.

At a minimum, plaintiffs seeking an injunction on appeal must prove (1) they are "likely to succeed on the merits"; (2) they will "suffer irreparable harm" without the injunction; (3) the "balance of equities" favors them; and (4) the "injunction is in the public interest." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009). B.P.J. says the Court should balance these factors and issue an injunction if a "substantial case" is presented. Mot. 13. But the correct test "is far stricter." *Real Truth*, 575 F.3d at 347. No such balancing is allowed, and "all four requirements must be satisfied." *Id.* at 346; *accord Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (per curiam).

And the standard should be even higher for B.P.J.'s expedited request. B.P.J. seeks to reverse a summary judgment ruling based on a record over 3,000 thousand pages long. This appeal is particularly ill-suited for a rare injunction on an expedited basis.

# ARGUMENT

## I. B.P.J. is unlikely to prevail on the merits.

### A. B.P.J. is unlikely to prevail under equal protection.

B.P.J. says the Sports Act violates equal protection because it "discriminates on the basis of transgender status." Mot. 15. But it doesn't. The Act distinguishes based on sex; this distinction is allowed because it reflects the "inherent differences between men and women"; *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up); and this is true whether B.P.J. challenges the law facially or as applied.

#### 1. The Sports Act designates sports teams based on biological sex, not gender identity.

To decide equal-protection claims, courts "begin with the statutory classification itself." *Califano v. Boles*, 443 U.S. 282, 293-94 (1979). The Sports Act designates athletic teams "based on biological sex." W. Va. Code § 18-2-25d(c)(1). Under the Act, all males—those who identify as male, female, nonbinary, fluid, or anything else—cannot compete in female sports. Teams for males may be open to females, but not vice versa. *Id*. § 18-2-25d(c)(2)-(3). This keeps sports safe and competitive for females. Nowhere does the Act distinguish based on gender identity.

A law may classify based on biological sex without unlawfully discriminating on the basis of transgender status. *See Bauer v. Lynch*, 812 F.3d 340, 350-51 (4th Cir. 2016) ("[A]ccommodations addressing physiological differences between the sexes are not necessarily unlawful.");

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022). Nor does the fact that the Act may *affect* some transgender athletes mean that the law classifies based on gender identity. Many laws "affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271-72 (1979). A law that favors veterans isn't sex-based even if veterans are 98% male. *Id.* at 270, 274. Nor does "[t]he regulation of a medical procedure" that affects only one sex—like abortion—trigger heightened scrutiny. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022).

At most, B.P.J.'s challenge amounts to a claim that the Sports Act "has a disparate impact" on "transgender students." *Adams*, 57 F.4th at 810. But any disparate impact is "plausibly explained on a neutral ground." *Feeney*, 442 U.S. at 275. Sex-based distinctions often overlap or contradict a person's gender identity. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 609 (4th Cir. 2020). So they are "an unavoidable consequence of a legislative policy that has … always been deemed to be legitimate." *Feeney*, 442 U.S. at 279 n.25. Here, the Act keeps all males from competing in female sports, no matter how they identify. "Too many men are affected to [say] that the [law] is but a pretext" for disfavoring transgender people. *Feeney*, 442 U.S. at 275; *see Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974); *Dobbs*, 142 S. Ct. at 2245-46.

### 2. The Sports Act validly distinguishes based on biology because sex matters in sports.

The Equal Protection Clause does not eliminate the State's power to classify, but instead "measure[s] the basic validity of the legislative classification." *Feeney*, 442 U.S. at 271-72. Sex-based distinctions trigger intermediate scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). But sex is not "a proscribed classification." *Virginia*, 518 U.S. at 533. Equal protection just requires that a sex-based distinction serve an "important" government "objective[]" and that the "means" used "substantially relate[] to" the goal. *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 60 (2001). A "perfect fit" is not required; "only a reasonable one." *United States v. Staten*, 666 F.3d 154, 167 (4th Cir. 2011).

B.P.J. suggests the Court should narrowly tailor the analysis to B.P.J.'s (and every other student's) "individual circumstances" because the claim is as-applied. Mot. 17. That's wrong. Labeling a claim "facial or as-applied … does not speak … to the substantive rule of law." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). For as-applied claims under intermediate scrutiny, this Court does "not consider any individual characteristics of the person raising the as-applied challenge but focuse[s] entirely on the [law] itself and the evidence" showing its "purpose and fit." *Harley v. Wilkinson*, 988 F.3d 766, 769-70 (4th Cir. 2021); *accord Staten*, 666 F.3d at 167; *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 209 (4th Cir. 2019). The Supreme Court agrees. *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 801 (1989) (law's validity depends on how it relates "to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case"); *United States v. Edge Broadcasting Co.*, 509 U.S. 418, 431 (1993).

