No. 23-1078

═══════════════════════════════════════

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

───────────────────────────────

B.P.J., by next friend and mother, HEATHER JACKSON,

*Plaintiff-Appellant / Cross-Appellee*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON
COUNTY BOARD OF EDUCATION; W. CLAYTON BURCH, in his
official capacity as State Superintendent; DORA STUTLER,
in her official capacity as Harrison County Superintendent,

*Defendants-Appellees*,

and

WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION,

*Defendant-Appellee / Cross-Appellant*,

and

THE STATE OF WEST VIRGINIA, LAINEY ARMISTEAD,

*Intervenors-Appellees*.

───────────────────────────────

On Appeal From The United States District Court
For The Southern District Of West Virginia
Case No. 2:21-cv-00316 (Goodwin, J.)

═══════════════════════════════════════

**APPELLEES' RESPONSE BRIEF AND
CROSS-APPELLANT'S OPENING BRIEF**

═══════════════════════════════════════

JOHN J. BURSCH
CHRISTIANA M. KIEFER
Alliance Defending Freedom
440 First Street, NW, Suite 600
Washington, DC 20001
jbursch@ADFlegal.org
ckiefer@ADFlegal.org
(616) 450-4235

JOHANNES S. WIDMALM-DELPHONSE
Alliance Defending Freedom
44180 Riverside Pkwy.
Lansdowne, VA 20176
jwidmalmdelphonese@ADFlegal.org
(571) 707-4655

JONATHAN A. SCRUGGS
JACOB P. WARNER
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
jscruggs@ADFlegal.org
jwarner@ADFlegal.org
(480) 444-0020

*Counsel for Intervenor-Appellee
Lainey Armistead*

PATRICK MORRISEY
  *Attorney General*

LINDSAY S. SEE
  *Solicitor General*
  *Counsel of Record*

MICHAEL R. WILLIAMS
  *Senior Deputy Solicitor General*

CURTIS R. A. CAPEHART
  *Deputy Attorney General*

GRANT A. NEWMAN
  *Assistant Solicitor General*

SPENCER J. DAVENPORT*
  *Special Assistant*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
lindsay.s.see@wvago.gov
michael.r.williams@wvago.gov
curtis.r.a.capehart@wvago.gov
grant.a.newman@wvago.gov
spencer.j.davenport@wvago.gov
(304) 558-2021

*Counsel for Intervenor-Appellee
State of West Virginia*

* admitted in the District of Columbia;
practicing under supervision of West
Virginia attorneys

ii

ROBERTA F. GREEN
KIMBERLY M. BANDY
SHANNON M. ROGERS
Shuman McCuskey Slicer
1411 Virginia St. E., Suite 200
Charleston, WV 25301
(304) 345-1400
rgreen@shumanlaw.com
kbandy@shumanlaw.com
srogers@shumanlaw.com

*Counsel for Defendant-Appellee and
Cross-Appellant West Virginia
Secondary School Activities
Commission*

KELLY C. MORGAN
MICHAEL W. TAYLOR
KRISTEN V. HAMMOND
Bailey & Wyant, PLLC
500 Virginia St. E., Suite 600
Charleston, WV 25301
(303) 345-4222
kmorgan@baileywyant.com
mtaylor@baileywyant.com
khammond@baileywyant.com

*Counsel for Defendant-Appellees
West Virginia State Board of
Education and W. Clayton Burch,
State Superintendent*

SUSAN L. DENIKER
Steptoe & Johnson PLLC
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8154
susan.deniker@steptoe-johnson.com

*Counsel for Defendant-Appellees
Harrison County Board of
Education and Dora Stutler*

# TABLE OF CONTENTS

Jurisdictional Statement ........................................................................1

Statement of the Issues ........................................................................2

Introduction ...........................................................................................3

Statement of the Case ..........................................................................5

Summary of the Argument ................................................................15

Standard of Review ............................................................................17

Argument .............................................................................................17

I.    The Act Satisfies The Equal Protection Clause .........................17

    A.   The Act designates students to sports teams by sex,
       not gender identity.........................................................18

    B.   The Act is a constitutional sex-based classification ............25

    C.   B.P.J.'s as-applied challenge does not change the legal test ...........33

II.   The Act Satisfies Title IX....................................................................37

    A.   Title IX's text, history, and purpose sometimes command
       sex distinctions..........................................................38

    B.   Title IX deals with sex, not gender identity.........................42

    C.   Neither *Bostock* nor *Grimm* supports B.P.J.'s claim ...................48

III. The District Court Erred In Finding That WVSSAC Is A State
     Actor And In Denying WVSSAC's Motion For Summary
     Judgmen...................................................................................54

    A.   WVSSAC raised more than state-actor arguments on
       summary judgment........................................................55

    B.   WVSSAC cannot be a state actor in the absence of any
       challenged action ........................................................56

C.    The case is inappropriate for pre-enforcement review
      as to WVSSAC ..................................................................59

D.    The Court should vacate the district court's ruling
      on WVSSAC ..................................................................61

Conclusion..........................................................................................62

Addendum..........................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967) ................................................................ 60

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.,*
    57 F.4th 791 (11th Cir. 2022) ....................... 19, 21, 22, 26, 43, 44, 49

*Air Evac. EMS, Inc., v. Cheatham,*
    260 F. Supp. 3d 628 (S.D. W. Va. 2017) ............................................ 61

*AT&T Mobility LLC v. Concepcion,*
    563 U.S. 333 (2011) ................................................................ 45

*Bauer v. Lynch,*
    812 F.3d 340 (4th Cir. 2016) ................................................ 9, 20, 39

*Baynard v. Malone,*
    268 F.3d 228 (4th Cir. 2001) ........................................................ 54

*Beale v. Hardy,*
    769 F.2d 213 (4th Cir. 1985) ........................................................ 31

*BedRoc Ltd. v. United States,*
    541 U.S. 176 (2004) ................................................................ 38

*Bethesda Lutheran Homes & Servs., Inc. v. Leean,*
    154 F.3d 716 (7th Cir. 1998) ........................................................ 54

*Bostock v. Clayton Cnty.,*
    140 S. Ct. 1731 (2020) ............................... 16, 27, 46, 49, 50, 51, 52

*Bray v. Alexandria Women's Health Clinic,*
    506 U.S. 263 (1993) ............................................................ 24, 25

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
    531 U.S. 288 (2001) ............................................................ 57, 58

*Bruce & Tanya & Assocs. v. Bd. of Supervisors of Fairfax Cty.,*
    854 F. App'x 521 (4th Cir. 2021) ................................................... 54

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Bucklew v. Precythe,*
    139 S. Ct. 1112 (2019) ...................................................33

*Caban v. Mohammed,*
    441 U.S. 380 (1979)........................................................36

*Cage v. Harper,*
    42 F.4th 734 (7th Cir. 2022) ........................................50

*Califano v. Boles,*
    443 U.S. 282 (1979)...............................................18, 34

*Cape v. Tenn. Secondary Sch. Athletic Ass'n,*
    563 F.2d 793 (6th Cir. 1977)....................................20, 50

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985)...........................................24, 25, 35

*Clark ex rel. Clark v. Ariz. Interscholastic Ass'n,*
    695 F.2d 1126 (9th Cir. 1982)....................20, 26, 27, 39, 42

*Clark ex rel. Clark v. Ariz. Interscholastic Ass'n,*
    886 F.2d 1191 (9th Cir. 1989)......................................50

*Cohen v. Brown Univ.,*
    101 F.3d 155 (1st Cir. 1996) ......................20, 23, 49, 50

*Cohen v. Brown Univ.,*
    991 F.2d 888 (1st Cir. 1993) .........................................41

*Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n,*
    80 F. Supp. 2d 729 (W.D. Mich. 2000) ..........................58

*Corley v. United States,*
    556 U.S. 303 (2009)........................................................46

*Craig v. Boren,*
    429 U.S. 190 (1976).........................................................19

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,*
    526 U.S. 629 (1999)........................................................53

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Dobbs v. Jackson Women's Health Org.,*
142 S. Ct. 2228 (2022) ......................................................................21

*Engquist v. Or. Dep't of Agr.,*
553 U.S. 591 (2008).........................................................................35

*Estes v. Midwest Prods., Inc.,*
24 F. Supp. 2d 621 (S.D. W. Va. 1998) ..........................................59

*Exxon Shipping Co. v. Baker,*
554 U.S. 471 (2008).........................................................................33

*Farm Lab. Org. Comm. v. Stein,*
56 F.4th 339 (4th Cir. 2022) ...........................................................22

*Fla. Bar v. Went For It, Inc.,*
515 U.S. 618 (1995)............................................................................8

*Forte v. Bd. of Educ.,*
431 N.Y.S.2d 321 (N.Y. Sup. Ct. 1980) .........................................42

*Frontiero v. Richardson,*
411 U.S. 677 (1973).........................................................................43

*Grimm v. Gloucester Cnty. Sch. Bd.,*
972 F.3d 586 (4th Cir. 2020)...................................16, 22, 27, 36, 38, 51, 52, 54

*Harley v. Wilkinson,*
988 F.3d 766 (4th Cir. 2021)...........................................................34

*Hayden v. Grayson,*
134 F.3d 449 (1st Cir. 1998) ...........................................................24

*Jackson v. Birmingham Bd. of Educ.,*
544 U.S. 167 (2005).........................................................................48

*Johnson v. California,*
543 U.S. 499 (2005).........................................................................26

*Kleczek v. R.I. Interscholastic League, Inc.,*
612 A.2d 734 (R.I. 1992) .................................................................39

viii

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Kouambo v. Barr,*
  943 F.3d 205 (4th Cir. 2019)..................................................49

*Lehr v. Robertson,*
  463 U.S. 248 (1983)...........................................................35

*Mansourian v. Regents of Univ. of Cal.,*
  602 F.3d 957 (9th Cir. 2010)................................................40

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck,*
  370 F.3d 275 (2d Cir. 2004) ..................................39, 41, 45

*McGee v. Cole,*
  115 F. Supp. 3d 765 (S.D.W. Va. 2015) ..............................54

*Mentavlos v. Anderson,*
  249 F.3d 301 (4th Cir. 2001).........................................55, 57

*Meriwether v. Hartop,*
  992 F.3d 492 (6th Cir. 2021).........................................48, 49

*Michael M. v. Super. Ct. of Sonoma Cnty.,*
  450 U.S. 464 (1981)......................................................19, 29

*Miller v. Brown,*
  462 F.3d 312 (4th Cir. 2006)................................................60

*Miss. Univ. for Women v. Hogan,*
  458 U.S. 718 (1982)...........................................................34

*Monell v. Dep't of Soc. Servs. of City of N.Y.,*
  436 U.S. 658 (1978)...........................................................54

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable
  Corp.,*
  65 F.3d 1113 (4th Cir. 1995)................................................17

*Nat'l Ass'n of Agric. Emples v. Trump,*
  462 F. Supp. 3d 572 (D. Md. 2020) .....................................60

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Nat'l Park Hosp. Ass'n v. Dep't of the Interior,*
  538 U.S. 803 (2003).........................................................................60

*NCAA v. Tarkanian,*
  488 U.S. 179 (1988).........................................................................60

*Neal v. Bd. of Trs. of Cal. State Univs.,*
  198 F.3d 763 (9th Cir. 1999).............................................................5

*Neese v. Becerra,*
  No. 2:21-cv-163-Z, 2022 WL 1265925 (N.D. Tex. Apr. 26, 2022) ...........43, 45

*Neese v. Becerra,*
  No. 2:21-cv-163-Z, 2022 WL 16902425
  (N.D. Tex. Nov. 11, 2022).................................................................48

*O'Connor v. Bd. of Ed. of Sch. Dist. 23,*
  449 U.S. 1301 (1980).....................................................................3, 34

*Patsy v. Bd. of Regents of Fla.,*
  457 U.S. 496 (1982).........................................................................33

*Pelcha v. MW Bancorp, Inc.,*
  988 F.3d 318 (6th Cir. 2021).............................................................50

*Peltier v. Charter Day Sch., Inc.,*
  37 F.4th 104 (4th Cir. 2022) ......................................48, 55, 57, 58, 61

*Pers. Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979)..........................................21, 22, 23, 24, 25, 34

*Price Waterhouse v. Hopkins,*
  490 U.S. 228 (1989).........................................................................47

*Reed v. Reed,*
  404 U.S. 71 (1971)...........................................................................19

*Ricci v. DeStefano,*
  557 U.S. 557 (2009).........................................................................22

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Romer v. Evans,*
517 U.S. 620 (1996)................................................25

*Shalala v. Ill. Council on Long Term Care,*
529 U.S. 1 (2000)..................................................60

*Smith v. NCAA,*
266 F.3d 152 (3d Cir. 2001) ...........................58, 59, 60

*State ex rel. WVSSAC v. Oakley,*
164 S.E.2d 775 (W. Va. 1968)...................................56

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.,*
576 U.S. 519 (2015)................................................42

*Texas v. United States,*
523 U.S. 296 (1998)................................................60

*Tuan Anh Nguyen v. INS,*
533 U.S. 53 (2001)...............5, 19, 20, 22, 26, 27, 29, 34, 36

*In re Under Seal,*
749 F.3d. 276 (4th Cir. 2014).....................................24

*United States v. Champlin Refin. Co.,*
341 U.S. 290 (1951)................................................45

*United States v. Edge Broad. Co.,*
509 U.S. 418 (1993)................................................34

*United States v. O'Brien,*
391 U.S. 367 (1968)................................................24

*United States v. Riverside Bayview Homes, Inc.,*
474 U.S. 121 (1985)................................................41

*United States v. Virginia,*
518 U.S. 515 (1996)......................9, 19, 25, 27, 34, 38, 39

