**CASE NO. 23-1078**

---

# In the United States Court of Appeals for the Fourth Circuit

---

B.P.J., by her next friend and mother; HEATHER JACKSON
*Plaintiffs-Appellants*

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY
BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOL
ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as
State Superintendent; DORA STUTLER, in her official capacity as Harrison
County Superintendent
*Defendants-Appellees*

and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD
*Intervenors-Appellees*

On Appeal from the United States District Court for the Southern District of West
Virginia at Charleston, Honorable Joseph R. Goodwin, District Judge
Civil Action No. 2:21-cv-00316

---

**BRIEF FOR *AMICUS CURIAE* INSTITUTE FOR FAITH & FAMILY
IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

---

Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
(910) 326-4554
lawyerdeborah@outlook.com
*Counsel for Amicus Curiae*

**DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS FRAP RULE 26.1 and LOCAL RULE 26.1**

*Amicus curiae*, Institute for Faith & Family, a nonprofit corporation, makes the following disclosures:

1.  *Amicus* is not a publicly held corporation or other public entity.

2.  *Amicus* does not have a parent corporation.

3.  No publicly held corporation or other publicly held entity owns 10% or more of the stock of *amicus*, because it is a nonprofit corporation and does not issue stock.

4.  No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation.

DATED:    May 3, 2023                        /s/Deborah J. Dewart
                                             Deborah J. Dewart
                                             Counsel for *Amicus Curiae*
                                             *Institute for Faith & Family*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF AUTHORITIES ............................................................................. iv

IDENTITY AND INTEREST OF *AMICUS CURIAE* ........................................... 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................ 2

ARGUMENT ................................................................................................. 4

I.     *BOSTOCK* REQUIRES NARROW INTERPRETATION AND APPLICATION ..................................................................................4

II.    *BOSTOCK*'S EXTREME LITERALISM WARRANTS RESTRAINT ........6

    A.    Bostock's extreme literalism confuses language, leading to absurd results in athletics .................................................................7

    B.    Bostock's extreme literalism ignores biological reality, including physiological differences between men and women that are relevant to athletic competition ...................................................8

    C.    Bostock's extreme literalism leads to illogical results as applied to athletics ...............................................................................10

    D.    Bostock's extreme literalism destroys the whole concept of *women's* sports ................................................................12

III.   *BOSTOCK*'S APPROACH SHOULD NOT BE IMPORTED INTO A MUCH DIFFERENT CONTEXT .................................................13

    A.    Unlike the *individual* treatment *Bostock* stressed, athletic competitions mandate consideration of women as a *group* ...............14

    B.    Bathrooms and ballgames are not analogous ......................................15

IV.    EXTENSION    OF    *BOSTOCK*    RAISES    CONSTITUTIONAL
        CONCERNS ........................................................................................18

            A.    *Bostock* raises concerns about the Constitution's separation of
                    powers........................................................................................18

            B.    *Bostock* raises concerns about democratic accountability and the
                    rule of law..................................................................................19

V.      THE WORD "DISCRIMINATION" BEGS FOR CLARITY......................20

CONCLUSION ..............................................................................................21

# TABLE OF AUTHORITIES

## Cases

*Adams v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022) ..................................................... 7, 8, 10

*Att'y Gen. v. Mass. Interscholastic Athletic Ass'n*,
   393 N.E.2d 284 (Mass. 1979) ...............................................................11

*Bauer v. Lynch*,
   812 F.3d 340 (4th Cir. 2016) ............................................................ 14

*B.C. ex rel. C.C. v. Bd. of Educ., Cumberland Reg'l Sch. Dist.*,
   531 A.2d 1059 (N.J. Super. Ct. App. Div. 1987) ............................... 12

*B.P.J. v. West Virginia State Bd. of Educ.*,
   2023 U.S. Dist. LEXIS 20427 *; 2023 WL 1805883 (4th Cir. 2023) ................ 2

*Bostock v. Clayton County, Georgia*,
   140 S. Ct. 1731 (2020) ................................................................ *passim*

*City of L.A. Dep't of Water & Power v. Manhart*,
   435 U.S. 702 (1978) ............................................................................ 9

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
   139 S. Ct. 1507 (2019) ........................................................................ 7

*Doe by & through Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018) ............................................................. 16

*Frontiero v. Richardson*,
   411 U.S. 677 (1973) ...................................................................... 8, 15

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) ..................................................... 9, 11, 17

*Hecox v. Little*,
   479 F.Supp.3d 930 (D. Idaho 2020) ................................................... 4

iv

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) .................................................. 6

*Michael M. v. Superior Ct.*,
    450 U.S. 464 (1981) ............................................................. 9

*Milliken v. Bradley*,
    418 U.S. 717 (1974) ........................................................... 19

