CASE NO. 23-1078 (L)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

B.P.J., by next friend and mother, HEATHER JACKSON,
*Plaintiff-Appellant,*

v.

WEST VIRGINIA STATE BOARD OF EDUCATION, *et al.*,
*Defendants-Appellees,*

*and*

THE STATE OF WEST VIRGINIA, *et al.,*
*Intervenors-Appellees*

_____

On Appeal from the United States District Court
for the Southern District of West Virginia
Case No. 2:21-cv-00316 (Goodwin, J.)

_____

## AMICUS CURIAE BRIEF OF
## WOMEN'S DECLARATION INTERNATIONAL USA
## IN SUPPORT OF APPELLEES AND AFFIRMANCE

_____

Samuel J. Salario, Jr.
LAWSON HUCK GONZALEZ, PLLC
1700 South MacDill Avenue
Suite 300
Tampa, FL 33629
813-765-5113
samuel@lawsonhuckgonzalez.com

Kara Dansky
WOMEN'S DECLARATION
INTERNATIONAL USA
P. O. Box 21160
Washington, D.C.  20009
800-939-6636
president@womensdeclarationusa.com

*Counsel for Amicus Curiae*

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, Women's Declaration International USA, makes the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity? **No.**


2. Does party/amicus have any parent corporations? **No.**

   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? **No.**

   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? **No.**

   If yes, identify entity and nature of interest:

5. Does this case arise out of a bankruptcy proceeding? **No.**

   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

6. Is this a criminal case in which there was an organizational victim? **No.**

   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Dated: May 3, 2023

/s/ *Kara Dansky*
Kara Dansky

*Counsel for Women's Declaration*
*International USA*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iv

INTEREST OF AMICUS CURIAE ............................................................ 1

SUMMARY OF THE ARGUMENT ........................................................... 2

ARGUMENT ............................................................................................... 4

    I.    The West Virginia law ensures equal dignity and treatment for women by recognizing that sex is an objective and coherent legal category that protects women from discrimination, while "gender identity" is not. . 4

    II.    The West Virginia law guarantees that women share in the important benefits of athletics on equal terms with men. .................................. 14

        A. Sex-based separation is essential to women's equal participation in the benefits of athletics. ............................................................... 14

        B. Male participation in women's sports denies women equal participation in the benefits of athletics. ....................................... 17

        C. Defining women and girls by reference to puberty blockers and hormone therapy dangerously medicalizes gender identity. ......... 20

        D. The West Virginia law protects women's spaces and safety. ........ 25

    III.    Defining males as females for purposes of athletics threatens preferences addressing discrimination against females. .................... 25

CONCLUSION.......................................................................................... 28

CERTIFICATE OF COMPLIANCE ....................................................... 29

CERTIFICATE OF SERVICE ................................................................. 30

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams by and through Kasper v. School Bd. of St. Johns County*
    57 F.4th 79 (11th Cir. 2022)............................................................ 14, 17, 19

*Bostock v. Clayton County, Ga.*
    140 S.Ct. 1731 (2020) ............................................................ 5, 10

*Cohen v. Brown Univ.*
    101 F.3d 155 (1st Cir. 1996)............................................................ 15

*Columbus-America Disc. Grp. v. Atlantic Mut. Ins., Co.*
    56 F.3d 556 (4th Cir. 1995)............................................................ 12

*Grimm v. Gloucester Cty. Sch. Bd.*
    972 F.3d 586 (4th Cir. 2020)............................................................7, 11, 12

*Lettieri v. Equant Inc.*
    478 F.3d 640, 644 (4th Cir. 2007)............................................................ 8

*Parker v. Franklin Cty. Comm. Sch. Corp.*
    667 F.3d 910 (7th Cir. 2012)............................................................ 15

*Peltier v. Charter Day School, Inc.*
    37 F.4th 104 (4th Cir. 2022) ............................................................ 7, 8

*Price Waterhouse v. Hopkins*
    490 U.S. 228 (1989) ............................................................ 7, 8, 10, 25

*Roper v. Simmons*
    543 U.S. 551 (2005) ............................................................ 21

*Sony Corp. of Am. v. Univ. City Studios, Inc.*
    464 U.S. 417 (1984) ............................................................ 12

*U.S. v. Virginia*
    518 U.S. 515 (1996) ............................................................11, 22

**Statutes**

W.V. Code § 18-2-25d(b)(1)-(2) (2022). ................................................................. 4

**Legislative Materials**

Act of Mar. 23, 2023, 2023 Ky. Laws Ch. 132 (Ky. 2023)..................................... 22

Act of Feb. 14, 2023, South Dakota Laws Ch. 127 (S.D. 2023) ........................... 22

Act of Jan. 28, 2023, 2023 Utah Laws S.B. 16 (Utah 2023) ................................. 22

Fla. S.B. 254, 2023 Leg., Reg Sess. (Fla. 2023)................................................... 22

Gender Transition Procedures for Minors, 2023 Ind. Legis. Serv. P.L. 10-2023 (Ind. 2023) ..................................................................................................................... 22

N.D. H.B. 1254, 68th Leg. Assemb., Reg. Sess. (N.D. 2023) (enacted) ............... 22

Vulnerable Child Prot. Act, 2023 Idaho Laws Ch. 292 (Idaho 2023).................... 22

**Regulations**

34 C.F.R. § 106.37 (2022) ................................................................................... 26

34 C.F.R. § 106.41 (2022) ................................................................................... 15

**Other Authorities**

Alberto Frigerio, et al., *Structural, Functional, and Metabolic Brain Differences as a Function of Gender Identity or Sexual Orientation: A Systematic Review of the Human Neuroimaging Literature*
        50 ARCHIVES OF SEXUAL BEHAVIOR 3329 (2021)........................................ 13

Allison K. Heather, *Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology*
        Int. J. Environ. Res. Public Health (Jul. 26, 2022)
        https://doi.org/10.3390/ijerph19159103 ..................................................... 18

Andrea Orwoll, *Pregnant "Persons": The Linguistic Defanging of Women's Issues and the Legal Danger of "Brain-Sex" Language*
17 Nev. L.J. 667 (2017)................................................................ 2

Anthony Latham, *Puberty Blockers for Children: Can They Consent?*
28 The New Bioethics 268 (2022)............................................. 22

Brianne L. Gorod, *The Adversarial Myth: Appellate Court Extra-Record Factfinding*
61 Duke L.J. 1, 49-50 (2005)..................................................... 12

