# 23-1078

# United States Court of Appeals
### *for the*
# Fourth Circuit

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiffs-Appellants,*

– v. –

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF EDUCATION; WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION; W. CLAYTON BURCH, in his official capacity as State Superintendent; DORA STUTLER, in her official capacity as Harrison County Superintendent,

*Defendants-Appellees,*

– and –

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

*Intervenors-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON IN CASE NO. 2:21-CV-00316 HONORABLE JOSEPH R. GOODWIN, U.S. DISTRICT COURT JUDGE

**BRIEF OF *AMICI CURIAE* FEMALE OLYMPIC ROWERS MARY I. O'CONNOR, CAROL BROWN, PATRICIA SPRATLEN ETEM, VALERIE McCLAIN, AND JAN PALCHIKOFF IN SUPPORT OF APPELLEES AND AFFIRMANCE**

SARAH E. CHILD
NELSON MADDEN BLACK LLP
475 Park Avenue South
Suite 2800
New York, New York 10016
(212) 382-4300

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1078     Caption: B.P.J. v. W. Va. State Bd. of Educ.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Female Olympic Rower Mary I. O'Connor
(name of party/amicus)

who is _____ Amicus _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sarah E. Child _____    Date: _____5/3/2023_____

Counsel for: Mary I. O'Connor _____

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>23-1078</u>        Caption: <u>B.P.J. v. W. Va. State Bd. of Educ.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Female Olympic Rower Carol Brown</u>
(name of party/amicus)

_____

 who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sarah E. Child                          Date:         5/3/2023

Counsel for: Carol Brown

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1078__     Caption: __B.P.J. v. W. Va. State Bd. of Educ.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Female Olympic Rower Patricia Spratlen Etem__
(name of party/amicus)

_____

who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sarah E. Child _____    Date: _____ 5/3/2023 _____

Counsel for: Patricia Spratlen Etem _____

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. ___23-1078___        Caption: ___B.P.J. v. W. Va. State Bd. of Educ._____

Pursuant to FRAP 26.1 and Local Rule 26.1,

___Female Olympic Rower Valerie McClain_____
(name of party/amicus)

_____

who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.   Does party/amicus have any parent corporations?                              ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:




3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
     other publicly held entity?                                                  ☐YES ☑NO
     If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sarah E. Child                          Date:        5/3/2023

Counsel for: Valerie McClain

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __23-1078__      Caption: __B.P.J. v. W. Va. State Bd. of Educ.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Female Olympic Rower Jan Palchikoff__
(name of party/amicus)

_____

 who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐YES ☑NO

2.      Does party/amicus have any parent corporations?      ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?      ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sarah E. Child                         Date:          5/3/2023

Counsel for: Jan Palchikoff

- 2 -

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................... ii

INTEREST OF *AMICI CURIAE* ...................................................................1

SUMMARY OF ARGUMENT .......................................................................3

ARGUMENT ...................................................................................................4

    I.    Title IX As Written Created Unprecedented Opportunities for Female
        Athletes That Would Be Undermined by the
        Invalidation of W. Va. Code § 18-2-25d.................................................4

        A.  Mary I. O'Connor, MD – U.S. Women's Olympic
            Rowing Team 1980 ........................................................................6

        B.  Carol Brown, MBA – U.S. Women's Olympic
            Rowing Team 1976, 1980, 1984 ..................................................10

        C.  Patricia Spratlen Etem, MPH – U.S. Women's Olympic
            Rowing Team 1980, 1984 ............................................................12

        D.  Valerie McClain – U.S. Women's Olympic
            Rowing Team 1980, 1984 ............................................................14

        E.  Jan Palchikoff, MS – U.S. Women's Olympic
            Rowing Team 1976, 1980 ............................................................16

    II.   Female Athletes' Professional Development Is Directly Related to Their
        Athletic Achievements and Would Be Undermined by the
        Invalidation of W. Va. Code § 18-2-25d...............................................18

        A.  Mary I. O'Connor, MD – U.S. Women's Olympic
            Rowing Team 1980 ......................................................................19

        B.  Carol Brown, MBA – U.S. Women's Olympic
            Rowing Team 1976, 1980, 1984 ..................................................21

        C.  Patricia Spratlen Etem, MPH – U.S. Women's Olympic
            Rowing Team 1980, 1984 ............................................................23

        D.  Valerie McClain – U.S. Women's Olympic
            Rowing Team 1980, 1984 ............................................................26

        E.  Jan Palchikoff, MS – U.S. Women's Olympic
            Rowing Team 1976, 1980 ............................................................27

CONCLUSION ..............................................................................................29

i

# TABLE OF AUTHORITIES

**Cases**

*Equity in Athletics, Inc. v. Dep't of Educ.*,
  291 F. App'x 517 (4th Cir. 2008) ........................................................ 4

