No. 23-1078

In the United States Court of Appeals for the Fourth Circuit
_____

B.P.J., by her next friend and mother, HEATHER JACKSON ,

*Plaintiff-Appellant / Cross-Appellee,*

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF
EDUCATION; W. CLAYTON BURCH, in his official capacity as State Superin-
tendent; DORA STUTLER, in her official capacity as Harrison County Super-
intendent,

*Defendants-Appellees*

and

WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION,

*Defendant-Appellee / Cross-Appellant,*

and

THE STATE OF WEST VIRGINIA, LAINEY ARMISTEAD

*Intervenors-Appellees.*

_____
_____

**BRIEF OF *AMICI CURIAE* ALABAMA, ARKANSAS, AND 15
OTHER STATES IN SUPPORT OF APPELLEES**
_____
_____
_____

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
Hannah L. Templin
  *Assistant Solicitor General*

OFFICE OF THE ARKANSAS AT-
TORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@arkan-
sasag.gov

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
Bethany C. Lee
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GEN-
ERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@Ala-
bamaAG.gov

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................ii

INTEREST OF AMICI CURIAE ....................................................... 1

INTRODUCTION ............................................................................. 1

ARGUMENT ..................................................................................... 4

I. The Constitution Does Not Compel West Virginia to Classify Biological Males as Girls ............................................... 4

   A. B.P.J.'s Constitutional Claim is an Underinclusiveness Challenge ................................................................................ 4

   B. While a Challenge to Sex Discrimination Itself Warrants Heightened Scrutiny, an Underinclusiveness Challenge to the Contours of West Virginia's Sex Classifications Does Not. ............................................................ 8

   C. Classifying Males and Females by Biological Sex is Rational. .............................................................................. 15

II. Defining Sex Based on Biology Does Not Violate Title IX. ...... 19

III. Forcing States to Classify "Sex" on the Basis of "Gender Identity" Would Render Many Sex-Conscious Laws Unworkable ............................................................................... 23

CONCLUSION ............................................................................... 28

ADDITIONAL COUNSEL ............................................................ 30

i

# TABLE OF AUTHORITIES

CASES                                                                Page(s)

*Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.,*
    57 F.4th 791 (11th Cir. 2022) ................................... 15, 17, 20-22

*Adams v. Sch. Bd. of St. Johns Cnty.,*
    3 F.4th 1299 (11th Cir. 2021) .............................................. 14-15

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................. 19

*Bostock v. Clayton Cnty.,*
    140 S. Ct. 1731 (2020) ........................................................ 18, 22

*Brown v. Bd. of Educ.,*
    347 U.S. 483 (1954) .................................................................... 6

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .................................................................. 19

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) .................................................................. 17

*Cleburne Living Ctr., Inc. v. City of Cleburne,*
    726 F.2d 191 (5th Cir. 1984) .................................................... 17

*Cummings v. Premier Rehab Keller,*
    142 S. Ct. 1562, 1570 (2022) .................................................... 22

*F.C.C. v. Beach Commc'ns, Inc.,*
    508 U.S. 307 (1993) .................................................................. 18

*F.S. Royster Guano Co. v. Virginia,*
    253 U.S. 412 (1920) .............................................................. 14-15

*Frontiero v. Richardson,*
411 U.S. 677 (1973) ..................................................................... 18

*Grimm v. Gloucester Cnty. Sch. Bd.,*
972 F.3d 586 (4th Cir. 2020)...................................................... 23

*Heller v. Doe,*
509 U.S. 312 (1993) .................................................................... 26

*Hoohuli v. Ariyoshi,*
631 F. Supp. 1153 (D. Haw. 1986)............................10-11, 13-14

*J.E.B. v. Alabama,*
511 U.S. 127 (1994).................................................................... 27

*Jana-Rock Constr., Inc. v. N.Y. Dep't of Econ. Dev.,*
438 F.3d 195 (2d Cir. 2006) .............................. 10, 13, 14, 16, 18

*Katzenbach v. Morgan,*
384 U.S. 641 (1966)...................................................................8-9

*Miss. Univ. for Women v. Hogan,*
458 U.S. 718 (1982)................................................................... 28

*Nat'l Fed. of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012).................................................................... 22

*Orion Ins. Grp. v. Wash. State Off. of Minority &*
*Women's Bus. Enters.,* No. 16-5582-RJB, 2017
WL 3387344 (W.D. Wash. 2017)....................................12-13, 26

*Orion Ins. Grp. v. Wash.'s Off. of Minority &*
*Women's Bus. Enters.,* 754 F. App'x 556
(9th Cir. 2018)............................................................................ 12

*Peightal v. Metro. Dade Cnty.,*
940 F.2d 1394 (11th Cir. 1991)...................................................9

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) ...................................................................... 22

*Pers. Adm'r of Mass. v. Feeney,*
442 U.S. 256 (1979) ................................................................. 16

*Price Waterhouse v. Hopkins,*
490 U.S. 228 (1989) ................................................................. 27

*Reed v. Reed,*
404 U.S. 71 (1971) ..................................................................... 8

