**No. 23-1078**

**In the**
**United States Court of Appeals for the Fourth Circuit**

B.P.J., by his next friend and mother, HEATHER JACKSON,
*Plaintiff-Appellant*,

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY BOARD OF
EDUCATION; WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION;
W. CLAYTON BURCH, in his official capacity as State Superintendent; DORA
STUTLER, in her official capacity as Harrison County Superintendent,
*Defendants-Appellees,*
and
THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,
*Intervenors-Appellees.*

**On Appeal from the**
**United States District Court for**
**the Southern District of West Virginia (Charleston Division)**

Brief *Amicus Curiae* of
Public Advocate of the United States, America's Future,
U.S. Constitutional Rights Legal Defense Fund, One Nation Under God
Foundation, Fitzgerald Griffin Foundation, and Conservative Legal Defense and
Education Fund in Support of Defendants-Appellees and Affirmance

| | |
|---|---|
| RICK BOYER | WILLIAM J. OLSON* |
| Lynchburg, VA | JEREMIAH L. MORGAN |
| PATRICK MCSWEENEY | ROBERT J. OLSON |
| Powhatan, VA | WILLIAM J. OLSON, P.C. |
| JOSEPH P. SECOLA | 370 Maple Avenue West, Suite 4 |
| Danbury, CT | Vienna, VA  22180-5615 |
| J. MARK BREWER | (703) 356-5070 |
| Houston, TX | *Attorney of Record |
| KERRY L. MORGAN | *Attorneys for Amici Curiae* |
| Wyandotte, MI | May 3, 2023 |

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* do not have parent corporations, they are not publicly traded companies, and no publicly held corporation owns 10% or more of their stocks.

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

I.      PLAINTIFF'S CLAIM IS PREDICATED ON FALSEHOODS AND FEELINGS . . . . . . 3

II.     TITLE IX WAS DESIGNED TO REMEDY, NOT REQUIRE,
        DISCRIMINATION AGAINST FEMALES IN EDUCATION. . . . . . . . . . . . . . . . 10

III.    "GENDER IDEOLOGY" HARMS BOTH "TRANSGENDER"-IDENTIFYING
        PERSONS AND THE REST OF SOCIETY ALIKE . . . . . . . . . . . . . . . . . . . . . . 14

        A.    Gender Ideology Demands Acceptance of a Scientifically False
              Premise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        B.    The "Science" behind Gender Ideology Is Collapsing
              Worldwide . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        C.    "Gender-affirming" Medical Intervention Creates Lifelong
              Physical Harms to "Transitioning" Child Victims . . . . . . . . . . . . . 18

IV.     THE COURTS HAVE NO AUTHORITY TO REINTERPRET TEXT TO
        CREATE RIGHTS OUT OF WHOLE CLOTH . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ii

# TABLE OF AUTHORITIES

Page

HOLY BIBLE

*Judges* 21:25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
*Proverbs* 28:18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
*Ecclesiastes* 1:9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
*Jeremiah* 17:9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
*John* 18:38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
*Romans* 2:14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
*Ephesians* 6:12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-6

STATUTES

20 U.S.C. § 1681 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
WV Code § 18-2-25d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CASES

*Bostock v. Clayton Cty*, 140 S.Ct. 1731 (2020) . . . . . . . . . . . . . . . . . . . . . 10
*Engel v. Vitale,* 370 U.S. 421 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
*Lee v. Weisman*, 505 U.S. 577 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) . . . . . . . . . . . 24
*Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963) . . . . . . . . . . . . . . 4
*Soule v. Conn. Association of Schools*, 57 F.4th 43 (2d Cir. 2022) . . . . . . . . . . . 9
*Stone v. Graham*, 449 U.S. 39 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MISCELLANEOUS

118 *Cong. Rec.* 5803 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
118 *Cong. Rec.* 5804 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
118 *Cong. Rec.* 5807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
E. Abbruzzese, S. Levine, and J. Mason, "The Myth of 'Reliable Research'
   in Pediatric Gender Medicine: A critical evaluation of the Dutch
   Studies—and research that has followed." JOURNAL OF SEX &
   MARITAL THERAPY 1 (Jan. 2, 2023) . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 20
D. R. Anderson, "Sex Reassignment Doesn't Work.  Here Is the Evidence,"
   *Heritage Foundation* (Mar. 9, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
R. Anderson and R. George, "Physical Interventions on the Bodies of
   Children to 'Affirm' their 'Gender Identity' Violate Sound Medical
   Ethics and Should be Prohibited," *Public Discourse* (Dec. 8, 2019) . . . . . 21

iii

M. Artigues and M. Cretella, "Sex is a Biological Trait of Medical
    Significance," American College of Pediatricians (Mar. 2021) . . . . . . 15, 16

F. Bergman, "ACLU Pushes Chemical Castration of Transgender Kids after
    Fighting Use of Same Drugs for Sex Offenders," *Slay* (Aug. 25, 2022) . . . 9

K. Bolar, "8th Place: A High School Girl's Life After Transgender Students
    Join Her Sport," *Daily Signal* (May 6, 2019) . . . . . . . . . . . . . . . . . . . 13

J. Cahn, The Return of the Gods (Frontline: 2022) . . . . . . . . . . . . . . . . . . . . . . 5

Declaration of Independence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Endocrine Society, "Endocrine Treatment of Gender-Dysphoric/
    Gender-Incongruent Persons: An Endocrine Society Clinical
    Practice Guideline," J CLIN ENDOCRINOL METAB. 3869 (Nov. 2017) . 20, 21

