No. 23-1078

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

B.P.J., by her next friend and mother, HEATHER JACKSON,

*Plaintiff - Appellant/Cross - Appellee,*

v.

WEST VIRGINIA STATE BOARD OF EDUCATION; HARRISON COUNTY
BOARD OF EDUCATION; W. CLAYTON BURCH, in his official capacity as
State Superintendent; DORA STUTLER, in her official capacity as Harrison
County Superintendent,

*Defendants - Appellees,*
and

WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION,

*Defendant - Appellee/Cross - Appellant,*
and

THE STATE OF WEST VIRGINIA; LAINEY ARMISTEAD,

*Intervenors - Appellees.*

---

On Appeal from the United States District Court for the Southern District of West
Virginia (Charleston Division)
The Honorable Joseph R. Goodwin, District Judge
District Court Case No. 2:21-cv-00316

---

## PLAINTIFF-APPELLANT B.P.J.'S RESPONSE TO THE STATE OF
## WEST VIRGINIA AND LAINEY ARMISTEAD'S MOTION TO SUSPEND
## THE INJUNCTION PENDING APPEAL

---

*Counsel for Plaintiff-Appellant/Cross-Appellee listed on the following page*

Joshua A. Block
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2569

Sruti Swaminathan
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara Borelli
Carl Charles
LAMBDA LEGAL
1 West Court Square
Suite 105
Decatur, GA 30030
Phone: (424) 298-7911

Aubrey Sparks
Nick Ward
AMERICAN CIVIL LIBERTIES
UNION OF WEST VIRGINIA
FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (304) 202-3435

Julie Veroff
Kathleen Hartnett
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000

Elizabeth Reinhardt
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305

Mariah A. Young
COOLEY LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606
Phone: (312) 881-6500

*Counsel for Plaintiff-Appellant/Cross-
Appellee B.P.J.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................1

FACTUAL BACKGROUND ...............................................4

ARGUMENT .....................................................................5

    I.    The Majority of the Motion Should Be Disregarded as an Impermissible Supplemental Brief. ...........................................5

    II.    The State and Intervenor Have Not Met Their High Burden to Justify Suspending the Injunction. ...........................................8

        A.    The State and Intervenor Have Not Shown a Change in Factual Conditions. ................................................10

        B.    The State and Intervenor Have Not Shown that Any Alleged Change Is Significant Enough to Warrant Suspending the Preliminary Injunction. ....................................14

            1.    B.P.J.'s Track-and-Field Results Do Not Alter Her Likelihood of Success on the Merits. ...........................15

            2.    B.P.J.'s Track-and-Field Results Do Not Alter the Equities or Jeopardize the Public Interest. ...................19

        C.    The State and Intervenor Have Not Shown that Suspending the Injunction Is Tailored to the Allegedly "New" Facts. ........................................21

CONCLUSION ................................................................22

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Am. Coll. of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*,
  506 F. Supp. 3d 328 (D. Md. 2020)......................................................................9

*Centennial Broad., LLC v. Burns*,
  433 F. Supp. 2d 730 (W.D. Va. 2006)...........................................................6, 12

*Favia v. Ind. Univ. of Penn.*,
  7 F.3d 332 (3d Cir. 1993) ...............................................................................6, 12

*Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States*,
  No. 4:18-CV-148, 2023 WL 1110298 (E.D. Va. Jan. 30, 2023).......................12

*Gooch v. Life Invs. Ins. Co. of Am.*,
  672 F.3d 402 (6th Cir. 2012) ..............................................................................8

*Hecox v. Little*,
  479 F. Supp. 3d 930 (D. Idaho 2020) ...............................................................20

*Horne v. Flores*,
  557 U.S. 433 (2009).............................................................................................2

*L.J. v. Wilbon*,
  633 F.3d 297 (4th Cir. 2011) ....................................................................5, 8, 15

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
  60 F.3d 823, 1995 WL 406612 (4th Cir. 1995)................................................6, 9

*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992).................................................................................8, 12, 21

*Sprint Commc'ns Co. L.P. v. Cat Commc'ns Intern., Inc.*,
  335 F.3d 235 (3d Cir. 2003) ...............................................................................6

*Stone v. Trump*,
  400 F. Supp. 3d 317 (D. Md. 2019).........................................................5, 8, 14

*Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 404 F. 3d 821 (4th Cir. 2005) .....12

ii

## TABLE OF AUTHORITIES
### (continued)

**Page**

**Statutes**

W. Va. Code § 18-2-25d(a)(3) ......................................................................20

**Other Authorities**

Fed. R. App. Proc. 28(c) ...............................................................................6

**INTRODUCTION**

In February 2023, this Court granted B.P.J.'s request to restore, pending appeal, the preliminary injunction that had allowed B.P.J. to participate on the girls' cross-country and track-and-field teams at her middle school for three seasons, since fall 2021. (ECF 50.) The Supreme Court declined to disturb that decision. (ECF 88-2.) B.P.J. then spent spring 2023 doing exactly what this Court's interim order contemplated her doing: playing on her school's track-and-field team with her friends, trying to improve her performance, and competing in meets where she tried her best. As with the previous year's track-and-field season, B.P.J. supported her teammates, had fun, and placed ahead of some girls and behind others in her events of shotput and discus. (She was too slow to compete in the track events.)

The State of West Virginia and Intervenor Lainey Armistead (a former West Virginia college soccer player who lives in Florida, and who never competed against B.P.J. or any transgender athlete (JA0036, JA1655)) now come to this Court complaining about B.P.J.'s entirely predictable spring track-and-field season. They argue the injunction pending appeal should be suspended, and that B.P.J. should be barred from trying out for the cross-country team this fall, because she worked hard to improve her performance in shotput and discus and placed ahead of some girls at meets. None of the other Defendants joined the motion. (Mot. 7 n.2.)

1

The State and Intervenor's request is meritless and should be denied. To start, large portions of the motion are not even addressed to the standard for suspending an injunction and instead attempt to rehash and supplement arguments from their merits briefing. The Court should reject this back-door attempt to submit an unauthorized supplemental brief.

As to the test for suspending a preliminary injunction, B.P.J.'s spring track-and-field results do not constitute a "significant change . . . in factual conditions" that "render[] continued enforcement" of the preliminary injunction pending appeal "detrimental to the public interest." (Mot. 7 (quoting *Horne v. Flores*, 557 U.S. 433, 447 (2009)).) The State and Intervenor come nowhere close to meeting their heavy burden to show otherwise.

*First*, nothing has changed since the Court's interim order. Before that order was granted, B.P.J. had placed ahead of other girls in sports competitions for three seasons—a point Defendants emphasized in (unsuccessfully) opposing interim relief and then (unsuccessfully) asking the Supreme Court to vacate this Court's order. *See infra* Section II.A.

*Second*, even if B.P.J.'s track-and-field results represented a significant change in factual conditions, they do not render the injunction at odds with the public interest. The State and Intervenor have not shown that B.P.J.'s results alter her likelihood of success on the merits of her claims, or that they change the conclusion

2

that the equities and public interest are best served by allowing her the opportunity to play sports like any other girl at her school pending appeal.

The State and Intervenor's claim that B.P.J. is on some unusually accelerated trajectory of athletic improvement (Mot. 7)—and the associated implication that her improvement is because she is transgender (Mot. 12)—is based on misleading math and unfounded assumptions.  B.P.J. improved her performance in shotput and discus this year as compared to her sixth-grade year—when she was totally new to the events, having elected to try them after being too slow to take part in the running events (JA4285)—through commitment and hard work.  As explained below, the numbers actually show that B.P.J.'s improvement is apace with that of her cisgender peers.  And in any case, a girl like B.P.J. placing ahead of other girls does not result in cognizable harm.  It did not in February, when the Court granted interim relief that the Supreme Court let stand, and it does not now.

*Third*, suspending the preliminary injunction pending appeal is not responsive to the supposedly changed conditions.  The notion that B.P.J.'s performance in shotput and discus will translate into faster running times in cross country is pure speculation.

The State and Intervenor's motion to suspend the injunction pending appeal should be denied.

3

## FACTUAL BACKGROUND

B.P.J. is a 13-year-old girl who is transgender.  As a result of receiving puberty-delaying medication and estrogen hormone therapy, she has never gone through endogenous puberty and instead has hormone levels within the typical range of cisgender girls her age.  (JA0877; JA1743; JA2147; JA3088; JA4257; JA4281; JA4284-4285; Pltf. Resp. App. (Decl. of Heather Jackson) ¶ 4.)