Applying the correct standard, the Sports Act satisfies equal protection. To start, it promotes equal athletic opportunities for females. Designating sex-specific sports to promote this goal is allowed "to advance full development of the talent and capacities" of women and girls. *Virginia*, 518 U.S. at 533. "There is no question that" these goals are an "important governmental interest." *Clark I*, 695 F.2d at 1131.

The Sports Act tightly fits this interest. The U.S. Supreme Court "has consistently upheld statutes" when the sex distinction "realistically reflects the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981). Laws may distinguish males for having sex with underage females because of pregnancy risks. *Id.* at 471-73. And laws may impose "a different set of rules" to prove biological parenthood because of "the unique relationship of the mother to … birth." *Nguyen*, 533 U.S. at 63-64. In fact, "biological sex … is the driving force behind the Supreme Court's sex-discrimination" cases. *Adams*, 57 F.4th at 803 n.6.

In sports, "[t]he difference between men and women … is a real one." *Nguyen*, 533 U.S. at 73. Unlike in *Grimm*, where this Court held that designating sex-specific bathrooms "was not substantially related"

to ensuring bodily privacy because officials presented no "evidence that a transgender student" would observe other students undressed, 972 F.3d at 614, here, B.P.J. *agrees* that designating sports by sex generally furthers the state's interest in protecting female athletes. And B.P.J.'s counsel has argued elsewhere that "privacy" rulings like *Grimm* offer no help in cases like this because the state's interest in protecting female sports is "distinct." App.1747-48. Males and females "are not physiologically the same for the purposes of physical" activities. *Bauer*, 812 F.3d at 350. Indeed, "due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark I*, 695 F.2d at 1131. And most "females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement" without distinct teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam).

B.P.J. claims to be "similarly situated" to "girls" after identifying as one and taking drugs to mitigate male puberty. Mot. 15. But anyone can take these drugs—including males who identify as boys. And biological sex "is not a stereotype." *Adams*, 57 F.4th at 809. The physiological differences between the sexes are real and "enduring." *Virginia*, 518 U.S. at 533. Moreover, because B.P.J. argues that males with naturally low testosterone levels, or who just perform poorly in sports, can be excluded from female sports, App.1724, B.P.J.'s theory would have the perverse effect of *requiring West Virginia to discriminate based on gender*

*identity*—a classification that, according to B.P.J.'s own experts, is not "useful" for indicating "athletic performance." App.814 (167:24-168:1).

The Sports Act accommodates the physiological differences between the sexes, which are rooted in biology. B.P.J. agrees that laws designating sex-specific sports teams are legal because it would be unfair for most biological males to compete in female sports because of their physiological advantages. Yet B.P.J. also argues that a biology-based distinction is illegal and pushes instead for an identity-based one—which has nothing to do with physiology. If designating sex-specific sports is valid to accommodate the average physiological differences between males and females, it cannot be invalid because it draws a biology-based distinction. This line validly applies to 99% of males because they are biologically male; so it must also be valid as applied to B.P.J. who is biologically male.

Despite this near-perfect efficiency, West Virginia need not use a classification "capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 63, 70; *accord Clark I*, 695 F.2d at 1132. Requiring such proof would require a "perfect" fit when this Court requires only a "reasonable" one. *Harley*, 988 F.3d at 769. And that would convert intermediate scrutiny into strict, contradict Fourth Circuit and Supreme Court precedent, and create up a circuit split—which this Court should avoid. *Ward*, 491 U.S. at 801; *Adams*, 57 F.4th at 809.

### B.   B.P.J. is unlikely to prevail under Title IX.

Title IX forbids schools from treating individuals "worse than others who are similarly situated" based on sex. *Grimm*, 972 F.3d at 618. While B.P.J. claims to be "similarly situated" to a biological female, that is incorrect. Section I.A.2, *supra*. That alone dooms B.P.J.'s claim. So does Title IX's text.

#### 1.   Title IX deals with sex, not gender identity.

Title IX prohibits "discrimination" in educational programs and activities "on the basis of sex." 20 U.S.C. § 1681(a). But Title IX does not define "sex," so we "look to the ordinary meaning of the word when it was enacted in 1972." *Adams*, 57 F.4th at 812. And this ordinary meaning in 1972 was "biological sex." *Id* (collecting sources); *accord Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 1265925, at \*12 (N.D. Tex. Apr. 26, 2022). As the Supreme Court put it, "sex" is "an immutable characteristic" determined solely by "birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973).