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989)...................................................................34

*Washington Post v. McManus,*
  944 F.3d 506 (4th Cir. 2019)....................................................36

*West Virginia v. B.P.J.,*
  143 S.Ct. 889 (2023) .................................................................15

*White Coat Waste Project v. Greater Richmond Transit Co.,*
  35 F.4th 179 (4th Cir. 2022) .....................................................36

*Williams v. Sch. Dist. of Bethlehem,*
  998 F.2d 168 (3d Cir. 1993) ..............................................5, 6, 42, 45

*Yates v. United States,*
  574 U.S. 528 (2015)...................................................................49

*Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio
  High Sch. Athletic Ass'n,*
  647 F.2d 651 (6th Cir. 1981).....................................................59

## Statutes

20 U.S.C. § 1681 ...........................................................5, 38, 42, 43, 44, 48

20 U.S.C. § 1686...........................................................................44

20 U.S.C. § 1687 ...........................................................................41

42 U.S.C. § 2000e-2 ...............................................................47, 48

42 U.S.C. § 2000e-5 ...................................................................47

Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974).............................40

W. Va. Code § 18-2-25...............................................................57

W. Va. Code § 18-2-25d ...................................3, 8, 17, 18, 19, 26, 27, 54

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

## Regulations

34 C.F.R. § 106.33 .................................................................44

34 C.F.R. § 106.41 ....................................................3, 5, 8, 40, 43

Nondiscrimination of the Basis of Sex in Education Programs or
  Activities Receiving Federal Financial Assistance,
    85 Fed. Reg. 30,026 (May 19, 2020) ...............................43

Nondiscrimination on the Basis of Sex in Education Programs or
  Activities Receiving Federal Financial Assistance: Sex-
  Related Eligibility Criteria for Male and Female Athletic
  Teams,
    88 Fed. Reg. 22,860 (Apr. 13, 2023) ..............................11

Nondiscrimination on the Basis of Sex Under Federally Assisted
  Education Programs and Activities,
    40 Fed. Reg. 24,128 (June 4, 1975).................................40


## Other Authorities

117 Cong. Rec. 30,407 (1971) .............................................41

118 Cong. Rec. 5,807 (1972) ...............................................39

A. Scalia & B. Garner,
  Reading Law: The Interpretation of Legal Texts (2012)...............41, 45

Alison K. Heather, et al., *Transwoman Elite Athletes: Their
  Extra Percentage Relative to Female Physiology*,
  19 Int'l J. Env't Res. Pub. Health 9103 (2022) ........................53

Am. Psych. Ass'n, *Guidelines for Psychological Practice with
  Transgender and Gender Nonconforming People*,
  70 Am. Psych. 832 (Dec. 2015) ...............................46, 47

American Heritage Dictionary of the English
  Language (1976)..........................................................43

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

Caroline Downey, *Female High-School Volleyball Athleye
   Suffers Serious Head Injury after Transgender Player
   Spikes 'Abnormally Fast' Ball*, YAHOO! NEWS (Oct. 22, 2022) .................... 7

Chris W. Surprenant, *Accommodating Transgender Athletes*,
   18 GEO. J.L. & PUB. POL'Y 905 (2020) ........................................................ 7

Courtney Megan Cahill, *Sex Equality's Irreconcilable
   Differences*, 132 YALE L.J. 1065 (2023) ........................................................ 53

Deborah L. Brake, *Title IX As Pragmatic Feminism*,
   55 CLEV. ST. L. REV. 513 (2007) .................................................................. 45

Doriane Coleman et al., *Pass the Equality Act, but Don't Abandon
   Title IX*, WASH. POST (April 29, 2019, 3:49 p.m.) ............................................ 52

*Fast Facts: Title IX*, NAT'L CTR. FOR EDUC. STAT.
   (last visited Apr. 24, 2023) .................................................................................. 5

FINA, POLICY ON ELIGIBILITY FOR THE MEN'S AND WOMEN'S
   COMPETITION CATEGORIES (2022) ................................................................ 11

Gillian R. Brassil & Jeré Longman, *Who Should Compete in
   Women's Sports? There Are 'Two Almost Irreconcilable
   Positions,'* N.Y. TIMES (Aug. 3, 2021) ........................................................ 6

Greg Johnson, *Thomas Concludes Spectacular Season with
   National Title*, PENN TODAY (Mar. 20, 2022) ................................................ 6

Jason Rafferty, *Ensuring Comprehensive Care & Support for
   Transgender & Gender-Diverse Children & Adolescents*,
   142 PEDIATRICS 1 (Oct. 2018) ...................................................................... 46

JODY L. HERMAN ET AL., WILLIAMS INST., AGE OF INDIVIDUALS
   WHO IDENTIFY AS TRANSGENDER IN THE UNITED
   STATES (2017) ................................................................................................ 7

Joe Brucker, *Beyond* Bostock: *Title IX Protections for
   Transgender Athletes*,
   29 JEFFREY S. MOORAD SPORTS L.J. 327 (2022) .......................................... 41

xiv

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

Katie Barnes, *Penn Swimmer Lia Thomas Leaves Ivy League
Meet a Four-Time Champion, but Questions Remain*, ESPN
(Feb. 20, 2022) ...................................................................................6

Letter from Kimberly M. Richey, Acting Ass't Sec'y for Civil
Rights, U.S. Dep't of Educ. (Aug. 31, 2020) .................................11

*Letter to Chief State School Officers, Title IX Obligations in
Athletics*, U.S. DEP'T OF EDUC (Sept. 1975) ................................40

NCAA Transgender Policy Background, Resources, NCAA
(Apr. 6, 2021, 2:00 p.m.) ...............................................................10

OXFORD ENGLISH DICTIONARY (re-issue ed. 1978) ...........................43

Paul M. Anderson, *Title IX at Forty: An Introduction and
Historical Review of Forty Legal Developments That Shaped
Gender Equity Law*, 22 MARQ. SPORTS L. REV. 325 (2012).........41

Press Release, World Athletics, World Athletics Council Decides
on Russia, Belarus, and Female Eligibility (Mar. 23, 2022).......10, 33

*Quick Facts about Title IX and Athletics*,
NAT'L WOMEN'S L. CTR (June 21, 2022)........................................5

Sean Murphy & Hannah Schoenbaum, *Biden sports plan angers
transgender advocates, opponents*, AP NEWS (Apr. 7, 2023).......33

Transgender Guidelines, WORLD RUGBY
(last visited Apr. 24, 2023).............................................................11

Trisha Ahmed, *North Dakota Governor Signs Trans Athlete
Bans Into Law*, AP NEWS (Apr. 11, 2023)......................................11

WEBSTER'S NEW WORLD DICTIONARY (1972) ....................................43

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1966) ........38

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

Wylie C. Hembree et al., *Endocrine Treatment of Gender-
    Dysphoric/Gender-Incongruent Persons: An Endocrine
    Society Clinical Practice Guidelines,*
    102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869
    (Nov. 2017)..........................................................................................46

## JURISDICTIONAL STATEMENT

On January 5, 2023, the district court granted summary judgment for the West Virginia State Board of Education, W. Clayton Burch, the Harrison County Board of Education ("HCBOE"), Dora Stutler, the State of West Virginia, and Lainey Armistead. It denied summary judgment for B.P.J. and the West Virginia Secondary School Activities Commission ("WVSSAC"). B.P.J. and WVSSAC timely noticed appeals on January 23, 2023 and February 1, 2023, respectively. JA4289, JA4291.

The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has subject-matter jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Biological males have recently competed in female school sports, depriving biological females of athletic opportunities. West Virginia passed H.B. 3293 ("the Act"), which designated sports teams based on biological sex. B.P.J. would prefer for the State to designate teams based on gender identity—even though that trait has concededly nothing to do with athletic performance.

The issues presented are:

1. Does the Equal Protection Clause bar a State from designating sports teams based on biological sex?

2. Does Title IX bar a State from designating sports teams based on biological sex?

3. Did the district court err in finding that WVSSAC is a state actor and then denying WVSSAC's motion for summary judgment on that basis?

## INTRODUCTION

For about as long as school sports have existed, everyone has recognized that sex-specific sports afford equal opportunities for young women. Without separation, "a substantial risk" exists that "boys would dominate the girls' programs and deny them the equal opportunity to compete in interscholastic events." *O'Connor v. Bd. of Ed. of Sch. Dist. 23*, 449 U.S. 1301, 1307 (1980) (Stevens, J., in chambers). Yet biological males identifying as female have increasingly competed against—and beaten—females in women's sports. High-school-girl sprinters in Connecticut, collegians swimming in the Ivy League, teen volleyball players in Hawaii, community-college basketball girls in California, and student-athletes elsewhere found themselves falling behind or failing to make the team. Fair play was at risk.

H.B. 3293 offers an equitable solution while preserving the benefits of competition. The Act clarifies that—for purposes of sex-specific sports in West Virginia—"sex" means "biological sex" determined by "reproductive biology and genetics at birth." W. VA. CODE §§ 18-2-25d(c)(1), (b). Echoing parts of Title IX's implementing regulations, the Act then says women's and girls' sports teams based on "competitive skill" or "involv[ing] a contact sport" are not open to males. *Id.* § 18-2-25d(c)(2); 34 C.F.R. § 106.41(b).

Believing that the law should have looked to gender identity rather than biology, B.P.J. claims the Act's definitions violate both the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education Amendments of 1972. At first, the district court seemed to agree, and it

granted B.P.J.'s request for a preliminary injunction. But with the benefit of a full record, the district court changed course; it found that the Act complies with both the Constitution and Title IX. The district court recognized some commonsense truths. Among them: "on average, males outperform females athletically because of inherent physical differences between the sexes," so defining sports teams by sex is an important government interest, and the Act appropriately advances that interest. JA4272. The district court thus vacated the preliminary injunction and entered summary judgment for the State defendants and an intervening athlete.

On appeal, the full record again confirms that B.P.J.'s preferred definition of "sex" contradicts both the Equal Protection Clause and Title IX. Making gender identity the dividing line between "male" and "female" would undo the progress made in women's sports, as biological men and women are not similarly situated in athletics. A gender-identity standard also would be difficult to administer and hinge on a characteristic that B.P.J.'s own expert concedes has nothing to do with sports. And B.P.J.'s fallback definition—focused on individual circumstances, Opening.Br.35—is problematic because it warps relevant legal standards. So not only does B.P.J. fail to show how a "biological sex" definition violates the Fourteenth Amendment or Title IX, but B.P.J. also fails to offer a viable alternative.

This Court should affirm the district court's decision on the Act and allow West Virginia to continue protecting its athletes.

## STATEMENT OF THE CASE

**A.** For decades, women's sports took a backseat to men's sports. Few females participated in school athletics—and if they did, they did so with lesser opportunities. *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993).

That changed when Congress passed Title IX of the Education Amendments of 1972. That law prohibits "discrimination" "on the basis of sex" in educational programs and activities that receive federal financial assistance. 20 U.S.C. § 1681(a). Regulations confirmed Title IX's nondiscrimination principle applies to interscholastic athletics. *See* 34 C.F.R. § 106.41. And because males and females are often not similarly situated in athletics, *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001), Title IX allows—and sometimes requires—sex-specific athletic teams where selection is "based on competitive skill" or the activity is a contact sport. 34 C.F.R. § 106.41(b). In other words, Title IX acknowledges that "athletics require a gender conscious allocation of opportunities in the first instance" "[b]ecause men are not 'qualified' for women's teams (and vice versa)." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 772 n.8 (9th Cir. 1999).

Title IX has been a success for female athletes. For high-school sports, girls' participation rates are 11 times greater from pre-Title IX. *Fast Facts: Title IX*, NAT'L CTR. FOR EDUC. STAT., https://bit.ly/3MIAeiC (last visited Apr. 24, 2023). And for college sports, women now make up 44 percent of all college athletes, compared to 16 percent pre-Title IX. *Quick Facts about Title IX and*

*Athletics*, Nat'l Women's L. Ctr. (June 21, 2022), https://bit.ly/41eUaxC.
Title IX and its complementary laws and regulations have afforded women
"real opportunities" to compete, "not illusory ones." *Williams*, 998 F.2d at
175.

But more recently, Title IX's promise of equal opportunity for women
and girls began breaking down, as biological males began competing in
women's sports. Consider Lia Thomas, a biological male swimmer on the
University of Pennsylvania women's swim team, who recently set several Ivy
League records and became an NCAA champion. Katie Barnes, *Penn
Swimmer Lia Thomas Leaves Ivy League Meet a Four-Time Champion, but
Questions Remain*, ESPN (Feb. 20, 2022), https://es.pn/3zNFXML; Greg
Johnson, *Thomas Concludes Spectacular Season with National Title*, Penn
Today (Mar. 20, 2022), https://bit.ly/41lYqvh. Or consider CeCe Telfer, who
won an NCAA championship in women's hurdles in 2018 despite never making it
to a championship while competing for the men's team. Gillian R. Brassil & Jeré
Longman, *Who Should Compete in Women's Sports? There Are 'Two Almost
Irreconcilable Positions*,' N.Y. Times, https://bit.ly/40zZlrp (Aug. 3, 2021). In
Connecticut, two biological males recently took 15 high school track
championships that would have otherwise gone to nine girls. The female athletes
were demoralized and sued the State. *See* Complaint, *Soule v. Conn. Assoc. of
Schs.*, No. 3:20-cv-00201-RNC (D. Conn. filed Feb. 12, 2020). And a North
Carolina school district forfeited all games against a volleyball team with a male
athlete after that athlete spiked a ball into a girl's face at an "abnormally fast"

speed, causing her head-and-neck injuries. *See* Caroline Downey, *Female High-School Volleyball Athlete Suffers Serious Head Injury after Transgender Player Spikes 'Abnormally Fast' Ball*, YAHOO! NEWS (Oct. 22, 2022), https://bit.ly/3H9souZ. Considering events like these, West Virginia athletes "face[d] the hard decision of competing on an unfair playing field with heightened safety risks, or not competing at all." JA4313; *see also generally* JA4307-4385 (declarations from female athletes).