*Parents for Priv. v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ............................................ 16

*Pelcha v. MW Bancorp, Inc.*,
    988 F.3d 318 (6th Cir. 2021) ................................................ 6

*Prescott v. Rady Child.'s Hosp. San Diego*,
    265 F. Supp. 3d 1090 (S.D. Cal. 2017) ................................. 6

*Reno v. Bossier Parish Sch. Bd.*,
    528 U.S. 320 (2000) ............................................................. 7

*Sch. of the Ozarks, Inc. v. Biden*,
    41 F.4th 992 (8th Cir. 2022) ............................................. 5, 6

*Tuan Anh Nguyen v. INS*,
    533 U.S. 53 (2001) ............................................................... 9

*United States v. Virginia*,
    518 U.S. 515 (1996) ......................................................... 9, 18

## Statutes

Title VII, 42 U.S.C. § 2000e et seq. ...................... 4, 5, 6, 7, 8, 13, 14, 21

Title IX, 20 U.S.C. §§ 1681-1688 ...................................... *passim*

20 U.S.C. § 1681 ............................................................. 10

20 U.S.C. § 1686 ....................................................... 10, 11, 17

W. Va. Code § 18-2-25d ........................................................................... 2

**Other Authorities**

34 C.F.R. § 106.33 ........................................................................... 10, 17

34 C.F.R. § 106.34 ............................................................................... 10

34 C.F.R. § 106.41 ............................................................................... 10

34 C.F.R. § 106.41(b) .......................................................................... 10

34 C.F.R. § 106.41(c) .......................................................................... 12

Stephen Breyer, Active Liberty (Vintage Books 2006) ........................... 19

Equal Rights Amendment ...................................................................... 12

Exec. Order No. 13988, 86 Fed. Reg. 7023 (Jan. 20, 2021) .................... 3

Kim Forde-Mazrui, *Article: Why the Equal Rights Amendment Would
    Endanger Women's Equality: Lessons From Colorblind Constitutionalism*,
    16 Duke J. Const. Law & Pub. Pol'y 1 (Spring 2021) ................... 13, 18

Jacqualyn Gillen, *Comment: Striking the Balance of Fairness and Inclusion:
    The Future of Women's Sports After the Supreme Court's Landmark
    Decision in* Bostock v. Clayton County, GA,
    28 Jeffrey S. Moorad Sports Law Journal 415 (2021) ......................... 3

Rena M. Lindevaldsen, *Article*: Bostock v. Clayton County:
    *A Pirate Ship Sailing Under a Textualist Flag*,
    33 Regent U.L. Rev. 39 (2020-2021) ........................... 4, 6, 7, 8, 9, 21

Memorandum from Pamela Karlan, Application of
    *Bostock v. Clayton County* to Title IX of the
    Education Amendments of 1972 (March 26, 2021) ......................... 16

Rachel N. Morrison, *Article: Gender Identity Policy
    Under the Biden Administration*,
    23 Federalist Soc'y Rev. 85 (2022) ..................................... 2, 10, 12

vi

Office for Civil Rights, U.S. Dep't of Educ.,
*Requirements Under Title IX of the Education Amendments of 1972*,
https://www2.ed.gov/about/offices/list/ocr/docs/interath.html ......................... 10

Michael E. Rosman, *Article: Gender Identity, Sports, and Affirmative Action: What's Title IX Got to Do With It?*,
53 St. Mary's L. J. 1093 (2022) ................................................ 12, 14, 15, 20, 21

The Federalist No. 47 ............................................................................... 19

*The Biden Plan to Advance LGBTQ+ Equality in America and Around the World*,
JOE BIDEN FOR PRESIDENT: OFFICIAL CAMPAIGN WEBSITE,
https://joebiden.com/lgbtq-policy/ ....................................................... 3

https://www.edfirstnc.org/post/female-hs-volleyball-player-seriously-injured-by-alleged-trans-competitor-in-north-carolina (last visited April 17, 2023)...............1

https://www.congress.gov/bill/118th-congress/house-bill/734/................................ 3

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Institute for Faith and Family is a North Carolina nonprofit corporation established to preserve and promote faith, family, and freedom through public policies that protect constitutional liberties, including the right to live and work according to conscience and faith. See https://iffnc.com.

The outcome of this Fourth Circuit case is particularly important in North Carolina, which is also in the Fourth Circuit. The North Carolina House and Senate have both passed the *Fairness in Women's Sports Act* (HB 574 and SB 63). The bills are different versions; the Senate version does not cover colleges and universities. The legislation would protect females from being forced to play against biological males on sports teams, which can leave females with injuries and cheats them out of equal opportunities. Just recently, a female high school volleyball player in Cherokee County, NC suffered severe head and neck injuries, resulting in long-term concussion symptoms, when a biological male spiked a ball in her face during a return play.[2]

---

[1] No party's counsel authored the brief in whole or in part, and no one other than the amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief. FRAP 29(c)(5). A motion for leave to file accompanies this brief.