18B Charles Alan Wright, et al., *Federal Practice and Procedure* § 4478 (3d ed.).12

Christen Price, *Women's Spaces, Women's Rights: Feminism and the Transgender Rights Movement*
103 Marq. L. Rev. 1509 (2020) .................................................. 9

*Cheering On Women and Girls in Sports*
110 Harv. L. Rev. 1627 (1997) ..................................................11

Dionne L. Koller, *Not Just One of the Boys: A Post-Feminist Critique of Title IX's Vision for Gender Equity in Sports*
43 Conn. L. Rev. 401 (2010). .................................................... 16

Doriane Lambelet Coleman, et al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*,
27 Duke J. Gender L. & Policy 69 (2020)............................... 15, 16, 18, 19

Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*
51 Sports Medicine 199 (2020)................................................ 18, 20, 22, 24

George Orwell, *Nineteen Eighty-Four* (Plume/Harcourt Brace 2003 ed.) ............... 6

Grant R. Tomkinson, et al., *European normative values for physical fitness in children and adolescents aged 9-17 years: results from 2 779 165 Eurofit performances representing 30 countries*
52 Br. J. Sports Med. 1445 (2018) ........................................... 23

Jean Hatchet, *The performance of a lifetime*
THE CRITIC (Apr. 10, 2023) ............................................................. 8

Jennifer Bilek, *Custom Vaginoplasty "For Your Inner Well Being,"*
THE ELEVENTH HOUR (Oct 23, 2023) .......................................... 21

Jessica A. Clarke, *Sex Assigned at Birth*
122 COLUM. L. REV. 1821 (2022).................................................. 6

Kathleen Stock, *Changing the concept of "woman" will cause unintended harms*
THE ECONOMIST (Jul. 6, 2018) .................................................. 5,6

Leor Sapir, *Yes, Europe Is Restricting "Gender-Affirming Care,"*
CITY JOURNAL (Feb. 13, 2023) .................................................... 22

Lidewij Sophia Boogers, et al., *Transgender Girls Grow Tall: Adult Height is Unaffected by GnRH Analogues and Estradiol Treatment*
107 J. CLIN. ENDOCRINOL METAB. 3605 (2022) ........................... 23

Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*
8 ARCHIVES OF SEXUAL BEHAVIOR 3553 (2021)..................... 21, 22

Mark Jon Catley, *Normative health-related fitness values for children: Analysis of 85347 results on 9-17-year-old Australians since 1985*
47 BR. J. SPORTS MED. 98 .......................................................... 23

Megan Twohey and Christina Jewett, *They Paused Puberty, but Is There A Cost*
THE NEW YORK TIMES (Nov. 14, 2022)....................................... 22

Movement Advancement Project, *Bans on Transgender Youth Participation in Sports* ......................................................................................... 24

Nat'l. Fed. of State H.S. Assocs., *High School Athletics Participation Survey* (2022)....................................................................................... 15

N.C.A.A, *The State of Women in College Sports* (2022) ...................... 16

Pat Eaton-Robb, *Connecticut runners part of debate over transgender athletes*
ASSOCIATED PRESS (Feb. 24, 2019) ............................................................ 19

Risa Aria Schnebly, *Sex Determination in Humans*
THE EMBRYO PROJECT ENCYCLOPEDIA (Jul. 16, 2021).................................. 6

Rachyl Jones, *Tik Tok Watched Dylan Mulvaney Become a Woman One Day at a Time*
OBSERVER (Sept. 10, 2022).......................................................................... 9

S. Eiberg, et al., *Maximum oxygen uptake and objectively measured physical activity in Danish children 6-7 years of age: the Copenhagen school child intervention study*
39 BR. J. SPORTS MED. 725 (2005) ............................................................ 23

Sheila Jeffreys, *Gender Hurts: A Feminist Analysis of the Politics of Transgenderism*
1-2, 4 (Routledge ed. 2014) ...................................................................... 7

Susana Diaz and J. Michael Bailey, *Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases*
52 ARCHIVES OF SEXUAL BEHAVIOR 1031, 1040 (2023)............................. 13

U.S. DEP'T. OF EDUC., QUESTIONS AND ANSWERS REGARDING OCR'S INTERPRETATION OF TITLE IX AND SINGLE SEX SCHOLARSHIPS, CLUBS, AND OTHER PROGRAMS at 3-5 (2021) .................................................................... 26

U.S. OFFICE OF PERSONNEL MGT., GUIDANCE REGARDING GENDER IDENTITY AND INCLUSION IN THE FEDERAL WORKPLACE 2-3 (2023)............................. 10

World Aquatics, *Policy on Eligibility for the Men's and Women's Competition Categories*.............................................................................................. 24

World Athletics, *World Athletics Council Decides on Russia, Belarus and female eligibility* (Mar. 23, 2023) ....................................................................... 24

World Rugby, *Transgender Guidelines*. .................................................... 24

Yael Halon, *Lia Thomas exposed 'male genitalia' in women's locker room after meet, Riley Gaines says: Dropped 'his pants'*
FOX NEWS (Feb. 9, 2023) .......................................................................... 25

Yaron Steinbuch, *Injured North Carolina Volleyball player urges transgender ban for female sports teams in schools*
NEW YORK POST (April 21, 2023) ................................................................ 20

## <u>INTEREST OF AMICUS CURIAE</u>

This appeal presents the question of what it means to be a "female." Women's Declaration International USA ("WDI USA") is the U.S. chapter of an international group of women protecting sex-based rights of women and girls. Feminism is central to WDI USA, and it seeks to represent the breadth of the female experience. Its volunteers include female academics, writers, activists, and health practitioners.

WDI's founders authored the Declaration on Women's Sex-Based Rights, which affirms the sex-based rights of women and girls and challenges the discrimination they experience when the sex-based categories of female and male are replaced by the category of "gender identity." The Declaration is rooted in the idea that the right of women and girls to live free from discrimination derives from being female and not from "gender identity." Article 7 provides that "[t]o ensure fairness and safety for women and girls, the entry of boys and men who claim to have female 'gender identities' into teams . . . set aside for women should be prohibited as a form of sex discrimination."