*Mercer v. Duke Univ.*,
  190 F.3d 643 (4th Cir. 1999) ................................................................ 4

**Statutes**

20 U.S.C. § 1681 (2000) ........................................................................ 4

W. Va. Code § 18-2-25d  ............................................................... 3, 4, 18

**Other**

Fed. R. App. P. 29  ................................................................................ 1

Rebecca Hinds, *The 1 Trait 94 Percent of C-Suite Women Share
  (And How to Get It)*, Inc.,
  https://www.inc.com/rebecca-hinds/the-1-trait-94-percent-of-c-suite-
  women-share-and-how-to-get-it.html (Feb. 8, 2018) ……………………  19

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are five female Olympic rowers who lived through the enactment of Title IX and urge the Court to enforce this vital statute as written: to protect biological females.

Mary I. O'Connor, Carol Brown, Patricia Spratlen Etem, Valerie McClain, and Jan Palchikoff grew up during a time when female athletics were not prioritized, let alone afforded equal treatment. Some attended high schools that were banned from offering girls' sports by state law. Others cut their teeth in underfunded pre-Title IX collegiate programs, practicing with damaged equipment, and forbidden to enter the boathouse when the men's team was around. All benefitted mightily from Title IX's eventual passage, which enabled them to compete on female collegiate crew teams and advance to the highest levels of athletic achievement as United States Olympians.

Having experienced the harsh inequalities of female athletics prior to Title IX, *amici* are gravely concerned about the newest threat to women in sports: the forced inclusion of biological males identifying as women. They know personally that their athletic accomplishments would have been severely impacted if they had competed

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel for *amici* certifies that this brief was not authored in whole or in part by counsel for any party and no person or entity other than *amici* or *amici*'s counsel has made a monetary contribution to its preparation or submission.

against biological males and have a strong interest in ensuring Title IX's legacy remains one of equality for female athletes.

Moreover, as a doctor, an MBA, C-suite professionals, coaches, philanthropists, and mothers, *amici* are well-positioned to attest to the indispensable role athletic achievement plays in the academic, professional, financial, and personal lives of female athletes.

As such, *amici* submit this brief to ask the Court to refrain from resurrecting the inequality that characterized female athletic programs prior to Title IX. The athletic and professional futures of tens of thousands of girls and women across the country depend on it.

## SUMMARY OF ARGUMENT

The enactment of Title IX altered the course of history for women in athletics. Its legacy, however, is acutely threatened when laws like W. Va. Code § 18-2-25d are invalidated.

First, as written, Title IX created unprecedented opportunities for female athletes, which is powerfully demonstrated in the stories of five female Olympic rowers recounted below. *Amici* experienced the female athletic landscape pre-Title IX, when male athletic programs were the only ones deemed worthy of funds and resources. They achieved tremendous athletic accomplishments because Title IX provided them with equal opportunity. Nonetheless, *amici* submit that since biological sex is the most important determinant in athletic performance, the invalidation of West Virginia's statute would eliminate fair competition and destroy the equality Title IX was intended to achieve.

Second, female athletes' professional development is directly related to their athletic achievements and would be undermined by the invalidation of W. Va. Code § 18-2-25d. *Amici*—who are exceptionally credentialed and accomplished professionals—can collectively confirm that the empowerment they experienced as athletes significantly influenced their professional lives, financial success, and overall well-being. In some instances, job offers came as a direct result of their athletic accomplishments. In others, skills they developed as female athletes were

critical to their success in the classroom, in the Boardroom, and in professions dominated by males. They can thus speak to the tangible effect even one athletic achievement can have on a female athlete's professional career, and the ways these opportunities are jeopardized when biological males appropriate female athletes' records and awards.

In short, as Title IX pioneers and first-generation U.S. Women's Rowing Olympians, *amici* see disturbing parallels between pre-Title IX female athletic programs and the invalidation of statutes like W. Va. Code § 18-2-25d. They therefore ask this Court to refrain from returning to that era of discrimination and to preserve Title IX's legacy of equality.

## ARGUMENT

### I.     Title IX As Written Created Unprecedented Opportunities for Female Athletes That Would Be Undermined by the Invalidation of W. Va. Code § 18-2-25d

Title IX of the Education Amendments of 1972 "prohibits discrimination on the basis of sex by educational institutions receiving federal financial funding." *Mercer v. Duke Univ.*, 190 F.3d 643, 645 (4th Cir. 1999); *see* 20 U.S.C. § 1681(a) (2000). This includes discrimination in athletic programs. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 291 F. App'x 517, 523 (4th Cir. 2008).