*Romer v. Evans,*
517 U.S. 620 (1996) ................................................................. 16

*Roschen v. Ward,*
279 U.S. 337 (1929) ................................................................... 8

*Semler v. Ore. State Bd. of Dental Exam'rs,*
294 U.S. 608 (1935) ................................................................... 9

*South Dakota v. Dole,*
483 U.S. 203 (1987) ................................................................. 22

*Trump v. Hawaii,*
138 S. Ct. 2392 (2018) ........................................................ 15-16

*U.S. Dep't of Agric. v. Moreno,*
413 U.S. 528 (1973) ................................................................. 17

*United States v. Virginia,*
518 U.S. 515 (1996) ........................................................ 6, 8-9, 18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
429 U.S. 252 (1977) ................................................................. 16

*Williams v. Sch. Dist. of Bethlehem Pa.,*
998 F.2d 168 (3d Cir. 1993) ..................................................... 21

iv

*Williamson v. Lee Optical Co.*,
    348 U.S. 483 (1955) ................................................................... 8

CONSTITUTION

U.S. Const. amend. XIV, §1 ............................................................. 8

STATUTES AND REGULATIONS

34 C.F.R. §106.32 ......................................................................... 21

34 C.F.R. §106.33 ......................................................................... 21

34 C.F.R. §106.41 ..................................................................... 5, 21

W. Va. Code §18-2-25d(a) .......................................................... 4, 9

W. Va. Code §18-2-25d(b) .............................. 5, 7, 13, 14, 20, 23, 28

W. Va. Code §18-2-25d(c) ..................................... 4-5,7, 13, 19, 28

OTHER AUTHORITIES

Am. Psych. Ass'n, *Guidelines for Psychological Practice with
    Transgender and Gender Nonconforming People*, 70 Am.
    Psychologist 862 (Dec. 2015), *available at*
    https://www.apa.org/practice/guidelines/transgender.pdf ... 24-25

Jason Rafferty, *Policy Statement, Am. Academy of Pediatrics,
    Ensuring Comprehensive Care & Support for Transgender
    & Gender-Diverse Children & Adolescents*, 142 Pediatrics
    no. 4 at 2 (Oct. 2018), *available at* https://perma.cc/EE6U-
    PN66 ........................................................................................ 24-25

Natalie Allen, *Here's How Our Laws Can Protect Fairness in
    Women's Sports*, ADF (Feb. 10, 2023) https://adfle-
    gal.org/article/protecting-fairness-womens-sports-de-
    mands-comprehensive-legislation ............................................... 4

*PFLAG, PFLAG National Glossary of Terms* (June 2022), http://plfag.org/glossary ........................................................... 23

World Professional Ass'n for Transgender Health (WPATH), *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People* 97 (7th Version) (2012) ................................................................................ 25

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guidelines*, 102 J. Clinical Endocrinology & Metabolism 3869 (Nov. 2017) ............................................... 25

## INTEREST OF AMICI CURIAE

The States of Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Montana, Mississippi, Nebraska, South Carolina, South Dakota, Texas, Utah, and Virginia (the "*Amici* States") submit this brief in support of Appellees. Many of the *Amici* States have encountered claims substantively similar to those B.P.J. pushes here— claims demanding not that States stop sex segregation but rather that they redefine sex altogether. When federal courts apply the wrong legal analysis to those claims, they force States to engage in protracted litigation and even enlist the help of biologists and other experts just to defend the basic proposition that sex classifications depend on biology. *Amici* States thus have a strong interest in ensuring that courts apply the correct legal framework, which lets States define sex consistent with biology.

## INTRODUCTION

There's something strange about B.P.J.'s reading of the Equal Protection Clause. Female applicants to Virginia Military Institute did not seek to maintain VMI's segregation but assert they were really men whom VMI unconstitutionally misclassified and rejected. Nor did Oliver Brown ask the Supreme Court to bless separate-but-equal schooling so

long as the Board of Education of Topeka would classify him as white. But Plaintiff B.P.J., also traveling under the banner of Equal Protection, asks this Court to ensure that West Virginia continues to segregate public interscholastic sports teams based on sex. B.P.J. just wants West Virginia to segregate differently.

This is not a sex-discrimination challenge. Far from demanding all sports go coed, B.P.J. wants to take advantage of sex-segregated sports. This is an underinclusiveness challenge. B.P.J. asks federal courts to compel West Virginia to continue segregating on the basis of sex, but to define "girls" broadly enough to include some biological males. That is, B.P.J. seeks the sex-segregated regime's benefits by challenging the contours of the segregation. But while separating males and females for the benefit of girls' sports warrants heightened scrutiny, following the understanding of sex that has endured for millennia does not. B.P.J.'s argument warrants only rational basis review—and defining sex consistent with biology easily passes muster.