"Gender Ideology Harms Children," *American College of Pediatricians*
    (Sept. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

G. Marinov, "In humans, sex is binary and immutable," *Academic
    Questions*, Vol. 33, Issue 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

T. O'Neil, "California ex-trans teen backs Florida ban on Medicaid funds for
    transgender medical interventions," *Fox News* (Jul. 10, 2022). . . . . . . . . 22

J. Reed, "I Thought I Was Saving Trans Kids. Now I'm Blowing the
    Whistle," *The Free Press* (Feb. 9, 2023) . . . . . . . . . . . . . . . . . . . . . . . . 22

J. Reed, Letter to the Hon. Andrew Bailey, Attorney General of Missouri
    (Jan. 26, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

S. Salai, "D.C. Public Schools host drag queen performance for high
    school students," *Washington Times* (June 3, 2022) . . . . . . . . . . . . . . . . . 4

B. R. Sandler, *Title IX: How We Got It and What a Difference it Made*,
    CLEVELAND STATE L.R., vol. 55, issue 5 (2007). . . . . . . . . . . . . . . . . . . 12

R. Schlott, "Trans battle in sports is 'erasure of what a woman is,'
    ex-Kentucky swimmer Riley Gaines says," *New York Post* (Mar. 2,
    2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

N. Silverio, "'Watching Us Undress': Trans Swimmer Lia Thomas
    Allegedly Exposed 'Male Genitalia' In Women's Locker Room,"
    *DailyCaller.com* (Feb. 9, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

S. Stryker, "Transgender History in the United States and Places That
    Matter," *National Parks Service* (2016) . . . . . . . . . . . . . . . . . . . . . . 24, 25

"Transgender adults more satisfied after transitioning," *Scripps News*
    (Mar. 24, 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

J. Van Maren, "World-renowned child psychiatrist calls trans treatments
    'possibly one of the greatest scandals in medical history'" The
    Bridgehead (Sept. 25, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

N. Wolf, "My Mind Blown by 1560 Geneva Bible," *Daily Clout*
    (Mar. 27, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

C. Wright and E. Hilton, "The Dangerous Denial of Sex," *Wall Street
    Journal* (Feb. 13, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

v

## INTEREST OF *AMICI CURIAE*

Public Advocate of the United States is exempt from federal income taxation under section 501(c)(4) of the Internal Revenue Code ("IRC"). America's Future, U.S. Constitutional Rights Legal Defense Fund, One Nation Under God Foundation, Fitzgerald Griffin Foundation, and Conservative Legal Defense and Education Fund are exempt from federal income taxation under IRC section 501(c)(3). Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of the law.[1]

Some of these *amici* also filed *amicus* briefs in similar cases, including four briefs filed in a case involving the School Board in Gloucester County, Virginia:

- G.G. v. Gloucester County School Board, No. 15-2056, Fourth Circuit, Brief *Amicus Curiae* in Support of Petition for Rehearing *En Banc* (May 10, 2016);

- Gloucester County School Board v. G.G., No. 16-273, U.S. Supreme Court, Brief *Amicus Curiae* in Support of Petitioner (January 10, 2017);

- G.G. v. Gloucester County School Board, No. 15-2056, Fourth Circuit, Brief *Amicus Curiae* in Support of Affirmance (May 15, 2017); and

- Gloucester County School Board v. Grimm, No. 20-1163, U.S. Supreme Court, Brief *Amicus Curiae* in Support of Petitioner (March 26, 2021).

---

[1] No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

## STATEMENT OF THE CASE

In 2021, the West Virginia legislature enacted the "Save Women's Sports Bill," WV Code § 18-2-25d ("the Act"), to protect women's sports by defining the terms "female," "girl," and "woman" as describing biological females.  B.P.J., a 12-year-old male, who describes himself as a "transgender girl," challenged the law under the Equal Protection Clause and Title IX, seeking to compete on the girls' track and cross country teams.  *B.P.J. v. W. Va. State Bd. of Educ.*, 2023 U.S. Dist. LEXIS 1820 (S.D. W. Va. 2023) at *3, *7.

The district court granted a temporary injunction against the law in July 2021.  *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347 (S.D. W. Va. 2021).  In January 2023, after considering substantial evidence offered by the parties, the district court granted summary judgment motions for the State of West Virginia, holding that "the legislature's chosen definition of 'girl' and 'woman' in [the sports] context is constitutionally permissible," dissolving its injunction.  *Id.* at **3, 30.

B.P.J. appealed the district court order determination to this Court where a divided panel of this Court granted a temporary injunction against the Act without opinion.  *B.P.J. v. W. Va. State Bd. of Educ.*, Case No. 23-1078, Dkt. 50 (4th Cir. 2023).  Appellees filed an application to vacate this Court's injunction with

Supreme Court Chief Justice John Roberts, which was denied on April 6, 2023, with Justices Alito and Thomas dissenting. *West Virginia v. B.P.J.*, 2023 U.S. LEXIS 1497 (U.S. 2023).