B.P.J. loves playing team sports.  Because of the District Court's July 2021 as-applied preliminary injunction, B.P.J. was able to participate on Bridgeport Middle School's girls' cross-country and track-and-field teams as a sixth grader, and on the cross-country team as a seventh grader.  (JA0899; JA4285-4286; Jackson Decl. ¶ 5.)  B.P.J. consistently placed in the back of the pack during both cross-country seasons.  For track-and-field, she was too slow to make the team for the girls' running events, so participated exclusively in shotput and discus instead, and regularly placed near the bottom in meets.  (JA4285-4286.)

After this Court granted B.P.J.'s request to stay dissolution of the preliminary injunction (ECF 50), B.P.J. was able to participate on the girls' track-and-field team as a seventh grader.  Once again, she was too slow to compete in the running events, so continued with shotput and discus.  (Jackson Decl. ¶ 6.)  B.P.J. did not take that opportunity to participate for granted, worked hard to improve her performance, and put in her best effort at every practice and track meet.  (*Id.* ¶ 7.)  She practiced for

4

hours after school and on weekends to better her throwing form. (*Id.*) Because of her hard work, B.P.J.'s shotput and discus improved over her results from sixth grade.[1] (Mot. App. 1-2.) B.P.J.'s mother has been incredibly proud to watch her daughter persevere and always participate with enthusiasm. (Jackson Decl. ¶¶ 7-8.)

This fall, B.P.J. will be an eighth grader at Bridgeport Middle School. She is excited to try out for the girls' cross-country team. Although she is far from the fastest runner, she loves getting out on the field and doing her best. She hopes to have the opportunity to run again with teammates who she now considers her second family, just as she did as a sixth and seventh grader. (Jackson Decl. ¶¶ 5, 10.)

## ARGUMENT

### I. The Majority of the Motion Should Be Disregarded as an Impermissible Supplemental Brief.

Most of the State and Intervenor's motion is not directed to the specific question at hand: whether a "'significant change . . . in factual conditions'" has occurred "that makes 'enforcement of the [preliminary injunction] . . . detrimental to the public interest.'" *Stone v. Trump*, 400 F. Supp. 3d 317, 331-32 (D. Md. 2019) (quoting *L.J. v. Wilbon*, 633 F.3d 297, 305 (4th Cir. 2011)) (alterations in *Stone*). Instead, the motion is largely a supplemental brief on the merits, repeating arguments

---

[1] The State and Intervenor's framing of B.P.J.'s results, especially as compared to other girls on her school's team, is misleading. *See infra* Section II.B.1.

that the State and Intervenor have made in prior briefing, and belatedly citing sources that they could have included in their merits briefing but did not.

"Unless the court permits, no further briefs may be filed" after a reply brief. Fed. R. App. Proc. 28(c). And "a party moving to dissolve a preliminary injunction should not be permitted to relitigate arguments 'that have already been considered . . . in [the] initial decision.'" *Centennial Broad., LLC v. Burns*, 433 F. Supp. 2d 730, 734 (W.D. Va. 2006) (quoting *Sprint Commc'ns Co. L.P. v. Cat Commc'ns Intern., Inc.*, 335 F.3d 235, 242 (3d Cir. 2003)); *see also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 60 F.3d 823, 1995 WL 406612, at *2 (4th Cir. 1995) (unpublished table decision) ("The motion [to modify a preliminary injunction] . . . should not serve as an avenue of untimely review of that determination.") (quoting *Favia v. Ind. Univ. of Penn.*, 7 F.3d 332, 340 (3d Cir. 1993)). This Court thus should disregard as an unauthorized supplemental brief the substantial portions of the motion that do not pertain to B.P.J.'s spring track-and-field performance.

The motion rehashes the State and Intervenor's prior briefing in its discussion of the supposed reasons the West Virginia Legislature enacted H.B. 3293 and the reasons for and benefits of sex-separated sports; its erroneous claim that B.P.J. is asking for sports teams to be separated according to gender identity; and its slanted recitation of the procedural history. (*Compare* Mot. 2-5 *with* ECF 48-1 at 1-5; ECF

89 at 3-15.)  And it cites legal authority that they could have, but did not, include before.  (Mot. 3 (newly citing *Lafler*).)

The motion also repeats the State and Intervenor's prior briefing in arguing that B.P.J. is unlikely to prevail on the merits of her equal protection and Title IX claims.  (*Compare* Mot. 13-15 *with* ECF 48-1 at 8-20; ECF 89 at 17-53.)  In so doing, the State and Intervenor augment their prior presentation with an article they could have included in their earlier briefs but did not.  (Mot. 14 (newly citing Boogers, et al.).)  They also improperly respond to aspects of B.P.J.'s reply brief with points that do not pertain to her spring track-and-field results.  (Mot. 13 (seeking to fault B.P.J. for not addressing *Bauer*).)