#### 2.   Title IX sometimes requires sex distinctions.

Sports show that Title IX doesn't just permit sex distinctions; Title IX sometimes requires it. Again, start with the text. Title IX doesn't forbid noticing sex (sex blindness) but states that no person "shall, on the basis of sex, be excluded from participation in [or] be denied the benefits of … any education program or activity." 20 U.S.C. § 1681(a). To "exclude" means "to shut out," "hinder the entrance of," or "bar from participation,

14

enjoyment, consideration, or inclusion." Webster's Third New International Dictionary 793 (1966). To "deny" means "to turn down or give a negative answer to." *Id*. at 603. And these words must be understood as applying to an "education program or activity," including sports. Together, these words forbid schools from shutting out or hindering females from enjoying, participating in, or reaping *educational* benefits.

And enjoying these *educational* benefits sometimes requires noticing sex. After all, an educational program "made up exclusively of one sex is different from a community composed of both." *Virginia*, 518 U.S. at 533 (cleaned up). When both sexes are present, recognizing sex differences can be necessary for students to fully enjoy educational programs and activities. As Title IX's sponsor put it, sometimes sex separation is "absolutely necessary to the success of the program—such as in classes for pregnant girls or emotionally disturbed students, in sports facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5807 (1972). In sports, too, sex separation is necessary to provide females with "the chance to be champions." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 295 (2d Cir. 2004).

Accommodating the "enduring" differences between males and females is written repeatedly into Title IX. *Virginia*, 518 U.S. at 533. Indeed, Title IX "explicitly permit[s] differentiating between the sexes in certain instances," *Adams*, 57 F.4th at 814—from some single-sex educational institutions and organizations, 20 U.S.C. § 1681(a)(1)-(9) to

15

"separate living facilities for the different sexes," *id.* § 1686. If sex included gender identity, then Title IX's regulations would not make sense. They allow for "separate [sports] teams for members of each sex," 34 C.F.R. § 106.41(b), and direct schools to "provide equal athletic opportunity for … both sexes" to "effectively accommodate the interests and abilities of members of both sexes," *id.* § 106.41(c). Title IX cannot require sex-blindness; it would make Title IX's text and rules incoherent.

Title IX's context confirms this conclusion. Although courts start with the words themselves, *Neese*, 2022 WL 1265925, at *14, a text "cannot be divorced from the circumstances existing at the time [the statute] was passed, and from the evil which Congress sought to correct and prevent," *United States v. Champlin Refin. Co.*, 341 U.S. 290, 297 (1951). Many courts have recognized that "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick*, 370 F.3d at 286; *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 & n.36 (1979). "The circumstances and the evil" that motivated Title IX "are well-known." *Champlin*, 341 U.S. at 297. It had nothing to do with gender identity, and everything to do with sex.

No one seriously disputes that Title IX allows educational institutions to consider sex in some circumstances—athletics being case-in-point. It is almost universally understood that Title IX allows sex-specific sports. But to interpret Title IX as requiring sex blindness would make sex-specific sports illegal. Schools could no longer use "biology-based

16

classifications to separate physical education classes involving contact sports like boxing or rugby." *Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 16902425, at *11 (N.D. Tex. Nov. 11, 2022). Yet as 34 C.F.R. 106.41(b) and its passage confirm, Congress never intended Title IX to require sex-blindness in the first place.

Shortly after Title IX, Congress passed the Javits Amendments, directing the Health, Education, and Welfare department to publish athletics regulations. Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (Aug. 21, 1974). HEW proposed regulations that included provisions identical to the sports exception now codified at 34 C.F.R. 106.41(b). *Compare* Non-discrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24128, 24142–43 (1975), *with* 34 C.F.R. § 106.41. Congress then allowed the regulations to take effect. *See McCormick*, 441 U.S. at 287. Thus, Congress ratified the regulation's understanding of Title IX—an understanding that allows educational institutions to recognize biological sex (and the corresponding physiological differences that result from it) when necessary to ensure equal access in education, such as in sports. Congress endorsed this understanding again in 1987, defining Title IX's educational programs to cover *all education programs*, including sports. *See* 20 U.S.C. § 1687(2)(A); *Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir. 1993). In all these ways, Congress re-affirmed that Title IX allows for sex-specific sports.