**B.** The Act was West Virginia's effort to promote fair play among all the State's athletes in line with Title IX's promise. The West Virginia Legislature passed the Act after noting the recent instances of biological male athletes competing in women's sports at the international, national, and state levels. *See*, *e.g.*, JA0154-0155; *see also* JA0214 (legislator noting constituent outreach about protecting women's sports); *accord* Chris W. Surprenant, *Accommodating Transgender Athletes*, 18 GEO. J.L. & PUB. POL'Y 905, 906 (2020) (explaining "recent" cases in which "transgender athletes" were "winning events, setting performance records, or otherwise impacting the outcome of competitions" that raised questions about whether and how to accommodate them). This concern was especially relevant in West Virginia, as West Virginia may have the highest per capita rate of transgender youth in the country. JODY L. HERMAN ET AL., WILLIAMS INST., AGE OF INDIVIDUALS WHO IDENTIFY AS TRANSGENDER IN THE UNITED STATES 5 (2017), https://bit.ly/3oG8Gkh. And the need for clarity was great. Thus, the Legislature reasonably relied on "studies and anecdotes pertaining to different

locales," *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995), to preserve women's sports in West Virginia.

School sports teams in West Virginia have long designated athletic teams based on sex to ensure equal opportunities in athletics for females. Opening.Br.4. The Act reaffirms that framework. It starts with legislative findings that biological males and females are not "similarly situated" in sports. W. VA. CODE § 18-2-25d(a)(3). These "inherent differences are a valid justification for sex-based classifications" to "promote equal athletic opportunities for the female sex." *Id.* § 18-2-25d(a)(2), (5). After making these findings, the Act defines "biological sex," "male," and "female" based on "reproductive biology and genetics at birth." *Id.* § 18-2-25d(b)(1)-(3). While the original bill text reached every sport, the ultimate Act matches language from Title IX's implementing regulations, 34 C.F.R. § 106.41(b), saying only that women's and girls' sports teams based on "competitive skill" or "involv[ing] a contact sport" should not be open to males, W. VA. CODE § 18-2-25d(c)(2).

Consistent with the goal to protect equality in *female* sports—and in line with the idea that girls sometimes played on boys teams before the Act, *see* JA0052 (noting a girl who played on the boys' football team)—biological females who identify as males can play on boys' or coed teams. A biological male who identifies as female can still play male sports while self-identifying as female. And the Act is singularly focused on sports, so biological males can identify as females and be treated accordingly at school—as B.P.J. has done and been. Opening.Br.8-9. It is only in sports—where biological sex has a direct

effect—that biological males cannot compete with females. *See Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) (explaining males and females are not "the same for the purposes of physical" activities).

The Act, like the Equal Protection Clause and Title IX, recognizes the inherent and "enduring" *physiological* differences between males and females. *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*"). Experts established that biological males are, on average, bigger, stronger, and faster than biological females. JA2493-2526; JA2860-2912. Men have 60% to 100% greater arm strength than women and 25% to 60% greater leg strength than women. JA2499-2500. Males are 10%-13% faster, "an overwhelming difference." JA2501. Men's advantage in jumping is even greater. JA2504. Males throw, hit, and kick faster and farther than females. JA2505. Even before puberty, "[b]oys exhibit advantages in athletic performance," including in "cardiovascular endurance, muscular strength, muscular endurance, speed/agility and power tests," and in activities like sprints, runs, jumps, push-ups, and grips. JA2514-2526.

These differences also increase the risk of injury to females if biological males are allowed to compete against them. JA2861; JA2876-2908. Males wield "large average advantages in size, weight, and physical capacity over females," and their performance advantage begins "[e]ven before puberty." JA2861. Testosterone suppression does not "eliminate male physiological advantages relevant to performance and safety." JA2885-2908. And females are more likely to sustain injuries like concussions and anterior cruciate

ligament injuries to begin with. JA2886-2897. "The addition of biologically male athletes into women's contact sports will inevitably increase the risk of concussive injury to girls and women." JA2893.

Treatment has not been shown to eliminate "the pre-existing athletic advantage that prepubertal males have over prepubertal females in almost all athletic events." JA2493. Even B.P.J.'s expert, Joshua Safer, relied on a study that showed differences: males who identify as female ran 1.5 miles 21% faster than natal females; after receiving gender-affirming hormone therapy, they still ran that distance 12% faster. JA2106. And "[b]ecause different sports require different types of physical performance," Safer acknowledged studies suggesting "that the existence and extent of a performance advantage may vary from sport to sport," even after hormone therapy. JA2106-2107.

**C.** Sports leagues have imposed limits, too. The NCAA, for example, allowed biological males to compete in women's sports only if the males have been on testosterone suppression treatment for a year before competing on a women's team. NCAA Transgender Policy Background, Resources, NCAA (Apr. 6, 2021, 2:00 p.m.), https://bit.ly/410F4Mz. Other organizations go further. The World Athletics Council, the governing body for international track and field, requires biological males to compete in male sports unless they do not experience male puberty. Press Release, World Athletics, World Athletics Council Decides on Russia, Belarus, and Female Eligibility (Mar. 23, 2022), https://bit.ly/3GCsif3. The world governing body for swimming has required biological males to compete with males unless they have not experienced any part of male puberty.

10

FINA, POLICY ON ELIGIBILITY FOR THE MEN'S AND WOMEN'S COMPETITION CATEGORIES (2022), https://bit.ly/41jhYR3. Likewise, biological males "may not currently play women's rugby." Transgender Guidelines, WORLD RUGBY, https://bit.ly/3mLd68Z (last visited Apr. 24, 2023). Other organizations are considering similar changes.

States are also wrestling with the issue. Like West Virginia, at least 19 other States have chosen to protect fairness and safety in women's sports. *See* Trisha Ahmed, *North Dakota Governor Signs Trans Athlete Bans Into Law*, AP NEWS (Apr. 11, 2023), https://bit.ly/3KEaqlh. More States—and even Congress—are considering similar laws.

Consistent with history, the federal government had concluded that Title IX regulations "authorize single-sex teams based only on biological sex at birth—male or female—as opposed to a person's gender identity." Letter from Kimberly M. Richey, Acting Ass't Sec'y for Civil Rights, U.S. Dep't of Educ. (Aug. 31, 2020), https://bit.ly/40BbJHF; *see also* Statement of Int. of the U.S., *Soule*, No. 3:20-cv-00201-RNC (Mar. 24, 2020), ECF No. 75. But the Biden Administration recently proposed to make it illegal to require all males to compete in male sports, choosing instead to allow exceptions based on an individual's age, competition level, and sport, something that B.P.J.'s theory forbids. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (Apr. 13, 2023).

Even that proposal recognizes that interests like "fairness in competition" justify the kind of historical sex-based distinctions found in the Act.  *Id.* at 22,860-61.

**D.**    B.P.J., a 12-year-old biological male who identifies as female, sued to enjoin enforcement of the Act.  B.P.J. argues that the Act's sex-based distinction violates the Constitution's Equal Protection Clause because it does not satisfy heightened scrutiny as applied to B.P.J.  B.P.J. also says the Act violates Title IX because it purportedly treats males who identify as female worse than females, whom B.P.J. considers similarly situated students.  Opening.Br.21.

B.P.J. has not offered a consistent standard that the State should apply.  B.P.J. sometimes advocates for an "individual circumstances" approach, claiming to be uniquely situated to girls because of the interventions B.P.J. has undergone.  Opening.Br.35, 40-41.  Other times, B.P.J. argues that biological males "are similarly situated to" biological females "for purposes of athletics at the moment they verbalize" their female identity—"regardless of their hormone levels."  JA4274.  But in the end, B.P.J. requests a blanket rule: designating sports teams based on sex "discriminates based on transgender status" in every instance.  Opening.Br.24.  This rule would forbid sex-based considerations when they matter most.

The trial court entered a preliminary injunction based on a few short declarations within two months of B.P.J. filing the lawsuit.  JA0439-0453.  The injunction allowed B.P.J. to compete in girls' sports while litigation continued.  The court also denied the defendants' motions to dismiss.  The parties then

engaged in extensive discovery, which included voluminous expert testimony and other substantial evidence.

E.      After taking seven months to review the weighty record, the district court entered summary judgment for the State and other defendants. JA4256-4278.  Thousands of pages of expert reports and studies confirmed that biology affects athletic performance.  Even B.P.J.'s expert agreed that "gender identity … is not a useful indicator of athletic performance." JA2319-2320. And although B.P.J. argued for "individual circumstances" because B.P.J. is on hormone-impacting drugs, scientists disagree on "whether and to what extent" taking such drugs will reduce male physiological advantages.  JA4273; JA2514-2526 (describing studies showing boys have greater lean body mass, strength, speed, and cardiovascular endurance than girls even before puberty); JA2493 ("[N]o published scientific evidence [shows] that the administration of puberty blockers to males before puberty eliminates the pre-existing athletic advantage that prepubertal males have over prepubertal females.").  So "after reviewing all of the evidence in the record, including B.P.J.'s telling responses to requests for admissions" acknowledging that some sex-separation was warranted, JA4274, the court held that the Act complies with both the Constitution and Title IX.

Starting with the constitutional claim, the district court recognized that biological males have physiological advantages over biological females. JA4272-4274.  These "inherent" advantages—at least partly admitted by B.P.J.—make "biological males … not similarly situated to biological females"

in sports. JA4272, JA4277. The court rejected B.P.J.'s argument that B.P.J.'s individual circumstances should drive the case. JA4273-4275. "[A] transgender girl is biologically male and, barring medical intervention, would undergo male puberty like other biological males." JA4273.

Turning to the Title IX claim, the district court found that the Act—like Title IX—"authorizes sex separate sports … so long as overall athletic opportunities for each sex are equal." JA4276. Title IX's context shows that it was passed "to increase opportunities for women and girls in athletics." JA4276. The court found the Act satisfies Title IX's requirements and advances its goals because B.P.J. is not "similarly situated to biological females for purposes of athletics," and B.P.J. was "not excluded from school sports entirely" because male and coed teams remained available. JA4277.

The district court denied a separate motion for summary judgment from WVSSAC. JA4261-4263. WVSSAC is a nonprofit private corporation that organizes and sponsors interscholastic sports programs in West Virginia. B.P.J. acknowledged that WVSSAC's policies are gender-neutral, and nothing in WVSSAC's policies would exclude B.P.J. from playing. JA0061. WVSSAC did not take any action as to B.P.J., and B.P.J. did not identify any future harm that WVSSAC will likely cause. WVSSAC also had no role in enacting the Act, and it has no future role in establishing regulations concerning its implementation. JA4245, JA3510. Thus, WVSSAC argued it is not a state actor because it does not receive federal funds, JA0491, and it could not be

14

subject to scrutiny under either the Equal Protection Clause or Title IX, JA0491. The district court found WVSSAC was a state actor anyway. JA4263.

**F.** Following the district court's order, B.P.J. unsuccessfully sought an injunction pending appeal from the district court. JA4296-4302. That court reiterated that "separating athletic teams based on biology is substantially related to the state's important interest in providing equal athletic opportunities to females, who would otherwise be displaced if required to compete with males." JA4299-4300. The court also said again that the Act, "which largely mirrors Title IX, [does not] violate[] Title IX." JA4299-4300.

A divided panel of this Court, however, issued a new injunction pending appeal. ECF No. 50. The Supreme Court later denied a request to vacate that injunction. *West Virginia v. B.P.J.*, 143 S. Ct. 889 (2023). Justice Alito, joined by Justice Thomas, would have vacated the injunction because, among other things, the "application concern[ed] an important issue" that was likely to come before the Supreme Court "in the near future." *Id.*

## SUMMARY OF THE ARGUMENT

The district court said it well: "The state is permitted to legislate sports rules … because sex, and the physical characteristics that flow from it, are substantially related to athletic performance and fairness in sports." JA4273-7274. B.P.J. had to show that the Act's sex distinction violated Title IX or the Constitution. B.P.J. did neither.

**I.**     B.P.J.'s equal-protection arguments fail.  The Act clarifies what has long been the norm for competitive sports:  Schools may preserve fairness and safety for female athletes by placing athletes on teams based on biological sex.  Gender identity is not relevant to athletic performance.  That the Act may affect transgender athletes does not mean that the law discriminates based on gender identity.  Nor does it mean that the Court should jettison biological sex for gender identity as the *only* proper consideration for sorting out competitive sports teams.  So in passing the Act, the West Virginia Legislature made a valid legislative judgment that complies with the Equal Protection Clause.

**II.**     Title IX also allows West Virginia to designate sex-specific sports teams.  Title IX forbids schools from treating individuals "worse than others who are similarly situated" based on sex.  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1740 (2020).  In athletics, B.P.J. is not "similarly situated" to biological females, and that dissimilarity dooms B.P.J.'s claim.  Title IX's text and purpose treat "sex" as a binary based on sexual biology.  Still, B.P.J. urges the Court to extend *Grimm v. Gloucester County School Board*, 972 F.3d 586, 614 (4th Cir. 2020), *as amended* (Aug. 28, 2020), to the athletic context.  But *Grimm* confronted a dearth of evidence and said the bathroom policy there was rooted in gender stereotypes.  In contrast, an extensive record backs the Act, and the law addresses material biological differences.