[2] https://www.edfirstnc.org/post/female-hs-volleyball-player-seriously-injured-by-alleged-trans-competitor-in-north-carolina (last visited April 27, 2023).

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

This Court should uphold the West Virginia Save Women's Sports Act passed by the legislature in 2021, requiring public schools to designate sports teams "based on biological sex" and prohibiting biological males from participating on teams "designated for females, women, or girls." W. Va. Code § 18-2-25d. The Court should also affirm the Order and reasoning of the District Court, finding there was no violation of Equal Protection or Title IX, because "separating athletic teams based on biology is substantially related to the state's important interest in providing *equal athletic opportunities to females*, who would otherwise be displaced if required to compete with males." *B.P.J. v. West Virginia State Bd. of Educ.*, 2023 U.S. Dist. LEXIS 20427 *7; 2023 WL 1805883 (4th Cir. 2023) (emphasis added). As amicus curiae explains in this brief, the Supreme Court's opinion in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) does not require that athletic teams be separated on the basis of self-identified gender identity.

One of President Biden's top legislative priorities on the campaign trail was "to amend the 1964 Civil Rights Act to explicitly prohibit discrimination based on sexual orientation and gender identity." Rachel N. Morrison, *Article: Gender Identity Policy Under the Biden Administration*, 23 Federalist Soc'y Rev. 85

(2022);[3] *see also* Exec. Order No. 13988, 86 Fed. Reg. 7023 (Jan. 20, 2021) (stating children should not be denied access to school sports and "all persons should receive equal treatment under the law, no matter their gender identity or sexual orientation").

In contrast to this pro-transgender agenda, H.R. 734 ("Protection of Women and Girls in Sports Act of 2023") passed the House Education And Workforce Committee by a vote of 25-17 on March 9, 2023. This Act would determine sex based on reproductive biology and genetics at birth. https://www.congress.gov/bill/118th-congress/house-bill/734/. Previously, the "Protect Women's Sports Act," introduced on December 10, 2020 by Democratic Hawaii Representative Tulsi Gabbard and Republican Representative Markwayne Mullin, would have "den[ied] federal funding to schools that permit a biological male to participate in an athletic program or activity that is designated for biological women or girls." Jacqualyn Gillen, *Comment: Striking the Balance of Fairness and Inclusion: The Future of Women's Sports After the Supreme Court's Landmark Decision in* Bostock v. Clayton County, GA, 28 Jeffrey S. Moorad Sports Law Journal 415, 419 (2021). At about the same time, "Idaho lawmakers passed a bill to make Idaho the first state to ban transgender athletes from participating on girls' sports teams at the primary, secondary, and college levels." *Id*. at 419-420. A federal

---

[3] *The Biden Plan to Advance LGBTQ+ Equality in America and Around the World*, JOE BIDEN FOR PRESIDENT: OFFICIAL CAMPAIGN WEBSITE, https://joebiden.com/lgbtq-policy/

3

judge issued a temporary injunction against Idaho's law. *Id*. at 434; *Hecox v. Little*, 479 F.Supp.3d 930, 988 (D. Idaho 2020). But other states have enacted similar bans.

Against this backdrop, "the Supreme Court's decision in *Bostock v. Clayton County* ushers in new threats to the safety, well-being, and constitutional rights of many Americans." Rena M. Lindevaldsen, *Article*: Bostock v. Clayton County: *A Pirate Ship Sailing Under a Textualist Flag*, 33, 39 Regent U.L. Rev. 39 (2020-2021). Lower courts must exercise caution and judicial restraint rather than mechanically applying *Bostock* to other contexts, such as sports.

## ARGUMENT

## I.   *BOSTOCK* REQUIRES NARROW INTERPRETATION AND APPLICATION.

*Bostock*'s reach should be limited to what the Court *did* decide—not what it *did not* decide. This case was a shocking departure from the understanding of the Congress that enacted Title VII and the courts that interpreted it over several decades of litigation. The majority and dissenting opinions all acknowledged there were many issues the Court did *not* address. Lower courts should not hastily use *Bostock* as a band-aid to fix every perceived "discrimination" based on sexual orientation or gender identity. In the athletic arena, the results are illogical, absurd, and patently unfair to women.

*Bostock*'s implications are staggering. The employers in that case rightly worried that the Court's decision would "sweep beyond Title VII to other federal or

state laws that prohibit sex discrimination," including private facilities and dress codes. *Bostock*, 140 S. Ct. at 1753. "But none of these other laws are before us," the Court assured them, and "we do not purport to address bathrooms, locker rooms, or anything else of the kind." *Ibid*. Those words now ring hollow. "Anything else" is now knocking at the Court's door.