WDI USA is interested in this appeal because it threatens the erasure of "female" (including "woman" and "girl") as a legal category. Women and girls have endured centuries of discrimination precisely because they are members of the category of females, objectively defined by genetics and biology. The categories of "gender identity," "transgender woman," and "transgender girl" erase the meaning

of "female" by replacing the objective *fact* of being a woman with a claimed, subjective *sense* of being a woman.[1]

This linguistic destabilization of the meaning of "female" permits males who claim a female identity to make demands on women and girls that were previously unheard of and that undermine women's dignity and safety. In view of its interest and work on these issues, WDI USA has a meaningful perspective to offer the Court.

No counsel for a party authored this brief in whole or in part. No party or counsel for a party contributed money that was intended to fund preparing or submitting this brief. No person—other than WDI USA, its members, or its counsel—contributed money that was intended to fund preparing or submitting this brief. WDI USA is authorized to file this amicus brief as stated in its motion for leave to file, which is not opposed by any party.

## SUMMARY OF THE ARGUMENT

B.P.J. is a minor-aged male who wants to run cross-country on a school team reserved for girls. B.P.J. does not dispute that it is important for school sports to be separated by sex to ensure fair competition and safety for female athletes. But B.P.J.

---

[1] Andrea Orwoll, *Pregnant "Persons": The Linguistic Defanging of Women's Issues and the Legal Danger of "Brain-Sex" Language*, 17 NEV. L.J. 667, 693 (2017) ("[T]he postmodern identity movement calls into question the ability of human beings to be put into sexed or gendered categories at all.").

2

thinks the West Virginia law that does this should include B.P.J. in its definition of "female" because B.P.J. has a deeply felt, persistent "gender identity" as female.

It is hard not to sympathize with males like B.P.J. But the unavoidable fact is that males are *not* females and cannot *become* females, regardless of the "gender with which they identify." The objective genetic and biological facts of sex are immutable, highly relevant in athletics, and enormously important to the ongoing struggle of women and girls to overcome sex-based discrimination.

The coherent legal category of "female," as defined by West Virginia law and commonly understood, refers to humans with XX chromosomes and a female reproductive system. That category is significant because it is females, not males who claim to identify as women and girls, who have historically suffered and continue to face discrimination solely on account of their biology—*i.e.*, on account of being female—and will suffer a new version of those old harms if a state cannot define females as females for purposes of female sports.

Gender identity is not an objective or coherent legal category. It defines a person's subjective identity by reference to whatever sense or feeling the person has of what it means to "be of the gender with which he or she identifies" and whatever expression the person decides to give that "sense" or "feeling."

When males claim to identify as women or girls, the category of "gender identity" reduces to regressive stereotypes about what it means to be female and

3

thereby deprives females of agency to define their role in the world for themselves. Allowing males to compete in female-only athletics doubles down on that harm by reversing hard-fought gains women and girls have made in athletics, and by extension in education, business, government, and society, and denying them the dignity and safety of female-only spaces.

The District Court was correct to hold that West Virginia's definition of "female" is consistent with the Equal Protection Clause and Title IX, which are supposed to reject stereotypes of women and girls, not reinforce them.

## **ARGUMENT**

I.     **The West Virginia law ensures equal dignity and treatment for women by recognizing that sex is an objective and coherent legal category that protects women from discrimination, while "gender identity" is not.**

For women, who have struggled for centuries with sex-based animus, this case presents an existential question: What does it mean to be female? West Virginia answered that question objectively, defining "female[s]," "women," and "girls" as humans with XX chromosomes and female reproductive systems.[2] That definition recognizes both the biological reality of sex and that it is the female sex that most depends on the protections antidiscrimination laws like Title IX provide.

---

[2]     *See* W.V. Code § 18-2-25d(b)(1)-(2) (2022).

B.P.J.'s argument is irreconcilable with that definition. As the District Court recognized, its premise is that *any male* must be defined by law *as a female* if that is the male's claimed gender identity. (JA4269). That premise renders the category "female" incoherent because if anyone who claims a sense of being female *is* female irrespective of biology and genetics, the category has neither limits nor meaning. It also strips women of agency to define their own place in society and transfers it to males, who will define womanhood with damaging stereotypes that relegate women and girls to second-class status and promote sex-based discrimination.

To begin, "sex" and "gender identity" are not synonyms.[3] Historically, the term "sex" universally referred to the observable fact of the distinction between female and male—based on genetic characteristics and reproductive biology—not a mutable status "assigned at birth."[4] "Women" and "girls" are the female sex.[5]

---

[3]    *Bostock v. Clayton County, Ga.*, 140 S.Ct. 1731, 1746-47 (2020) ("We agree that homosexuality and transgender status are distinct concept from sex.").

[4]    *See id.* 140 S.Ct. at 1756 & App. A (Alito, J., dissenting) (collecting dictionary definitions of "sex" at the time of the adoption of Title VII); Kathleen Stock, *Changing the concept of "woman" will cause unintended harms*, The Economist (Jul. 6, 2018), https://www.economist.com/open-future/2018/07/06/changing-the-concept-of-woman-will-cause-unintended-harms

[5]    *See* Orwall, *supra*, at 670 ("There are undeniable legal consequences of living in a female body. . . . Thus, woman specific language must be used in legal discussions of sex-based discrimination. . . .").

Sex is established at conception, when either an X sperm or a Y sperm fertilizes an egg.[6] It is easily identifiable and is recorded with nearly 100% accuracy. In contrast, the expression "assigned at birth" was developed to indicate that medical professionals "assigned" a sex to members of a tiny class of babies whose sex could not easily be determined because they had both male and female reproductive characteristics, but who were nonetheless genetically either female or male.[7]

The extension of this limited medical description to imply that *every* human is arbitrarily "assigned" a sex that might not be his or her "real" sex serves the same purpose as Orwell's Newspeak: It denies women and girls the language necessary, when discussing priorities of the transgender movement, to speak out loud that they are unchangeably different from males in ways that matter—especially in their experience of sex-based discrimination and especially in sports.[8] But just as two plus two equals four, every person is a member of either the female or male sex. As a matter of objective reality, males cannot become female.

---

[6]     *See* Risa Aria Schnebly, *Sex Determination in Humans*, THE EMBRYO PROJECT ENCYCLOPEDIA (Jul. 16, 2021), https://embryo.asu.edu/pages/sex-determination-humans.

[7]     *See* Jessica A. Clarke, *Sex Assigned at Birth*, 122 COLUM. L. REV. 1821, 1834-36 (2022).

[8]     George Orwell, *Nineteen Eighty-Four* 309-10 (Plume/Harcourt Brace 2003 ed.); *see also* Stock, *supra* (discussing "conceptual engineering").