*Amici* experienced the equal opportunity Title IX ushered in for biological females firsthand and achieved immense success as a result. They can state

4

unequivocally that being forced to compete against biological males identifying as women would have severely harmed their athletic, academic, Olympic, and professional careers. Indeed, *amici* represented the United States in Olympic women's rowing at a time when European female athletes doped with testosterone to enhance their performance. This was condemned by the international athletic community, yet allowing *actual* biological males to compete is deemed acceptable in some athletic programs today.

*Amici* understand that the well-being of transgender athletes is an area of deep concern and agree they should have a venue for athletic competition. However, promoting the rights of one group by discriminating against another does not constitute a just solution, and is an unfair burden for women to carry. Instead, transgender athletes can compete fairly in an open category, to prevent discrimination against both groups.

In sum, *amici'*s stories show the extraordinary ways Title IX has empowered women. But they are also a cautionary tale. Athletic programs are always one policy away from the inequality that characterized women's sports pre-Title IX. Enjoining West Virginia's law would therefore be a devastating step back for tens of thousands of female athletes across the country.

## A. Mary I. O'Connor, MD – U.S. Women's Olympic Rowing Team 1980

It is difficult for me to adequately share the incredible impact Title IX had on my life. My passion for equity and justice was ignited by Title IX and my professional and financial success are directly related to my athletic achievements.

When I was in high school, there were no girls' sports teams. I grew up in a small town, the second of six children. Neither of my parents graduated from college. They knew education was the key to opportunity, and we were encouraged to study hard, get good grades, and go to college. I still remember opening the acceptance letter to Yale. Through student loans, working in the cafeteria, and financial aid, I was able to attend.

At Yale I was introduced to rowing. I loved being on a team, being on the water, and working hard and pushing myself. I did not love being cold and wet for 30 minutes on the bus ride back to campus from the boathouse after practice. There was no locker room for the women's crew. We would wait on the bus for the guys to shower, while we shivered. This was injustice. I was at one of the most prestigious universities in the country and being treated as a lesser student because of my sex. To be silent was to condone this unfair treatment.

The spring of my freshman year, 19 of us marched into the Athletic Director's office to protest. While our captain read a statement beginning with the words "[t]hese are the bodies that Yale is exploiting," we stripped to show "Title IX"

6

written on our bare chests and backs. The New York Times and International Herald Tribune picked up our story. The University was embarrassed into action, and we had our locker room by the following spring. Our protest is heralded as the first stand for Title IX in college athletics. My lifelong commitment to fighting injustice began.

At Yale I was a successful athlete. We were Eastern Sprint champions for several years and national champions my senior year, which was the first year the women's national championship was held. I was selected to the U.S. National Team and earned a bronze medal at the 1979 World Championships. This was a major victory for U.S. women's rowing. I was also a member of the 1980 Women's Olympic Rowing Team.

As an elite athlete, I competed against women who took testosterone, commonplace for Eastern European women athletes then. We were racing against women doping with anabolic steroids; the playing field was not level. This was emotionally abusive. Do others not see the injustice? Why are sports leaders not standing up for fairness and integrity?

This devaluation of women in sports happens regularly today. For example, USRowing permits men identifying as women to compete as women, with limitations placed only on international teams. Only in mixed boats is female sex a requirement. In this category, half the athletes are men and half are women, and the women must be biologically female. Why? Because otherwise, a boat of 50 percent

males and 50 percent females could race against a boat of 50 percent males and 50 percent biological males identifying as women. The boat of biological males would be faster than the boat of males and females. Fairness for the males would be compromised. Thus, USRowing said it was acceptable to destroy fairness for females, but fairness must be protected for males at all costs.

 This misogynistic policy was made by people who are not evil, but who do not realize saying "transwomen are women" devalues women. Transwomen can identify as women, but they are not biological women. They cannot change their sex. And as a physician-scientist, I reiterate that there is no amount or duration of testosterone suppression for a male who identifies as a woman that will level the playing field.

Our society socialized girls to "play nice with dolls" and boys to "win on the football team." As a result, boys learned the life skills of working within a hierarchy and how to win and lose. Sports has therefore been the great equalizer for girls to learn the life skills boys historically obtained from athletics, teaching them self-discipline, patience, determination, teamwork, and grit.

Compromising opportunities for girls to participate in sports by allowing males to take their place on a team, win medals, and invade their private spaces will destroy the culture of sex equality we worked so hard to achieve the last 50 years. Our sons will suffer too as they learn to see girls as less than them. After all, if boys

8

deserve fairness in competition but girls do not, what else would a boy think but that he matters more than a girl?

This is not to mention that when denied fair competition, female athletes lose trust in the societal institutions that are supposed to protect them. This leads to depression, anxiety, feelings of marginalization, learned helplessness, and emotional trauma, the impacts of which are profound and long-lasting.