This case shows that the final outcome of these claims should be the same regardless of the scrutiny applied—as the district court held, West Virginia's law satisfies even heightened scrutiny. Here, West Virginia

had to engage in nearly two years of extensive litigation while its law was preliminarily enjoined before the State was vindicated at the summary judgment stage. Many other state and local governments likewise have been forced to wade through years of litigation and employ costly experts to justify decisions as basic as giving a "Female" designation on a driver's license only to females or making a girls' sports team available only to girls. Moreover, compelling States to define sex according to gender identity would jeopardize States' ability to enforce coherent sex-conscious policies. It may even force them to resort to sex stereotyping as they search to define "boy" and "girl" beyond biology. The Constitution compels none of this.

But here, the district court granted a preliminary injunction over a year ago and the case proceeded to discovery and merits briefing. After considering the evidence and the parties' motions for summary judgment, the district court revisited its initial view of the merits and determined that West Virginia's law protecting girls-only sports teams is entirely permissible. This Court should affirm.

# ARGUMENT

## I. The Constitution Does Not Compel West Virginia to Classify Biological Males as Girls.

### A. B.P.J.'s Constitutional Claim Is an Underinclusiveness Challenge.

West Virginia's Save Women's Sports Act seeks to "promote equal athletic opportunities for the female sex." W. Va. Code §18-2-25d(a)(5). Thus, it joins a number of other States in codifying longstanding segregation of girls' and boys' sports teams. *See* Natalie Allen, *Here's How Our Laws Can Protect Fairness in Women's Sports*, ADF (April 13, 2023) (listing states with girls-sports statutes).[1] Recognizing that "[b]iological males would displace females to a substantial extent if permitted to compete on teams designated for biological females," *id.* at §18-2-25d(a)(3), the law calls for public schools' interscholastic sports teams to be "expressly designated" for either "[m]ales, men, or boys," "[f]emales, women, or girls," or "[c]oed or mixed" teams. *Id.* at §18-2-25d(c)(1). Much as in Title IX, athletic teams or sports designated for males are open to all sexes, but teams or sports "designated for females, women, or girls shall

---

[1] https://adflegal.org/article/protecting-fairness-womens-sports-demands-comprehensive-legislation.

not be open to students of the male sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* at §18-2-25d(c)(2)-(3); *accord* 34 C.F.R. 106.41(b) (recognizing that "contact sport[s]" teams need not admit members of the opposite sex). The baseline for these distinctions is "biological sex determined at birth." W. Va. Code §18-2-25d(b).

B.P.J. does not argue that West Virginia's decision to segregate sports teams on the basis of sex violates the Equal Protection Clause. *See* Reply Br. Supp. Stay, Doc. 49, at 8 (emphasizing that it is "not sex separation in sports [] that B.P.J. challenges"). Just the opposite. B.P.J. *wants* West Virginia to continue segregating sports teams by sex. *See* Doc. 512 at 10 (hereinafter "Op.") ("B.P.J. wants to play on a girls' team."). And B.P.J. "admits that there are benefits associated with school athletics, 'including when such athletics are provided in a sex-separated manner.'" *Id.* (quoting Doc. 286-1 at 1445). The issue here, by B.P.J.'s lights, "is not with the state's offering of girls' sports and boys' sports," but rather "with the state's definitions of 'girl' and 'boy.'" *Id.* So B.P.J. seeks to compel the State to continue segregating—just to adjust the contours of its segregation. All in the name of Equal Protection.

This should give the Court pause. Asking a federal court to compel segregation along protected characteristics is unusual. Doing so under the Equal Protection Clause is bizarre. When the United States sued on behalf of high-school girls seeking admission to VMI, the government argued that the institution's "exclusively male admission policy violated the Equal Protection Clause of the Fourteenth Amendment," *United States v. Virginia*, 518 U.S. 515, 523 (1996), not that female applicants were in fact males who should be able to avail themselves of an otherwise salutary sex-segregated admissions process. And Oliver Brown was not trying to take advantage of separate-but-equal schooling on the theory that the Board of Education of Topeka should have classified him as white. *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). When black students were "denied admission to schools attended by white children under laws requiring or permitting segregation according to race," *id.* at 487-88, the problem was not that the Board had separated Topeka's races too finely; the problem was that the Board had separated races at all. In canonical Equal Protection cases, segregation provides the cause of action. But here, according to B.P.J., segregation provides the remedy. *See* Doc. 286-1.

Which reveals the truth about B.P.J.'s claim. Contrary to B.P.J.'s framing, B.P.J.'s grievance is emphatically *not* that the Act discriminates "on the basis of sex." *Id.* at 21. If B.P.J. wanted to challenge segregation, the relief sought would involve coed teams. So the relief B.P.J. actually seeks—to "play on *girls'* teams," *id.* at 42 (emphasis added)—gives the game away. The grievance in this case is that by defining "[f]emales, women, or girls" by "biological sex determined at birth," W. Va. Code §18-2-25d(b), the class benefiting from the Save Women's Sports Act (*i.e.*, "females, women, or girls") is unlawfully narrow. "Athletic teams or sports designated for females, women, or girls," *id.* at §18-2-25d(c)(1), B.P.J. contends, should include "transgender girls," Doc. 291 at 12—that is, biological males. So B.P.J. wants West Virginia to continue segregating boys' and girls' sports, but to define the class benefiting from the segregation more broadly. *See* Op. 10.