## ARGUMENT

### I.      PLAINTIFF'S CLAIM IS PREDICATED ON FALSEHOODS AND FEELINGS.

Appellant B.P.J.'s Opening Brief ("Aplt. Br.") begins with a false statement: "**B.P.J. is a 12-year-old girl**...." Aplt. Br. at 7 (emphasis added). If that statement were actually true, the suit should be dismissed, as it would completely undermine Appellant's claim. Then, Appellant would have no dispute with the West Virginia statute, as all girls can play on girls' teams. But the Appellant Brief then admits that its opening assertion is false, as it takes the position: "B.P.J. is transgender," B.P.J. was "assigned a male sex at birth," and B.P.J. "has been diagnosed with gender dysphoria." Aplt. Br. at 7-8.

Appellant is really arguing that even though B.P.J. is a boy, the Court should disregard that biological fact because: he "has known she [he] is a girl," and he "has lived as a girl," and that not being able to try out for the girls' team "made her [him] feel angry and sad," and his feelings should cause the Court to revise its view on the law to adapt. Appellant's argument raises an extremely important threshold question — "do feelings establish reality?" Another way to put that

3

question was the way Pilate put it to Jesus: "What is truth?" *John* 18:38.

For almost the entire course of our nation's history, we have looked to external sources to establish reality, truth, and morality — and, in particular, God and the Bible. More recently, courts have operated on the erroneous assumption that there can be, and the state should take, a neutral position regarding God and the Bible. However banning religion fosters irreligion. Discouraging theism encourages atheism. Now that the Courts have led the way to banish God and the Bible from our government schools and the public arena,[2] the void is being filled. In part, the void is being filled by transgenderism. In many states and Washington, D.C. public schools are hosting a drag queen performance as part of a pride month celebration for high school students. *See* S. Salai, "[D.C. Public Schools host drag queen performance for high school students](#)," *Washington Times* (June 3, 2022).

It must be recognized that transgenderism is neither a new, nor a secular phenomenon. It has ancient spiritual roots. In turning away from God, without

---

[2] *See, e.g., Engel v. Vitale,* [370 U.S. 421](#) (1962) (voluntary school prayer constituted an "establishment of religion"); *Sch. Dist. of Abington Twp. v. Schempp*, [374 U.S. 203](#) (1963) (banning reading of 10 Bible verses a day, where parents could excuse students by request); *Stone v. Graham*, [449 U.S. 39, 42](#) (1980) (banning posting of Ten Commandments on school walls; inducing school children to "read, meditate upon, perhaps to venerate and obey, the Commandments … is not a permissible state objective"); *Lee v. Weisman*, [505 U.S. 577](#) (1992) (banning prayer offered by clergyperson at public school graduation ceremonies as "subtle coercive pressure" and "indirect coercion").

even knowing it, many have adopted a pagan worldview.  One of the "gods" of the

pagan world was Ishtar, the "goddess of war and sexual love."  *See* "Ishtar,"

Britannica.  "An ancient Mesopotamian tablet records ... 'When I sit in the

alehouse, I am a woman, and I am an exuberant young man.'"  *See* J. Cahn, The

Return of the Gods (Frontline: 2022) at 118.

> [Ishtar] was the goddess of transmutation and metamorphosis.  Her
> nature was to alter nature and most specifically the nature of male and
> female, man and woman.  An ancient Sumerian hymn reveals her
> power.  It was to "…turn a man into a woman and a woman into a
> man, to change one into the other…."  [*Id*. at 118 n.3.]

The goddess Ishtar had summertime festivals and parades.  "The parades of the

goddess featured men dressed as women, women dressed as men, each dressed as

both, male priests parading as women, and cultic women acting as men.  They

were public pageants and spectacles of the transgendered, the cross-dressed, the

homosexual, the intersexual, the cross-gendered."  *Id*. at 181.

While the term "transgender" may have been coined only in 1965, those

ancient pagan roots confirm what Solomon explained:  "The thing that hath been,

it is that which shall be ... and there is no new thing under the sun."  *Ecclesiastes*

1:9.  The Bible also makes clear that what may appear to only be a political or

cultural dispute, has an important spiritual component.  "For we wrestle not

against flesh and blood, but against principalities, against powers,

against the rulers of the darkness of this world, against spiritual wickedness in high places." *Ephesians* 6:12.

Thus, Appellant has asked this Court, albeit unknowingly, to impose an ancient pagan religious belief that by adopting the appearance and mannerisms of biological females, biological men can become women and must be treated as such. Such ancient pagan religious beliefs are not constitutionally neutral, as the legislature of the State of West Virginia recognized, and should not be imposed on schools by this Court.

For its rejection of the God of the Bible and the embrace of the alternative, the nation is reaping the whirlwind, as particularly young people believe that reality is relative, there is no absolute truth, and there are certainly no objective standards of morality. When there is no such higher authority, there is no external standard, and anything goes: "In those days there was no king in Israel: every man did that which was right in his own eyes." *Judges* 21:25.