Furthermore, the State and Intervenor attempt to bolster their arguments concerning the equities and the public interest with extensive citations about the benefits to girls of participating in school sports, which could have been submitted previously but were not, and which do not hinge on the supposedly "new" facts. (Mot. 15-17 (newly citing *Parker*, Koller, George, Lourdes Cordoba, Mitten & Ross, Feigley, Yuracko).)

The State and Intervenor likewise seek to inappropriately supplement their prior briefing regarding their (incorrect) contention that the stigma and hurt B.P.J. would experience if subjected to H.B. 3293's discrimination are not cognizable injuries.  (Mot. 18-19 (newly citing *Peeples*, *Beltran*, *Guerra*).)  They do the same

7

concerning their argument that preventing a state from enforcing a duly enacted law harms the public interest.  (Mot. 19-20 (newly citing *Berman*, *Karr*, *Equity in Athletics*).)

The State and Intervenor may not use B.P.J.'s track-and-field performance this spring—itself nothing new, *see infra* Section II—as a backdoor to supplement their merits briefing.  This Court therefore should strike as an unauthorized supplemental brief all portions of the State and Intervenor's motion that do not pertain to the allegedly "changed" facts and whether they justify modification of the injunction.[2]

## II.    The State and Intervenor Have Not Met Their High Burden to Justify Suspending the Injunction.

The State and Intervenor face a high burden in asking this Court to suspend the injunction pending appeal.  "[S]uch judicial intervention is guarded carefully." *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012).  Accordingly, the State and Intervenor "must establish 'a significant change either in factual conditions or in law' that makes 'enforcement of the preliminary injunction . . . detrimental to the public interest.'"  *Stone*, 400 F. Supp. 3d at 331-32 (quoting *L.J.*, 633 F.3d at 305) (cleaned up); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992) (same); (Mot. 7).  "'Minor changes in the facts or law usually

---

[2] None of the repeated points made by the State and Intervenor, or their new citations, entitle them to any relief, for the reasons set forth in B.P.J.'s prior briefing.

are insufficient.'" *Am. Coll. of Obstetricians & Gynecologists v. U.S. Food & Drug Admin.*, 506 F. Supp. 3d 328, 338 (D. Md. 2020) (quoting *Multi-Channel TV*, 1995 WL 406612, at *3).

The State and Intervenor fail to carry their heavy burden. They contend that B.P.J.'s shotput and discus performance this past spring—when, as a seventh grader, she improved upon her results as a sixth grader, and placed ahead of some cisgender girls (and behind others)—constitutes a significant change in factual circumstances warranting suspension of the preliminary injunction pending appeal because "[w]e now know that *dozens* of young student-athletes have" placed behind B.P.J. (Mot. 1; *see also id.* at 8.) But the fact that B.P.J. outperformed some cisgender girls is not new—the same was true each of the three seasons she played school sports while the preliminary injunction was in place, as the State and Intervenor emphasized to this Court when B.P.J. sought interim relief. *See infra* Section II.A.

Moreover, B.P.J.'s seventh-grade track-and-field results do not render maintenance of the preliminary injunction pending appeal inequitable. They do not alter the conclusions that B.P.J. remains likely to succeed on the merits of her claims and that the equities and public interest overwhelmingly favor allowing her to participate in girls' school sports. *See infra* Section II.B.

Finally, even if the State and Intervenor could show that B.P.J.'s spring shotput and discus results constitute a significant change in circumstances,

9

suspending the injunction pending appeal would not be "suitably tailored to the changed circumstance," *Rufo*, 502 U.S. at 383, because the effect will be to bar her from trying out for cross-country, a totally different sport. *See infra* Section II.C.

Because the State and Intervenor's motion fails at every step of the analysis, the Court should deny their request.

## A.    The State and Intervenor Have Not Shown a Change in Factual Conditions.

B.P.J.'s track-and-field performance this past spring is not a change in factual conditions. When this Court entered its interim order in February 2023, B.P.J. had already competed on girls' teams at Bridgeport Middle School for three seasons and placed ahead of some cisgender girls. (JA4285-JA4286.) For example, at track-and-field meets in spring 2022, when B.P.J. was in sixth grade, she placed 35 out of 53 participants and 15 out of 25 participants in discus, and 36 out of 45 participants and 57 out of 61 participants in shotput. (JA4285-JA4286.)