B.P.J. agrees that Title IX allows for this distinction, at least some-times. The only question is what type of distinction Title IX allows "for members of each sex" in sports. The answer is biological sex. Section I.B.1 *supra*. This makes sense in the athletic context, where biological distinc-tions matter most. The Sports Act accommodates these differences by giv-ing space for women to compete fairly. So it cannot violate Title IX when Title IX contemplates this precise distinction. Otherwise, any student who identifies as female could play female sports, even without taking drugs—something no major sports organization allows.

### 3. *Bostock* and *Grimm* do not forbid the Sports Act.

*Bostock* and *Grimm* do not require Title IX be interpreted to require West Virginia to allow B.P.J. on female sports teams.

First, *Bostock* doesn't mean Title IX forbids sex-specific sports. *Bostock* limited its ruling to Title VII employment. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1753 (2020). Title VII "is a vastly different statute" than Title IX, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 168 (2005); *see Neese*, 2022 WL 16902425, at \*8. And *Bostock*'s logic does not work when applied to sex-specific sports. Whereas *Bostock* interpreted Title VII to forbid considering sex when hiring and firing, Title IX often re-quires sex distinctions to accommodate physiological differences between males and females. Section I.B.2 *supra*. Thus, Title VII principles do not "automatically apply" to Title IX. *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021).

Indeed, there is a stark difference between firing employees because of their gender identity and providing sex-specific sports. Sex is "not relevant to the selection, evaluation, or compensation of employees." *Bostock*, 140 S. Ct. at 1741 (cleaned up). But in athletics, "gender is not an irrelevant characteristic." *Cohen v. Brown Univ.*, 101 F.3d 155, 176–78 (1st Cir. 1996). The 3,000+ page record shows this; the court below held this; and B.P.J.' own counsel seems to agree—suggesting such a "distinct[ion]" matters. App.1747-48. In fact, to achieve Title IX's purpose of giving women equal opportunity in athletics, Title IX *must* treat the sexes differently by designating specific teams for females. *See Clark ex rel. Clark v. Ariz. Interscholastic Ass'n (Clark II),* 886 F.2d 1191, 1193 (9th Cir. 1989). So courts have frequently refused to read Title VII requirements into Title IX's athletic context. *See Cohen*, 101 F.3d at 177.

Second, *Bostock* and *Grimm* did not conflate gender identity and biological sex. Those cases said that gender-identity discrimination necessarily considered sex, and this constituted sex discrimination under Title VII. *Bostock*, 140 S. Ct. at 1748; *Grimm*, 972 F.3d at 616. But those cases did not consider the converse—whether considering sex is always gender-identity discrimination. The Sports Act *only* considers biological sex, not gender identity. This does not treat B.P.J. "worse than others who are similarly situated." *Bostock*, 140 S. Ct. at 1740; *Grimm*, 972 F.3d at 618. Like all males, B.P.J. can participate on male teams. Like all

males, B.P.J. cannot play on female teams. That way, females have an equal opportunity to compete. That is what Title IX is all about.

## II.    The remaining factors favor protecting female athletes.

B.P.J. says the remaining factors favor an injunction because the injunction would allow B.P.J. to participate in sports, protect B.P.J.'s identity, and harm "no one." Mot. 20-21. But the injunction would thwart the will of West Virginia voters and harm all females who compete against and lose to B.P.J. this spring and beyond.

The Sports Act represents the state's considered judgment about the harms of allowing males to compete in female sports. After much debate, lawmakers chose to protect fair play and safety for biological females. While B.P.J. disagrees with that judgment, B.P.J. is wrong that the harm is one-sided. And this Court should consider *all* "the public consequences" that the injunction would bring. *Winter*, 555 U.S. at 24.

Consider the scores of girls who have already lost to B.P.J. in competitions. App.1729-46. B.P.J. stresses how the law affects only one person, but that's not how B.P.J.'s peers likely see it. When males displace females "even to the extent of one player … the goal of equal participation by females in interscholastic athletics is set back, not advanced." *Clark II*, 886 F.2d at 1193. And these girls—no less than B.P.J.—will experience their middle school years only once during their life. Their lives, interests, and dignity matter too. An injunction would injure them.

B.P.J. minimizes that injury. While B.P.J. may finish "near the back of the pack" sometimes, Mot. 2, bumping other girls down the standings harms them. Indeed, it "may not seem like a big deal to some, but placements matter to athletes." App.219. They understand that losing is a part of every sport, but they still want to earn their spot "fair and square." *Id.* And that goes even for B.P.J.'s "teammates" and "coaches" who have given B.P.J. "support." Mot. 9. *Every biological woman and girl* who participates in female sports benefits from sex-specific sports.