On these issues, the Court should affirm.

\* \* \* \*

16

**III.** WVSSAC also argues that B.P.J.'s equal-protection claim is not viable against it for a separate reason: WVSSAC is a private corporation that has not acted relative to B.P.J. Thus, it cannot have been engaged in "state" action. WVSSAC has not excluded, denied benefits to, or discriminated against B.P.J. And WVSSAC does not receive federal funds, so it is not subject to Title IX.

On this issue, WVSSAC contends the Court should reverse or, alternatively, vacate the district court's finding that WVSSAC is a state actor.

## STANDARD OF REVIEW

This Court reviews a summary judgment ruling and "a constitutional challenge to a statute" de novo. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Corp.*, 65 F.3d 1113, 1119, 1123 (4th Cir. 1995).

## ARGUMENT

### I. The Act Satisfies The Equal Protection Clause.

B.P.J.'s equal-protection claim turns on the false idea that the Act excludes males who identify as female from sports—and that the Constitution will not stomach a "categorical" decision to designate school sports teams by the category of "biological sex." Opening.Br.17; W. VA. CODE § 18-2-25d(a)(4). But B.P.J. offers shifting versions of what line *would* be constitutionally allowed—intervention before puberty, testosterone suppressants after, or other case-by-case assessments—without explaining where the Constitution draws the line between these and a host of other options. That's the problem.

17

The Constitution does not require States to reject sex distinctions when accounting for sex differences is critical to ensuring equal opportunities. Here, West Virginia made a valid legislative judgment. The district court understood that its role was to test whether the detailed record supports the West Virginia Legislature's finding that biologically male and female students "are not in fact similarly situated" in "sports involving competitive skill or contact." *Id.* § 18-2-25d(a)(3)-(4). It does. The Act accommodates physiological differences rooted in biological sex in a context where those differences matter. Because the Constitution allows that choice, the Court should affirm.

## A. The Act designates students to sports teams by sex, not gender identity.

B.P.J. challenges the Act by incorrectly saying it distinguishes by gender identity. Opening.Br.20, 23 (arguing the Act designates "sports based on their transgender status."). Yet that premise is wrong. The Act is a sex-based classification that affects all biologically male students equally, no matter how they identify.

**1.** In analyzing equal-protection claims, courts look to "the statutory classification itself," not to how a challenger depicts it. *Califano v. Boles*, 443 U.S. 282, 293-94 (1979). The district court recognized that this part of the analysis is easy: The Act "plainly separates student athletes based on sex." JA4269. By its own terms, the Act places students on sports teams "based on biological sex"—that is, each student's "male or female … reproductive

18

biology and genetics" as determined "at birth." W. VA. CODE §§ 18-2-25d(b), (c)(1). Teams designated for males may be open to females, but not vice versa. *Id.* § 18-2-25d(c)(2)-(3). Students born as male compete on male or coed public-school teams no matter how they identify.

The statute's classification by sex is consistent with the Constitution's equal-protection demand. Many laws do the same. The key is that these laws reject sex-based stereotypes and instead "realistically reflect[] the fact that the sexes are not similarly situated in certain circumstances." *Michael M. v. Super. Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981). After all, physiological differences between the sexes are real and "enduring." *VMI*, 518 U.S. at 533. Sex can thus "represent[] a legitimate, accurate proxy" to pursue a permissible legislative end. *Craig v. Boren*, 429 U.S. 190, 204 (1976). The Constitution forbids laws classifying by sex for reasons "wholly unrelated to the objective of the statute"—like one preferring male over female estate administrators. *Reed v. Reed*, 404 U.S. 71, 76 (1971). But laws *can* constitutionally impose "a different set of rules" to prove biological parenthood because of "the unique relationship of the mother … to birth." *Nguyen*, 533 U.S. at 63-64. They can also punish males more harshly for having sex with underage females because of pregnancy risks that affect biological females only. *Michael M.*, 450 U.S. at 471-73.

Sports is an area where it makes sense for laws to "classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status" or gender identity. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*,

57 F.4th 791, 809 (11th Cir. 2022). B.P.J. "recognizes the benefits of sex-separated athletics," JA4269, and B.P.J.'s expert agreed that gender identity is not "useful" for indicating "athletic performance," JA2319-2320. Instead, in this *physical* context, "[t]he difference between men and women … is a real one." *Nguyen*, 533 U.S. at 73. Males and females "simply are not physiologically the same for the purposes of physical" activities, so "accommodations addressing physiological differences between the sexes are not necessarily unlawful." *Bauer*, 812 F.3d at 350 (construing *VMI*). That reality is the driving purpose behind many sex-specific sports teams: "[D]ue to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" together. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("*Clark I*"); *see also Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam) (without distinct teams, many biological "females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement").

In this way, athletics are "distinctly different" from "admissions," "employment," or many other contexts that may "require[]" different analyses. *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996). Even the district court—"hard-pressed to find many other contexts where one's sex and gender are relevant legislative considerations"—recognized that "this one discrete context" is different. JA4266. B.P.J.'s schools and the State, after all,

20

have not distinguished on biological sex in other areas of B.P.J.'s life and school experience. *See* Opening.Br.8-9.

The Act's focus on "a 'biological sex' classification" does not discriminate "because of" gender identity; it "equate[s]" B.P.J., Opening.Br.26, with other students who share the same general physiological characteristics in an area where those differences matter.

**2.** B.P.J.'s contrary arguments fail. First, saying the Act may *affect* transgender students more than others does not mean that the law classifies *based on* gender identity. Many laws "affect certain groups unevenly"; they are constitutional if they "treat[] them no differently from all other members" of the overall "class described." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271-72 (1979). Although the Act affects biologically male athletes identifying as female, it treats them "no differently" from other biologically male athletes. For example, a law that favors veterans is not sex-based discrimination even if veterans are 98% male. *Id.* at 270, 274. Nor is "[t]he regulation of a medical procedure" that affects only one sex. *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245-46 (2022). The same logic holds here. Because the Act applies equally to all biological males, a "lack of identity" exists between its sex-based classification and transgender persons. *Adams*, 57 F.4th at 809.

At most, what B.P.J. calls a "categorical ban on transgender girls playing on girls' school sports teams," Opening.Br.2, is a contention that the Act disproportionately affects certain transgender girls. That effect cannot doom the Act. "The Equal Protection Clause … prohibits only intentional

discrimination; it does not have a disparate-impact component." *Ricci v. DeStefano*, 557 U.S. 557, 627 (2009) (Ginsburg, J., dissenting). Cases discussing "when a neutral law has a disparate impact" "signal[] no departure from the settled rule that the Fourteenth Amendment guarantees equal laws, not equal results." *Feeney*, 442 U.S. at 273; *see also Farm Lab. Org. Comm. v. Stein*, 56 F.4th 339, 352 (4th Cir. 2022) ("[F]acially neutral laws must be treated as such, even when those laws are accompanied by disparate effects.").

In this context especially, disparate impacts are "an unavoidable consequence of a legislative policy that has … always been deemed to be legitimate." *Feeney*, 442 U.S. at 279 n.25. B.P.J. disagrees, arguing *Grimm* held that sex-based distinctions "discriminate[] based on transgender status." Opening.Br.24. But *Grimm* criticizes sex stereotypes; it does not forbid sex-based distinctions when sex is relevant. 972 F.3d at 608-10. And if disparate impact were enough to defeat a law, then countless lawful distinctions would fall—even when biological sex is "not a stereotype" that unfairly separates people otherwise similarly situated. *Nguyen*, 533 U.S. at 68; *accord Adams*, 57 F.4th at 809; *see also id.* at 819 (Lagoa, J., specially concurring) ("[I]t is neither myth nor outdated stereotype that there are inherent differences between …male[s] and … female[s] and that those born male … have physiological advantages in many sports.").

A purported change in state policy also does not prove that the Act discriminates by gender identity and not, as it says, by biological sex. The district court correctly rejected this argument: classifying based on sex is fine

"if the classification is substantially related to an important government interest." JA4270. West Virginia schools have long separated athletic teams based on sex—protecting a historically disadvantaged group's opportunities. *E.g.*, Opening.Br.12; *see also Cohen*, 101 F.3d. at 177 (saying it has long been the "norm" to designate teams by sex). It was only after biologically male athletes started competing in women's sports at the international, national, and state levels that West Virginia's Legislature clarified that "sex" means "biology." *See* JA4303-4385; *see also* JA1459-1460 (describing recent instances in West Virginia in which biological boys inquired about competing with girls). B.P.J. argues this clarification was a marked change because a prior internal, informal WVSSAC Board policy allowed transgender students to play on teams consistent with their gender identity if their school agreed and no other school objected. Opening.Br.12-13. But B.P.J. also admits "no known examples [exist] of this policy having been used"—in other words, biologically male students played on boys' and men's sports teams before the Act. Opening.Br.13. The Act ensures that rule still applies today.

**3.** The Act could be gender-identity discrimination in disguise if anyone had proof that "an unconstitutional *purpose* [were] at work." *Feeney*, 442 U.S. at 273 (emphasis added). B.P.J. aims for that purpose by maligning the Act as a "product of fear and dislike of transgender people." Opening.Br.15; *see also id.* at 29-31; N.Y.Amici.Br.26 (same). This attack fails, too.

For one thing, the district court explained that B.P.J. did not argue below "that the law is unconstitutional under the Supreme Court's animus

doctrine." JA4264. The argument is thus forfeited. *In re Under Seal*, 749 F.3d. 276, 285 (4th Cir. 2014) (explaining forfeiture in civil cases). Nor could B.P.J. meet the high standard on the merits. Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences," but a deliberate choice to "select[] or reaffirm[] a particular course of action" because of its consequences for a particular group. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271-72 (1993). It reflects a "bare … desire to harm" "a politically unpopular group." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447 (1985); *see also Hayden v. Grayson*, 134 F.3d 449, 453 (1st Cir. 1998) (explaining that "competent evidence of purposeful discrimination" is required to satisfy the "onerous" "burden" of proving "discriminatory purpose" (cleaned up)).

B.P.J. emphasizes it suffices if a law is passed "in part" because of its discriminatory effects. Opening.Br.30 (quoting *Feeney*, 442 U.S. at 279). Even so, B.P.J. must prove that "the decisionmaker, in this case a state legislature," acted with that purpose. *Feeney*, 442 U.S. at 279. Yet as the district court explained, even if one legislator may have harbored "private bias" or "moral disapproval," the record does *not* "contain evidence of that type of animus more broadly throughout the state legislature." JA4264; *see also United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."). Rather, other parts of the record show that many legislators

24

did not act from improper intent.  One delegate, for example, stressed that "trying to place guardrails" in sports "does not mean that individuals of this committee or of this body do not respect someone, do not have dignity for someone, despite whatever their gender might be."  JA0114; *see also* JA0150 ("West Virginia just wants to be fair.  We're not trying to discriminate against anybody."); JA0156 (explaining that the Act is "not just one sided" because athletes who might lose "the ability to obtain a scholarship to college, or to be able to participate in … a state event or a national event … [because of] unfair competitive advantage … suffer too"); JA0218 ("This isn't against anyone.  It is … for the policy of helping our girls, helping our women have the opportunity.").

This is not the "stuff out of which … invidiously discriminatory animus is created."  *Bray*, 506 U.S. at 274; *contrast with Romer v. Evans*, 517 U.S. 620, 632 (1996) (finding that a law was motivated by animus because it was "inexplicable by anything but animus").  It is a commonsense rule that protects female athletes.

### B.   The Act is a constitutional sex-based classification.

The Equal Protection Clause does not eliminate the State's power to classify, but "measure[s] the basic validity of the legislative classification." *Feeney*, 442 U.S. at 271-72.  The Act passes muster.

Sex is not "a proscribed classification."  *VMI*, 518 U.S. at 533.  Instead, sex-based distinctions trigger intermediate scrutiny.  *City of Cleburne*, 473 U.S. at 440.  Equal protection demands that a sex-based distinction serve an

"important" government objective and that the "means" the State chooses "substantially relate[] to" that goal. *Nguyen*, 533 U.S. at 60. A perfect fit is not required, only a substantial one. *Id.* at 70. The "alternative chosen may not maximize equality, and may represent trade-offs between equality and practicality. But … even the existence of wiser alternatives than the one chosen does not serve to invalidate" a policy that "is substantially related to the goal." *Clark I*, 695 F.2d at 1131-32 (citation omitted). Intermediate scrutiny, unlike strict scrutiny, does not require the government to prove that a classification is "'narrowly tailored'" to "'further compelling governmental interests.'" *Johnson v. California*, 543 U.S. 499, 505 (2005) (citation omitted).

Here, the Act serves the important interest of promoting fair and safe athletic opportunities for biologically female athletes, and it appropriately accommodates physiological differences between the sexes rooted in biology by using a biology-based sex classification to designate school teams. The Act explains that classifying teams by sex "promote[s] equal athletic opportunities for the female sex." W. VA. CODE § 18-2-26d(a)(5). In this way, the Act follows Title IX, which "paved the way for significant increases in athletic participation for girls and women." *Adams*, 57 F.4th at 818 (Lagoa, J., specially concurring) (cleaned up). Below, "even B.P.J. agree[d] that the state has an important interest in providing equal athletic opportunities for female students." JA4269; *see also* JA4265 (B.P.J. "admits that there are benefits associated with athletics, including when such athletics are provided in a sex-separated manner" (cleaned up)). B.P.J. does not disavow those concessions

26

here.  Opening.Br.37.  Designating sex-specific sports to promote that end helps "advance full development of the talent and capacities" of women and girls.  *VMI*, 518 U.S. at 533.  Especially when the parties agree on the advantages from sex-differentiated sports, JA4269; Opening.Br.26, acknowledging the line is a valid legislative choice.  It's "not a stereotype," unfairly separating people otherwise similarly situated.  *Nguyen*, 533 U.S. at 68.  "There is no question," then, that fair athletic opportunity is an "important governmental interest."  *Clark I*, 695 F.2d at 1131.