Title VII does not stand alone, nor does Title IX. There are "[o]ver 100 federal statutes" that "prohibit discrimination because of sex." *Bostock*, 140 S. Ct. at 1778 (Alito, J., dissenting). It was not difficult to predict that private facilities would be next on the chopping block. "The Court may wish to avoid this subject, but it is a matter of concern to many people who are reticent about disrobing or using toilet facilities in the presence of individuals whom they regard as members of the opposite sex." *Id*. at 1778-1779 (Alito, J., dissenting). Such concerns were hardly speculative, considering prior circuit court decisions and the 2016 advisory from the Department of Justice that purported to mandate use of public school bathrooms according to gender identity. *Id*. at 1779. Additionally, Justice Alito warned of a multitude of potential applications, with women's sports leading the list. "The effect of the Court's reasoning may be to force young women to compete against students who have a very significant biological advantage . . . ." *Ibid*. Additional threats include housing (*see Sch. of the Ozarks, Inc. v. Biden*, 41 F.4th 992 (8th Cir. 2022)),

employment by religious organizations, healthcare (sex reassignment surgeries),[4] freedom of speech (*Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021)), and other constitutional claims such as Equal Protection. *Id*. at 1780-1783 (Alito, J., dissenting). These concerns are very troubling and hardly speculative in view of post-*Bostock* judicial developments.

One recent Sixth Circuit ruling, citing the Court's caution about the many laws that were not before them, properly declined to extend *Bostock*'s rationale, explaining that "the rule in Bostock extends no further than Title VII and does not stretch to the ADEA." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021). Other lower courts should follow this example.

## II.    *BOSTOCK*'S EXTREME LITERALISM WARRANTS RESTRAINT.

Legal activists are using *Bostock* as a springboard to coerce sweeping social engineering in other unrelated contexts. LGBT advocates demand that courts reinterpret a broad swath of anti-discrimination laws to include sexual orientation and gender identity within the definition of "sex." A fair reading of *Bostock* does not warrant these radical legal maneuvers.

---

[4] *See* Lindevaldsen, *A Pirate Ship*, 33 Regent U.L. Rev. at 74, citing a district court holding that a hospital staff's refusal to use preferred pronouns violates the Affordable Care Act. *Prescott v. Rady Child.'s Hosp. San Diego*, 265 F. Supp. 3d 1090, 1098-100 (S.D. Cal. 2017).

The sole question before the *Bostock* Court was whether an employer discriminated "because of sex" by taking action against an employee "simply for being homosexual or transgender." *Bostock*, 140 S. Ct. at 1753. The Court expressly disclaimed deciding whether "other policies and practices might or might not qualify as unlawful discrimination," even under Title VII (*id.*), let alone Title IX. Lower courts must heed this warning.

**A.**  ***Bostock*'s extreme literalism confuses language, leading to absurd results in athletics**.

"[C]ourts must avoid interpretations that would attribute different meanings to the same phrase or word in all but the most unusual of statutory circumstances." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 814 (11th Cir. 2022) (cleaned up); *see Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019); *Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 329 (2000).

The *Bostock* majority admitted that "homosexuality and transgender status are distinct concepts from sex." 140 S. Ct. at 1746-47. Neither concept is "tied to either of the two biological sexes." *Id.* at 1758 (Alito, J., dissenting). Yet the court proceeded to treat them as synonymous. In addition to the massive public policy implications, "the potentially greater concern" with *Bostock*'s approach is "its characterization as a case decided on a plain meaning interpretation." Lindevaldsen, *A Pirate Ship*, 33 Regent U.L. Rev. at 78. The "plain meaning" camouflage obscures the Court's failure to consider dictionary and medical definitions, common

understanding, prior judicial rulings, or various statutes and Executive Orders. *Id*. Chaos ensues.

What Title VII prohibits—and presumably Title IX as well—is "discrimination because of *sex itself*, not everything that is related to, based on, or defined with reference to, sex." *Bostock*, 140 S. Ct. at 1761 (Alito, J., dissenting). It is inconceivable, for example, that federal law would prohibit an employer's consideration of an employee's record of sexual harassment, sexual assault, or sexual violence. *Ibid*. Would an employer be required to hire a registered sex offender for a position working with young children? *Bostock*'s extreme literalism does not rule out such results and should not be replicated in the context of sports.

**B.     Bostock's extreme literalism ignores biological reality, including physiological differences between men and women that are relevant to athletic competition**.