Gender identity is not sex and should not be conflated with sex. In *Grimm v. Gloucester County School Board*, this Court defined "gender identity" as some people's "deeply felt, inherent sense" that they are not the sex they are, which causes them to "express a gender" opposite to their sex.[9] To define it that way, however, is necessarily to say that gender identity is not objectively ascertainable and is instead the product of social convention.[10] How can a male "feel" or "sense" that the male is a woman and "express" it by wearing dresses, earrings, and makeup, except by having lived in a culture where that is what is expected of women? Or, to use the framing of B.P.J.'s brief, how can a boy "live as a girl" (IB 3) without an understanding derived from family, friends, or others of what that means?

Unfortunately, social expectations of what it means to be a woman typically reduce to harmful stereotypes about roles, personalities, and behavioral traits produced by a culture that expects males to be assertive, hard-charging, and dominant and females to be passive, reserved, and subordinate.[11] As a consequence,

---

[9]    972 F.3d 586, 594 (4th Cir. 2020).

[10]    *See, e.g.*, *Grimm*, 972 F.3d at 608 (stating that a girl who identified as male "was viewed as failing to conform to the sex stereotype" of females); *see also* Sheila Jeffreys, *Gender Hurts: A Feminist Analysis of the Politics of Transgenderism* 1-2, 4 (Routledge ed. 2014).

[11]    *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 256 (1989); *Peltier v. Charter Day School, Inc.*, 37 F.4th 104, 125-26 (4th Cir. 2022); *see also* Jeffries, *supra*, at 1-2 ("'Gender', in traditional patriarchal thinking, ascribes skirts, high

there is a long history of discrimination against women and girls who embody the qualities society expects of males and denigrates such women as unladylike, manly, or bitchy.[12] It is stigmatizing and harmful to women and girls to allow men to define womanhood by reference to overbroad, essentializing stereotypes about what it means to be female and how women and girls are supposed to behave.[13]

Take Dylan Mulvaney as an example. Mulvaney claims to be a woman by reference to damaging stereotypes of females, portraying them as controlled by emotion, unserious, fashion-obsessed, and financially irresponsible, among other things.[14] And because players like Nike, Walmart, and Maybelline demand that Mulvaney be defined as a woman notwithstanding Mulvaney's male sex, Mulvaney has a gigantic platform to convey these stereotypes to millions, including young

---

heels and a love of unpaid domestic labor to those with female biology, and comfortable clothing, enterprise, and initiative to those with male biology.").

[12]      *See, e.g.*, *Hopkins*, 490 U.S. at 256-58 (1989); *Lettieri v. Equant Inc.*, 478 F.3d 640, 644 (4th Cir. 2007).

[13]      *See, e.g.*, *Peltier*, 37 F.4th at 114 (describing how female students forced to wear skirts testified that the policy communicated to them that girls "weren't worth as much as boys," "are not in fact equal to boys," and "should be less active than boys and . . . are more delicate than boys").

[14]      *See* Jean Hatchet, *The performance of a lifetime*, THE CRITIC (Apr. 10, 2023), https://thecritic.co.uk/the-performance-of-a-lifetime/.

women and girls just beginning to answer for themselves who they are, what they want, and what they can do in society.[15]

So, we have a male telling women what a woman is in ways that reduce women to the exact stereotypes they have fought to eliminate. Perhaps not in intention, but certainly in effect, Mulvaney's expression of womanhood is not different from males telling females that their place is in the kitchen or that they don't need to go to college. In the same way, it "elevates male identities, priorities, and desires, and undermines women's rights" to equal treatment.[16]

None of this to say that Mulvaney has anything in common with B.P.J. beyond "gender identity." But it does put in stark relief what is at stake in B.P.J.'s challenge to West Virginia's definition of "female," "women," and "girls." B.P.J.'s argument posits, for example, that a male who shared physiological traits in common with B.P.J. should not be defined as a female for purposes of single-sex sports, but that a male with those traits *and* a claimed sense of female identity should. (JA4724). What is the difference except that the latter behaves in a manner that reflects female stereotypes and the former does not? If the Equal Protection Clause and Title IX

---

[15]     *See* Rachyl Jones, *Tik Tok Watched Dylan Mulvaney Become a Woman One Day at a Time*, OBSERVER (Sept. 10, 2022), https://observer.com/2022/09/tiktok-watched-dylan-mulvaney-become-one-day-at-a-time/.

[16]     Christen Price, *Women's Spaces, Women's Rights: Feminism and the Transgender Rights Movement*, 103 MARQ. L. REV. 1509, 1511 (2020).

require every state to define males who claim to identify as female as "female" for purposes of school sports, then they will unavoidably justify and reinforce negative stereotypes about women.

And it gets worse. This stereotype-based, definitional sea change also grants males license to make extreme demands of women that would have been unthinkable until recently. These include demands that women affirmatively validate a male's sense of identity as a woman by using opposite-sex pronouns and admitting the male to spaces where women are intimate and vulnerable, such as changing rooms, showers, and domestic violence shelters.[17] The social costs (e.g., harassment, deplatforming) to women who resist those demands are already severe.

Holding that federal law requires redefining "female" to include "males who claim to identify as women" makes those demands legally coercive. This is not conjectural: Last month, the federal government issued guidance threatening that federal employees who refuse to refer to a male who claims to identify as a woman with female pronouns commit unlawful harassment.[18] The result is legalized

---

[17] *See* Price, *supra*, at 1525-1535; *see also Bostock*, 140 S.Ct. at 1772 (Alito, J., dissenting) (explaining that Americans in 1964 "would have been bewildered" to learn that Title VII addressed gender identity).

[18] *See* U.S. OFFICE OF PERSONNEL MGT., GUIDANCE REGARDING GENDER IDENTITY AND INCLUSION IN THE FEDERAL WORKPLACE 2-3 (2023).

discrimination against women who resist sexist stereotypes and maintain that female as a category is different from male as a category in ways that are important.

That is an affront to what the Equal Protection Clause and Title IX promise women—namely, that women will *not* be governed by male-engineered stereotypes of womanhood.[19] To say that they instead require females to accept the untruth that a male is a female by virtue of the male's "expression" of womanhood breaks that promise and offends the separate and equal dignity of women. That is especially harmful in sports, where the Equal Protection Clause and Title IX are supposed to protect women's rights to develop and display the same assertiveness, confidence, and authority historically expected only of men.