I want everyone to have opportunities in sports and in life. Athletes with gender dysmorphia should be allowed to participate in sports for their own health and mental welfare. However, the path forward is not to blatantly discriminate against females by allowing males to compete as women and take their medals, honors, scholarships, private spaces, sense of personal security, and recognitions that will advance their professional careers. We must create an arena that is safe and just for these athletes, without denying women fairness or decreasing their opportunities. Other solutions exist. For example, by defining the women's category as females only and allowing all other athletes to participate in an "open" category, all individuals can enjoy the benefit of sports. Additionally, those athletes would not have to be in a controlled forum (e.g., testosterone suppression) and could determine whether they wish to transition to a different gender without the pressure of meeting competitive requirements.

Science is real. Facts matter. Sex matters in sports, and boys and men outperform girls and women in sports. At any matched level, many men beat the best woman. Sex differences go far beyond the impact of testosterone. Please do not destroy the dreams of girls in our county to be treated equally and with respect. Protect the female category in sports.

### B. Carol Brown, MBA – U.S. Women's Olympic Rowing Team 1976, 1980, 1984

My pedigree as a three-time Olympic rower and bronze medalist is in spite of the blatant discrimination I faced as a female athlete.

I did not participate in high school athletics because there was a ban on girls sports in the Illinois public school system until Title IX was passed. I then became a member of the third class of women at Princeton University, but Title IX was not enacted until my sophomore year.

Prior to and during Title IX's enactment, conditions for female athletes were challenging. We were not permitted in the boathouse when the men's team was around and were forced to use the bushes instead of the boathouse restroom. Our coach was a volunteer and we held bake sales to buy him a raincoat and a megaphone because the University did not provide them. We were always last to the dining hall because of our practice schedule and since there were no women's showers at the boathouse, we ate while still dripping wet from practice.

10

Fortunately, we leveraged Title IX to address these inequalities. When it was passed, it leveled the playing field for me and all women who came after me. Not having been an athlete growing up, the experience of playing sports in college changed my life forever. Without Title IX, I would never have had access to a viable rowing program and the opportunity to become an Olympian in Montreal 1976, which was the first time women's rowing was on the Olympic program. Title IX also fueled the founding of a women's ice hockey team that I joined my senior year. I also started the women's swim team and was captain for three years, becoming a three-sport athlete at Princeton.

In addition to the bronze medal in the 1976 Olympics, I earned one bronze and three silver world championship medals as part of the U.S. National Team. I was also inducted into the U.S. Rowing Hall of Fame in 1991 and 2016.

I know what it feels like to challenge oneself to achieve the seemingly impossible, to commit to your teammates to always try your hardest, and to set lofty goals and follow through, regardless of setbacks, distractions, and naysayers. I also know what it feels like to walk into an Olympic stadium with your country's name on your back and hear more than 100,000 voices cheering "USA!" I still get goosebumps when I think about those memories.

These memories, however, are clouded by the fact that the playing field was never fair my entire elite athletic career. The Eastern European women's teams were

taking male steroids and competing with a significantly unfair physiological advantage. I still wonder what we could have achieved if the competition had been fair.

Today I am a passionate advocate for women's sports, safe and fair athletic opportunities, and the preservation of Title IX as originally written—to promote and protect opportunities for biological females. Everyone, male or female, should have the opportunity to benefit from sports, but inclusion for one group cannot be at the expense of fair play for another.

### C. Patricia Spratlen Etem, MPH – U.S. Women's Olympic Rowing Team 1980, 1984

Title IX was enacted when I was in college. It had a profound effect on my life, enabling me to reach each of my academic, professional, philanthropic, and personal goals. And it has done so by allowing biological females to have equal opportunities in sport.

I was raised by parents who fearlessly advanced civil rights, racial justice, multicultural respect, personal achievement, and access to quality education for all. Our household ran on discipline, accountability, trustworthiness, hard work, earned advancement, and fairness. Excellence in sport, school, family, work, and life could not be achieved without upholding these tenets.

While youth sports in the 1960s were co-ed through elementary school, my fifth-grade physical education teacher advocated for an all-girls soccer team. I

12

kicked the winning goal in the city elementary school girls' playoffs. I would not have been chosen for the role if I was playing on a co-ed team. The thrill of that accomplishment stayed with me my entire life. Biological girls at every competitive level deserve to have that experience, and to develop teamwork skills, leadership, agency, esteem, and a sense of belonging with other biological girls, unfettered by the presence of boys.