B.P.J.'s claim thus reduces to a textbook underinclusiveness challenge: B.P.J. likes the law's sex-segregation regime and simply seeks inclusion among its beneficiaries. Such challenges warrant only rational basis review. West Virginia's law easily passes muster.

**B.    While a Challenge to Sex Discrimination Itself Warrants Heightened Scrutiny, an Underinclusiveness Challenge to the Contours of West Virginia's Sex Classifications Does Not.**

The Equal Protection Clause of the Fourteenth Amendment prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1. The Supreme Court has explained that laws "provid[ing] that different treatment be accorded to [individuals] on the basis of their sex" warrant heightened scrutiny. *Reed v. Reed*, 404 U.S. 71, 75 (1971). And when litigants seek to eliminate "official action that closes a door or denies opportunity to women (or to men)," heightened scrutiny applies. *Virginia*, 518 U.S. at 532-33.

But "[t]he prohibition of the Equal Protection Clause goes no further than the invidious discrimination," *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955), and "[a] statute is not invalid under the Constitution because it might have gone farther than it did," *Roschen v. Ward*, 279 U.S. 337, 339 (1929). Rather, "reform may take one step at a time"; "[t]he legislature may select one phase of one field and apply a remedy there, neglecting the others." *Williamson*, 348 U.S. at 489; *accord, e.g.*, *Katzenbach v. Morgan*, 384 U.S. 641, 656-57 (1966) (rational basis where Congress extended benefit to citizens educated in "American-flag schools"

8

in Puerto Rico but did "not extend[] the relief … to those educated in non-American-flag schools"); *cf. Peightal v. Metro. Dade Cnty.*, 940 F.2d 1394, 1409 (11th Cir. 1991) ("The Equal Protection Clause does not require a state actor to grant preference to all ethnic groups solely because it grants preference to one or more groups.").

So even assuming the West Virginia Legislature might have been able to craft a statute that permitted B.P.J. or other transgender girls to play on girls' sports teams while simultaneously "promoting equal athletic opportunities for the female sex," W. Va. Code §18-2-25d(a)(5)—which is unlikely—the statute challenged here would still stand. That a group of biological males might also seek the benefit of playing female-only sports does not render the law unconstitutional, for "[t]he state was not bound to deal alike with all these classes, or to strike at all evils at the same time or in the same way." *Semler v. Ore. State Bd. of Dental Exam'rs*, 294 U.S. 608, 610 (1935). Thus, while the State's decision to segregate sports teams by sex in the first instance warrants heightened scrutiny, *see, e.g., Virginia*, 518 U.S. at 532-33, the sex classification that informs how far West Virginia's law "extend[s] … relief," *Katzenbach*, 384 U.S. at 656-57, does not.

9

Underinclusiveness claims like B.P.J.'s have often been raised in the racial-affirmative-action context, and their dispositions underscore why challenges to classification—rather than to discrimination itself—warrant only rational basis review. Where a court "is not asked to pass on the constitutionality of [an affirmative-action] program or of the racial preference itself," but is asked instead "to examine the parameters of the beneficiary class," the court engages in "a traditional 'rational basis' inquiry as applied to social welfare legislation." *Hoohuli v. Ariyoshi*, 631 F. Supp. 1153, 1159 (D. Haw. 1986). So where, as here, plaintiffs seek to avail themselves of a sex-segregated program by broadening the "parameters of the beneficiary class," *id.*, the government's decision not to calibrate the class to plaintiffs' preferences does not warrant heightened scrutiny. *See id.* at 1160-61 (rejecting Equal Protection claim because government's "definition of 'Hawaiian' … ha[d] a rational basis").

The Second Circuit explicated this principle in *Jana-Rock Construction, Inc. v. New York Department of Economic Development*, 438 F.3d 195 (2d Cir. 2006). The case involved "New York's 'affirmative action' statute for minority-owned businesses," which extended to "Hispanics" but did "not include in its definition of 'Hispanic' people of Spanish or

Portuguese descent." *Id.* Plaintiff Rocco Luiere owned a construction company and was "the son of a Spanish mother whose parents were born in Spain," but he was not considered Hispanic for purposes of the New York program. *Id.* at 199. (This despite Luiere's sworn affidavit stating, "I am a Hispanic from Spain." *Id.* at 203.) Like the plaintiff in *Hoohuli*, Luiere did not "challenge the constitutional propriety of New York's race-based affirmative action program," but only the State's decision not to classify him as Hispanic for purposes of the program. *Id.* at 200, 205.

On its way to rejecting Luiere's claim, the Second Circuit confirmed that "[t]he purpose of [heightened scrutiny] is to ensure that the government's choice to use racial classifications is justified, not to ensure that the contours of the specific racial classification that the government chooses to use are in every particular correct." *Id.* at 210. And because "[i]t [was] uncontested by the parties" that New York's affirmative-action program satisfied strict scrutiny—just as it is uncontested here that sex-segregated sports satisfy heightened scrutiny—a heightened level of review retained "little utility in supervising the government's definition of its chosen categories." *Id.* So the Second Circuit "evaluate[d] the

plaintiff's underinclusiveness claim using rational basis review" and duly rejected it. *Id.* at 212.