In our nation's charter, our nation's founders confessed their beliefs that there is a Creator, that they were created beings, "that they are endowed by their Creator with certain unalienable Rights," and that it was "to secure these Rights, Governments are instituted among Men...." Accordingly, we owe a duty to our Creator according to the "Laws of Nature and of Nature's God." *See* Declaration

of Independence.  These were all principles grounded in Scripture, and they

continue to undergird the Constitution.[3]  B.P.J.'s unstated position is the polar

opposite — that every opinion is equally valid, and it is up to the individual to

decide what is truth for him.  The gist of Appellant's argument that "What I feel

and what I believe is truth" is not a legal proposition that can be validated by this

Court.  Sitting judges see cases daily proving that following your feelings can lead

to disaster.  Holy Writ cautions:  "The heart is deceitful above all things, and

desperately wicked: who can know it?"  *Jeremiah* 17:9.  It is critical to the rule of

law that such issues be resolved by reason, not by emotion.  How B.P.J. "feels" —

particularly as an immature 12-year-old — is not dispositive of any legal issue

before the court.  It is also irrelevant if his family, his coaches, and his classmates

have tried to be supportive of him while suffering from gender dysphoria, as

Appellant asserts.  Aplt. Br. at 8.  Persons with gender dysphoria need counseling

---

[3]  The Bible generally used at the time of the nation's founding was the Geneva Bible.  *See* N. Wolf, "My Mind Blown by 1560 Geneva Bible," *Daily Clout* (Mar. 27, 2023) ("I was searching for the earliest English translation of the Bible from the Hebrew — because, of course, I am seeking guidance and comfort in a time of chaos and crisis....  This version is the one used by William Shakespeare, John Donne, John Milton — but also by the Puritans, and by our own Founders....  Reading it, I understood why the Puritans would give up everything and sail across unknown seas to create a sacred community in the wilderness.  I understood what gave our Founders the courage to challenge the greatest Empire on earth at that time.").  *See also* Naomi Wolf's reading of the Book of Genesis.

to bring their feelings into conformity with reality, not encouragement from coaches to follow a path that leads to sterility, a lifetime of drug dependence, and profound regret by many.[4]  Those who are demanding that the world bend to those with an irrational perspective by providing what they falsely label "gender affirming care" are the real threat to these children.  "Whoso walketh uprightly shall be saved: but he that is perverse in his ways shall fall at once."  *Proverbs* 28:18.

Appellant's brief asserts:  "B.P.J. has not and will not go through endogenous puberty....  Instead, her levels of circulating testosterone will stay in a typical female range," and he "regularly finishes at the back of the pack."  All such allegations designed to demonstrate that B.P.J. is not a good athlete, and will not displace anyone from a place in the finals or edge them out for a scholarship, are completely irrelevant.  To be sure, the case would have been much less appealing if the plaintiff below were a 16-year-old boy who felt like a girl, but who had the benefits of circulating testosterone who wanted to run cross country.  However, the case is not resolved by whether or not puberty blockers were taken.  It would be naive to believe the selection of B.P.J. by the ACLU Foundation[5] to bring this

---

[4]  *See* section III.C., *infra*.

[5]  The legal agenda of the ACLU is not modest, demanding chemical castration in the form of puberty blockers for trans youth even at religious

test case was accidental.[6]  Whatever rule is adopted in this case, unless overturned, likely will govern the status of all other athletes in the Fourth Circuit, whether they have had surgical or chemical alteration or not, such as Connecticut, where two biological male students were allowed to compete in girls' high school track events.  *See Soule v. Conn. Association of Schools*, <u>57 F.4th 43</u> (2d Ci<u>r. 2022</u>), *reh. en banc granted*.  If the principle is extended to college, it could apply to students like swimmer Riley Gaines, who was forced to undress and dress in locker rooms with, as well as compete with, fully intact 6' 1" male Lia Thomas at the University of Pennsylvania.[7]  No court can allow each person to be a law unto himself.  *See Romans* 2:14.

---

hospitals.  F. Bergman, "ACLU Pushes Chemical Castration of Transgender Kids after Fighting Use of Same Drugs for Sex Offenders," *Slay* (Aug. 25, 2022).

[6]  Similarly, in earlier litigation, the selection of a girl, G.G., to be the plaintiff to break down same-sex restrooms and showers in government schools was strategic.  How much less appealing that case would have been if the plaintiff there had been a 16-year-old boy asserting he "felt" he was a girl, and therefore eagerly wanted to change clothes and shower with the girls.

[7]  N. Silverio, "'Watching Us Undress': Trans Swimmer Lia Thomas Allegedly Exposed 'Male Genitalia' In Women's Locker Room," *Daily Caller.com* (Feb. 9, 2023).

## II.    TITLE IX WAS DESIGNED TO REMEDY, NOT REQUIRE, DISCRIMINATION AGAINST FEMALES IN EDUCATION.

Title IX of the Educational Amendments of 1972, P.L. 92-318, provided that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A brief review of the text and history of Title IX demonstrates conclusively that it was intended to enhance opportunities for females — not to enhance opportunities for men, irrespective of how they viewed themselves. There is not one word in Title IX about gender, or gender identity — only "sex," which was universally understood when written to mean biological male and female.[8] At the time Title IX was written, "gender" was primarily an attribute of nouns in certain non-English languages, such as French, where they can be masculine or feminine.

_____

[8] Justice Kavanaugh's dissenting opinion in *Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) explains the fatal flaw in the Supreme Court's analysis of Title VII — failure to interpret a text in its context. As he explained: "There is no serious debate about the foundational interpretive principle that courts adhere to ordinary meaning, not literal meaning, when interpreting statutes. As Justice Scalia explained, 'the good textualist is not a literalist.'" *Id*. at 1825 (Kavanaugh, J., dissenting). There is no good reason to repeat that fundamental error here in interpreting Title IX.

Senate sponsor Birch Bayh (D-IN) introduced the legislation, stating that its object was to ensure that females have the same educational opportunities available to males.  Senator Bayh attacked "corrosive and unjustified discrimination against women."[9]  He stressed that the bill was designed to address preferential treatment for biological males over females.  *Id.*  He denounced stereotypes of females as "pretty things who go to college to find a husband … and finally marry, have children, and never work again."[10]  Senator Bayh repeatedly lamented disparate opportunities in education and employment between "males" and "females."  *Id*.  "I am concerned that in 1970 the percentage of the female population enrolled in college was markedly lower than the percentage of the male population…."  *Id*. at 5805.