In opposing interim relief, the State and Intervenor made the exact same argument animating their current motion—*i.e.*, that B.P.J. is displacing cisgender girls by outperforming them. Specifically, the State and Intervenor asked this Court not to reinstate the preliminary injunction pending appeal because B.P.J. was "routinely defeating and displacing many female athletes." (ECF 48-1 at 5.) They invited this Court to "[c]onsider the scores of girls who have already lost to B.P.J. in competitions." (*Id.* at 20.) Those girls, they said, had been "harmed, and more girls

10

will be," and "[t]heir harms should not be forgotten, erased, or dismissed." (*Id.* at 2.) They argued that reinstating the preliminary injunction would "harm all females who compete against and lose to B.P.J. this spring and beyond" (*id.* at 20), because "bumping other girls down the standings harms them" (*id.* at 21). And they advised this Court that B.P.J. "may not finish 'near the back of the pack' much longer" because she would "train to win" and, "[a]s B.P.J. grows, B.P.J. will more likely begin beating the competition." (*Id.*)

After this Court rejected those arguments and granted B.P.J.'s request to restore the preliminary injunction pending appeal, the State and Intervenor went to the Supreme Court, where they likewise emphasized that B.P.J. had placed ahead of cisgender girls in athletic competitions. They told the Supreme Court that "[j]ust during the time that the preliminary injunction was in place, . . . B.P.J. displaced girls 105 times across eleven events" (Defs.' U.S. Sup. Ct. App. at 36), that "B.P.J. finished in front of numerous female runners," that "B.P.J. displaced 18 female athletes who would have finished higher," and that she "displaced other athletes at other events last fall" (Defs.' U.S. Sup. Ct. Reply at 12). They argued, as they do here, that "bumping other girls down the standings . . . harms them" (Defs.' U.S. Sup. Ct. App. at 36) and that "placements matter—particularly to athletes trying to build up finishes, spots, qualifying times, and points to qualify for more competitive races and future championship competitions" (Defs.' U.S. Sup. Ct. Reply at 12).

And they cautioned that "[a]s B.P.J. grows, more girls will fall behind more often." (Defs.' U.S. Sup. Ct. App. at 36)

Thus, fully cognizant that B.P.J. had placed ahead of other girls in various competitions, and despite the State and Intervenor's arguments that such alleged "displacement" was likely to continue, this Court and the Supreme Court allowed B.P.J. to continue to have the opportunity to play on her school's girls' sports teams pending appeal. That B.P.J. has done exactly what this Court and the Supreme Court allowed her to do—play on her school's girls' sports teams—is not a change in factual circumstances. *See Favia*, 7 F.3d at 338 ("A motion to modify a preliminary injunction is meant only to relieve inequities that arise *after* the original order." (emphasis added)); *Centennial Broad.*, 433 F. Supp. 2d at 734-35 (explaining a party may not "seek[] to dissolve a preliminary injunction based solely on the amplification of old theories . . . whether or not they have been amplified by new 'facts' or refashioned arguments"); *Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States*, No. 4:18-CV-148, 2023 WL 1110298, at *2 (E.D. Va. Jan. 30, 2023) (the change in facts must have been "unforeseen" (quotation marks omitted)); *cf. Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 404 F. 3d 821, 827 (4th Cir. 2005) ("'[M]odification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree.'" (quoting *Rufo*, 502 U.S. at 385)).

The State and Intervenor nonetheless misleadingly suggest that things have changed because B.P.J. "told the Court a few months ago . . . that not one 'single person' would be harmed by enjoining" H.B. 3293, thus implying that B.P.J. promised she would not place ahead of any cisgender girls. (Mot. 1; *see also id.* at 8.) But B.P.J. never suggested that she would always finish last or make no effort to improve her performance.[3] B.P.J.'s position was and continues to be that B.P.J. has no innate athletic advantage by virtue of the sex she was designated at birth, and that placing ahead of other girls in competitions is not cognizable harm to those girls. *See infra* Section II.B.2. Moreover, B.P.J. and her mom both told this Court how important it is to B.P.J. that she always try her best and how much she loves the feeling of working hard. (JA4282, JA4286.) Trying her best and working hard is precisely what she has done.