B.P.J. also may not finish "near the back of the pack" much longer. Mot. 2. Athletes train to win. And puberty can catapult a child from zero to hero quickly. As B.P.J. grows, B.P.J. will more likely begin beating the competition. While B.P.J. stresses that drugs can mitigate male puberty, the science says otherwise. *E.g.* Lidewij Sophia Boogers et al., *Transgender Girls Grow Tall: Adult Height Is Unaffected by GnRH Analogue and Estradiol Treatment*, The Journal of Clinical Endocrinology & Metabolism (June 6, 2022), https://bit.ly/3jW1PRK.

B.P.J. has another spot available. The Act designates sports by sex to accommodate the average physiological differences between the sexes, not diverse gender identities. B.P.J. may compete on the boys' team. App.1727. And in sports, many females across the country have long sought to compete on male teams because they desire more competition. *See O'Connor v. Bd. of Educ. of Sch. Dist. 23*, 449 U.S. 1301 (1980).

Finally, because West Virginians deserve to have a valid statute enforced, the "public interest is … served" by upholding the Act during this appeal. *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029, 1036 (4th Cir. 1980). And while B.P.J. asks for a lone exception, the underlying rule has no limiting principle. If this court issues the requested injunction, what should schools say to the male student whose gender identity "switches back and forth"? App.1255 (121:3-6). Or the male with low testosterone? Or the male who lacks athletic talent? There's no principled reason for excluding these students if there's an exception for B.P.J. An exception for B.P.J. would only create more inequity. The public interest is better served by applying the law consistently to everyone.

This case is far past preliminary stages; the court below upheld the Act on summary judgment. And while this case concerns a debate fraught with emotions on both sides, that's all the more reason to defer to state lawmakers. *Andino v. Middleton*, 141 S. Ct. 9, 10 (2020) (Kavanaugh, J., concurring). It's their call to make. And they made a valid one.

## CONCLUSION

This Court should deny the requested injunction.

Dated: February 15, 2023

By: */s/ John J. Bursch*

JOHANNES S. WIDMALM-DELPHONSE
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jwidmalmdelphonse@ADFlegal.org

JOHN J. BURSCH
CHRISTIANA M. KIEFER
ALLIANCE DEFENDING FREEDOM
440 First Street, NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org
ckiefer@ADFlegal.org

JONATHAN A. SCRUGGS
JACOB P. WARNER
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org
jwarner@ADFlegal.org

*Attorneys for Intervenor-Appellee Lainey Armistead*

KRISTEN V. HAMMOND
KELLY C. MORGAN
MICHAEL W. TAYLOR
BAILEY & WYANT, PLLC
500 Virginia St. E., Suite 600
Charleston, WV 25301
(303) 345-4222
khammond@baileywyant.com
kmorgan@baileywyant.com
mtaylor@baileywyant.com

*Attorneys for Appellee West Virginia State Board of Education
and W. Clayton Burch, State Superintendent*

23

SHANNON M. ROGERS
KIMBERLY M. BANDY
ROBERTA F. GREEN
SHUMAN MCCUSKEY SLICER,
PLLC
1411 Virginia Street East
Suite 200
Charleston, WV 25301
(304) 345-1400
srogers@shumanlaw.com
kbandy@shumanlaw.com
rgreen@shumanlaw.com

*Attorneys for Appellee West Virginia Secondary School Activities Commission*

CURTIS R. A. CAPEHART,
*DEPUTY ATTORNEY GENERAL*
WEST VIRGINIA ATTORNEY
GENERAL'S OFFICE
1900 Kanawha Blvd. E.
Bldg 1, Room 26E
Charleston, WV 25305
(304) 558-2021
curtis.r.a.capehart@wvago.gov

LINDSAY S. SEE
*SOLICITOR GENERAL*
MICHAEL R. WILLIAMS
*Sr. DEPUTY SOLICITOR GENERAL*
WEST VIRGINIA ATTORNEY
GENERAL'S OFFICE
1900 Kanawha Blvd. E
Bldg 1, Room 26E
Charleston, WV 25305-0220
(304) 558-2021
Lindsay.S.See@wvago.gov
Michael.R.Williams@wvago.gov

*Attorneys for Intervenor-Appellee State of West Virginia*

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,182 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using 14-point Century Schoolbook.

Dated: February 15, 2023

*/s/ John J. Bursch*
John J. Bursch

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2023, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

_/s/ John J. Bursch_
John J. Bursch