The outcome therefore hinges on the Act's fit.  The district court correctly held that the Act stands "because sex, and the physical characteristics that flow from it, are substantially related to athletic performance and fairness in sports."  JA4273-4274.

**1.**  The Act's classification holds up as a general matter.  The district court recognized that "B.P.J.'s issue here is not with the state's offering of girls' sports and boys' sports," but "with the state's definition of 'girl' and 'boy.'"  JA4265.  In other words, B.P.J. objects to where the state legislature drew the line, not the fact that the line exists.  But the district court rightfully refused to issue a "legal declaration that a transgender girl is 'female.'"  JA4265.  Like the West Virginia Legislature, *see* W. VA. CODE § 18-2-25d(a)(4), the lower court recognized that "sex and gender are related" but "not the same," JA4271.  *See also Bostock*, 140 S. Ct. at 1746-47 (noting "transgender status" is a "distinct concept[] from sex"); *Grimm*, 972 F.3d at 594 (distinguishing "gender identity" from "sex-assigned-at-birth").  Generally

27

speaking, "a person either has male sex chromosomes or female sex chromosomes," and sex chromosomes, in turn, determine much of what is relevant in sex-based sports performance. JA4271-4272. Yet not everyone's "gender identity is in line with [the] biological sex" those chromosomes represent. JA4271. Even so, "a transgender girl is biologically male," and notwithstanding gender identity, "biological males generally outperform females athletically." JA4273.

It is not true that "whether the challenged class is constitutionally valid with respect to the excluded group"—"transgender females"—is "a question unasked by the District Court." Opening.Br.32. The lower court found that transgender girls, being biologically male, have the same biological characteristics that justify the Act's choice to designate sex-specific teams. JA4273-4274. Recall that B.P.J.'s expert agreed that gender identity is not a "useful" metric for gauging "athletic performance." JA2319-2320. And given B.P.J.'s concession "that circulating testosterone in males creates a biological difference in athletic performance," the district court "d[id] not see how [it] could find that the state's classification … is *not* substantially related to its interest in providing equal athletic opportunities for females." JA4272 (emphasis added). The Act thus does not traffic in mere "generalizations" with some "statistical support." Opening.Br.36 (cleaned up). It turns on conceded biological realities.

**2.** The choices and circumstances of some transgender females do not invalidate the Act's distinction, either.

28

*First*, a potential disconnect in a few cases between the Act's purposes and fit would not be reason to strike it down. "None" of the Supreme Court's "gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance." *Nguyen*, 533 U.S. at 70. The relevant inquiry is "not whether the statute is drawn as precisely as it might have been, but whether the line chosen … is within constitution limitations." *Michael M.*, 450 U.S. at 473 (plurality op.). Athletic advantages sound in biological sex, and even puberty-blocking interventions do not erase that advantage. The Act is, at a minimum, "substantially" tied to the State's interest in fair athletic opportunity.

*Second*, too much variety persists within the class of "transgender girls" to make subclasses like "transgender girls who take puberty blockers" constitutionally workable. B.P.J. challenges the Act's fit by saying that some biological males become "similarly situated" to biological girls when they identify as female and take drugs to mitigate male puberty. Opening.Br.9, 13-14, 19, 21. But some "may have difficulty accessing" those drugs; others may not want them, "choos[ing] to only transition socially"; still others may not identify as female until after puberty. JA4273; *see also* U.S.Amici.Br.11 (only "some" transgender females take drugs). B.P.J. has no answer for biological men who take these same drugs for different medical reasons of their own.

The district court did not reach its conclusion by speculation. Among "all of the [record] evidence" it considered, JA4266, was testimony from

B.P.J.'s doctor and experts showing that "gender identity" is an unworkable substitute for biological sex when it comes to sports classifications.  B.P.J.'s doctor called gender "a spectrum" with "no solid number" of genders on it— "more … than we understand, can conceptualize[,] or can count"—but at least 27 she could name from memory.  JA4485-4486.  Gender is "fluid," she said, because it's tied to an "individual's definition of themselves," JA4486, and this fluidity means that "how people understand [and] experience [gender identity] and express it can change over time," JA0579.  Yet B.P.J. offers the Court no method to determine how a gender-identity based classification would work in athletics.

*Third*, even looking at biological males in B.P.J.'s circumstances would not doom the Act.  B.P.J. says that the Act uses factors that "have *no* bearing on the average physical differences" that provide athletic advantage and that "*no* evidence" shows biological sex has "any demonstrated effect on athletic ability."  Opening.Br.40.  Bold claims—but because B.P.J. concedes that the vast majority of biological men can be excluded, B.P.J. has admitted that biological sex is an accurate proxy for athletic performance.

"[T]he thousands of pages" of record evidence confirm the decisive concession.  JA4273.  Dr. Gregory Brown explained, for instance, that "much data" and "multiple studies" show that "significant physiological differences, and significant male athletic performance advantages in certain areas, exist before significant developmental changes associated with male puberty have occurred."  JA2514.  The "seminal work on the physiology of elite young female

athletes" concluded that differences in "bone density, body composition, cardiovascular function, metabolic function, and other physiologic factors that can influence athletic performance" mean that "[y]oung girl athletes are not simply smaller, less muscular boys." JA2514. Other studies showed key differences at various periods of life, often starting well before puberty. *See* JA2514-2526 (birth to five months, between three and eight years old, measurements starting at ages seven and eight). In a footnote, even B.P.J. admits this evidence exists; B.P.J. claims the differences the studies show are "modest" and might be "attributable to … social causes." Opening.Br.42 n.7. But modest does not mean nonexistent, and "mere speculation" does not create a genuine factual dispute. *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Nor was the State required to establish that those "who receive puberty-delaying treatment followed by gender-affirming hormone therapy" perform better on average than biological females as a group. Opening.Br.41. "[N]o published scientific evidence [shows] that the administration of puberty blockers to males before puberty eliminates *pre-existing* athletic advantage." JA2545 (emphasis added). B.P.J. overlooks pre-existing advantages entirely.

3. Lastly, the district court understood how far B.P.J.'s logic extends. After (again) "reviewing all of the evidence" and B.P.J.'s "telling responses to requests for admission," the court found "B.P.J. really argues that transgender girls are similarly situated to cisgender girls for purposes of athletics at the moment they verbalize their transgender status, regardless of their hormone levels." JA4274. Similarly, B.P.J. conceded that the State may

31

exclude biological males from women's teams even when physiological or other factors (like naturally low testosterone levels or a disability that affects performance) make their performance closer to the average girl's than to the average boy's. JA4274. B.P.J.'s theory would make self-declared identity decisive. Yet B.P.J. does not push for this outcome, at least not consistently. And this equivocation is telling: If it were true as a *constitutional* matter that sex-specific sports teams unlawfully discriminated based on gender identity, then everyone who identifies as female should be allowed to play on girls' teams, full stop. The problem, of course, is that little evidence supports going so far. Put aside that this approach *would* require discriminating based on gender identity—for instance, low testosterone, male-identifying students, no; low testosterone, female-identifying students, yes. Equal protection is turned upside down.

A gender-identity rule of the sort preferred by B.P.J. would also erase the approaches used by many other entities wrestling with this same issue in real time. In just the past two years, athletic bodies in sports like swimming, triathlon, rugby, and cycling—including organizations like the National Collegiate Athletics Association and International Olympic Committee—have "either categorically barred biological males from elite women's sports or tightened restrictions on them." Supp'l Br. of Defs.-Appellants at 22-26, *Hecox v. Little*, Case Nos. 20-35813, 20-35815 (9th Cir. Feb. 21, 2023), ECF No. 201. Indeed, the World Athletics Council just issued new regulations prioritizing "fairness" and competitive "integrity" by "exclud[ing] male-to-

female transgender athletes who have been through male puberty" from certain international track and field events. Press Release, World Athletics, *supra*. Even the federal government recently announced a proposed Department of Education rule that would allow schools to "adopt policies that limit transgender students' participation" at least sometimes and for some sports, "particularly in more competitive high school and college" contexts. Sean Murphy & Hannah Schoenbaum, *Biden sports plan angers transgender advocates, opponents*, AP NEWS (Apr. 7, 2023), https://bit.ly/3UvDVu1.

At bottom, this reduces to a policy judgment. And "legislative … solutions are preferable." *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 513 (1982); *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 520 (2008) ("[L]egislatures are far better situated than … [c]ourt[s] to assess the empirical data, and to balance competing policy interests."). A legislature's "superior institutional competence" is especially important here, where people of good faith can (and do) disagree about the "policy considerations" at stake. *Id.*

### C.   B.P.J.'s as-applied challenge does not change the legal test.

Finally, the Court should not tailor the analysis to B.P.J.'s individual circumstances simply because the case includes an as-applied claim. That argument conflates the legal test—the Act's treatment across a class generally—with the scope of relief—tailoring injunctions to a specific party.

In truth, the "facial or as-applied" label "does not speak at all to the substantive rule of law." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). A

statute's validity always turns on how it relates "to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989); *see also United States v. Edge Broad. Co.*, 509 U.S. 418, 427 (1993) (explaining that equal-protection analysis does not depend on "whether the governmental interest is directly advanced as applied to a single person or entity"). As-applied or not, then, "broad legislative classification[s] must be judged by reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." *Califano*, 434 U.S. at 55; *see also, e.g.*, *Harley v. Wilkinson*, 988 F.3d 766, 769 (4th Cir. 2021) (refusing to consider claimant's "individual characteristics" in as-applied Second Amendment challenge under intermediate scrutiny), *abrogated on other grounds by N.Y. St. Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

Challenges to sex-based classifications are no exception. The Supreme Court looks at a statute's disparate treatment of men and women as a whole, not at a plaintiff's individual circumstances. *See, e.g.*, *Nguyen*, 533 U.S. at 53; *VMI*, 518 U.S. at 515; *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982). Equal-protection challenges in this context still focus on "the basic validity of the legislative classification" overall. *Feeney*, 442 U.S. at 272. So "[i]f the classification is reasonable in substantially all of its applications," the policy cannot "be said to be unconstitutional simply because it appears arbitrary in an individual case." *O'Connor*, 449 U.S. at 1306.

34

This authority explains why B.P.J.'s brief aims mostly at one category of students the Act affects—a subset of biologically male athletes. Opening.Br.3, 13, 17, 19-21, 33, 37-39, 41, 43-44. Plaintiffs bringing equal-protection claims "generally allege that they have been arbitrarily classified as members of an identifiable group." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 601 (2008) (cleaned up). B.P.J. is thus entitled to as-applied relief *only* if the Court concludes the Act is not substantially related to the State's interests across the broader group. Emphasizing B.P.J.'s individual circumstances and choices wrongly shifts the test. It would be one thing to say that the prevalence of puberty blockers across the class might perhaps affect the Act's fit; B.P.J. has not argued as much, but the district court appreciated the significant class-wide differences here, anyway. JA4273. Yet it's another thing to say that B.P.J.'s *own* choice to use puberty blockers is enough for an injunction. And even individually, B.P.J. ignores the possibility that B.P.J. may later choose to forego interventions or take up contact sports.

Not even B.P.J.'s authority condones this doctrinal shift. Before the Supreme Court granted as-applied relief in *City of Cleburne*, for instance, it explained that it "should look to the likelihood that governmental action premised on a particular classification is valid as a general matter, not merely to the specifics of the case before" it. 473 U.S. at 446. In *Lehr v. Robertson*, 463 U.S. 248, 267 (1983), the Court similarly used "the facts of [a specific] case" to "illustrate" how the challenged law *generally* discriminated against certain "unwed fathers" through "overbroad generalizations in gender-based

classifications." *Caban v. Mohammed*, 441 U.S. 380, 394 (1979) (cleaned up). As for this Court's precedent, the free-speech case B.P.J. cites granted facial relief under the ordinary substantive standard. *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 204 (4th Cir. 2022). When the Court *does* grant as-applied relief in free-speech cases, it still considers "fit" generally, not to a specific application. *E.g.*, *Washington Post v. McManus*, 944 F.3d 506, 513, 523 (4th Cir. 2019) (granting as-applied relief after concluding that fit was not "reasonable" where challenged statute "burdens too much and furthers too little").

*Grimm* is no different. The Court granted relief "as to Grimm" after explaining the challenged policy "rel[ied] on sex stereotypes" and other "overbroad generalizations." 972 F.3d at 608-09. The same logic applies to anyone identifying as the opposite sex, not just Grimm. The Court nowhere purported to narrow the ordinary intermediate-scrutiny standard. *Id.* at 613 ("[We] hold that the Board's policy is not substantially related to its important interest in protecting students' privacy.").

In truth, endorsing B.P.J.'s approach would dispense with four decades of intermediate-scrutiny precedent. Styling a complaint "as applied" would be enough to require a sex-based classification to be a perfect fit in "every instance," effectively converting intermediate scrutiny into strict. *Nguyen*, 533 U.S. at 70. Even B.P.J. seems to admit that that rule goes too far, rejoining that the "alternative to 'narrow tailoring' [under strict scrutiny] is not 'no tailoring.'" Opening.Br.36. But no one—least of all the initially skeptical

district court—argues for that.  After reviewing the full record, the lower court found that even for "transgender girl[s]," the "physical characteristics that flow from" biological sex are "substantially related" to West Virginia's important interest.  JA4274.  The Act is a valid legislative judgment applied to B.P.J. and to everyone.