*Bostock* began with the correct assumption that "sex" "refer[s] only to biological distinctions between male and female." 140 S. Ct. at 1739. "[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth." *Adams*, 57 F.4th at 807, quoting *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). This "biological reality" was "repeatedly acknowledged" in past years, "that men and women fall into two distinct groups, most notably distinguishable by their reproductive capacities." Lindevaldsen, *A Pirate Ship*, 33

Regent U.L. Rev. at 56, citing *City of L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 202-08 (1978); *United States v. Virginia*, 518 U.S. 515, 588 (1996).

"To fail to acknowledge even our most basic biological differences . . . risks making the guarantee of equal protection superficial, and so disserving it." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001). It does not require a medical degree to understand that "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse. Only women may become pregnant." *Michael M. v. Superior Ct.*, 450 U.S. 464, 471 (1981); *see* Lindevaldsen, *A Pirate Ship*, 33 Regent U.L. Rev. at 56. *Bostock*'s promising initial assumption now rings hollow as litigants import its ultimate rationale and conclusions into other contexts. The relevance of physiological differences varies from one context to another. Separate restrooms for male and female are reasonable and constitutional (even though courts have given short shrift to the privacy concerns) while separate restrooms for black and white races are not, "because there are biological differences between the two sexes that are relevant with respect to restroom use in a way that a person's skin color is demonstrably not." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 535 (4th Cir. 2020) (Niemeyer, J., dissenting). Similarly, biological differences between the two sexes are relevant with respect to *sports participation* "in a way that a person's skin color is demonstrably not." *Bostock* is not a one-size-fits-all test that can be evenly applied in every context.

9

The text and regulations for Title IX "repeatedly recognize a biological binary of male and female." Morrison, *Gender Identity Policy Under the Biden Administration*, 23 Federalist Soc'y Rev. at 115; *see* 20 U.S.C. § 1681 ("one sex," "both sexes," "other sex," "boy or girl conferences"); 34 C.F.R. § 106.34 ("one sex," "boys and girls"); *id.* § 106.41 ("one sex," "both sexes," "other sex"); 20 U.S.C. § 1686 (providing for sex-segregated living facilities); 34 C.F.R. § 106.33 (separate toilet, locker room, and shower facilities). Although "Title IX's statutory language says nothing specifically about sports . . . the Title IX regulations that apply to sports . . . mirror the blanket-rule-with-specific-exception framework that Title IX statutorily applies to living facilities." *Adams*, 57 F.4th at 818 (Lagoa, J., concurring). These regulations provide explicitly for sex-segregated sports "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). It could hardly be more clear:

> Title IX's passage was lauded for dramatically increasing athletic opportunities for women and girls by ensuring that "athletic interests and abilities of male and female students must be equally and effectively accommodated." Office for Civil Rights, U.S. Dep't of Educ., *Requirements Under Title IX of the Education Amendments of 1972*, https://www2.ed.gov/about/offices/list/ocr/docs/interath.html (last modified Jan. 10, 2020).

Morrison, *Gender Identity Policy Under the Biden Administration*, 23 Federalist Soc'y Rev. at 123.

**C.      Bostock's extreme literalism leads to illogical results as applied to athletics**.

Since Title IX regulations explicitly permit sex separation for private facilities, what are the implications if "sex," "sexual orientation," and "gender identity" are interchangeable terms? Should separate facilities be provided for homosexual women and heterosexual women? Should separate facilities be provided for men who identify as women, or for women who identify as men? Does the word "sex" have any coherent meaning after *Bostock*? Illogical results and absurdities abound.

Even if the extreme literalism employed in *Bostock* were the correct approach, it is risky to import it into other unrelated contexts. As Judge Niemeyer pointed out in *Grimm*, the majority's statement—that the provision for segregated bathrooms "cannot override the *statutory* prohibition against *discrimination* on the basis of sex" (emphasis added)—overlooks the express provision "*in the statute*" allowing schools to "maintain[] separate living facilities for the different sexes." *Grimm*, 972 F.3d at 635 (Niemeyer, J., dissenting); *see* 20 U.S.C. § 1686.

*Bostock*'s approach spawns a multitude of confusion and questions. What about a biological female (transgender or not) playing on the *men*'s team? What about a biological male who is *not* transgender playing on the women's team? This second possibility has already become a reality. *Att'y Gen. v. Mass. Interscholastic Athletic Ass'n*, 393 N.E.2d 284, 290, 296 (Mass. 1979) (holding that exclusion of

11

males from girls' teams is prohibited under state equal rights amendment). After this ruling, the Executive Director of the Massachusetts Interscholastic Athletic Association testified to the disastrous results, allowing male dominance and displacing girls in sports where they previously participated. Michael E. Rosman, *Article: Gender Identity, Sports, and Affirmative Action: What's Title IX Got to Do With It?*, 53 St. Mary's L. J. 1093, 1140 (2022). *See B.C. ex rel. C.C.v. Bd. of Educ., Cumberland Reg'l Sch. Dist*., 531 A.2d 1059, 1063 (N.J. Super. Ct. App. Div. 1987) (upholding athletic association's regulation barring boys from participating in girls' sports, because it would risk injury to the girls and discourage their participation).