When this Court held in *Grimm* that a female who identified as a man was similarly situated to males for purposes of a same-sex bathroom policy, it did not consider how legal recognition of males as females codifies damaging stereotypes about females. That might be because it found that, like sex, gender identity is "immutable" and is "not a choice."[20] This Court should not repeat the oversight in

---

[19]    *See U.S. v. Virginia*, 518 U.S. 515, 550 (1996) ("[G]eneralizations about 'the way women are,' estimates of what is appropriate for *most women*, no longer justify denying opportunity to women . . . ."); Note, *Cheering On Women and Girs in Sports*, 110 Harv. L. Rev. 1627, 1640 (1997) ("[W]omen's attitudes towards sports are socially constructed and have been limited by discrimination and stereotypes. Congress passed Title IX to combat such discrimination and stereotypes . . . .").

[20]    972 F.3d at 594, 612-13.

this case. *Grimm* was an appeal from a district court's order granting summary judgment to the plaintiff. This Court did not determine that, on the district court record, it was an undisputed fact that gender identity is immutable. Rather it relied on a single citation to a single appellate amicus brief.[21]

But statements in an amicus brief are not evidence, appellate courts do not make findings of fact, and such a finding would generally not apply in a different case involving different parties.[22] And *Grimm*'s statement cannot be regarded as one of general knowledge so well understood that it can inform a court's crafting of a legal rule.[23] The evidence in this case, as well as existing science and everyday observation, provide ample reason to conclude that gender identity is not irrevocably fated and instead is linked to psychological, familial, social, and other factors that implicate individual agency.[24] (*See* JA3666-3682). That gender identity is immutable

---

[21]    972 F.3d at 594, 612-13 (citing Br. Medical Amici 7).

[22]    *See Sony Corp. of Am. v. Univ. City Studios, Inc.*, 464 U.S. 417, 434 n.16 (1984); *Columbus-America Disc. Grp. v. Atlantic Mut. Ins., Co.*, 56 F.3d 556, 575 (4th Cir. 1995); 18B Charles Alan Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 4478 (3d ed.).

[23]    *See* Brianne L. Gorod, *The Adversarial Myth: Appellate Court Extra-Record Factfinding*, 61 DUKE L.J. 1, 49-50, 63-66 (2005) (explaining that "there is a real danger when judges, inexperienced in making empirical judgments and unrestrained in how they do so, are forced to make factual determinations that are highly contestable and ideologically laden").

[24]    *See, e.g.*, Susana Diaz and J. Michael Bailey, *Rapid Onset Gender Dysphoria: Parent Reports on 1655 Possible Cases*, 52 ARCHIVES OF SEXUAL BEHAVIOR 1031,

is not a settled truth. The biological fact of having XX chromosomes and a female reproductive system is.

But even on its own terms, *Grimm*'s statement is irrelevant to consideration of the real-word harms sex-based stereotypes cause females, and the resultant dangers to females B.P.J.'s argument presents, for two reasons. First, belonging to the category "female" is *objectively* immutable and has consequences, and that category is made legally incoherent if laws that prohibit discrimination against women end up requiring states to define as "females" males who claim to identify as women. Second, even if a male's *sense* of identity as a woman were immutable, the way a male *expresses* that identity—*i.e.*, how the male outwardly defines womanhood—necessarily derives from external sources like stereotypes.[25] It is not cast in biological concrete that women like pink and wear skirts.

---

1040 (2023); Alberto Frigerio, et al., *Structural, Functional, and Metabolic Brain Differences as a Function of Gender Identity or Sexual Orientation: A Systematic Review of the Human Neuroimaging Literature*, 50 ARCHIVES OF SEXUAL BEHAVIOR 3329, 3347 (2021) (explaining that "the majority of [brain features] in transgenders resemble those of their native sex" and that it is "not possible to identify specific brain features which consistently differ between cisgender and transgender groups").

[25]     Frigerio, *supra*, at 3330 ("[H]umans express their gender identity, and their sexual behavior is, then, influenced by personal and social experiences and expectations.").

It is that relationship—the relationship between a male's expression of womanhood and stereotypes—that makes a legal rule requiring that males be defined as females so threatening to women's rights. Being female matters.

## II. The West Virginia law guarantees that women share in the important benefits of athletics on equal terms with men.

B.P.J. does not dispute that West Virgina's interest in ensuring that women participate in athletics on equal terms with men is "important." (JA4269). But because no one disputes that, it is too easy to overlook why. Single-sex athletics have reduced discrimination against women, advanced women in every area of life, and protected women's spaces. Allowing males to compete on female teams based on males' claimed feelings of womanhood jeopardizes the gains women and girls have made through increased participation in single-sex sports.

### A. Sex-based separation is essential to women's equal participation in the benefits of athletics.

To understand why single-sex sports are closely linked to women's rights, start with this observation:

> At nearly every park in the country, young girls chase each other up and down soccer fields, volley back and forth on tennis courts, and shoot balls into hoops. And at colleges, it is now commonplace to see young women training in state-of-the-art athletic facilities, from swimming pools to basketball arenas, with the records of their accolades hung from the rafters.[26]

---

[26]    *Adams by and through Kasper v. School Bd. of St. Johns County*, 57 F.4th 791, 818 (11th Cir. 2022) (Lagoa, J., specially concurring).

14

Because female participation in athletics is ubiquitous today, it might be tempting in a case like this—where the human instinct for compassion is strong—to neglect the fact that female participation in school sports was anemic just decades ago. The dramatic change is directly linked to Title IX and its implementing regulations.[27]

Title IX and its regulations ensure that women and girls enjoy equal participation in athletics by requiring that women have equal access to and funding for sports and permitting (and sometimes requiring) separate, single-sex sports teams.[28] The results for women and girls have been astounding.

Take high school. In 1972—the year Title IX was adopted—girls represented only 7.4% of total athletes, with boys dominating at 92.6%.[29] That's a participation gap of 85.2% or a ratio of 12.5 boy athletes for every girl. By 2022, however, girls

---

[27]    *See Parker v. Franklin Cty. Comm. Sch. Corp.*, 667 F.3d 910, 916 (7th Cir. 2012) ("Title IX has gone a long way in changing society's view of female athletes by . . . encouraging female participation and interest in sports."); *Cohen v. Brown Univ.*, 101 F.3d 155, 188 (1st Cir. 1996) ("[T]itle IX has changed the face of women's sports as well as our society's interest in and attitude toward women athletes and women's sports.").