I became the second African American woman to make the U.S. Women's Olympic Rowing Team in 1980 and 1984, a World Championship U.S. Women's Rowing medalist in 1979, 1981, and 1983, the Cal Crew Athlete of the Decade for 1976-1986, and a member of the California Athletics Women's Hall of Fame. How? My beloved university—University of California, Berkeley ("Cal")—complied with Title IX, creating a women's rowing team and providing equal access and fair, safe, exclusively biological female competition. I thrived in this budding team's tight-knit community. I even went from being the slowest runner my first year to being the fastest runner my last two years, because I practiced relentlessly, was coachable, and was not compromised by competing against a biological male.

Title IX next enabled me to travel the world through my university and U.S. National Team experiences. I thrived, making solid contributions to the team's success in Europe, and mastering yet another level of competition. I soon earned a spot on the 1979 World Championship Team and the 1980 Olympic Team.

13

In the early 1980s, I courageously asked the Cal men's coach if I could train with the men, and it was clear just how much more muscle mass and force the men had. Across all competitive levels in rowing, men's ergometer times are a minute to 1.5 minutes faster than women's times. My lived training experience is clear: there is no possible way to erase male athletic advantage in competition and a female-only category is essential for fair competition.

I went on to win a 1983 silver medal at the World Championships and compete on the 1984 U.S. Women's Olympic Rowing Team. After 1984, I married my husband, an oarsman out of the U.S. Naval Academy, and we continued the scholar-athlete legacy, raising three amazing children who excelled to elite or professional levels in their sports. Title IX supported economic viability for our family, as it has for millions of girls since its inception.

Title IX policy gave me a lifetime of educational, professional, and personal accomplishments. And it created a community of oarswomen who remained close friends, raised families together, and continue to support the female-only category in sport—as it is integral to the legacy of Title IX.

### D. Valerie McClain – U.S. Women's Olympic Rowing Team 1980, 1984

I started rowing at the club level before Title IX was implemented, because that was the only way women could compete. I was a national champion in high

school and attended University of California, Berkeley for college after Title IX was enacted.

Without Title IX, I would never have achieved athletic and academic success. At Cal, I was one of the few varsity athletes to compete on both the men's and women's crew teams as a coxswain. This position does not involve pulling an oar and is unrelated to physiological strength, so I was not at a disadvantage when competing against men. It did, however, require excellent judgment, technical ability, and communication skills.

Being the first female in the history of Cal athletics to earn a varsity letter on a men's team taught me to pursue my dreams with relentless strength and courage. It empowered me for the rest of my life and was foundational to my academic and professional success.

I went on to earn three silver medals at the World Championships between 1981 and 1983, was a member of the 1980 U.S. Women's Olympic Rowing Team, rowed on the U.S. Women's Olympic team in 1984, and served as a member of the Women's Olympic Rowing Committee from 1974-78 and 1980-84.

Having participated at an elite level in both all-male and all-female boats, I witnessed firsthand the importance of fairness in sport. I can say unequivocally that there is a distinct difference between the speed and power in a boat of men versus a boat of women. Even if you replaced an elite woman with a mediocre man, the

15

difference in speed off the line, speed through the water, and overall speed against the clock is significant. At all levels of competition, male rowers will outperform their female counterparts. Not only does race data absolutely validate these statements, but I felt these differences as an individual coxswain responsible for steering the boat and instructing the crew.

Reading Title IX to permit biological males to compete in female races would fundamentally change the nature of the competition and turn an empowering experience into an unfair and demeaning one.

### E. Jan Palchikoff, MS – U.S. Women's Olympic Rowing Team 1976, 1980

I experienced both sides of Title IX, before and after its enactment. I was a vocal advocate for Title IX on campus, serving as a founding member of the Union of Women Athletes which advocated for the statute. I also experienced many inequalities. My swim team at University of California, Los Angeles ("UCLA") included three Olympic medalists, but we had a volunteer coach, no travel expense fund, and limited access to the competition level pool. My rowing team was sometimes locked out of the boathouse by the men's coach. Women athletes paid for all team expenses and used damaged and oversized equipment. We did not have access to the full experience of college athletics, but we paid the same fees for tuition, housing, and books as the men. The experience was demeaning and yet we persevered.

I did not experience the benefit of Title IX until I became a collegiate rowing coach six years later, after I made the U.S. Women's Olympic Rowing Teams in 1976 and 1980. While there were still huge inequities, the team had paid coaches, new equipment, a budget, and scholarship funds. Women athletes could also leverage Title IX when advocating for support.

I experienced unfairness not only as a college athlete, but also as an Olympian. I competed in the Olympics when competitors from Eastern European nations used performance enhancing male anabolic steroids. The three medal-winning crews in my event at the 1976 Olympics were from countries that were systematically doping. We suspected doping was occurring but were powerless to do anything.

Nevertheless, rowing had a truly life-changing impact on me. In addition to being a member of the 1976 and 1980 Olympic teams, I helped UCLA reach the U.S. Women's Rowing Association National Championships for the first time in 1974 and was a five-time member of the U.S. National Team and a National Champion in 1979.