Consider also the case of Ralph Taylor. In 2010, Taylor "received results from a genetic ancestry test that estimated that he was 90% European, 6% Indigenous American, and 4% Sub-Saharan African." *Orion Ins. Grp. v. Wash. State Off. of Minority & Women's Bus. Enters.*, 2017 WL 3387344, at *2 (W.D. Wash. Aug. 7, 2017), *aff'd sub nom. Orion Ins. Grp. v. Wash.'s Off. of Minority & Women's Bus. Enters.*, 754 F. App'x 556 (9th Cir. 2018). This was big news for a man who "grew up thinking of himself as Caucasian." *Id.* Once Taylor "realized he had Black ancestry, he 'embraced his Black culture.'" *Id.* He "joined the NAACP" and began to "take[] great interest in Black social causes." *Id.* at *3. Finally, Taylor classified himself as "Black" and applied for special benefits under State and federal affirmative-action programs. *Id.* at *2-3.

But the programs' managers weren't convinced. They rejected Taylor's proposed racial classification and denied his application. So Taylor brought suit alleging, among other things, that the State and federal governments' restrictive definition of "Black" violated his constitutional and statutory rights. *Id.* at *4. He advocated an expansive definition of

12

"Black," asserting he fit into the category because "Black Americans are defined to include persons with 'origins' in the Black racial groups in Africa" and his genetic testing revealed he had African ancestry. *Id.* at *11. The court summarily dispatched with Taylor's claim. *Id.* Rather than apply heightened scrutiny and force the State to justify its definition of "Black," the court applied rational basis review and rejected Taylor's claim accordingly. *Id.* at *13 ("Both the State and Federal Defendants offered rational explanations for the denial of the application.").

The relief B.P.J. seeks ("to preserve B.P.J.'s ability to continue to play on girls' teams," Doc. 291 at 42) presumes the constitutionality of sex-segregated sports teams, in turn requiring B.P.J. to challenge the lawfulness of "designat[ing]" an "[a]thletic team" for "girls" "based solely on the individual's reproductive biology and genetics at birth." W. Va. Code §18-2-25d(b), (c). This is a challenge to the "contours," *Jana-Rock*, 438 F.3d at 210, "parameters," *Hoohuli*, 631 F. Supp. at 1159, or "narrower definition," *Orion*, 2017 WL 3387344 at *11, along which the Act discriminates, not a challenge to discrimination itself. B.P.J. thus follows in the footsteps of Rocco Luiere and Ralph Taylor, not in those of the female VMI applicants and Oliver Brown.

13

Just as Luiere and Taylor sought to benefit from racially discriminatory regimes but contested how the races were defined, B.P.J. endorses sex-segregated sports teams and only challenges West Virginia's decision to "base[]" its definition of "[f]emale" on "biological sex" rather than gender identity. W. Va. Code §18-2-25d(b). But because the "purpose" of heightened scrutiny "is to ensure that the government's choice to use [protected] classifications is justified," not to police the classifications' "contours," *Jana-Rock*, 438 F.3d at 210, the "contours" attendant to West Virginia's sex-segregated sports teams warrant only rational basis review. *Cf. Hoohuli*, 631 F. Supp. at 1159 n.23 ("The mere mention of the term 'race' does not automatically invoke the 'strict scrutiny' standard.").

And lower-court judges have recognized this distinction in the transgender context, too. Dissenting from the panel opinion that the en banc Eleventh Circuit would later vacate, Chief Judge Pryor explained that while "[s]eparating bathrooms by sex treats people differently on the basis of sex," by contrast "the mere act of determining an individual's sex, using the same rubric for both sexes, does not treat anyone differently on the basis of sex." *Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1326 (11th Cir. 2021) (*Adams II*) (Pryor, C.J., dissenting); *accord, e.g.*, *F.S.*

*Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920) ("[T]he 'equal protection of the laws' required by the Fourteenth Amendment does not prevent the states from resorting to classification for the purposes of legislation.").

So when the full Eleventh Circuit eventually held that separating bathrooms based on biological sex did not violate the federal Constitution, the en banc majority limited its application of intermediate scrutiny to the question whether "the School District's policy of assigning bathrooms based on sex violate[d] the Equal Protection Clause." *Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 799 (11th Cir. 2022) (en banc) (*Adams III*). Because "th[e] case ha[d] never been about" the "means by which the School Board determine[d] biological sex," *id.* at 799 n.2, the court had no cause to address the propriety of the School Board's sex classifications—which "d[id] not treat anyone differently on the basis of sex," *Adams II*, 3 F.4th at 1326 (Pryor, C.J., dissenting), and thus would have warranted only rational basis review.