Senator Bayh noted that Title IX's language dealt expressly with differentiations on the basis of "sex."  For example, he stated:  "[c]entral to my amendment are sections 1001-1005, which would prohibit discrimination **on the basis of sex** in federally funded education programs."  *Id.* at 5807 (emphasis added).  Section 1007 of Title IX required the Commissioner of Education to "investigate **sex** discrimination at all levels of education ... and report ...

---

[9]  118 *Cong. Rec.* 5803.
[10]  118 *Cong. Rec.* 5804.

11

recommendations for action to guarantee equality of opportunity in education **between the sexes**." *Id*. at 5808 (emphasis added).

In his remarks, Sen. Bayh made clear that Title IX would allow "differential treatment by sex" "in sports facilities or other instances where **personal privacy must be preserved**" (emphasis added).[11]  Nothing in the language of Title IX even contemplates allowing naked male students to invade the locker rooms, bathrooms, and sports competitions of female students.

The person whom the *New York Times* called the "godmother of Title IX" recounted that Title IX was never intended to be applied to sports.  Under Title IX generally, "You can categorize by other means but not by sex....  There is, of course, **one major exception** to this — **where strict integration will not work** — and **that of course, is sports**."  B. R. Sandler, *"Title IX: How We Got It and What a Difference it Made*," CLEVELAND STATE L.R., vol. 55, issue 4 (2007) at 480 (emphasis added).  Dr. Sandler recognized that in sports, "some sex segregation is necessary.  **If all teams were integrated by sex, few women would have access to sports**." *Id*. at 482 (emphasis added).  That is precisely the evil which Title IX and the West Virginia statute seek to remedy.

---

[11]  118 *Cong. Rec.* 5807 (emphasis added).

Appellant's Brief is callous to the fact that the hopes of actual girls and women across America are being destroyed and those ambitions foreclosed as more and more male athletes are allowed to compete on girls' sports teams. "It's very frustrating and heartbreaking when us girls ... already know that these athletes are going to come out and win no matter how hard you try," said Selina Soule, another of the Connecticut plaintiffs in a similar case now pending in the Second Circuit on *en banc* review, *Soule v. Connecticut Assn. of Schools,* No. 21-11365. "They took away the spots of deserving girls ... me being included."[12]

"We are not moving forward. This is actually quite the opposite. We're going back 50 years in time to before Title IX," said Riley Gaines, a star women's collegiate swimmer bested by Will Thomas (a/k/a Lia Thomas) who transferred from the Penn State men's swim team.[13] "We're watching the denial of the most basic of truths. When you can't acknowledge what a woman is, there's a huge problem," she added. "This is deeper than just sports. **This is a systematic erasure of what a woman is.**" *Id.* (emphasis added).

Attempts to stretch the 1972-1975 term "sex discrimination" to encompass the 2023 term "gender identity" is a blatant rewriting of the intent and text of Title IX,

---

[12] K. Bolar, "8th Place: A High School Girl's Life After Transgender Students Join Her Sport," *Daily Signal* (May 6, 2019).

[13] R. Schlott, "Trans battle in sports is 'erasure of what a woman is,' ex-Kentucky swimmer Riley Gaines says," *New York Post* (Mar. 2, 2023).

13

to accomplish the radical socio-political goals of a radical political lobby.  In the

intervening half-century, Congress has never redefined the word "sex" relative to

Title IX in a manner so patently contrary to the legislation's text or intent.  The

West Virginia statute is consistent with the text and tradition of Title IX and

furthers the goals of its sponsors.

## III.   "GENDER IDEOLOGY" HARMS BOTH "TRANSGENDER"-IDENTIFYING PERSONS AND THE REST OF SOCIETY ALIKE.

### A.   Gender Ideology Demands Acceptance of a Scientifically False Premise.

Appellant illogically asserts "B.P.J. does not challenge sex separation in sports,

nor would a judgment in her favor prevent West Virginia from continuing to

maintain separate girls' and boys' teams....  B.P.J. simply wants to play on the

girls' team like other girls."  Aplt. Br. at 26-27.  Having a boy play on a girls' team

is to eliminate separate girls' and boys' teams.

> To characterize this line of reasoning as having no basis in reality
> would be an egregious understatement.  It is false at every
> conceivable scale of resolution.  In humans ... biological sex
> corresponds to one of two distinct types of reproductive anatomy that
> develop for the production of small or large sex cells—sperm and
> eggs, respectively — and associated biological functions in sexual
> reproduction.  In humans, reproductive anatomy is unambiguously
> male or female at birth more than 99.98% of the time….  No third
> type of sex cell exists in humans, and therefore there is no sex

"spectrum" or additional sexes beyond male and female.  Sex *is* binary.[14]

The American College of Pediatricians also recognizes this biological reality. Sex is not assigned at birth, as Appellants claim (Aplt. Br. at 7).  Doctors Michael Artigues and Michelle Cretella remind us that "[s]ex is a dimorphic, innate trait defined in relation to an organism's biological role in reproduction.  In humans, primary sex determination occurs at fertilization and is directed by a complement of sex determining genes on the X and Y chromosomes.… Consideration of these innate differences is critical to the practice of good medicine and to the development of sound public policy for children and adults alike."[15]  While it is possible to alter a person's appearance or physiology, it does not change biolotical sex.  *Id*.  Further, even the federal government is not so "woke" as to tell physicians to ignore sex in treatment decisions:  "[t]he National Institutes of Health urges scientists and physicians to include sex as a biological variable in all aspects of healthcare.  [T]he reality of sexual dimorphism and its importance to health has been documented for decades."  *Id.*

---

[14]  C. Wright and E. Hilton, "The Dangerous Denial of Sex," *Wall Street Journal* (Feb. 13, 2020).  (Colin Wright is an evolutionary biologist at Penn State University; Emma Hilton is a developmental biologist at the University of Manchester).