The State and Intervenor further misrepresent B.P.J.'s prior briefing by claiming that she agreed that the Court could revisit its interim order and modify the injunction "if B.P.J. started displacing more girls." (Mot. 13 (citing ECF 49 at 15 n.10).) B.P.J. said no such thing. Rather, in response to Defendants' crass suggestion that "puberty" could "catapult [her] from zero to hero quickly" (ECF 48-

---

[3] When B.P.J. rejected "Defendants' hypotheticals" as implausible (Mot. 8 (quoting ECF 34-1 at 21)), she was referring to Defendants' suggestion that there might be "a biological male whose gender identity switches 'back and forth'" seeking to participate on girls' teams. (ECF 34-1 at 21.)

1 at 21), B.P.J. explained that no such risk existed because she "will be going through a typically female puberty," but "[s]hould some unexpected circumstance arise"— *i.e.*, should B.P.J. change her medical care and instead go through a typically male puberty—"Defendants could always seek to modify the injunction" (ECF 49 at 15 n.10). B.P.J.'s medical care has not changed since the Court's interim order. As noted above, she continues to receive hormone therapy to suppress her endogenous puberty and induce a typically female puberty, and her hormone levels are within the range typical of cisgender girls. (Jackson Decl. ¶ 4.)

This past spring, as in the three sports seasons before, B.P.J. outperformed some cisgender girls, and placed behind many others. (Or, in the State and Intervenor's framing, cisgender girls displaced B.P.J. 108 times this track-and-field season.) (Mot. App. 1-2.) Because the State and Intervenor have failed to identify a change in factual conditions, there is no basis for suspending the preliminary injunction pending appeal.

**B.    The State and Intervenor Have Not Shown that Any Alleged Change Is Significant Enough to Warrant Suspending the Preliminary Injunction.**

Having failed to show a change in factual circumstances, the State and Intervenor necessarily cannot satisfy the second prong of their burden—showing that the change in factual circumstances is "significant" such that it "makes 'enforcement of the [preliminary injunction] . . . detrimental to the public interest.'" *Stone*, 400 F.

14

Supp. 3d at 331-32 (quoting *L.J.*, 633 F.3d at 305) (alterations in *Stone*).  B.P.J.'s shotput and discus results from this spring do not change the fact that she is likely to succeed on the merits of her claims, or that a preliminary injunction pending appeal is consistent with the equities and the public interest.

### 1.   B.P.J.'s Track-and-Field Results Do Not Alter Her Likelihood of Success on the Merits.

The State and Intervenor contend that B.P.J.'s track-and-field results show she has an innate physiological advantage over her cisgender girl peers because she is transgender, and therefore are relevant to whether, for purposes of equal protection, H.B. 3293's categorical exclusion satisfies heightened scrutiny as to B.P.J. and to whether, for purposes of Title IX, B.P.J. is similarly situated to cisgender girls.  (Mot. 14-15.)  They are wrong.  B.P.J.'s track-and-field performance this past spring does not alter her likelihood of success on her equal protection and Title IX claims.

The State and Intervenor seek to paint B.P.J.'s improved performance as significant and anomalous, claiming she "is outpacing girls in performance growth at an unusual rate" and implying this relates to her being a girl who is transgender. (Mot. 12.)  But the data do not back up those assertions.  B.P.J.'s relatively modest improvements in performance are the result of experience and hard work and do not indicate that she has an innate biological advantage over her cisgender girl peers.

First, the State and Intervenor's math is faulty.  They purport to compare B.P.J.'s rate of improvement in shotput to the rate of improvement experienced by

two other girls from her middle school, and assert that B.P.J.'s "best distance improved by 53%" whereas the other girls improved "by roughly 32% and 9%." (Mot. 12.)  But they arrive at those figures by using one time period for B.P.J. and a different time period for the other girls.   For B.P.J., they compare her last performance in 2022 as a *sixth* grader with her best performance in 2023 as a *seventh* grader—*i.e.*, *across two seasons*.  (*Id.*)  For the other two girls (I.M. and A.V.), however, the State and Intervenor compare their first performance in 2023 with their best performance in 2023—*i.e.*, *within a single season*.  (Mot. 12 (explaining the rate calculation is "over the course of the spring").)  Using the same single-season, first vs. best approach for B.P.J. that the State and Intervenor use for B.P.J.'s peers, her rate of improvement this spring was *16%* (24' 11" to 28' 10")—far lower than the 32% rate achieved by her cisgender peer I.M.  (Mot. App. 1, 35.)