## II.    The Act Satisfies Title IX.

B.P.J.'s Title-IX argument fails, too.  B.P.J. starts by attacking a non-existent law, suggesting the Act "excludes B.P.J. from school sports." Opening.Br.46, 51.  The Act, of course, does no such thing—biological boys remain free to participate in either coed teams or male teams.  The district court recognized that fact, too.  JA4277.  B.P.J.'s real complaint must be that the Act directs B.P.J. to male or coed school sports.  Yet Title IX's text and purpose allow schools to create sex-specific teams and make biological sex the dividing line.  The Act continues Title IX's legacy by applying a uniform law to all biological males to protect female athletes from unfair competition and increased safety concerns.  Unlike *Grimm* and *Bostock*, which involved targeted gender-identity discrimination, this case concerns a logical sex distinction that protects equal opportunities for women where sex is relevant. This Court should honor Title IX's text, history, and purpose by upholding the Act.

## A. Title IX's text, history, and purpose sometimes command sex distinctions.

Title IX allows and sometimes requires sex classifications because males and females are biologically different.  The West Virginia Legislature reiterated this fact when it passed the Act, which the district court recognized "largely mirror[ed] Title IX."  JA4277.

**1.**  Statutory interpretation starts and ends with the statute's text if it is unambiguous.  *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004).  And Title IX is clear: No person "shall, on the basis of sex, be excluded from participation in, [or] be denied the benefits of … any education program or activity."  20 U.S.C. § 1681(a).  To "exclude" means "to shut out," "hinder the entrance of," or "bar from participation, enjoyment, consideration, or inclusion."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 793 (1966).  To "deny" means "to turn down or give a negative answer to."  *Id.* at 603.  These words must be understood as applying to an "education program or activity," including sports.  Together, these words forbid schools from shutting out or hindering biological females from enjoying, participating in, or reaping educational benefits.

Thus, Title IX sometimes requires States to account for sex.  After all, an educational program "made up exclusively of one sex is different from a community composed of both."  *VMI*, 518 U.S. at 533 (cleaned up).  Recognizing sex differences can be necessary for students to fully enjoy educational programs and activities.  *See id.* at 550 n.19 (noting that admitting women "would

38

undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements"). Or as Title IX's principal sponsor put it, sometimes sex separation is "absolutely necessary to the success of the program—such as … in sports facilities." 118 CONG. REC. 5,807 (1972).

Considering all that, not all sex distinctions that "deny" or "exclude" violate Title IX. Once more: males and females are sometimes differently situated. *VMI*, 518 U.S. at 533 (cleaned up) ("Physical differences between men and women … are enduring: the two sexes are not fungible."). For example, this Circuit has said that physical fitness standards that distinguish between sexes do not necessarily violate Title VII because "men and women simply are not physiologically the same." *Bauer*, 812 F.3d at 350. Other courts have said the same of programs covered by Title IX. *See, e.g.*, *Kleczek v. R.I. Interscholastic League, Inc.*, 612 A.2d 734, 739 (R.I. 1992) (observing how males are "substantially taller, heavier and stronger than their girl counterparts").

**2.** Sex-specific sports give females "the chance to be champions." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 295 (2d Cir. 2004). As the district court found, and B.P.J. concedes, "biological males generally outperform females athletically." JA4273; *Clark I*, 695 F.2d at 1131 ("[D]ue to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" together.); *Kleczek*, 612 A.2d at 738 ("Because of innate physiological differences, boys and girls are not similarly situated as they enter athletic competition."). If female athletes

are squeezed off teams or relegated to the back of the pack by "requiring them to prevail against men," then that barrier "foreseeably preclude[s] their future participation" in sports. *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 970 n.18 (9th Cir. 2010). Title IX recognizes this fact by allowing—and sometimes requiring—sex separation.

Text in the regulations confirms the same. After passing Title IX, Congress passed the Javits Amendments, which directed the Health, Education, and Welfare department (the Department of Education's predecessor) to make "reasonable provisions considering the nature of particular sports." Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). In 1975, HEW issued its final regulations, which included the sports exception now codified at 34 C.F.R. § 106.41(b). *Compare* Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24,128, 24,142-43 (June 4, 1975), *with* 34 C.F.R. § 106.41. The implementing regulations authorize sex-segregated teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). All subject entities must also "provide equal athletic opportunity for members of both sexes," *id.* § 106.41(c), which includes "levels of competition" that "effectively accommodate the … abilities of members of *both* sexes," and equal opportunities for public recognition or "publicity" to *both* sexes, *id.* §§ 106.41(c)(1), (10) (emphasis added). If a school opens its teams to members of both sexes but girls do not make the teams or always place far behind, Title IX might require sex-specific teams. *Letter to Chief State School Officers,*

*Title IX Obligations in Athletics*, U.S. DEP'T OF EDUC. (Sept. 1975), https://bit.ly/3zNrFvq (stating a school would not comply with Title IX if it disbanded "its women's teams and opened up its men's teams to women, but only a few women were able to qualify for the men's teams").

Title IX's history also confirms that Congress never intended Title IX to require biological sex-blindness in sports. During Title IX's drafting, some feared it would require mixed-sex sports teams. *See* Paul M. Anderson, *Title IX at Forty: An Introduction and Historical Review of Forty Legal Developments That Shaped Gender Equity Law*, 22 MARQ. SPORTS L. REV. 325, 333 (2012). In response, Senator Bayh stated that Title IX did not "desegregate" anything, but merely "provide[d] equal access for women and men students to the educational process and extracurricular activities in school." 117 CONG. REC. 30,407 (1971); Joe Brucker, *Beyond* Bostock*: Title IX Protections for Transgender Athletes*, 29 JEFFREY S. MOORAD SPORTS L.J. 327, 341 (2022).

Congress ratified this understanding again in 1987, defining Title IX's educational programs to cover all educational programs, including sports. *See* 20 U.S.C. § 1687(2)(A); *Cohen v. Brown Univ.*, 991 F.2d 888, 894 (1st Cir. 1993) (explaining import of Restoration Act to sports). And Congress has left the regulations in place for five decades now—understanding that educational institutions sometimes need to recognize biological sex to ensure equal access. *See McCormick*, 441 U.S. at 287; A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 322-26 (2012); *see also*, *e.g.*, *United States v.*

*Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985) ("[A] refusal by Congress to overrule an agency's construction of legislation is at least some evidence of the reasonableness of that construction."). In much the same way, Congress chose to "retain the relevant statutory text" when amending Title IX in 1987, and that choice is "convincing support" that it "accepted and ratified" the "unanimous precedent" endorsing sex-specific sports around that time. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015); *see, e.g., Clark I*, 695 F.2d at 1231 (volleyball); *Williams*, 998 F.2d at 169 (field hockey); *Forte v. Bd. of Educ.*, 431 N.Y.S.2d 321, 322 (N.Y. Sup. Ct. 1980) (volleyball).

### B. Title IX deals with sex, not gender identity.

B.P.J. agrees that Title IX allows sex-based distinctions, at least sometimes. Opening.Br.26, 55 ("B.P.J. does not challenge sex-separation in sports."). But B.P.J. disagrees on where that line is drawn—wanting to read "sex" to match only B.P.J.'s specific understanding of "gender identity." *Id.* at 55. B.P.J. never explains how Title IX's text, purpose, or history supports this reading. For good reason: such an interpretation ignores the statute's plain language and would undermine its purpose, which the district court correctly described as "promot[ing] sex equality." JA4276.

**1.** Text is the starting point. Title IX prohibits "discrimination" in educational programs and activities "on the basis of sex." 20 U.S.C. § 1681(a). Title IX does not define "sex," so the Court "look[s] to the ordinary meaning of the

42

word when it was enacted in 1972." *Adams*, 57 F.4th at 812. This ordinary 1972 meaning was "biological sex," that is, male and female. *See, e.g.*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1976) ("The property or quality by which organisms are classified according to their reproductive functions."); OXFORD ENGLISH DICTIONARY (re-issue ed. 1978) (defining "sex" as "[e]ither of the two divisions of organic beings distinguished as male and female respectively"); WEBSTER'S NEW WORLD DICTIONARY (1972) ("either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions"); *accord Neese v. Becerra*, No. 2:21-cv-163-Z, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26, 2022). As the Supreme Court put it one year after Congress passed Title IX, "sex" is "an immutable characteristic" determined by "birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). And again, the implementing regulations for athletics envision sex as a binary concept, requiring "separate [sports] teams for members of each sex," 34 C.F.R. § 106.41(b), and directing schools to "provide equal athletic opportunity for … *both* sexes" to "effectively accommodate the interests and abilities of members of *both* sexes," *id.* § 106.41(c) (emphases added).

Congress repeatedly wrote accommodations for the "enduring" differences between males and females into Title IX. 20 U.S.C. § 1681, *et seq.*; *see also Neese*, 2022 WL 1265925, at *12 (Title IX "presumes sexual dimorphism"); *accord* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg.

30,026, 30,178 (May 19, 2020) ("Title IX and its implementing regulations include provisions that presuppose sex as a binary classification."). For example, Title IX allows schools to change from admitting "only students of *one sex*" to admitting "students of *both sexes.*" 20 U.S.C. § 1681(a)(2) (emphases added); *see also id.* § 1681(a)(6)(B) (referring to "Men's" and "Women's" associations and organizations for "Boy[s]" and "Girl[s]," "the membership of which has traditionally been limited to persons of one sex"). Title IX also exempts "father-son or mother-daughter activities … but if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex.*" *Id.* § 1681(a)(8) (emphases added). This provision not only speaks of "the other" sex—rather than "another" sex—but further ties them to biology-linked terms like "father-son" and "mother-daughter."

Indeed, Title IX "explicitly permit[s] differentiating between the sexes in certain instances," *Adams,* 57 F.4th at 814—like for single-sex educational institutions and organizations, 20 U.S.C. § 1681(a)(1)-(9). And even where Title IX doesn't imply a binary definition of sex with absolute clarity, *id.* § 1686 ("separate living facilities for the different sexes"), the implementing regulations clarify educational institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33.

**2.** Equating sex with gender identity is not only atextual; it opposes Title IX's purpose to prevent sex discrimination and protect educational opportunities. A text "cannot be divorced from the circumstances existing at the time [the statute] was passed, and from the evil which Congress sought to correct and prevent." *United States v. Champlin Refin. Co.,* 341 U.S. 290, 297 (1951). Naturally, "a textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored." SCALIA & GARNER, *supra*, at 63.

Many courts have recognized that "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities" in a time when biological women were facing significant barriers. *McCormick*, 370 F.3d at 286; *Williams*, 998 F.2d at 175 ("[I]t would require blinders to ignore that the motivation for the promulgation of the regulation" was to increase opportunities for women and girls). This purpose "to prohibit the discriminatory practice of treating women worse than men" "is evident in the text itself." *Neese*, 2022 WL 1265925, at *10 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 334 (2011)). And as shown above, Title IX operates in binary terms. If sex included gender identity like B.P.J. argues, Opening.Br.47, then Title IX's regulations would not make sense. Protected opportunities for biological females would disappear. Mandating sex-blindness would make Title IX's text and rules incoherent. Deborah L. Brake, *Title IX As Pragmatic Feminism*, 55 CLEV. ST. L. REV. 513, 535 (2007) (explaining a "[sex]-blind approach" "marginalizes and subordinates women" because it "would help only those women who are most 'like' men in their athletic interests and abilities and

who are able to succeed in a world of sport structured on men's terms"). This Court should construe Title IX "so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States,* 556 U.S. 303, 314 (2009).

In sum, Title IX's text, statutory context, and purpose all focus on biology, not gender identity—a distinction the Supreme Court has recognized. *Bostock,* 140 S. Ct. at 1746-47 (noting "transgender status" is a "distinct concept[] from sex").

**3.** What's more, tethering sex to biology makes practical sense. Biological sex offers a stable, objective definition of sex that serves as a near-perfect proxy for the physiological differences between males and females. But as noted already, "gender identity" resists coherent line drawing. "[T]ransgender" is "not [a] diagnos[i]s," but a "personal" and "dynamic way[]" of describing one's own gender experience." Jason Rafferty, *Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 PEDIATRICS 1, 3 (Oct. 2018) ("AAP Statement"). A person may identify as "transgender" even though it "is not necessarily visible to others." Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 AM. PSYCH. 832, 862 (Dec. 2015) ("APA Guidelines"). Even "transgender" is not a neat label. It is often "an umbrella term" to include individuals who "decline to define themselves as gendered altogether." Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An*

*Endocrine Society Clinical Practice Guidelines*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017) ("Endocrine Society Guidelines"); APA Guidelines at 862.  Finally, an individual's gender identity "can be fluid, shifting in different contexts."  AAP Statement at 2.

States cannot coherently classify sports teams based on private, "internal," and "fluid" feelings that might not be "visible to others."  Designating teams based on gender identity would force States to define "sex" according to subjective and shifting perceptions largely rooted in sex stereotypes.  Even B.P.J. seems to want a definition based in sex stereotypes, arguing that B.P.J. presents as female and "regularly finish[es] near the back of the pack." Opening.Br.3-5.  But that subjective assessment would force West Virginia to classify its sports teams based on whoever "walk[s] more femininely, talk[s] more femininely, dress[es] more femininely, wear[s] make-up, ha[s] her hair styled, and wear[s] jewelry." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (plurality op.), *superseded by statute on other grounds* 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B).  Poor-performing male athletes identifying as male would have to be allowed to participate in girls' sports, as they could claim to have "no 'physical characteristics relevant to athletic performance'" that might distinguish them from (B.P.J.'s conception of) female-identifying teammates.  Opening.Br.50.  Such an approach embodies the very stereotypes Title IX confronts.  Yet States need not define sex based on stereotypes. Defining "sex" based on biology serves the legitimate state interest of preserving fairness and affording safety for biologically female athletes.