### D.    Bostock's extreme literalism destroys the whole concept of *women's* sports.

The expanded application of *Bostock* is on a collision course with the very purpose of Title IX and its provision for sex-specific sports—to ensure equal athletic opportunities for women. Allowing biological males to participate undermines this purpose—and indeed, the very idea of *women's* sports. Morrison, *Gender Identity Policy Under the Biden Administration*, 23 Federalist Soc'y Rev. at 124; 34 C.F.R. § 106.41(c). Ironically, it is precisely *because of sex*, i.e., the physiological differences between men and women that cannot be blithely dismissed, that sex-separated athletic teams and competitions are necessary.

One commentator explains that if the Equal Rights Amendment were ever passed and the government adopted an anti-classification approach, viewing the

*classification* as the constitutional evil, rather than the *subordination* of a protected group, "[t]he effect would be that laws and government policies designed to improve women's opportunities would likely be subject to strict scrutiny—because they necessarily take account of sex—and likely struck down." Kim Forde-Mazrui, *Article: Why the Equal Rights Amendment Would Endanger Women's Equality: Lessons From Colorblind Constitutionalism*, 16 Duke J. Const. Law & Pub. Pol'y 1, 35 (Spring 2021). Sex classification in "extracurricular activities such as sports" would be vulnerable under strict scrutiny. *Id*. at 38. That is essentially what *Bostock* has already foisted upon us, erasing distinctions between male and female and allowing LGBT rights to blindly trump all others. The result is to destroy the equal opportunities for women that Title IX was intended to provide.

## III. *BOSTOCK*'S APPROACH SHOULD NOT BE IMPORTED INTO A MUCH DIFFERENT CONTEXT.

One of the problems with cases like *Bostock*, where courts fashion legal rules never contemplated or considered by the original legislative body, is the concerns that arise when the newly minted rule is imported into a much different context. Title VII regulates discrimination in *employment* decisions—*not* education, *not* access to bathrooms or other private facilities, *not* athletic competitions. These contexts highlight specific differences between male and female that are not necessarily relevant in every employment relationship. It is even more dangerous to play "leap frog" with a novel judicial fiat—applying *Bostock*'s rationale to bathrooms with a

blind eye to privacy and then leaping to ballgames, where obvious physiological differences have drastic and even dangerous consequences.

**A.    Unlike the *individual* treatment *Bostock* stressed, athletic competitions mandate consideration of women as a *group*.**

*Bostock* concluded that "an employer cannot escape liability" under Title VII "by demonstrating that it treats males and females comparably as *groups*" (140 S. Ct. at 1744). The Court explained that "Congress's key drafting choices—to focus on discrimination against *individuals and not merely between groups* and to hold employers liable whenever sex is a but-for cause of the plaintiff 's injuries—virtually guaranteed that unexpected applications would emerge over time." *Id*. at 1735 (emphasis added). But although the sports issue implicates Title IX rather than Title VII, "at least one court has said that an employer does not violate Title VII by having separate physical requirements for men and women." Rosman, *Gender Identity, Sports,* 53 St. Mary's L. J. at 1104-1105. In *Bauer v. Lynch*, the Fourth Circuit validated "the FBI's gender-normed standards for physical fitness for its trainees" (*id*. at 1105), acknowledging that "the physiological differences between men and women impact their relative abilities to demonstrate the same levels of physical fitness." 812 F.3d 340, 351 (4th Cir. 2016).

*Bostock* admitted that "[t]he employers might be onto something if Title VII only ensured equal treatment between *groups* of men and women." *Bostock,* 140 S. Ct. at 1748 (emphasis added). In athletics, that is precisely where the concerns arise.

14

Allowing biological males to compete on women's teams promotes inequality at the group level, "invidiously relegating the *entire class of females* to inferior legal status without regard to the actual capabilities of its individual members." *Frontiero*, 411 U.S. at 686-87. But consider this—"[t]he logic of the Court's decision could even affect *professional* sports." *Bostock*, 140 S. Ct. at 1780 (Alito, J., dissenting) (emphasis added). *Bostock* did not address that situation and indeed *could not* because none of the parties were professional athletes. Under Title IX, there are express provisions for sex segregation that do protect entire groups of men and women. Indeed, "if one accepts the propriety of sex segregation," as Title IX does, "it becomes quite difficult to identify a case of *individual* sex discrimination." Rosman, *Gender Identity, Sports*, 53 St. Mary's L. J. at 1110. The provision of separate but comparable athletic teams for men and women is a commonsense solution to ensure equal treatment at both levels—groups and the individuals that comprise them.