[28]    *See* 34 C.F.R. § 106.41 (2022); *see also* Doriane Lambelet Coleman, et al., *Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule*, 27 DUKE J. GENDER L. & POLICY 69, 71-73 (2020).

[29]    *See* NAT'L. FED. OF STATE H.S. ASSOCS., HIGH SCHOOL ATHLETICS PARTICIPATION SURVEY (2022), https://www.nfhs.org/media/5989280/2021-22_participation_survey.pdf (showing 294,015 girls and 3,666,917 boys).

represented 42.5% of student-athletes and boys represented 57.5%.[30] In fifty years, the girls' participation rate jumped by 35.1%, narrowing the gap with boys to 15%. For every 1.35 boys playing sports, there is at least one girl also competing.

The effect at colleges and universities has been the same. In 1982, the participation gap in NCAA Division I athletics was 47.2%, with women comprising 26.4% of total athletes and men comprising 73.6%.[31] That was almost three male athletes for every female. By 2020, the gap closed to 47.1% women and 52.9% men or 1.1 male athletes for every female.[32] DII and III sports mirror that trend.[33]

These increases in female athletic participation are inextricably tied to women's advances in business, government, and society. It is no secret that participation in school athletics correlates with academic success, social integration, and personal satisfaction.[34] If you want to know what that means for women:

> Girls who play sports stay in school longer, suffer fewer
> health problems, enter the labor force at higher rates, and

---

[30]    *See id.* (showing 3,241,472 girls and 4,376,582 boys).

[31]    NCAA, THE STATE OF WOMEN IN COLLEGE SPORTS 18 (2022), https://s3.amazonaws.com/ncaaorg/inclusion/titleix/2022_State_of_Women_in_College_Sports_Report.pdf (showing 26,461 women and 73,742 men).

[32]    *Id.* (showing 86,645 women and 97,423 men).

[33]    *See id.* at 18-19.

[34]    *See* Coleman, *supra*, at 104-05; Dionne L. Koller, *Not Just One of the Boys: A Post-Feminist Critique of Title IX's Vision for Gender Equity in Sports*, 43 CONN. L. REV. 401, 412-13 (2010).

> are more likely to land better jobs. They are also more likely to lead. Research shows stunningly that 94 percent of women C-Suite executives today played sport, and over half played at a university level. Being engaged in sports inculcates the values of fitness and athleticism for lifelong health and wellness and imparts additional socially valuable traits, including teamwork, sportsmanship, and leadership, as well as individually valuable traits including goal setting, time management, and grit.[35]

For example, Hewlett Packard and eBay CEO Meg Whitman, Sunoco CEO Lynn Elsenhans, General Motors CEO Mary Barra, U.S. Senator Kelley Ayotte, U.S. Senator Kristin Gillibrand, North Dakota Governor Kristi Noem, and Massachusetts Governor Maura Healey were all college athletes.

### B.   Male participation in women's sports denies women equal participation in the benefits of athletics.

Backtracking on women's equal participation in sports by opening their teams to male competitors who, whether sincerely or not, express themselves as women, turns back the clock because the male comparative advantage in athletics makes it impossible for females to compete with males on equal terms.

Why males have overwhelming advantages in athletic competition needn't be rehashed here. It suffices to say that those advantages "appear, on assessment of the

---

[35]   *Adams*, 57 F.4th at 820-21 (Lagoa, J., specially concurring) (cleaned up) (citing sources).

performance data, insurmountable,"[36] and they exist "across the board, at both the elite and non-elite levels of almost all standard sports and events."[37] When females are forced to compete against males, even those who identify as women or girls, females "have little chance of winning."[38]

Examples aren't hard to come by. In college, Lia Thomas dominated NCAA Women's Division I women's swimming after a so-so career on a men's team; CeCe Telfer placed in multiple events at the NCAA Women's DII Outdoor Track and Field Championships after competing without success on a men's team; and June Eastwood earned a spot on a NCAA Women's DI cross-country team after mid-level performance on a men's team. (JA2531, 2533, 4383). High school athletes have

---

[36]    Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 SPORTS MEDICINE 199, 200 (2020).

[37]    Coleman, *supra*, at 87.

[38]    *See* Allison K. Heather, *Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology*, Int. J. Environ. Res. Public Health (Jul. 26, 2022), https://doi.org/10.3390/ijerph19159103.

similar experiences.[39] As these cases illustrate, conflating the categories of "female" and "gender identity" renders the category "female" meaningless in school sports.[40]

Plainly, "removing distinctions based on biological sex from sports . . . harms not only girls' and women's prospects in sports, but also hinders their development and opportunities beyond the realm of sports."[41] It's not hard to see why. If a male places first in a female track event, there are females who place second, place eighth, and don't place at all. For every male starter on a female lacrosse team, there are females who sit on the bench or don't make the cut. Those women unavoidably lose out on opportunities for college recruitment, athletic scholarships, and the development of traits that make athletics so important to female achievement. (*E.g.*, JA4379-80). Disillusionment and dropout aren't hard to predict; no one wants to play with a stacked deck. (*See, e.g.*, JA4383-84).

That is doubly true when one considers the risks to women's physical safety from defining males as females for purposes of women's sports. Last September, a

---

[39]    *E.g.*, Pat Eaton-Robb, *Connecticut runners part of debate over transgender athletes*, ASSOCIATED PRESS (Feb. 24, 2019), https://apnews.com/article/ct-state-wire-north-america-gender-identity-connecticut-sports-dcbca5cf940548628dba351f6c91bcd9.

[40]    Coleman, *supra*, at 87 ("[I]f both 'sex' and 'gender identity' became the basis for eligibility for girls' and women's sport . . . inherent differences would no longer be the rationale for separate sex sport. . . .").

[41]    *Adams*, 57 F.4th at 821 (Lagoa, J., specially concurring).

North Carolina high school senior named Payton McNabb suffered a concussion and neck injury after a male athlete who claims a "transgender" identity spiked a ball into her face during a volleyball game. Testifying before the state legislature in support of a bill to maintain single-sex sports, she stated that she continues to struggle with the effects of her injuries, including impaired vision, partial paralysis on the right side of her body, unremitting headaches, anxiety, and depression.[42]

Simply put, sex separation in sports is as essential to a safe and equal playing field for women and girls as weight or age classes often are for other competitors:[43] The objective, biology-based category of "female" matters immensely, and maintaining the integrity of that category is essential to women's rights to equal participation in athletics.