 Through these experiences, I established lifelong friendships and became an effective teammate and leader. I learned the value of committing to goals, dealing with adversity, and becoming an advocate. I also kept participating in sports and set four track cycling masters world records: the hour record in three consecutive age

17

groups (60-64 record in 2014, 65-69 record in 2017, and 70-74 record in 2021), and the 65-69 record in the 2016 500-meter time trial.

Sport is how countless girls and women express themselves, in the same way artists, dancers, musicians, and writers do. For me, the essence of sport is the pure joy and exhilaration of pushing myself against other equally committed women. The integrity of sport is based on fairness and the expectation that people entrusted with policy and decision-making will apply the best available evidence in support of that fairness. Without fairness in competition, there can be no sport for women and girls.

I have dedicated my career to ensuring as many people have access to sport as possible. However, such access must be fair and cannot come at the disadvantage of biological females. Representing my country and the experience of being celebrated for all I worked so hard to achieve is something I will never forget. This life-changing experience will be lost for women if we fail to preserve Title IX as written.

## II.    Female Athletes' Professional Development Is Directly Related to Their Athletic Achievements and Would Be Undermined by the Invalidation of W. Va. Code § 18-2-25d

There is a direct relationship between female athletic achievement and professional development that is harmed by the inclusion of biological males in female athletics, as the invalidation of West Virginia's statute would require.

*Amici* were hired specifically because of their athletic achievements, and used the skills and qualities they developed as female athletes to thrive in the professional world. They are singularly accomplished, having earned advanced academic degrees, served as senior executives and Board members in prestigious organizations,[2] and one becoming one of the most well-known female orthopedic surgeons in the nation. *Amici*'s collective experience makes it clear that permitting biological males to compete in female athletics deprives female athletes of recognition, medals, records, and awards—all of which could be cited on a resume or used to attract an employer—and destroys the equality of opportunity Title IX was meant to ensure.

### A. Mary I. O'Connor, MD – U.S. Women's Olympic Rowing Team 1980

My professional success and subsequent financial security are directly related to the opportunities Title IX provided me.

After the disappointment of the 1980 Olympic boycott, I returned to my academic pursuits and entered medical school. I became an orthopedic surgeon, a profession that was and remains dominated by white males. There are still very few women in orthopedics, but there were even fewer when I entered training. I was

---

[2] Indeed, a staggering 94% of women serving as business executives—including several *amici*—are former athletes, and 52% of them participated in college athletics. Rebecca Hinds, *The 1 Trait 94 Percent of C-Suite Women Share (And How to Get It)*, Inc., https://www.inc.com/rebecca-hinds/the-1-trait-94-percent-of-c-suite-women-share-and-how-to-get-it.html (Feb. 8, 2018).

accepted to the prestigious residency program at Mayo Clinic in Rochester, Minnesota. While I had great letters of recommendation and strong grades and board scores, I was accepted because I was an Olympian. I achieved something the male orthopedic surgeons selecting me could relate to and respect. It was okay for them to let me into the club. If my place on the Olympic team had been taken by a male identifying as a woman, my entire life would have been negatively impacted.

After residency and fellowship at Mayo Clinic, I became the first woman orthopedic surgeon to join the staff there. I was one of the few women to obtain the level of full academic professor and chaired an orthopedic department. I was honored with the Mayo Clinic Distinguished Clinician Award. In 2015, I was recruited to Yale School of Medicine to be the inaugural Director of the Center for Musculoskeletal Care. In 2021, I left academic medicine to co-found and serve as Chief Medical Officer of Vori Health, a virtual musculoskeletal medical practice with a mission to empower humanity to lead a healthier life.

I have also interviewed hundreds of young people for residency positions, fellowships, or academic jobs. What I seek to learn is if they have excelled at anything, including sports. If so, I can support them to excel in medicine.

While I risk this being interpreted as boasting, I share my prominence in orthopedics as it reflects the opportunity Title IX provided me and the indispensable role athletics plays in career opportunities. I was the first female surgeon to be a

member of the Musculoskeletal Tumor Society ("MSTS"), the International Society of Limb Salvage ("ISOLS"), the American Association of Hip and Knee Surgeons ("AAHKS"), and The Knee Society. I was the first woman president of MSTS, ISOLS, and AAHKS and have been president of the Association of Bone and Joint Surgeons and the Ruth Jackson Orthopaedic Society. I chaired the American Academy of Orthopedic Surgery Women's Health Issues Advisory Board and the Diversity Advisory Board. I served on the Advisory Committee on Research on Women's Health at the National Institutes of Health. In 2010, I became the inaugural Chair of Movement is Life, a multi-stakeholder coalition committed to eliminating musculoskeletal health disparities. In 2023, I was honored with the American Academy of Orthopedic Surgery Diversity Award. I broke many glass ceilings for women in my profession and am one of the most well-known female orthopedic surgeons in this country. None of this would have occurred without my prior success in athletics, and competing against biological males would have deprived me and many others of these opportunities.