## C.    Classifying Males and Females by Biological Sex Is Rational.

The Supreme Court "hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Trump v. Hawaii*, 138 S. Ct. 2392,

2420 (2018). But "[o]n the few occasions where [it] ha[s] done so, a common thread has been that the laws at issue lack any purpose other than a bare desire to harm a politically unpopular group." *Id.* (cleaned up). This means that the only way B.P.J. might attack a rational basis for West Virginia's Save Women's Sports Act would be through a plausible allegation that the legislation is "inexplicable by anything but animus." *Romer v. Evans*, 517 U.S. 620, 632 (1996); *see also, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."); *Jana-Rock*, 438 F.3d at 211 ("[Plaintiffs] must show New York's intent to harm the groups of Hispanics that were excluded.").

But B.P.J. "does not argue that the law is unconstitutional under the Supreme Court's animus doctrine." Op. 9. Indeed, nothing in B.P.J.'s complaint suggests that "invidious gender-based discrimination" pervaded West Virginia's decision to classify sex according to biology, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979), let alone "that [H.B. 3293] lack[s] any purpose other than a bare desire to harm" transgender individuals, *Hawaii*, 138 S. Ct. at 2420 (cleaned up). So it is unsurprising

16

that the district court could not "find unconstitutional animus on the record before [it]".  Op. 9.[2]

Nor could B.P.J.'s argument succeed on the theory that transgender individuals constitute a "quasi-suspect class." *See* Mot. Stay, Doc. 34-1, at 11. Such a claim is implausible given that the Supreme Court has held that even the mentally disabled—who had been "subjected to . . . grotesque mistreatment," including compulsory sterilization in at least 32 states, *Cleburne Living Ctr., Inc. v. City of Cleburne*, 726 F.2d 191, 197 (5th Cir. 1984), *aff'd in part and vacated in part*, 473 U.S. 432 (1985), and suffered "[a] regime of state-mandated segregation and degradation" that "in its virulence and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 462 (1985) (Marshall, J., concurring in part)—did not constitute a quasi-suspect class. *See also, e.g.*, *Adams III*, 57 F.4th at 803 n.5

---

[2] B.P.J. did complain about the social media conduct of the bill's co-sponsor. Op. 8-9. But as the district court explained, the fact that "one legislator held or implicitly supported private bias" cannot be sufficient to show "animus more broadly throughout the state legislature." *Id.* at 9. And it certainly cannot show that the "reason for [the law's] passage was the 'bare desire' to harm transgender people." *Id.* (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 535 (1973)).

(expressing "grave 'doubt' that transgender persons constitute a quasi-suspect class").

Case law only confirm that point. The Court has always taken a biological understanding of sex for granted. *See, e.g., Virginia*, 518 U.S. at 533 ("Physical differences between men and women, however, are enduring"); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.) ("[S]ex … is an immutable characteristic determined solely by the accident of birth."); *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) (proceeding "on the assumption that 'sex' ... refer[s] only to biological distinctions between male and female"). That should be enough. *Cf. F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993) ("Where there are plausible reasons for Congress' action, our inquiry is at an end. This standard of review is a paradigm of judicial restraint." (citation and quotation marks omitted)).

Just as Luiere could "point to nothing in the history of" New York's affirmative action program "that would support an inference of anti-Spanish animus," *Jana-Rock*, 438 F.3d at 212, B.P.J. is equally unable to show that H.B. 3293 deliberately discriminates against transgender individuals merely by enforcing the same understanding of sex that the

Supreme Court has always upheld. The absence of any "[f]actual allegations" detailing discriminatory intent that could "raise a right to relief above the speculative level" would doom an animus claim even at the 12(b)(6) stage, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and B.P.J.'s failure "to make a sufficient showing on an essential element" entitles Defendants to summary judgment, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    Defining Sex Based on Biology Does Not Violate Title IX.

B.P.J. also argues that West Virginia's law violates Title IX because it discriminates against transgender-identifying boys by imposing "separate and unequal treatment" that "both stigmatizes and isolates B.P.J." Doc. 291 at 24-25. But the Act plainly does not segregate boys based solely on their transgender status. The statute never once mentions "transgender girls," and it permits participation in sports by students of any sex or gender expression.[3] So B.P.J's argument relies on the

---

[3] B.P.J. argues that the Act "effectively prohibits [transgender girls] from participating in school athletics entirely." Doc. 291 at 23. This is simply not true. "[D]espite her repeated argument to the contrary, transgender girls are not excluded from school sports entirely." Op. 22.  Rather, *all* students "are permitted to try out for boys' teams, regardless of how they express their gender." *Id.*; W. Va. Code §18-2-25d(c)(2)-(3).

proposition that segregating sports according to "biological sex determined at birth," W. Va. Code §18-2-25d(b), necessarily constitutes "discrimination based on transgender status." Doc. 291 at 21. But the conclusion does not follow from the premise. *See Adams III*, 57 F.4th at 809 ("[A] policy can lawfully classify on the basis of biological sex without unlawfully discriminating on the basis of transgender status.").

Nonetheless, B.P.J. asserts that the Act violates Title IX by defining sex as biological sex, since "[n]either Title IX, nor its regulations, purport to define 'sex' based on reproductive anatomy or genetics at birth." Doc. 64 at 21. But as the district court observed, "[t]here is no serious debate that Title IX's endorsement of sex separation in sports refers to biological sex." Op. 21-22. Indeed, "[r]eputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, *i.e.*, discrimination between males and females." *Adams III*, 57 F.4th at 812 (collecting dictionary definitions). That definition was unambiguous. *See id.* at 813.