[15]  M. Artigues and M. Cretella, "Sex is a Biological Trait of Medical Significance," American College of Pediatricians (Mar. 2021).

Dr. Georgi K. Marinov explains:  "[T]he objective truth is that sex in humans is strictly binary and immutable, for fundamental reasons that are common knowledge to all biologists taking the findings of their discipline seriously. Denying that sex in humans is binary attacks the very foundations of biological sciences."[16]

However much the dominant political view may wish it otherwise, denying reality will inevitably harm those it claims to try to help.  "Acknowledging the fact of inborn genetic sex differences is also crucial for creating public policies that will ensure the health and safety of children and adults alike."[17]

### B.     The "Science" behind Gender Ideology Is Collapsing Worldwide.

The "science" upon which transgender ideology relies is a complete fabrication with no basis in real science.  Radical activists in the scientific and medical fields, often following government dollars, continue to beat the drum for development-stunting drugs and irreversible surgical procedures, all under the same rubric of "transgender mental health."  But the politico-"scientific" field of gender ideology

---

[16]  G. Marinov, "In humans, sex is binary and immutable," *Academic Questions*, Vol. 33, Issue 2.  (Georgi K. Marinov is Postdoctoral Research Scholar at the Department of Genetics, Stanford University School of Medicine, Stanford, California.)

[17]  *See* M. Artigues and M. Cretella.

"has a penchant for exaggerating what is known about the benefits" of these interventions, while downplaying the serious health risks and uncertainties.[18]

Recent months have seen a burgeoning tide of evidence from respected doctors and psychiatrists, including in peer-reviewed journals, that what has been understood for centuries is scientifically accurate. Sex is a biological fact, and "gender identity" is a political construct, in the pursuit of which countless children have been harmed, many for life.

Appellant in this case argues that "for individuals with gender dysphoria, being prevented from affirming their gender identity can result in severe anxiety, depression, self-harm, and suicidal ideation."[19] But as the JOURNAL OF SEX & MARITAL THERAPY pointed out in January 2023, the "gender-affirming care" push stems from a "highly politicized and fallacious narrative, crafted and promoted by clinician-advocates, [and] has failed to withstand scientific scrutiny internationally, with **public health authorities in Sweden, Finland, and most**

---

[18] E. Abbruzzese, S. Levine, and J. Mason, "The Myth of 'Reliable Research' in Pediatric Gender Medicine: A critical evaluation of the Dutch Studies — and research that has followed," JOURNAL OF SEX & MARITAL THERAPY at 1 (Jan. 2, 2023).

[19] "Plaintiff's Memorandum in Support of Temporary Injunction," *B.P.J. v. W. Va.*, Case No. Case 2:21-cv-00316, Dkt. 201-7, (filed in S.D. W. Va., May 26, 2021).

**recently England doing a U-turn on pediatric gender transitions in the last 24 months**."[20]

In reality, it has not been shown "that the benefits [of 'gender-affirming care'] were substantial enough to outweigh the burden of lifelong dependence on medical interventions, infertility and sterility, and various physical health risks. The studies also failed to quantify the risk to 'false positives' — that is, those gender dysphoric youth whose distress would have remitted with time without resorting to irreversible medical and surgical interventions." *Id.* at 3.

### C.    "Gender-affirming" Medical Intervention Creates Lifelong Physical Harms to "Transitioning" Child Victims.

The journal article "The Myth of 'Reliable Research,'" discussed *supra*, examined several Dutch studies which claim a high degree of success in addressing "mental health" of youth with "gender dysphoria" through "gender-affirming" medical procedures.  But "[t]he Dutch studies **did not evaluate physical health outcomes** of "gender-affirmative" treatments." *Id.* at 5 (emphasis added).

The studies from Holland "reported on only their best-case outcomes at each of the three phases of treatment (puberty blockers, cross-sex hormones, and surgery) — while failing to report the outcomes of the less positively affected, or even

---

[20] "The Myth of 'Reliable Research'" at 20 (emphasis added).

18

harmed, cases." *Id.* One of the Dutch "studies" in 2014 "studied" only 70

subjects. *Id.* at 7.

> The 70 participants who began the 2014 study, already biased toward
> more positive outcomes, shrank to 55. Fifteen subjects were dropped
> from the study and relabeled "nonparticipants." This subset,
> however, was not random, but instead heavily skewed toward
> **subjects who experienced serious problems**, including **3 who
> developed severe diabetes and obesity and 1 death** following
> surgical complications. [*Id.* (emphasis added).]