The State and Intervenor engage in a similarly misleading presentation regarding B.P.J.'s discus performance, calculating B.P.J.'s rate of improvement by comparing her last result as a sixth grader in 2022 with her best result as a seventh grader in 2023, while comparing worst vs. best results only in spring 2023 for two other Bridgeport Middle School seventh graders.  (Mot. 12.)

Of course B.P.J. performed better as a seventh grader in her second year of doing shotput and discus than she did as a sixth grader in her first year of doing those events—she is now older and more experienced with those events.  Coming in 11th

16

out of 41 in shotput as a seventh grader at a meet where she came in 36th out of 45 as a sixth grader; sometimes finishing in the top 10 in shotput and discus this year; and even attending the conference championship in those events this year do not constitute a change in factual conditions—let alone a *significant* change affecting B.P.J.'s likelihood of success on the merits.

Moreover, the State and Intervenor cherry-pick which cisgender peers to compare B.P.J. against to produce their desired framing of the "facts" and avoid inconvenient realities.  For shotput, they compare her to I.M. and A.V., and for discus, they compare her to A.V. and E.C.  (Mot. 12; Mot. App. 35-36, 39-40.)  They apparently ignore I.M. when it comes to discus because I.M. significantly improved her discus performance during the 2023 season.  Using the State and Intervenor's first vs. best meet in 2023 metric, I.M.'s rate of improvement was 58% (64' 2" to 101' 5")—far surpassing B.P.J.'s first vs. best rate of 32% (52' 1" to 68' 7").  (Mot. App. 1-2, 35-36.)

The State and Intervenor also ignore that when B.P.J. began participating in shotput and discus, her throwing distances were much worse than those of her peers when they began competing in those events.  For example, B.P.J.'s first shotput result at a track-and-field meet was 18' 6'5", whereas A.V.'s was 26'1.5", I.M.'s was 20' 0.75", and E.C.'s was 20' 5.5".  (Mot. App. 2, 37, 39-40.)  Likewise for discus, B.P.J.'s distance her first meet was 31' 11.5", whereas A.V.'s was 51' 9",

I.M.'s was 34' 4.5", and E.C.'s was 38' 1".  (Mot. App. 2, 37, 40.)  B.P.J. thus had far more room to improve than her peers. By describing improvement in terms of percentages, the State and Intervenor obscure these numbers.[4]

Additionally, the State and Intervenor assume, incorrectly and without any basis, that all these girls "train[ed] in much the same way." (Mot. 12.)  Members of the same team can—and often do—put in different amounts of effort, have different numbers of good and bad days, react differently to the pressures of competition versus practice, and so forth.  And students have different baseline abilities, personalities, growth spurt timelines, and the like, all of which result in tremendous variations in athletic performance, including among students of the same gender. (JA3108, JA3785-3788, JA3925.)  In B.P.J.'s case, she made significant strides in her shotput and discus performances this spring because she trained diligently and put in many extra hours after school and on the weekends.  (Jackson Decl. ¶ 7.)

In short, B.P.J.'s improvement has nothing to do with being transgender and everything to do with how much she enjoys pushing herself to do her best as part of a team.

---

[4] The State and Intervenor's "methodology" also elides that a student-athlete's performance does not always improve meet-over-meet.  Sometimes—as for A.V. in shotput and discus in 2023—a personal best occurs before a season low.  (Mot. App. 39.)  Comparing a first meet with a best meet, or a first meet with a last meet, thus does not necessarily capture whether or how much a student improved over time.

**2.    B.P.J.'s Track-and-Field Results Do Not Alter the Equities or Jeopardize the Public Interest.**

As was true when this Court issued its interim order, the equities and public interest overwhelmingly favor maintaining the preliminary injunction allowing B.P.J. the opportunity to participate in girls' school sports pending appeal.

Absent the injunction, B.P.J. will be completely excluded from her school's girls' teams. The District Court correctly recognized in its stay order that "[i]t is in the public interest that all children who seek to participate in athletics have a genuine opportunity to do so." (JA4298; *see also* JA0452 ("It is clearly in the public interest to uphold B.P.J.'s constitutional right to not be treated any differently than her similarly situated peers because any harm to B.P.J.'s personal rights is a harm to the share of American rights that we all hold collectively.").) Nothing about B.P.J.'s performance this spring changes that assessment.