47

### C.   Neither *Bostock* nor *Grimm* supports B.P.J.'s claim.

*Bostock* and *Grimm* support the Act's legality.  Neither case conflated gender identity with biological sex the way B.P.J. attempts to do here.  Nor did they involve a uniform law in a context where biological sex mattered; both cases involved targeted discrimination based on stereotypes.  So it would be inappropriate to extend *Bostock* and *Grimm* given the distinct circumstances of those cases.  (Nor has this Court already done so in a secret footnote holding.  *Contra* Opening.Br.47 (citing *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 130 n.22 (4th Cir. 2022)).)

**1.**  *Bostock*'s understanding of Title VII does not forbid biological sex-specific sports under Title IX.  Title VII and Title IX's text and purpose confirm this.  Title VII "is a vastly different statute" from Title IX.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 168 (2005); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("Title VII differs from Title IX in important respects.").

The differences in these statutes begin with their text.  Title VII prohibits discrimination in "employment practice[s]" "because of … sex," 42 U.S.C. § 2000e-2(a), while Title IX prohibits discrimination "under any education program" "on the basis of sex," 20 U.S.C. § 1681(a).  *Bostock* concluded that "because of … sex" means but-for causation, but "on the basis of sex" doesn't mean the same thing—or impose the same laxer causation standard.  *Neese v. Becerra*, No. 2:21-cv-163-Z, 2022 WL 16902425, at *12 (N.D. Tex. Nov. 11, 2022).  Instead, "on the basis of sex" means that biological sex must be the *sole* reason

for the discrimination. *Kouambo v. Barr*, 943 F.3d 205, 211 (4th Cir. 2019) (use of "the" article implies a singular object).

Even if the phrases were interchangeable, Title VII and Title IX's different contexts warrant different outcomes here. "[T]he same words, placed in different contexts, sometimes mean different things." *Yates v. United States*, 574 U.S. 528, 537 (2015). By its very terms, Title VII concerns hiring and firing in the workplace, while Title IX focuses on "schools and children." *Adams*, 57 F.4th at 808. And Title IX expressly authorizes separation based on sex sometimes. For reasons like these, courts have cautioned against taking the "principles announced in the Title VII context [and] automatically apply[ing] [them] in the Title IX context." *Meriwether*, 992 F.3d at 510 n.4.

*Bostock's* logic doesn't work when it comes to sex-specific sports. *Bostock* held that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions" about hiring and firing. *Bostock*, 140 S. Ct. at 1741. When an employer takes an adverse action, "if changing the employee's sex would have yielded a different choice by the employer[,] a statutory violation has occurred." *Id.* But that is very different from Title IX, where an athlete's biological sex is expressly relevant, often requiring sex-separated opportunities to account for physiological differences so as to provide fairness and safety to female athletes.

In other words, though an employee's sex isn't "relevant to the selection, evaluation, or compensation of employees," *Bostock*, 140 S. Ct. at 1741 (cleaned up), it "is not an irrelevant characteristic" in sports, *Cohen*, 101 F.3d at 178.

49

Without sex separation in sports, "the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement." *Cape*, 563 F.2d at 795. Unlike Title VII, then, Title IX employs awareness of sex to help "allocate opportunities separately for male and female students." *Cohen*, 101 F.3d at 177. If *Bostock* were blindly extended to school sports, a school would violate Title IX by adhering to Title IX. That would be an "absurd result[]," and one "the legislature did not intend." *Cage v. Harper*, 42 F.4th 734, 741 (7th Cir. 2022); *see Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1193 (9th Cir. 1989) ("*Clark II*") (finding that to achieve Title IX's purpose of equal opportunity in athletics, Title IX must treat the sexes differently). That also explains why some courts have refused to read Title VII requirements into Title IX's athletic context. *See Cohen*, 101 F.3d at 177. And it's why *Bostock* itself stressed that it did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination"—or address other issues that were not before the Court such as sex-specific "bathrooms, locker rooms, and dress codes." 140 S. Ct. at 1753; *cf. Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself.").

**2.** *Grimm* did not craft a blanket rule that all biology-based distinctions in every context "discriminate[] based on transgender status." Opening.Br.24. Such a rule would upend long-accepted practices in many parts of society: sex-separate prisons, rape trauma centers, and more. A blanket rule would upend this Court's own rule in *Bauer*, too. Instead, *Grimm* said only that *gender-*

*identity* discrimination necessarily considered *sex*, and this line-drawing constituted sex discrimination when no genuine governmental interests supported it. *Grimm*, 972 F.3d at 616. It did not consider the lawfulness of reliance on biological sex (as opposed to gender identity) in circumstances where physiological differences, as opposed to sex stereotypes, matter. The Act's definition does not treat B.P.J. "worse than others who are similarly situated." *Grimm*, 972 F.3d at 618; *see also Bostock*, 140 S. Ct. at 1740. Like all biological males, B.P.J. can participate on male teams and cannot play on female teams.

*Grimm*'s context matters. *Grimm* involved a biological female who identified as male and wanted to use the men's bathroom. School policy said that students must use the bathroom consistent with their biological sex. The Court held that this policy was based on unsupported "privacy concern[s] rooted in "fear[]," and it was specifically targeted at Grimm individually. *Grimm*, 972 F.3d at 614. The privacy concerns posed by a transgender student using the restroom were said to be the same as those of any other student. *Id.* Finally, the Court found that the school board "did not create a policy that it could apply to other students, such as students who had fully transitioned but had not yet changed their sex on their birth certificate." *Id.* at 615.

The facts here split from *Grimm* in every material way. The motivation behind the Act—a universal policy not targeted at any one student—is both rational and supported by the record, with studies showing the physiological differences between biological males (even those who identify as females) and biological females. And again, biological differences matter in sports, as it is "an

51

unusual if not unique institution … where the relevance of sex is undeniable, and where pretending that it is irrelevant ... will cause the very harm Title IX was enacted to address." Doriane Coleman et al., *Pass the Equality Act, but Don't Abandon Title IX*, WASH. POST (April 29, 2019, 3:49 p.m.), https://wapo.st/3KQdI6l. *Grimm* held that biologically male students may use restrooms corresponding with their gender identity without decreasing opportunities or compromising the safety of biological females. The record shows the same cannot be said in competitive or contact sports.

Perhaps recognizing these inherent differences, B.P.J. again retreats to an individual circumstances argument: B.P.J. hasn't gone through puberty yet, and pre-pubescent students should be treated differently. Opening.Br.21. But in the Title IX context, discrimination "means treating that individual worse than others who are similarly situated." *Grimm*, 972 F.3d at 618 (citing *Bostock*, 140 S. Ct. at 1740) (cleaned up)). Again: B.P.J. is not similarly situated to females in the context of sports, where biology determines who is "similarly situated." To hold otherwise could require States to allow boys with low testosterone or limited athletic ability to compete on girls' teams. B.P.J. also claims to be similarly situated to females because B.P.J. has "lived as a girl" in areas unrelated to athletics. Opening.Br.49. But an individual-circumstances rule would require schools to make more intrusive decisions on when it's permissible for biological males to play female sports. And B.P.J.'s argument—especially the part that highlights B.P.J.'s lifestyle—ignores the science that suggests physiological differences exist between males and females even before puberty. JA4273;

JA2514-2526 (describing studies showing boys have greater lean body mass, strength, speed, and cardiovascular endurance than girls even before puberty); JA2493 ("[N]o published scientific evidence [shows] that the administration of puberty blockers to males before puberty eliminates the pre-existing athletic advantage that prepubertal males have over prepubertal females."); *see also*, *e.g.*, Alison K. Heather, et al., *Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology*, 19 INT'L J. ENV'T RES. PUB. HEALTH 9103 (2022); Courtney Megan Cahill, *Sex Equality's Irreconcilable Differences*, 132 YALE L.J. 1065, 1084 (2023). B.P.J.'s theory demands the State intrude more into the privacy of the State's athletes while still not ensuring competitive fairness or safety.

West Virginia wants to avoid those invasive actions and regulate athletics based on an administrable test. The Act offers such a test, which adheres to the text, purpose, and history of Title IX. The district court recognized this. *See* JA4276 ("Title IX authorizes sex separate sports in the same manner as [the Act]."). This Court should, too.[*]

---

[*] Dora Stutler (a defendant to the constitutional claim) and HCBOE (a defendant to the Title IX claim) also offer alternative grounds for affirmance specific to them. *See* ECF Nos. 281, at 8-19; 301, at 4-20; 336, at 5-15. First, B.P.J. challenges no policy or practice of the HCBOE; rather, B.P.J. challenges only the Act, that is, a state law. "[A] recipient of federal funds may be liable in damages under Title IX only for its own misconduct. The recipient itself must 'exclude persons from participation in, ... deny persons the benefits of, or ... subject persons to discrimination under' its 'programs or activities' in order to be liable under Title IX." *Davis Next Friend LaShonda*

## III.    The District Court Erred In Finding That WVSSAC Is A State Actor And In Denying WVSSAC's Motion For Summary Judgment.

Cross-Appellant WVSSAC raises certain arguments on its own behalf. WVSSAC has no role here.  The record reflects no WVSSAC conduct relative to B.P.J.  WVSSAC was not involved in the enactment of the Act.  JA4245.

---

*D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640-41 (1999) (cleaned up); *accord Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001) ("[T]he implied damages remedy is available only when the funding recipient engages in intentional conduct that violates the clear terms of the statute." (cleaned up)).  "When [a] municipality is acting under compulsion of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury."  *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998).  In *Grimm*, the Court found that the plaintiff had met the elements of a Title IX claim because a county school board policy excluded Grimm.  972 F.3d at 616-17, 619.  But B.P.J. sued HCBOE only for enforcing the Act (as required); HCBOE is not responsible for injury that may flow from the Act, and it is entitled to summary judgment.

Similarly, Stutler cannot be liable for a constitutional violation merely because she is obliged to enforce state law.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978); *Bruce & Tanya & Assocs. v. Bd. of Supervisors of Fairfax Cty.*, 854 F. App'x 521, 530-32 (4th Cir. 2021).  "[A] plaintiff may challenge the constitutionality of a state law … by bringing suit against an official, in her official capacity, for enforcing or administering that law or rule. … If the plaintiff succeeds, any judgment against the official in her official capacity," including an award of attorneys' fees, "'imposes liability on the entity that she represents.'"  *McGee v. Cole*, 115 F. Supp. 3d 765, 772 (S.D. W. Va. 2015) (cleaned up).  The Act requires Stutler to enforce it.  W. VA. CODE §§ 18-2-25d(c), (d).  If Stutler has enforced or may enforce the Act, her actions are taken solely as a state agent; she would be considered a state official rather than a county official.  Thus, at most, Stutler may be subject to an injunction; she cannot be liable for enforcing the State's Act, and any monetary award assessed against Stutler must be paid by the State.

WVSSAC has taken no action relative to B.P.J. The statute does not envision any role for WVSSAC. JA3510.

## A. WVSSAC raised more than state-actor arguments on summary judgment.

The district court erred in asserting that "WVSSAC only argues that it is not a state actor and is therefore not subject to scrutiny under either the Equal Protection Clause or Title IX." JA4261. WVSSAC argued that B.P.J. "has not identified any illegal conduct on the part of WVSSAC" and that it has no actionable role under the Act. JA0492-0493. To prevail on an Equal Protection Claim, before reaching the "state action" analysis, B.P.J. must first prove that WVSSAC deprived B.P.J. of a constitutional right. *Peltier*, 37 F.4th at 115 (citing *Mentavlos v. Anderson*, 249 F.3d 301, 310 (4th Cir. 2001)). B.P.J. has not done so. WVSSAC has asserted repeatedly that none of its acts stands to be challenged or reviewed, as it has not acted and is not even alleged to have acted relative to B.P.J. JA0492. As for Title IX, WVSSAC has repeatedly emphasized that it has not excluded, denied benefits to, or discriminated against B.P.J. WVSSAC's regulations "are gender neutral and therefore transgender neutral," and "Plaintiff … has failed to prove that WVSSAC is a federally funded program." JA0496, JA0491.

WVSSAC argued that none of the relief B.P.J. seeks is available as against it, as WVSSAC has no authority to alter or amend the statute or the rules that may ultimately be promulgated by the State Board to implement the statute. JA0496-0498. The district court did not identify any action on the

part of WVSSAC that might have constituted a deprivation of B.P.J.'s constitutional or statutory rights, and B.P.J. has never identified any such conduct. Because WVSSAC has not acted at all, it cannot be a state actor in connection with B.P.J.'s claims.

## B. WVSSAC cannot be a state actor in the absence of any challenged action.

The district court's determination that WVSSAC is a state actor has no basis in the record. WVSSAC is a nonprofit private corporation that provides organization and sponsorship of interscholastic sports programs in West Virginia. ECF No. 276-1, at WVSSAC000124; JA1377; *State ex rel. WVSSAC v. Oakley,* 164 S.E.2d 775, 777 (W. Va. 1968). B.P.J. identifies WVSSAC's policies and forms as gender, and therefore transgender, neutral. JA0061. Even now, B.P.J. lauds WVSSAC's preexisting internal policy "that [by B.P.J.'s own gloss] allowed transgender students to participate on teams consistent with their gender identity if their school allowed them to participate." Opening.Br.12-14.