**B.  Bathrooms and ballgames are not analogous.**

In a troubling game of legal "leap frog," courts and administrative agencies now employ *Bostock* in a wide range of contexts beyond the Court's clear parameters. Executive branch directives have attempted to impose a radical re-interpretation of the simple word "sex" based on a breathtaking expansion of *Bostock*. The Civil Rights Division of the Department of Justice issued a

memorandum, based on an Executive Order, claiming that Title IX protects transgender students from discrimination based on gender identity in the context of single-sex restrooms. Memorandum from Pamela Karlan, Application of *Bostock v. Clayton County* to Title IX of the Education Amendments of 1972 (March 26, 2021). This Memorandum is based on an erroneous view of the law.

The first frontier was single-sex bathrooms. In some cases, persons who are not transgender assert privacy rights to challenge policies that *allow* transgenders to use facilities that do not correspond with biological sex. Unfortunately, courts have found pro-transgender policies permissible but not necessarily mandatory. *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534-535 (3d Cir. 2018) (School District may allow use of bathrooms and locker rooms that align with gender identity); *Parents for Priv. v. Barr*, 949 F.3d 1210, 1227 (9th Cir. 2020) (sex-segregated bathrooms permissible but not mandatory). In *Barr*, the Ninth Circuit reasoned that the statute does not "explicitly state, or even suggest, that schools may not allow transgender students to use the facilities that are most consistent with their gender identity." *Id*.

In other cases, transgender persons assert the right to use the bathroom corresponding to "gender identity" rather than sex. Ignoring the express statutory language of Title IX and its regulations, litigants challenge the use of biological sex as the sole criteria for separation of private facilities. Perhaps the most prominent of

these cases is *Grimm*, which "join[ed] a growing consensus of courts in holding" that "equal protection and Title IX can protect transgender students from school bathroom policies that prohibit them from affirming their gender." 972 F.3d at 593. Parroting *Bostock*, 140 S. Ct. at 1741-42, this Circuit reasoned that a discriminator "necessarily refer[s] to the individual's sex to determine incongruence between sex and gender, making sex a but-for cause for the discriminator's actions." *Grimm,* 972 F.3d at 616. Judge Niemeyer, dissenting, pointed out the statutory allowance for "separate living facilities for the different sexes," 20 U.S.C. § 1686, including "toilet, locker room, and shower facilities," 34 C.F.R. § 106.33. *Id*. at 628 (Niemeyer, J., dissenting). The majority departed from the "commonplace and universally accepted" practice "across societies and throughout history" to separate "on the basis of sex" private facilities designed for use by multiple persons at one time. *Id*. at 634. Abundant case law affirms the right to bodily privacy, which is "broader than *the risks of actual bodily exposure*" and extends to "*intrusion created by mere presence*." *Id*. at 633-634 (collecting cases). The shocking result of the court's ruling is that it "renders on a larger scale any separation on the basis of sex nonsensical." *Id*. at 628.

Bathrooms are not ballgames. The bathroom cases typically ignore massive privacy concerns and allow transgender rights to trump the rights of all other persons. *Bostock*'s reasoning does not require or even support these results. The

Court explicitly declined to address bathrooms or any other issues beyond employment per se. But even so, athletics involves physiological differences between men and women that are not implicated in the bathroom cases. "Physical differences between men and women" are "enduring" and render "the two sexes . . . not fungible." *United States v. Virginia*, 518 U.S. at 533, 550 n.19. Even a commentator sympathetic to transgender rights admits that "[c]ircumstances that involve strength and other athletic differences . . . might justify sex-exclusive sports." Forde-Mazrui, *Why the Equal Rights Amendment Would Endanger Women's Equality*, 16 Duke J. Const. Law & Pub. Pol'y at 39.

## IV. EXTENSION OF *BOSTOCK* RAISES CONSTITUTIONAL CONCERNS THAT WARRANT JUDICIAL RESTRAINT.

Lower courts should not rush to expand *Bostock*'s "novel and creative argument" that "because of sexual orientation" and "because of sex" are "not separate categories of discrimination after all." *Bostock*, 140 S. Ct. at 1824 (Kavanaugh, J., dissenting). *Bostock* upset decades of precedent and expectation. Its holding should be carefully confined and not expanded to new territory.