### C. Defining women and girls by reference to puberty blockers and hormone therapy dangerously medicalizes gender identity.

The Court should not promote puberty blockers and hormone therapy to answer the equal-rights and sex-discrimination problems male participation in female athletics present. That would dangerously classify gender identification as a

---

[42]     Yaron Steinbuch, *Injured North Carolina Volleyball player urges transgender ban for female sports teams in schools,* NEW YORK POST (April 21, 2023), https://nypost.com/2023/04/21/nc-volleyball-player-urges-transgender-ban-for-schools-female-sports/

[43]     *See* Hilton, *supra*, at 200.

medical problem requiring medical interventions and force states like West Virginia to require those interventions to address gender identity in sports.[44]

It would be exceptional for the law require a minor to use life-altering drugs to prevent the minor from becoming an adult of his or her own sex. By definition, minors lack the maturity of adults and are more susceptible to social influences and peer pressure.[45] Their views of their gender identity can and do change over time, and males who feel they are females—and vice versa—can and do feel differently later.[46] To hold that states must define male athletes who take puberty blockers and hormone therapy as females for purposes of sports unavoidably incentivizes minors to choose those life-changing interventions when they otherwise might not.

That incentive is profoundly flawed. It is untruthful to minors and demeaning to females because puberty blockers and hormone therapy do not change the objective fact of sex any more than a sense of gender identity does. Those

---

[44]     *Cf.* Jennifer Bilek, *Custom Vaginoplasty "For Your Inner Well Being,"* THE ELEVENTH HOUR (Oct 23, 2023) ("Transgenderism seems to be the only non-medical condition needing medical intervention, medical insurance and social validation as an identity."), https://www.the11thhourblog.com/post/custom-vaginoplasty-for-your-inner-well-being.

[45]     *See Roper v. Simmons*, 543 U.S. 551, 569 (2005).

[46]     *See* Diaz, *supra*; *see also* Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 8 ARCHIVES OF SEXUAL BEHAVIOR 3553, 3364-68 (2021).

interventions pose medical and psychological risks that are, at best, poorly understood and, at worst, catastrophic.[47] There are significant questions of consent.[48] And there is the question whether beginning treatments leads minors to even more radical interventions like surgeries they will later regret. These very real dangers of medicalizing gender identity are exactly why many governments in Europe and this country are moving to limit or prohibit puberty blockers, hormone therapy, and other interventions for minors.[49]

What is more, it's hardly undisputed that avoiding puberty eliminates male advantages in sports. (*See, e.g.*, JA2493). Males experience genetic differences tied to muscle development long before puberty.[50] Before puberty, boys run faster, jump farther, throw farther, grow bigger, and have greater lung capacity and strength than

---

[47]   *See* Littman, *supra*; *see also* Megan Twohey and Christina Jewett, *They Paused Puberty, but Is There A Cost*, THE NEW YORK TIMES (Nov. 14, 2022), https://www.nytimes.com/2022/11/14/health/puberty-blockers-transgender.html.

[48]   *See generally* Anthony Latham, *Puberty Blockers for Children: Can They Consent?*, 28 THE NEW BIOETHICS 268 (2022).

[49]   *See, e.g.,* Fla. S.B. 254, 2023 Leg., Reg Sess. (Fla. 2023); Vulnerable Child Prot. Act, 2023 Idaho Laws Ch. 292 (Idaho 2023); Gender Transition Procedures for Minors, 2023 Ind. Legis. Serv. P.L. 10-2023 (Ind. 2023); Act of Mar. 23, 2023, 2023 Ky. Laws Ch. 132 (Ky. 2023); N.D. H.B. 1254, 68th Leg. Assemb., Reg. Sess. (N.D. 2023) (enacted); Act of Feb. 14, 2023, South Dakota Laws Ch. 127 (S.D. 2023); Act of Jan. 28, 2023, 2023 Utah Laws S.B. 16 (Utah 2023); Leor Sapir, *Yes, Europe Is Restricting "Gender-Affirming Care,"* City Journal (Feb. 13, 2023), https://www.city-journal.org/article/yes-europe-is-restricting-gender-affirming-care

[50]   Hilton, *supra*, at 200-01.

girls.[51] The male advantage of height appears unaffected by puberty blockers and hormone therapy.[52] It is thus impossible to say with any confidence that advantages conferred before puberty are unimportant when males compete against females.

Furthermore, the logic of B.P.J.'s argument is not that females include males who identify as women and girls *and* who take puberty blockers and hormone therapy. As the District Court observed, the argument posits that males should be defined as females "for purposes of athletics at the moment they verbalize their transgender status." (JA4274). Some males will choose not to take puberty blockers or hormone therapy, and others may not know of or act upon their gender identity until it is too late to do so. (JA4273). And there is more than enough reason to conclude that hormone therapy after puberty does not diminish the male advantage to the degree necessary to ensure women have an equal playing field.[53]

---

[51]    *See* Grant R. Tomkinson, et al., *European normative values for physical fitness in children and adolescents aged 9-17 years: results from 2 779 165 Eurofit performances representing 30 countries*, 52 BR. J. SPORTS MED. 1445 (2018); Mark Jon Catley, *Normative health-related fitness values for children: Analysis of 85347 results on 9-17-year-old Australians since 1985*, 47 BR. J. SPORTS MED. 98 (2013); S. Eiberg, et al., *Maximum oxygen uptake and objectively measured physical activity in Danish children 6-7 years of age: the Copenhagen school child intervention study*, 39 BR. J. SPORTS MED. 725 (2005).

[52]    *See* Lidewij Sophia Boogers*,* et al., *Transgender Girls Grow Tall: Adult Height is Unaffected by GnRH Analogues and Estradiol Treatment*, 107 J. CLIN, ENDOCRINOL METAB. 3605, 3605-06 (2022).

[53]    *See* Hilton, *supra*, at 201-11 (analyzing studies on hormone therapy).

23

Indeed, sports governing bodies and legislatures have increasingly decided that male participation in female sports threatens women's and girls' ability to compete on equal terms, hormone therapy notwithstanding. In March, the global governing body for track and field prohibited males who have gone through puberty from participating in female events.[54] The governing bodies for swimming and women's rugby did the same last year.[55] And 21 states have adopted laws that protecting female-only sports by prohibiting males from competing with females.[56]

Unlike sports authorities and legislatures, courts engaged in the zero-sum game of deciding legal cases are not well situated to resolve contested scientific claims or to accommodate the conflicting interests they raise. The Court should be reluctant to wade into those controversies here, where women's strides in athletics—and by extension in life—on account of Title IX sports hang in the balance.