### B. Carol Brown, MBA – U.S. Women's Olympic Rowing Team 1976, 1980, and 1984

My academic and professional development was strongly influenced by my participation in athletics. My experiences as an elite athlete taught me to believe in myself, persevere in tough times, prepare thoroughly, and persist amidst obstacles.

These are lifelong skills my peers and I added to our resource toolbox, all because of Title IX.

After graduating from Princeton, I obtained my master's degree in business administration while working full-time and raising my two-year-old son. I balanced my demanding schedule because of the perseverance I learned as an elite athlete.

In the workplace I took on challenges I never would have considered without the self-confidence that came from my Olympic journey. I thrived working with motivated teams, led by example, and positively impacted those around me. Having "Olympian" on my resume opened a lot of doors and helped me secure multiple interviews.

I became the first female truck driver for Coke or Pepsi and was subjected to abundant sexism but still proved my competence. After that grueling experience, I moved into sales and management positions within the company. Because I gained respect as a driver, I led a successful campaign to permit other females to move directly into sales and management positions rather than be required to serve as drivers first.

Throughout my career, I also held many senior level management positions. I was elected to numerous volunteer leadership roles in sports organizations due to my status as a former athlete. I served as the Vice President of the U.S. Olympians and Paralympians Association from 2012-2021. Additionally, I served as an officer

with USRowing for 18 years, an officer with the U.S. Olympic Committee for 16 years, and as Vice President of the Athlete's Advisory Council for four years. I also held paid executive positions in non-profit finance and administration, serving as the Manager of Business and Operations of an elementary school, Vice President of Finance and Operations at Center for Financial Services Innovation, and Associate Director of Finance and Operations at the University of Chicago, Medicine and Biological Sciences Development Division. I was prepared for these high-level roles because of the qualities I acquired as a student athlete and the advocacy skills I developed when pushing for Title IX protections at Princeton. I also hired numerous individuals over the years and observed that athletes always rise to the top in interviews.

Ultimately, I believe in the profound importance of sport and want to ensure the values it represents survive. Invalidating West Virginia's statute would threaten those values. While I believe all people should have the opportunity to benefit from sport, this cannot be achieved by depriving the individuals Title IX was intended to protect of equal opportunity.

### C. Patricia Spratlen Etem, MPH – 1980, 1984 Women's Olympic Rowing Team

Title IX was seminal to my personal success and gave me the tools to excel not only athletically, but also academically and professionally. Rowing had such a profound impact on my career because it taught me how to work with a group of

people to achieve collective success, to refrain from being combative when given feedback, and to be unflappable when faced with adversity. My coaches and teammates pushed me to live up to standards higher than I knew existed, not just in physical performance but also in mental fortitude. I carried these experiences with me through parenthood, grandparenthood, philanthropic coalition volunteerism, and certainly into the C-suite as regional vice president of a national non-profit.

As a parent, I witnessed Title IX's legacy come full circle when my daughter received a full athletic scholarship to my alma mater and achieved Academic All-American status as a collegiate rower. I also supported my sons as they achieved elite and professional athletic status, and watched as my grandchildren began playing sports.

Professionally, I obtained a master's degree in public health and spent over 20 years developing public health programs for hospitals, city health and youth development divisions, and non-profit organizations. For the past eight years, I have served as the Vice President of Southern California Health Career Connection, a position designed to increase diversity in the health profession workforce, including by increasing LGBTQ+ representation. I also held senior executive positions with other non-profits like the American Lung Association and Public Health Foundation Enterprises. The skills I learned as a collegiate and elite athlete helped me negotiate

my contracts and salary raises, understand the value of each individual's contribution to the team, and bring the teams I managed to new levels of achievement.

In terms of philanthropy, I received a prestigious governor's appointment to the California Tobacco Education Research Oversight Committee which I served in a volunteer capacity for 12 years, overseeing the use of funds for tobacco control and prevention education in California. My elite athlete background gave me the confidence to thrive in times of stress, form effective relationships with high-stakes individuals, and work with others to develop state public policy.

I can say with certainty that being an athlete got me job interviews. I have also seen athletes shine in interviews I conducted. Employers are looking for competency, discipline, accountability, and motivation—all of which are in the toolbox of collegiate and elite athletes.

As an athlete, I also learned to respect science. Whether it was taking VO2 max tests as part of my athletic training, utilizing data to prepare a tobacco presentation to Congress in my volunteer appointment, or emphasizing the physiological differences between the sexes in Title IX advocacy, I have learned to trust data and its implications.