After all, the long-accepted purpose of Title IX in sports is to ensure that "overall athletic opportunities for each sex are equal," given that

"biological males are not similarly situated to biological females for purposes of athletics." Op. 21-22. And "[a]s other courts that have considered Title IX have recognized, although the regulation 'applies equally to boys as well as girls, it would require blinders to ignore that the motivation for the promulgation of the regulation' was to increase opportunities for women and girls in athletics." *Id.* at 21 (quoting *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (3d Cir. 1993)).

Plus, presuming anti-transgender discrimination wherever an entity enforces biological sex classifications would call into question Title IX itself.  The statute adopts biology-based sex classifications and insulates from liability various forms of sex segregation—including "separate teams for members of each sex." 34 C.F.R. §106.41(b); *see also id.* §§106.32 (housing), 106.33 (facilities). If "sex" included "gender identity," these carveouts "would be rendered meaningless. *Adams III*, 57 F.4th at 813-14.

And if the relevant dictionaries and logical implications of Title IX's implementing regulations left any doubt about the proper definition of "sex," the Spending Clause resolves it. Under the Spending Clause's clear-statement rule, "[t]he crucial inquiry [is] … whether Congress

21

spoke so clearly that we can fairly say that the State could make an informed choice." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981); *see also South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987). Thus, if Congress intended to condition Title IX spending on States' acquiescence to a non-biological definition of sex (contrary to all historical evidence), then Congress would have had to "unambiguously" state those "conditions" and "consequences of … participation." *Dole*, 483 U.S. at 207; *see also, e.g.*, *Cummings v. Premier Rehab Keller*, 142 S. Ct. 1562, 1570 (2022) (explaining States must "clearly understand" in advance the obligations that they are undertaking in exchange for federal funds). Only such unambiguous clarity keeps Spending Clause legislation from undermining States' status as "independent sovereigns." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576–77 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.). But Congress could hardly have been clear about lumping in gender identity with sex since "gender identity [is] a concept that was essentially unknown" when Title IX was enacted. *Bostock,* 140 S. Ct. at 1755 (Alito, J., dissenting).  B.P.J. fails to cite such unambiguous conditions because they do not exist. *Accord, e.g.*, *Adams III*, 57 F.4th at 815-17.

### III. Forcing States to Classify "Sex" on the Basis of "Gender Identity" Would Render Many Sex-Conscious Laws Unworkable.

A moment's reflection on the implications of B.P.J.'s position reveals the problems it invites. Start with defining "girls" and "boys" based on an individual's averred "gender identity." Doc. 64 at 2. Whereas "reproductive biology and genetics at birth," W. Va. Code §18-2-25d(b)(1), offers a stable, objective definition of "sex," the concept of "gender identity" is fluid, subjective, and resists coherent line-drawing. After all, according to some, "[g]ender … refers to 'a set of socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate,'" and "gender identity … is 'a person's deeply held core sense of self in relation to gender.'" Op. 16 (quoting *PFLAG, PFLAG National Glossary of Terms* (June 2022), http://plfag.org/glossary (cleaned up); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 636-37 (4th Cir. 2020) (Niemeyer, J., dissenting) (noting that the plaintiff's "transgender status, both at a physical and psychological level," required "over 20 pages [of] discussion" in the majority opinion). Indeed, the American Psychological Association (APA) notes that "gender identity is internal," so "a person's gender identity is not necessarily visible to others." Am.

Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 862 (Dec. 2015), *available at* https://www.apa.org/practice/guidelines/transgender.pdf (hereafter "APA Guidelines"); *see also id.* at 836 (asserting some individuals "experience their gender identity as fluid").

And according to the American Academy of Pediatrics (AAP), "gender identity can be fluid, shifting in different contexts." Jason Rafferty, *Policy Statement, Am. Academy of Pediatrics, Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, 142 Pediatrics no. 4 at 2 (Oct. 2018), *available at* https://perma.cc/EE6U-PN66 (hereafter "AAP Statement"); *see also* Op. 16 ("[G]ender is fluid."). There are also those who seek to "redefine gender" or who "decline to define themselves as gendered altogether"—who "think of themselves as both man and woman (bi-gender, pangender, androgyne); neither man nor woman (genderless, gender neutral, neutrois, agender); moving between genders (genderfluid); or embodying a third gender." APA Guidelines at 862. No State can coherently classify men and women based on private, "internal," "fluid" feelings that might not even be "visible to others."