With several years now to evaluate the Dutch studies, "an examination of the

outcomes reveals that standard measures of psychological functioning such as

anxiety, depression, anger, and global function showed very little clinically

significant change after treatment." *Id*. at 10. In fact, "[e]ven without setting out

to assess the risks, the Dutch research inadvertently revealed that the rate of

short-term morbidity and mortality associated with 'gender-affirming'

interventions may be as high as 6%-7%." *Id.* at 5.

Although the Dutch practitioners claim "positive" effects from significant

medical interventions, psychotherapy was also a major factor in obtaining their

allegedly "positive" results. "Contrary to the now-common but erroneous

assertion by the U.S. gender medicine establishment that psychotherapy for gender

dysphoria is akin to 'conversion' and should be avoided or even banned, the Dutch

studies reveal that psychotherapy was a key element of the protocol." *Id*. at 11.

The journal article points out, "Patients and their families cannot make informed decisions about a treatment when the physical health risks are assumed to be minimal and not reported, and only the potential psychological benefits are considered." *Id.* at 11-12. Yet gender ideology activists trumpet often-exaggerated "mental health" costs of giving "transgender" youth undesired information (the reality that they are biologically male or female), while ignoring or even concealing the physical health costs endemic to "gender care" medical intervention. More than a quarter of the patients in the Dutch protocols expressed "reproductive regret," after surgery to "alter" their sex led to sterility and inability to have children. *Id.* at 19. Over 60 percent of the Dutch subjects were still single in their early to mid-30's. "Relationship difficulties" were frequent. *Id.* Some 70 percent of male-to-female "transitioners" reported that their surgeries caused difficulty with sexual functions. *Id.* "The rate of medical detransition is already 10%-30% just a few years following transition," and these numbers "are likely to rise in the future as regret historically has taken over a decade to materialize." *Id.* at 19-20.

Additionally, the Endocrine Society has been a persistent advocate for such treatments as sex reassignment surgeries and puberty blockers as "gender-

affirming care."[21]  But according to its own protocols, its recommendations for

hormone therapy and sex reassignment surgery are based on "low quality" or "very

low quality" evidence.  *Id.* at 3872, 3880, 3894.  According to the Society,

evidence shows a "**young average age at death** following [sex reassignment]

surgery and [a] relatively larger number of individuals with somatic morbidity."

*Id*. at 3894 (emphasis added).  In its rush to impose gender ideology on

impressionable youth, the activists have heaped real pain on real children.  As

professors Ryan Anderson and Robert George explain:

> Not only are some medical professionals affirming falsehoods, they are
> mutilating bodies in the process.  So they are deploying bad means
> (mutilation) in the service of bad ends (affirming falsehoods)....
> [R]emoving reproductive organs and using plastic surgery to create parts or
> appendages that resemble those of the opposite sex (or neither, or both),
> mutilates the body in an effort to reinforce false beliefs at odds with reality.
> This is a misdirection of the medical profession, a violation of sound
> medical ethics.[22]

In 2022, Chloe Cole (a teen from California who had "de-transitioned" from

identifying as a boy, back to a girl) testified to the Florida legislature about her

deep sense of loss after radical "gender-affirming" surgery.  "I really didn't

---

[21]  Endocrine Society, "Endocrine Treatment of Gender-Dysphoric/ Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," J Clin Endocrinol Metab. 3869 (Nov. 2017).

[22]  R. Anderson and R. George, "Physical Interventions on the Bodies of Children to 'Affirm' their 'Gender Identity' Violate Sound Medical Ethics and Should be Prohibited," *Public Discourse* (Dec. 8, 2019).

21

understand all of the ramifications of any of the medical decisions that I was making," she testified. "I was unknowingly physically cutting off my true self from my body, irreversibly and painfully."[23] She told Florida Surgeon General Joseph Ladapo, "I don't know if I'll be able to fully carry a child.... And because I do not have my breasts, … I am not able to breastfeed whatever future children I have." *Id*.

Sweden's Christopher Gillberg, a world leader in child psychiatry, has called unproven medical interventions on "trans-identifying" children "possibly one of the greatest scandals in medical history."[24] Victims of the scandal, like Chloe, are collateral damage of the hoax.

On January 26, 2023, Missouri attorney general Andrew Bailey received a disturbing letter from Jamie Reed. Reed is a self-described "queer woman ... politically to the left of Bernie Sanders" and "married to a transman."[25] Reed was writing to Bailey as a whistleblower on the Washington University Transgender Center at St. Louis Children's Hospital, where she worked for four years. "During

---

[23] T. O'Neil, "California ex-trans teen backs Florida ban on Medicaid funds for transgender medical interventions," *Fox News* (Jul. 10, 2022).

[24] J. Van Maren, "World-renowned child psychiatrist calls trans treatments 'possibly one of the greatest scandals in medical history,'" The Bridgehead (Sept. 25, 2019).

[25] J. Reed, "I Thought I Was Saving Trans Kids. Now I'm Blowing the Whistle," *The Free Press* (Feb. 9, 2023).

my time at the Center cases of questionable treatment and failure to adhere to the

appropriate and applicable standard of care far outweighed the cases where clear

positive outcomes were seen," Reed wrote.[26]   "[W]hat is happening [to children] is

morally and medically appalling." *Id.*   Reed warned that "[t]he Center Clinic

directors and administrators created a culture of, 'get on board or get out' and

regularly intimidate Center staff in an attempt to silence ethical and medical

concerns...." *Id*.