Likewise, nothing about B.P.J.'s performance this spring changes the fact that B.P.J.'s participation on girls' teams harms no one. Without any evidence that B.P.J. has an inherent, unfair advantage over cisgender girls—and there is none—there is no cognizable difference between the harm a cisgender girl experiences when she places behind B.P.J. and the harm she experiences when she places behind another cisgender girl. That was true when this Court granted B.P.J.'s request for interim relief and it is no less true now.

19

The State and Intervenor falsely claim that "B.P.J. has never once disputed that [cisgender] girls can suffer harm from being pushed out of meets and competitions or by being displaced in the competitive standings by a [transgender girl]." (Mot. 17.)   B.P.J. has disputed this notion at every stage of this suit, consistently arguing that her participation does not harm anyone, even when she places ahead of some other girls.  (*See, e.g.*, ECF 49 at 5-6 n.7; ECF 52 at 42-43, 45-46.)  She also has consistently rebutted Defendants' theory that a transgender girl finishing anything other than absolute last constitutes substantial displacement. (*See, e.g.*, ECF 52 at 45-46).

The State and Intervenor's motion confirms their flawed view that H.B. 3293's categorical exclusion is necessary to protect a cisgender girl from ever being bumped down a single spot in an athletic competition.   That is not a credible consideration when evaluating the public interest.  *See Hecox v. Little*, 479 F. Supp. 3d 930, 984-85 (D. Idaho 2020) ("[E]xcluding transgender women and girls from women's sports entirely" is "an invalid interest").[5]

---

[5] Nor is it an important governmental interest for purposes of the heightened equal protection scrutiny analysis, or even consistent with H.B. 3293 itself, which justifies its categorical exclusion based on a concern about "displac[ing] [cisgender] females *to a substantial extent* . . . , as recognized in *Clark v. Ariz. Interscholastic Ass'n* (9th Cir. 1982)."  W. Va. Code § 18-2-25d(a)(3) (emphasis added).

### C.   The State and Intervenor Have Not Shown that Suspending the Injunction Is Tailored to the Allegedly "New" Facts.

As explained, the State and Intervenor cannot meet the standard for suspending the injunction. But even assuming they could, "the [C]ourt should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383. Here, it plainly is not.

The asserted basis for the motion is B.P.J.'s improved shotput and discus performance this past spring relative to how she was performing in girls' school sports as of February 2023, when this Court granted B.P.J.'s request for interim relief. But as the State and Intervenor acknowledge (Mot. 2), the effect of suspending the injunction would be to bar B.P.J. from trying out for and participating on the girls' cross-country team this fall—an entirely different sport. The State and Intervenor offer nothing other than speculation in claiming that B.P.J.'s ability to throw heavy objects is predictive of her running ability. (*See, e.g.*, Mot. 12 ("If B.P.J. improves similarly in cross-country running . . . .")). Indeed, the only reason B.P.J. started doing shotput and discus is because her track-and-field coach encouraged her to try them after she was too slow to qualify for the running events. (JA4285.) Preventing her from participating on the girls' cross-country team this fall—as she has done for the last two seasons—is hardly "tailored" to "the changed circumstance" to which the State and Intervenor point. *Rufo*, 502 U.S. at 383.

21

## CONCLUSION

For the foregoing reasons, the Court should deny the State and Intervenor's motion to suspend the injunction pending appeal.

Dated: July 19, 2023

*/s/ Julie Veroff*

Joshua A. Block
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2569

Sruti Swaminathan
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585

Tara Borelli
Carl Charles
LAMBDA LEGAL
1 West Court Square
Suite 105
Decatur, GA 30030
Phone: (424) 298-7911

Aubrey Sparks
Nick Ward
AMERICAN CIVIL LIBERTIES
UNION OF WEST VIRGINIA
FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (304) 202-3435

Julie Veroff
Kathleen Hartnett
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000

Elizabeth Reinhardt
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305

Mariah A. Young
COOLEY LLP
110 N. Wacker Drive
Suite 4200
Chicago, IL 60606
Phone: (312) 881-6500

*Counsel for Plaintiff-Appellant/Cross-Appellee B.P.J.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A), I certify that this motion complies with applicable type-volume and length limitations because this motion contains 5,198 words.

This motion complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(4)-(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman font.

Dated: July 19, 2023

*/s/ Julie Veroff*
Julie Veroff

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of Plaintiff-Appellant/Cross-Appellee B.P.J., by Her Next Friend and Mother, Heather Jackson, with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on July 19, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 19, 2023

*/s/ Julie Veroff*
Julie Veroff