B.P.J. has identified no "action" taken by WVSSAC relative to B.P.J. under the Act or otherwise sufficient to morph WVSSAC into a state actor. B.P.J conceded that WVSSAC had no input on enactment of the Act. JA4245. WVSSAC is not mentioned in the Act. JA3510. The Act provides for rules to be promulgated by the State Board. JA3510. They are then embedded by the State into WVSSAC's rule books. JA1333, JA1385, JA1399, JA1478, JA1494-1495, JA1531-1532. Only the State Board can revise, amend, or provide

56

waivers.  JA1401, JA1531-1532.  The schools create team rosters based on information available to the schools alone.  JA1332-1334.

In *Peltier*, this Court held that "[i]n assessing a private actor's relationship with the state for purposes of an Equal Protection claim, [the Court] must determine whether there is a sufficiently close nexus between the defendant's challenged action and the state so that the challenged action may be fairly treated as that of the state itself."  37 F.4th at 115 (cleaned up) (quoting *Mentavlos*, 249 F.3d at 314).  What is missing here is any action by WVSSAC relative to B.P.J. or the Act, either actual or projected, such that no basis exists for advancing to Equal Protection or Title IX analysis.

B.P.J. argues that the claims are valid against WVSSAC by relying on its enabling statute, West Virginia Code § 18-2-25, which B.P.J. argues authorizes WVSSAC to control, supervise, and regulate interscholastic athletic events.  JA0415.  In denying WVSSAC's motion, the district court relied on a "pervasive entwinement" of WVSSAC and the State.  But the Court overlooked the particulars of WVSSAC's structure that are different from entities in decisions such as *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001).  And, without a "challenged action," any inquiry into WVSSAC's structure, or a sufficiently close nexus, or entwinement between the "defendant's challenged action" and the State, is meaningless.

Without recognizing the disconnect, the district court relies on *Brentwood*, in which the alleged "challenged action" is the sanction imposed

by the Athletic Association upon the Academy for alleged undue influence in recruiting. 531 U.S. at 293. The district court further relies on *Peltier, supra*, in which a dress code is the "challenged action." B.P.J. relies on *Communities for Equity v. Michigan High School Athletic Association*, 80 F. Supp. 2d 729, 735 (W.D. Mich. 2000), in which the "challenged action" was the Athletic Association's alleged discrimination against female athletes *inter alia* by operating shorter seasons for female athletes. Among the authorities cited by the district court and B.P.J., none considers the instance of an entity that has undertaken no action at all. The district court identifies no "challenged action" undertaken by WVSSAC relative to B.P.J. that could serve as a predicate for the secondary analysis of whether such "challenged action" should be considered "state action."

WVSSAC ascribes to the spirit of Title IX but is not required by law to follow its precepts. WVSSAC voluntarily elects to follow Title IX given that its members (schools) are recipients of federal funding and therefore bound by Title IX. JA1425-1426. WVSSAC does not receive federal funding directly nor does it receive federal moneys from its members in the form of dues or otherwise. JA1378, JA4193; *Smith v. NCAA*, 266 F.3d 152, 156-57 (3d Cir. 2001). B.P.J. asserts that the Title IX claim is actionable against WVSSAC based on West Virginia's statutory delegation over federally funded programs. Opening.Br.47-48. Such delegation does not exist as characterized, and further has been expressly found to be insufficient to turn its actions into

"color of law" such as to convert WVSSAC into a "state actor." *Smith*, 266 F.3d at 155.

In *Yellow Springs Exempted Village School District Board of Education v. Ohio High School Athletic Association,* 647 F.2d 651 (6th Cir. 1981), the Sixth Circuit considered the applicability and enforcement of Title IX relative to co-educational sports. In considering whether Title IX applied to the Ohio High School Athletic Association, the court noted that "recipients" bear ultimate responsibility for providing an equal educational opportunity. *Id.* at 656. The court concluded that the determination as to compliance with Title IX must be made by individual schools, not OHSAA. *Id.*

Additionally, as WVSSAC receives none of the benefit of being a state actor—funding, immunities, and legislative protections—it falls outside the rubric of federal law, which generally assigns burden only where there is an assumed benefit. *See, e.g., Estes v. Midwest Prods., Inc.,* 24 F. Supp. 2d 621, 628 (S.D. W. Va. 1998).

## C.  The case is inappropriate for pre-enforcement review as to WVSSAC.

WVSSAC has not acted and no evidence shows that WVSSAC would act in the future. The Act provides for rules to be promulgated by the State Board. JA3510. The school, not WVSSAC, has the responsibility of placing students on a boys' or girls' roster according to the applicable rules. The only potential future action by WVSSAC, which is entirely speculative and remote as it relates to B.P.J., is eligibility enforcement. However, eligibility enforcement

is not enough to convert WVSSAC into a state actor. *Smith*, 266 F.3d at 156, 159 (2001) (quoting *NCAA v. Tarkanian*, 488 U.S. 179, 198 n.19 (1988)).

Here, B.P.J. is attempting to litigate and challenge potential future action by WVSSAC that may never occur. To determine whether a case is ripe for pre-enforcement review, courts "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (citation omitted); *see Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808 (2003). A claim is unfit for adjudication where the possibility of injury is remote and the issues presented abstract. *Texas v. United States*, 523 U.S. 296, 301 (1998) ("A claim is not ripe . . . if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (citation omitted)); *Miller*, 462 F.3d at 319.

"[P]arties typically cannot circumvent a comprehensive statutory scheme by bringing a pre-enforcement challenge in district court to government action that has not yet affected them." *Nat'l Ass'n of Agric. Emples v. Trump*, 462 F. Supp. 3d 572, 580 (D. Md. 2020). Even more so, parties cannot circumvent case and controversy and ripeness requirements to challenge non-action by a non-governmental entity that is not slated to act. Relative to WVSSAC, there is no "'legal question [that] is 'fit' for resolution," and delay would not mean hardship. *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 13 (2000) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967)).

Relative to WVSSAC, B.P.J. has raised no issues for judicial decision—WVSSAC did not participate in passing the legislation, it is not referenced in the legislation, it has no role in promulgating regulations under the legislation. As WVSSAC has argued *ab initio,* none of the allegations nor the facts adduced render this matter fit for adjudication as against WVSSAC, given that the possibility of any injury by WVSSAC is remote and speculative. As argued below, B.P.J. has proven no facts that would make a claim against WVSSAC ripe for pre-enforcement review. JA0493; *Air Evac. EMS, Inc., v. Cheatham*, 260 F. Supp. 3d 628, 636-37 (S.D. W. Va. 2017).

### D.    The Court should vacate the district court's ruling on WVSSAC.

The inquiry separating state action from private action is "highly fact-specific in nature." *Peltier*, 37 F.4th at 116. At the close of discovery, no party had identified any "challenged action" on the part of WVSSAC that might have violated B.P.J.'s rights. At best, if the district court found that a factual issue remained, it should have denied the motion on that basis. However, the affirmative finding that WVSSAC is a state actor, apparently in some universal sense divorced from any particular action, was unsupported, contrary to law and in error, premature, and unnecessary based on the record before the district court, and the court's reliance otherwise on mootness should be vacated.

## CONCLUSION

This Court should affirm the district court's judgment as to the constitutionality and lawfulness of the Act. The Court should reverse, or at least vacate, the order denying summary judgment as to WVSSAC.

Dated: April 26, 2023

Respectfully submitted,

JOHN J. BURSCH
CHRISTIANA M. KIEFER
Alliance Defending Freedom
440 First Street, NW, Suite 600
Washington, DC 20001
jbursch@ADFlegal.org
ckiefer@adflega.org
(616) 450-4235

JOHANNES S. WIDMALM-DELPHONSE
Alliance Defending Freedom
44180 Riverside Pkwy.
Lansdowne, VA 20176
jwidmalmdelphonese@ADFlegal.org
(571) 707-4655

JONATHAN A. SCRUGGS
JACOB P. WARNER
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
jscruggs@ADFlegal.org
jwarner@ADFlegal.org
(480) 444-0020

*Counsel for Intervenor-Appellee*
*Lainey Armistead*

PATRICK MORRISEY
  *Attorney General*

LINDSAY S. SEE
  *Solicitor General*
  *Counsel of Record*

MICHAEL R. WILLIAMS
  *Senior Deputy Solicitor General*

CURTIS R. A. CAPEHART
  *Deputy Attorney General*

GRANT A. NEWMAN
  *Assistant Solicitor General*

SPENCER J. DAVENPORT*
  *Special Assistant*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305
lindsay.s.see@wvago.gov
michael.r.williams@wvago.gov
curtis.r.a.capehart@wvago.gov
grant.a.newman@wvago.gov
spencer.j.davenport@wvago.gov
(304) 558-2021

*Counsel for Intervenor-Appellee*
*State of West Virginia*

* admitted in the District of Columbia;
practicing under supervision of West
Virginia attorneys

63

ROBERTA F. GREEN
KIMBERLY M. BANDY
SHANNON M. ROGERS
Shuman McCuskey Slicer
1411 Virginia St. E., Suite 200
Charleston, WV 25301
(304) 345-1400
rgreen@shumanlaw.com
kbandy@shumanlaw.com
srogers@shumanlaw.com

*Counsel for Defendant-Appellee and*
*Cross-Appellant West Virginia*
*Secondary School Activities Commission*

KELLY C. MORGAN
MICHAEL W. TAYLOR
KRISTEN V. HAMMOND
Bailey & Wyant, PLLC
500 Virginia St. E., Suite 600
Charleston, WV 25301
(303) 345-4222
kmorgan@baileywyant.com
mtaylor@baileywyant.com
khammond@baileywyant.com

*Counsel for Defendant-Appellees*
*West Virginia State Board of*
*Education and W. Clayton Burch,*
*State Superintendent*

SUSAN L. DENIKER
Steptoe & Johnson PLLC
400 White Oaks Boulevard
Bridgeport, WV 26330-4500
(304) 933-8154
susan.deniker@steptoe-johnson.com

*Counsel for Defendant-Appellees*
*Harrison County Board of*
*Education and Dora Stutler*

64

# ADDENDUM

**W. Va. Code § 18-2-25d: Clarifying participation for sports events to be based on biological sex of the athlete at birth**

(a) The Legislature hereby finds:

(1) There are inherent differences between biological males and biological females, and that these differences are cause for celebration, as determined by the Supreme Court of the United States in *United States v. Virginia* (1996);

(2) These inherent differences are not a valid justification for sex-based classifications that make overbroad generalizations or perpetuate the legal, social, and economic inferiority of either sex. Rather, these inherent differences are a valid justification for sex-based classifications when they realistically reflect the fact that the sexes are not similarly situated in certain circumstances, as recognized by the Supreme Court of the United States in *Michael M. v. Sonoma County, Superior Court* (1981) and the Supreme Court of Appeals of West Virginia in *Israel v. Secondary Schools Act. Com'n* (1989);

(3) In the context of sports involving competitive skill or contact, biological males and biological females are not in fact similarly situated. Biological males would displace females to a substantial extent if permitted to compete on teams designated for biological females, as recognized in *Clark v. Ariz. Interscholastic Ass'n* (9th Cir. 1982);

(4) Although necessarily related, as concluded by the United States Supreme Court in *Bostock v. Clayton County* (2020), gender identity is separate and distinct from biological sex to the extent that an individual's biological sex is not determinative or indicative of the individual's gender identity. Classifications based on gender identity serve no legitimate relationship to the State of West Virginia's interest in promoting equal athletic opportunities for the female sex; and

(5) Classification of teams according to biological sex is necessary to promote equal athletic opportunities for the female sex.

65

(b) Definitions. -- As used in this section, the following words have the meanings ascribed to them unless the context clearly implies a different meaning:

(1) "Biological sex" means an individual's physical form as a male or female based solely on the individual's reproductive biology and genetics at birth.

(2) "Female" means an individual whose biological sex determined at birth is female. As used in this section, "women" or "girls" refers to biological females.

(3) "Male" means an individual whose biological sex determined at birth is male. As used in this section, "men" or "boys" refers to biological males.

(c) Designation of Athletic Teams. --

(1) Interscholastic, intercollegiate, intramural, or club athletic teams or sports that are sponsored by any public secondary school or a state institution of higher education, including a state institution that is a member of the National Collegiate Athletic Association (NCAA), National Association of Intercollegiate Athletics (NAIA), or National Junior College Athletic Association (NJCAA), shall be expressly designated as one of the following based on biological sex:

(A) Males, men, or boys;

(B) Females, women, or girls; or

(C) Coed or mixed.

(2) Athletic teams or sports designated for females, women, or girls shall not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.

(3) Nothing in this section shall be construed to restrict the eligibility of any student to participate in any interscholastic, intercollegiate, or intramural athletic teams or sports designated as "males," "men," or "boys" or

designated as "coed" or "mixed": Provided, That selection for a team may still be based on those who try out and possess the requisite skill to make the team.

(d) Cause of Action. --

(1) Any student aggrieved by a violation of this section may bring an action against a county board of education or state institution of higher education alleged to be responsible for the alleged violation. The aggrieved student may seek injunctive relief and actual damages, as well as reasonable attorney's fee and court costs, if the student substantially prevails.

(2) In any private action brought pursuant to this section, the identity of a minor student shall remain private and anonymous.

(e) The State Board of Education shall promulgate rules, including emergency rules, pursuant to § 29A-3B-1 *et. seq.* of this code to implement the provisions of this section. The Higher Education Policy Commission and the Council for Community and Technical College Education shall promulgate emergency rules and propose rules for legislative approval pursuant to § 29A-3A-1 *et. seq.* of this code to implement the provisions of this section.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with Fed. R. App. P. 28.1(e)(2)(B) because it contains 15,177 words.

2.    This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point CenturyExpd BT font.

Dated: April 26, 2023

/s/ *Lindsay S. See*
Lindsay S. See

68