### A. *Bostock* raises concerns about the Constitution's separation of powers.

*Bostock* did an "end-run around the bedrock separation-of-powers principle that courts may not unilaterally rewrite statutes." *Bostock*, 140 S. Ct. at 1824 (Kavanaugh, J., dissenting). Lower courts should not repeat this error and perpetrate

18

an even greater distortion of law, logic, and reality by "[u]surping the constitutional authority of the other branches." *Id*. at 1755 (Alito, J., dissenting). Such joining of judge and legislator is a serious threat to life and liberty: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator*." The Federalist No. 47, at 326 (citing Montesquieu); *see Bostock*, 140 S. Ct. at 1824 (Kavanaugh, J., dissenting), quoting James Madison.

**B.    *Bostock* raises concerns about democratic accountability and the rule of law.**

Title IX concerns public education, a matter entrusted primarily to state and local governments. Local control over public education is "deeply rooted" in American tradition. Indeed, "local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process." *Milliken v. Bradley*, 418 U.S. 717, 741-742 (1974). Judicial restraint should characterize any sort of federal intervention. Extension of *Bostock* would remove decisions about education from the elected representatives closest to the people and most responsive to their concerns, depriving individuals of their liberty to participate in a contentious matter of public concern. "The United States is a nation built upon principles of liberty. That liberty means not only freedom from government coercion but also the freedom to participate in the government itself." Stephen Breyer, Active Liberty (Vintage Books 2006), at 3.

19

Justices Alito and Kavanaugh both recognized this concern. "If the Court had allowed the legislative process to take its course, Congress would have had the opportunity to consider competing interests," but instead "the Court has greatly impeded—and perhaps effectively ended—any chance of a bargained legislative resolution." *Bostock*, 140 S. Ct. at 1778 (Alito, J., dissenting). Justice Kavanaugh lamented the negative impact on "the rule of law and democratic accountability . . . when a court adopts a hidden or obscure interpretation of the law, and not its ordinary meaning." *Id.* at 1825 (Kavanaugh, J., dissenting). This extreme literalism "deprives the citizenry of fair notice of what the law is." *Id*. at 1828. Lower courts should not replicate this questionable approach in litigating Title IX.

## V.     THE WORD "DISCRIMINATION" BEGS FOR CLARITY.

In *Bostock*, the Court asked and then answered its own question: "What did 'discriminate' mean in 1964? As it turns out, it meant then roughly what it means today: 'To make a difference in treatment or favor (of one as compared with others).'" *Bostock*, 140 S. Ct. at 1740. But this quick question-answer only invites further questioning: Is *every* "difference in treatment or favor" *unlawful* discrimination? Is every such difference *invidious*, subject to legal prohibition? This question is critical, "[y]et, the definition of discrimination gets very little attention in recent Title IX literature, particularly in comparison with words like sex, gender identity, female, male." Rosman, *Gender Identity, Sports*, 53 St. Mary's L. J. at

20

1100. The same statutory language is used by some to argue that transgender participation is *mandatory*, while others assert it is *prohibited*. *Id*. at 1096.

It arguably undermines Title VII (and similarly Title IX) to include gender identity in the scope of "sex discrimination," "because the employee would be asking for protection *not* because he or she is a member of one of the two identifiable groups but because he or she desires to *switch from one group to another*." Lindevaldsen, *A Pirate Ship*, 33 Regent U.L. Rev. at 62. This effectively allows an individual to claim membership in both sexes (one according to biology, the other by subjective identification) and then "assert a discrimination claim either as a man or as a woman." *Id*. at 63. Could not such favoritism itself be deemed "discrimination"? As one commentator observes, the idea that non-discrimination "requires a set-aside for biological females," due to their physiological disadvantage, differs from "virtually every other concept of non-discrimination." Rosman, *Gender Identity, Sports*, 53 St. Mary's L. J. at 1096. Surely we have fallen down the rabbit hole in Alice's Wonderland.

## CONCLUSION

This Court should uphold the West Virginia *Save Women's Sports* Act.

Dated: May 3, 2023                    /s/Deborah J. Dewart
                                      Deborah J. Dewart
                                      Attorney at Law
                                      111 Magnolia Lane
                                      Hubert, NC 28539
                                      lawyerdeborah@outlook.com
                                      (910) 326-4554

                                      *Attorney for Amicus Curiae*
                                      *Institute for Faith and Family*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)**

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(d) because this brief contains **4,889** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the word-counting function of Microsoft Office 2010.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Microsoft Office Word in 14-point Times New Roman.

Dated: May 3, 2023

/s/Deborah J. Dewart
Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
lawyerdeborah@outlook.com
(910) 326-4554

*Attorney for Amicus Curiae*
*Institute for Faith and Family*

23

# CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2023, I electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 3, 2023

/s/Deborah J. Dewart
Deborah J. Dewart
Attorney at Law
111 Magnolia Lane
Hubert, NC 28539
lawyerdeborah@outlook.com
(910) 326-4554

*Attorney for Amicus Curiae*
*Institute for Faith and Family*