---

[54]     *See* World Athletics, *World Athletics Council Decides on Russia, Belarus and female eligibility* (Mar. 23, 2023), https://worldathletics.org/news/press-releases/council-meeting-march-2023-russia-belarus-female-eligibility.

[55]     World Acquatics, *Policy on Eligibility for the Men's and Women's Competition Categories*, https://resources.fina.org/fina/document/2022/06/19/525de003-51f4-47d3-8d5a-716dac5f77c7/FINA-INCLUSION-POLICY-AND-APPENDICES-FINAL-.pdf; World Rugby, *Transgender Guidelines*, https://www.world.rugby/the-game/player-welfare/guidelines/transgender.

[56]     *See* Movement Advancement Project, *Bans on Transgender Youth Participation in Sports*, https://www.lgbtmap.org/equality-maps/youth/sports_participation_bans.

**D.      The West Virginia law protects women's spaces and safety.**

If males are defined as females on the playing field, they will ultimately be defined as females in the locker room. Male intrusion where women are most vulnerable is a "threat to women's boundaries," denies them intimate spaces, and increases their exposure to sexual violence.[57] To say that any male whose gender identity is a woman can access a female locker room is necessarily to say that "sex-based boundaries do not matter (or matter less than the wishes of males who wish to cross them)."[58] As a Lia Thomas teammate explained after seeing Thomas in the locker room with male genitals exposed, "[w]e did not give our consent, [and] they did not ask for our consent" and that violation of female dignity was "worse than" the negative effect of being forced to compete against a male.[59]

**III.   Defining males as females for purposes of athletics threatens preferences addressing discrimination against females.**

Ignoring the objective fact of sex under Title IX also threatens preferences that ameliorate the negative effects of discrimination against females in education.

---

[57]      Price, *supra*, at 1535, 1539.

[58]      *Id.*

[59]      Yael Halon, *Lia Thomas exposed 'male genitalia' in women's locker room after meet, Riley Gaines says: Dropped 'his pants',* Fox News (Feb. 9, 2023), https://www.foxnews.com/media/lia-thomas-exposed-male-genitalia-womens-locker-room-after-meet-riley-gaines-dropped-pants .

If a male who identifies as woman is required to be regarded as a female in athletics, what principle stops the male from competing for scholarships that advance females, at least when a Title IX school is involved?

Consistent with Title IX regulations, many institutions offer or assist with scholarships for women students. Of course, schools routinely make athletic scholarships available to women in proportion to the number of females participating in sports at the school.[60] And scholarships are available to women for other purposes as well.[61] At the University of Iowa, for example, the Cathy Hinton Scholarship is "awarded to a female engineering student who is an Iowa resident," and the Women in Secondary Science/Math Education Scholarship is "presented to a female student from a rural area studying secondary science or math education."[62] At the University of California, Davis, the Kathleen C. Green Memorial Scholarship recognizes the "academic achievements of female biology students" and is awarded "with a

---

[60]     *See* 34 C.F.R. § 106.37(c) (2022).

[61]     *See* U.S. DEP'T. OF EDUC., QUESTIONS AND ANSWERS REGARDING OCR'S INTERPRETATION OF TITLE IX AND SINGLE SEX SCHOLARSHIPS, CLUBS, AND OTHER PROGRAMS at 3-5 (2021) (discussing permissible single-sex scholarships).

[62]     Univ. of Iowa, College of Educ., https://education.uiowa.edu/cost-and-aid/scholarships#scholarship-list; Univ. of Iowa, Scholarship Portal, https://uiowa.academicworks.com/opportunities/83404.

preference for women. . . ."[63] And at Boise State, there is a "Women in STEM,
Medicine and Law Scholarship" awarded with a preference given to females.[64]

Plainly, these scholarships are intended for members of the female sex. In
*United States v. Virginia*, the Supreme Court described the history of discrimination
against females—not males—in education, linking it to the objective fact of sex:

> Dr. Edward H. Clarke of Harvard Medical School, whose
> influential book, Sex in Education, went through 17
> editions, was perhaps the most well-known speaker from
> the medical community opposing higher education for
> women. He maintained that the physiological effects of
> hard study and academic competition with boys would
> interfere with the development of girls' reproductive
> organs.[65]

Just as being female matters in athletics because females are at a physiological
disadvantage, it matters with scholarships because women and girls suffer current
harms from discrimination in education. To hold that males who claim to identify as
women are females erases the objective fact of being female and its direct connection
to discrimination against women. The irony is that while the fact of being female
was once used to reduce females' access to education through admissions, the fact

---

[63]  Univ. of Calif. Davis, Financial Aid and Scholarships,
https://financialaid.ucdavis.edu/scholarships/campus/awards/cbs.

[64]  https://boisestate.academicworks.com/opportunities/19465.

[65]  515 U.S. at 536 n.9; *see also id.* 536-39.

of being female will now reduce females' access to education through scholarships because the category "female" will have been defined to make that fact irrelevant.

## **<u>CONCLUSION</u>**

The District Court's judgment correctly recognizes that sex and being female are objective facts that matter. It should be affirmed.

Dated: May 3, 2023          Respectfully Submitted,

*/s/ Kara Dansky*
Kara Dansky
WOMEN'S DECLARATION INTERNATIONAL USA
P.O. Box 21160
Washington, D.C.  20009
(800) 939-6636
president@womensdeclarationusa.com

Samuel J. Salario, Jr.
LAWSON HUCK GONZALEZ, PLLC
1700 South MacDill Avenue
Suite 300
Tampa, FL. 33629
813-765-5113
samuel@lawsonhuckgonzalez.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned hereby certifies that:

1. This brief complies with the type-volume limitation, as provided in Circuit Rule 29 and Fed. R. App. P. 29(a)(5), because, exclusive of the exempted portions of the brief as provided by Fed. R. App. P. 32(f), the brief contains 6,486 words.

2. This brief complies with the type-face and type-style requirements, as provided in Fed. R. App. P. 32(a) and Circuit Rule 32(b), because the brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

3. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: May 3, 2023                    */s/ Kara Dansky*
                                       Kara Dansky

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2023, I electronically filed the foregoing document through the court's electronic filing system, and that it has been served on all counsel of record through the court's electronic filing system.

*/s/ Kara Dansky*
Kara Dansky