Permitting biological males to compete with females, which ignores the science and the inherent physiological advantages men possess, risks returning female sport to a pre-Title IX era and stripping female athletes of the personal,

25

academic, professional, and philanthropic opportunities it afforded me and countless others.

### D. Valerie McClain, U.S. Women's Olympic Rowing Team 1980, 1984

I attribute my professional success directly to my experience in team sports and being a recipient of Title IX.

Women face an uphill battle in many professions as they strive to be promoted for their performance and attain greater gender equality. I was prepared for this battle because rowing taught me resilience. You do not win every fair race. What sets you apart from your peers is coming back to practice stronger on Monday after you lose on Saturday, knowing you can win the next race if you put in the hard work required. This only works if the competition is fair.

Rowing also gave me the confidence to express my opinions and share my experiences in a group of male colleagues. It enhanced my problem-solving, critical thinking, and decision-making skills. It empowered me to take control of a project as the leader, support my teammates, and provide expertise as an individual contributor. I clearly understand that what a team can do together greatly outweighs what a single individual can accomplish, helping me build teams throughout my career.

Because I was an Olympian, I was hired directly out of college by Hyatt Corporation through their Olympic Jobs Opportunity program. I was immediately

placed in their management trainee program and progressively promoted throughout their organization. Hyatt understood that athletic commitment, hard work, teamwork, and resilience would equate to solid work performance, and this understanding paid off.

Since working for Hyatt, I held senior management positions within the financial services industry, specifically in compliance, risk, governance, and ethics. Despite the blatant glass ceiling in this field, Title IX afforded me the opportunity to build confidence in my abilities; that confidence gave me the courage to step into a man's world and expect to be heard and respected. I also coached high school girls' rowing, women's college rowing, and masters rowing. My experiences in college and as an Olympian certainly prepared me for these roles and allowed me to teach the skills I developed to a younger generation of athletes.

My status as an Olympian always came up in the interview process, and I was able to explain how those experiences affected my leadership and management style. I also hired hundreds of employees and found that athletes effectively articulate the ways their skills transfer to the workplace. Protecting the female-only category in sport is critical to preserving these kinds of opportunities for female athletes.

### E. Jan Palchikoff, MS – U.S. Women's Olympic Rowing Team 1976, 1980

My career path was transformed by rowing. I realized how important sports were to me and elected to earn my master's degree in sports management. This was

a field with very few women and my long career as a leader in sport management began.

My work included coaching multiple women's crew teams at the collegiate level, major event production (Olympic Games, World Cup, Special Olympics World Games), senior leadership roles with U.S. Olympic & Paralympic Committee, USRowing, and FISA (now known as World Rowing), and 18 years with Special Olympics Southern California, serving in executive positions including Senior Vice President & Chief Program Officer. I was thoroughly equipped to hold these high-level positions and develop a successful career in a male-dominated field because of the skills I developed as a student athlete. I could not have done that if I was forced to compete against biological males.

Many of the athletes I coached have told me my presence as an accomplished athlete and female coach inspired them. The qualities I developed as an athlete enabled me to have a positive impact and become an effective role model and leader. They also empowered me to fight against inequality, which I have done my whole career, from my Title IX advocacy, to opposing the 1980 Olympic boycott, to my recent international efforts to organize women to challenge the Union Cycliste Internationale's lack of age group divisions after age 55, an unfair practice I helped eradicate.

The forced inclusion of biological males in female athletics is the next frontier of inequality under Title IX and undermines the incredible advances we made in the 50 years since its inception. We must preserve the female-only category in sport to protect the opportunities that changed my life and the lives of so many of my female friends and colleagues.

## CONCLUSION

For these reasons, *amici* respectfully request that the Court honor Title IX's legacy of equality we fought so hard to achieve and protect the female-only category in sport by affirming the district court's judgment as to the constitutionality of West Virginia's statute.

Dated this 3rd day of May 2023

Respectfully submitted,

/s/ Sarah E. Child_____
Sarah E. Child, Esq.
Nelson Madden Black LLP
475 Park Avenue South
Suite 2800
New York, NY 10016
Telephone: 212-382-4300
schild@nelsonmaddenblack.com

*Counsel for Amici Curiae*

29

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit, as provided in Fed. R. App. P. 29(a)(5), because, excluding the portions exempted by Fed. R. App. P. 32(f), it contains 6,499 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated this 3rd day of May 2023

Respectfully submitted,

/s/ Sarah E. Child_____
Sarah E. Child, Esq.
Nelson Madden Black LLP
475 Park Avenue South
Suite 2800
New York, NY 10016
Telephone: 212-382-4306
schild@nelsonmaddenblack.com

*Counsel for Amici Curiae*