But it gets worse. Attempting to define a "transgender" class is a fool's errand. As the AAP points out, "transgender" is "not [a] diagnos[i]s," but a "personal" and "dynamic way[] of describing one's own gender experience." AAP Statement at 3.  And while some guidelines note that not all "gender diverse" people identify as "transgender," AAP Statement at 2, others use "transgender" as "an umbrella term" that includes "a diverse group of individuals." Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guidelines*, 102 J. Clinical Endocrinology & Metabolism 3869  (Nov. 2017) (hereafter "Endocrine Society Guidelines"); *see also* World Professional Ass'n for Transgender Health (WPATH), *Standards of Care for the Health of Transsexual, Transgender, and Gender-Conforming People* 97 (7th Version) (2012) (hereafter "WPATH Guidelines"). Depending on whom you ask, the term covers people who identify with any of the following gender identities: "boygirl," "girlboy," "genderqueer," "eunuch," "bigender," "pangender," "androgyne," "genderless," "gender neutral," "neutrois," "agender," "genderfluid," and "third gender," and many others. WPATH Guidelines at 96; APA Guidelines at 862; Endocrine Society Guidelines at 3875. States forced to define sex

according to subjective perceptions lose the ability to meaningfully distinguish between males and females. Even if gender identity is a "core part of [a person's] identity," Doc. 64 at 19, States should not be forced to reduce their definitions of sex to incoherence. *Cf. Orion*, 2017 WL 3387344, at *11 (rejecting expansion of "Black" that would render classification "devoid of any distinction" and thus "strip the provision of all exclusionary meaning").

It is no answer to claim, as B.P.J. does, that by receiving "[p]uberty blocking treatment" B.P.J. "has not experienced the effects of testosterone that would be typical if" B.P.J. underwent "full endogenous puberty." Doc. 291 at 9. Nor is it relevant that B.P.J. has not won any cross-country competitions and thus "has not substantially displaced cisgender female athletes" or created "any specific fairness issue." Doc. 291 at 34-35. States are not required to tailor laws (let alone the contours of the terms informing the law's application) to every individual's unique circumstances. *See Heller v. Doe*, 509 U.S. 312, 321 (1993) ("A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." (internal citations, quotation marks omitted)).

Worse, B.P.J.'s "fairness issue" carveout to West Virginia's definition of sex rests on the assumption that B.P.J. fits in better with biological females because B.P.J. is an unexceptional athlete and has exhibited behavior typical of girls, such as looking and dressing like a girl. *See* Doc. 64 at 8 (stating that B.P.J. did not want to be "dressed as a boy"). But defining sex in terms of athletic performance and "a set of socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate," Op. 16 (citation omitted), would push West Virginia to rely on "overbroad stereotypes about the relative abilities of men and women"—"the very stereotype[s] the law condemns." *J.E.B. v. Alabama*, 511 U.S. 127, 131, 138 (1994).

Indeed, defining sex according to gender identity would place West Virginia in the perilous position of having to classify its sports teams based on whoever "'walk[s] more femininely, talk[s] more femininely, dress[es] more femininely, wear[s] make-up, ha[s] her hair styled, and wear[s] jewelry.'" *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (plurality op.). Can it really be that federal law permits B.P.J. to play on a girls' team so long as a State (or federal court) decides that B.P.J. runs or throws "like a girl"? Should a child's sex be determined by her or his

27

time on the mile run? Must States define sex based on "fixed notions" about the "abilities of males and females"? *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982).

Of course not. States need not define sex based on crude sex stereotypes. Defining sex based on sex will do.

## CONCLUSION

This case is about whether States may objectively classify "[f]emales, women, or girls" based on their "biological sex determined at birth." W. Va. Code §18-2-25d(b), (c). Because no federal law compels otherwise, the answer is yes. *Amici* States therefore respectfully ask the Court to affirm the district court's well-reasoned decision below.

May 3, 2023

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
Hannah L. Templin
  *Assistant Solicitor General*

OFFICE OF THE ARKANSAS AT-
TORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@arkan-
sasag.gov

Respectfully submitted,

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
  *Solicitor General*
Bethany C. Lee
  *Assistant Solicitor General*

OFFICE OF THE ATTORNEY GEN-
ERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@Ala-
bamaAG.gov

*Counsel for Amici Curiae*
*(Additional Counsel listed below)*

29

## ADDITIONAL COUNSEL

CHRIS CARR
Georgia Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS W. KOBACH
Kansas Attorney General

DANIEL CAMERON
Kentucky Attorney General

JEFF LANDRY
Louisiana Attorney General

AUSTIN KNUDSEN
Montana Attorney General

LYNN FITCH
Mississippi Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

KEN PAXTON
Texas Attorney General

SEAN D. REYES
Utah Attorney General

JASON MIYARES
Virginia Attorney General

## CERTIFICATE OF COMPLIANCE

1.    I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i). This brief contains 5,521 words, including all headings, footnotes, and quotations, and excluding the parts of the motion exempted under Fed. R. App. P. 32(f).

2.    In addition, pursuant to Fed. R. App. P. 32(g)(1), this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook font.

Dated:  May 3, 2023          /s/ Edmund G. LaCour Jr.
                                  Edmund G. LaCour Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2023, I caused the fore-going document to be electronically transmitted to the Clerk's Office us-ing the CM/ECF System, which will serve an electronic copy on all regis-tered counsel of record.

Dated:  May 3, 2023                    /s/ Edmund G. LaCour Jr.
                                       Edmund G. LaCour Jr.