> Medical harm and injury I witnessed include vaginal lacerations that
> required surgical repair due to the testosterone's damage to the vaginal
> tissues, liver injury due to medications being prescribed that are not within
> any standards of care (bicalutamide), mental health worsening after
> initiation of puberty blockers and cross sex hormones (including suicide
> attempts and increased hospitalizations), and harm to families.  [*Id.*]

Gender ideology advocates cite polls like one from the *Washington Post*

showing 78 percent of adults satisfied with their "gender transition."[27]   But the

American Psychiatric Association's DSM-5 still concedes that "as many as 98% of

gender confused boys and 88% of gender confused girls eventually accept their

biological sex after naturally passing through puberty."[28]   Just because many

---

[26]  J. Reed, Letter to the Hon. Andrew Bailey, Attorney General of Missouri
(Jan. 26, 2023).
[27]  "Transgender adults more satisfied after transitioning," *Scripps News*
(Mar. 24, 2023).
[28]  "Gender Ideology Harms Children," *American College of Pediatricians*
(Sept. 2017).

people eventually come to terms with their "gender transition" does not mean that the choice was healthy and not harmful.

"The most thorough follow-up of sex-reassigned people — extending over 30 years and conducted in Sweden, where the culture is strongly supportive of the transgendered — documents their lifelong mental unrest.  Ten to 15 years after surgical reassignment, the suicide rate of those who had undergone sex-reassignment surgery rose to **20 times that** of comparable peers" (emphasis added).[29]  "[D]eath due to neoplasm and cardiovascular disease was increased 2 to 2.5 times as well....  [M]ortality from this patient population did not become apparent until after 10 years.  The risk for psychiatric hospitalization was 2.8 times greater than in controls even after adjustment for prior psychiatric disease." *Id.*

## IV.    THE COURTS HAVE NO AUTHORITY TO REINTERPRET TEXT TO CREATE RIGHTS OUT OF WHOLE CLOTH.

In an effort to determine the meaning of Title IX and the Equal Protection Clause, it must be conceded that there is no relevant "historical tradition" (*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127 (2022)) supporting Appellant's view on either legal theory.  As the gender ideology advocates themselves concede, "[p]articularly since the Supreme Court ruled conclusively on

---

[29]  D. R. Anderson, "Sex Reassignment Doesn't Work.  Here Is the Evidence," *Heritage Foundation* (Mar. 9, 2018).

the constitutionality of same-sex marriage in 2015, transgender issues have come to be considered a cutting edge of the civil rights agenda....  In the second decade of the twenty-first century, transgender people and topics have become ubiquitous in the mass media as well as on social media."[30]

   Much has changed in America since 1972, but what has not changed is the text, history, or tradition of Title IX or the Equal Protection Clause.  There is nothing "deeply rooted in this Nation's history and tradition" about allowing biological males to compete on female sports teams.  If Congress wishes to expand the coverage of Title IX, it certainly knows how to do so.  This Court should not usurp that legislative function.  Title IX means what it has always meant. It means what it says.  It was intended to give girls equal opportunities with boys in school sports.  Allowing the false illusion of a boy "identifying" as a girl to rob girls of those opportunities is prohibited by the express terms and the clear legislative history of Title IX.  And at a deeply human level, it erases the identities and opportunities of the girls and women robbed of those opportunities today, in the name of destructive gender ideology.  West Virginia's statute upholds the rights of West Virginia's women and girls.  This Court should uphold these as well.

---

   [30]  S. Stryker, "Transgender History in the United States and Places That Matter," *National Parks Service* at 10-36 (2016).

## CONCLUSION

The District Court's Order denying Appellant's motion for summary judgment should be affirmed, with judgment entered for the Defendants-Appellees.

Respectfully submitted,

_/s/ William J. Olson_

| | |
|---|---|
| RICK BOYER | WILLIAM J. OLSON* |
| INTEGRITY LAW FIRM | JEREMIAH L. MORGAN |
| P.O. Box 10953 | ROBERT J. OLSON |
| Lynchburg, VA 24506 | WILLIAM J. OLSON, P.C. |
| | 370 Maple Avenue West, Suite 4 |
| PATRICK MCSWEENEY | Vienna, VA 22180-5615 |
| 3358 John Tree Hill Rd | (703) 356-5070 |
| Powhatan, VA 23139 | *Attorney of Record |
| | |
| JOSEPH P. SECOLA | KERRY L. MORGAN |
| SECOLA LAW OFFICES, LLC | PENTIUK, COUVREUR & KOBILJAK, P.C. |
| 113 Mill Plain Road #1002 | 2915 Biddle Avenue |
| Danbury, CT 06811 | Wyandotte, MI 48192 |
| | |
| J. MARK BREWER | May 3, 2023 |
| BREWER & PRITCHARD, P.C. | _Attorneys for Amici Curiae_ |
| 800 Bering Drive, Suite 201A | |
| Houston, TX 77057 | |

26

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.  That the foregoing Brief *Amicus Curiae* of Public Advocate of the United States, *et al*., in Support of Defendants-Appellees and Affirmance complies with the page limitation set forth by Rule 29(a)(5), because this brief contains 5,953 words, excluding the parts of the brief exempted by Rule 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 18.0.0.200 in 14-point Times New Roman.

   /s/ *William J. Olson*   
William J. Olson
Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Public Advocate of the United States, *et al.*, in Support of Defendants-Appellees and Affirmance, was made, this 3rd day of May, 2023, by the Court's Case Management/Electronic Case Files system upon the attorneys for the parties.

   /s/ *William J. Olson*   
William J. Olson
Attorney for *Amici Curiae*
