# EXHIBIT A

2023 WL 4661831
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Helen Doe, et al., Plaintiffs,
v.
Thomas C Horne, et al., Defendants.

No. CV-23-00185-TUC-JGZ
|
07/20/2023

ORDER ON MOTION FOR PRELIMINARY
INJUNCTION AND FINDINGS OF
FACT AND CONCLUSIONS OF LAW

**INTRODUCTION**

*1 Plaintiffs filed this action on April 17, 2023, seeking preliminary and permanent injunctive relief related to the implementation of A.R.S. § 15-120.02, the Save Women's Sports Act ("the Act"), which Plaintiffs allege precludes them from playing on girls' sports teams because they are transgender girls. Plaintiffs assert that they have not undergone male puberty and do not have a competitive or physiological advantage over their non-transgender peers on these teams. Plaintiffs ask the Court for declaratory relief that enforcement by Defendants of Ariz. Rev. Stat. § 15-120.02 violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title IX, 20 U.S.C. § 1681 et seq., the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, et seq.

The Arizona legislature adopted A.R.S. § 15-120.02, effective September 24, 2022, as follows: "Each interscholastic or intramural athletic team or sport that is sponsored by a public school or a private school whose students or teams compete against a public school shall be expressly designated as one of the following based on the biological sex of the students who participate on the team or in the sport: 1) 'males,' 'men' or 'boys'; 2) 'females,' 'women' or 'girls,' and 3) 'coed' or 'mixed.'" "Athletic teams or sports designated for 'females,' 'women' or 'girls' may not be open to students of the male sex." The statute does not apply to "restrict the eligibility of any student to participate in any... athletic team or sport designated as being for males, men or boys or designated as coed or mixed." The statute creates a private cause of action for injunctive relief and damages for any student for a deprivation of an athletic opportunity or who has suffered any direct or indirect harm as a result of a school knowingly violating this section.

The Motion for Preliminary Injunction asks the Court to enjoin enforcement of A.R.S. § 15-120.02 by Defendant Horne and enjoin implementation of and compliance with the Act by Defendants Kyrene Middle School and The Gregory School (TGS) as to Plaintiffs. The Court has granted intervenor status to the legislators who adopted the Act. The Motion for Preliminary Injunction was fully briefed by all parties and the Intervenor Legislators ("Intervenors"). The Court will grant the Motion for Preliminary Injunction pursuant to the Findings of Fact and Conclusions of Law set out below. Defendant Arizona Interscholastic Association, Inc.'s ("AIA") transgender policy, allowing transgender girls to play on teams consistent with their gender identity, complies with the terms of the preliminary injunction.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On July 10, 2023, the Court heard oral argument and took evidence pertaining to Plaintiffs' Motion for Preliminary Injunction. Having heard oral argument, having examined the proofs [1] offered by the parties, and having heard the arguments of counsel and being fully advised herein, the Court now finds generally in favor of Plaintiffs and against the Defendants, and hereby makes the following special Findings of Fact and Conclusions of Law pursuant to the Federal Rules of Civil Procedure, Rule 52(a) and (c) which constitutes the decision of the Court herein:

**I. Findings of Fact**

*2 To the extent these Findings of Fact are also deemed to be Conclusions of Law, they are hereby incorporated into the Conclusions of Law that follow.

**A. Gender identity and gender dysphoria.**
1. "Gender identity" is the medical term for a person's internal, innate, deeply held sense of their own gender. (Dr. Daniel Shumer ("Shumer Decl.") (Doc. 5) ¶ 18.) Everyone has a gender identity. (*Id.*)

2. "Gender identity" differs from "gender role," which are behaviors, attitudes, and personality traits that a particular society considers masculine or feminine, or associates with male or female social roles. For example, the convention that girls wear pink and have longer hair, or that boys wear blue and have shorter hair, are socially constructed gender roles. Gender identity does not refer to socially contingent behaviors, attitudes, or personality traits; it is an internal and largely biological phenomenon. (Shumer Decl. (Doc. 5) ¶¶ 19-22.)

3. There is a consensus among medical organizations that gender identity is innate and cannot be changed through psychological or medical treatments. (Dr. Stephanie Budge Rebuttal ("Budge Decl. (Rebuttal)") (Doc. 65-1) ¶ 31; Dr. Stephanie Budge ("Budge Decl.") (Doc. 4) ¶ 21; Daniel Shumer Rebuttal ("Shumer Decl. (Rebuttal)") (Doc. 65-2) ¶¶ 54–58; Shumer Decl. (Doc. 5) ¶ 23.)

4. When a child is born, a health care provider identifies the child's sex based on the child's observable anatomy. (Budge Decl. (Doc. 4) ¶ 18; Shumer Decl. (Doc. 5) ¶ 27.) This identification is known as an "assigned sex," and in most cases turns out to be consistent with the person's gender identity. (Budge Decl. (Doc. 4) ¶ 18; Shumer Decl. (Doc. 5) ¶ 27.)

5. The term "biological sex" is not defined in the Act, but the Court finds that as used by Defendants it is synonymous with the term "assigned sex." (*See* Declaration of Dr. James M. Cantor ("Cantor Decl.") (Doc. 82-2; Doc. 92-2) ¶¶ 105-107; Declaration of Dr. Gregory A. Brown ("Brown Decl.") (Doc. 82-1; 92-1) ¶ 1; Dr. Emma Hilton ("Hilton Decl.") (Doc. 92-8) ¶¶1.8, ¶ 3.1-3.2 (explaining sex is an objective feature determined at the moment of conception; infants are born male or female, ascertainable by chromosomal analysis or visual inspection at birth).) [2]

6. For a transgender person, that initial designation does not match the person's gender identity. (Budge Decl. (Doc. 4) ¶ 18; Shumer Decl. (Doc. 5) ¶ 27.)

7. Gender dysphoria is a serious medical condition characterized by significant and disabling distress due to the incongruence between a person's gender identity and assigned sex. (Budge Decl. (Doc. 4) ¶ 23; Shumer Decl. (Doc. 5) ¶ 28.) Defendant Horne and Intervenors accept that gender dysphoria is a medical condition. (Preliminary Injunction, Oral Argument: July 10, 2023).

\*3 8. Gender dysphoria is highly treatable. Every major medical association in the United States agrees that medical treatment for gender dysphoria is necessary, safe, and effective. (Budge Decl. (Doc. 4) ¶ 25; Shumer Decl. (Doc. 5) ¶ 30.)

9. "Transgender individuals may experience 'gender dysphoria,' which is 'characterized by significant and substantial distress as result of their birth-determined sex being different from their gender identity.' 'In order to be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.' If left untreated, symptoms of gender dysphoria can include severe anxiety and depression, suicidality, and other serious mental health issues. Attempted suicide rates in the transgender community are over 40%." *Hecox v. Little*, 479 F. Supp. 3d 930, 945-46 (D. Idaho 2020) (cleaned up), *aff'd* No. 20-35813, 2023 WL 1097255 (9th Cir. Jan. 30, 2023).

10. The major associations of medical and mental health providers in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association, and the Pediatric Endocrine Society, have endorsed medical standards of care for treating gender dysphoria in adolescents, which were developed by the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society. (Shumer Decl. (Doc. 5) ¶ 31.)

11. The goal of medical treatment for gender dysphoria is to alleviate a transgender patient's distress by allowing them to live consistently with their gender identity. (Budge Decl. (Doc. 4) ¶ 27; Shumer Decl. (Doc. 5) ¶ 30.)

12. Undergoing treatment to alleviate gender dysphoria is commonly referred to as "transition" and includes one or more of the following components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-delaying medication and hormone-replacement therapy; and (iii) for adults, surgeries to alter the appearance and functioning of primary- and secondary-sex characteristics. (Budge Decl. (Doc. 4) ¶¶ 26– 27; Shumer Decl. (Doc. 5) ¶ 34.)

13. For social transition to be clinically effective, it must be respected consistently across all aspects of a transgender individual's life. (Budge Decl. (Doc. 4) ¶ 27.)

14. At the onset of puberty, adolescents with gender dysphoria may be prescribed puberty-delaying medications to prevent the distress of developing physical characteristics that conflict with the adolescent's gender identity. (Budge Decl. (Doc. 4) ¶ 28; Shumer Decl. (Doc. 5) ¶ 35.)

15. For older adolescents, doctors may also prescribe hormone therapy to induce the puberty associated with the adolescent's gender identity. (Budge Decl. (Doc. 4) ¶ 28; Shumer Decl. (Doc. 5) ¶ 36.)

16. When transgender adolescents are provided with appropriate medical treatment and have parental and societal support, they can thrive. (Shumer Decl. (Doc. 5) ¶ 29.)

17. Untreated gender dysphoria can cause serious harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. (Budge Decl. (Doc. 4) ¶ 33; Shumer Decl. (Doc. 5) ¶ 28.)

*4 18. Being denied recognition and support can cause significant harm, exacerbate gender dysphoria, and expose transgender adolescents to the risk of discrimination and harassment. (Budge Decl. (Doc. 4) ¶¶ 33–34; Shumer Decl. (Doc. 5) ¶ 28.)

19. Attempts to "cure" transgender individuals by forcing their gender identity into alignment with their birth sex are harmful and ineffective. Those practices have been denounced as unethical by all major professional associations of medical and mental health professionals, such as the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association, among others. (Shumer Decl. (Doc. 5) ¶ 25.)

**B. Plaintiffs are transgender girls who have not and will not experience male puberty.**

20. Plaintiff Jane Doe is an 11-year-old transgender girl who will attend Kyrene Aprende Middle School beginning on July 19, 2023. (Jane Doe ("J. Doe Decl.") (Doc. 6) ¶ 1; Helen Doe (Second) ("H. Doe 2nd Decl.") (Doc. 78) ¶ 3.)

21. Jane has lived as a girl in all aspects of her life since she was five years old. (J. Doe Decl. (Doc. 6) ¶ 2; Helen Doe ("H. Doe Decl.") (Doc. 7) ¶¶ 3, 5.)

22. Jane was diagnosed with gender dysphoria when she was seven years old. (H. Doe Decl. (Doc. 7) ¶ 7.)

23. Jane has changed her name through a court order to a more traditional female name and has a female gender marker on her passport. (Pls. Exs. 13 (Doc. 90-1), 15 (Doc. 90-3).)

24. Jane has been monitored by her doctor for signs of the onset of puberty as part of her medical treatment for gender dysphoria. (H. Doe Decl. (Doc. 7) ¶ 11.)

25. At an appointment on June 27, 2023, Jane's doctor prescribed a Supprelin implant, which is a puberty-blocking medication. (Helen Doe (Third) ("H. Doe 3rd Decl.") (Doc. 97-1) ¶ 4.)

26. Jane is in the process of scheduling the implant procedure for as soon as possible. (*Id.*)

27. Accordingly, Jane has not and will not experience any of the physiological changes that increased testosterone levels would cause in a pubescent boy. (Shumer Decl. (Doc. 5) ¶ 45; Budge Decl. (Doc. 4) ¶ 28.)

28. Sports are very important to Jane and her parents. (J. Doe Decl. (Doc. 6) ¶ 5; H. Doe Decl. ¶ 12.)

29. Jane particularly loves playing soccer and has played soccer on girls' club and recreational sports teams for nearly five years. (J. Doe Decl. (Doc. 6) ¶¶ 6–8; H. Doe Decl. (Doc. 7) ¶ 12.)

30. Aside from its physical and emotional health benefits, soccer has helped Jane make new friends and connect with other girls. (J. Doe Decl. (Doc. 6) ¶ 7; H. Doe Decl. (Doc. 7) ¶ 13.)

31. Jane's teachers, coaches, friends, and members of her soccer team have all been supportive of Jane's identity. (H. Doe Decl. (Doc. 7) ¶ 9; Stipulation in Lieu of Answer ("Kyrene/Toenjes Stip.") (Doc. 59) ¶ 1.)

32. When Jane enters Kyrene Aprende Middle School this July, she intends to participate and compete with the cross-country team and try out for the girls' soccer and basketball

teams. (J. Doe Decl. (Doc. 6) ¶ 9; H. Doe 2 nd Decl. (Doc. 78) ¶ 4.)

33. Both the soccer and basketball teams at Kyrene Aprende Middle School have separate teams for boys and girls. (J. Doe Decl. (Doc. 6) ¶ 9.)

34. The cross-country team trains together, but boys and girls compete separately. (*Id.*)

 **\*5**  35. Registration for the cross-country team began on July 1, 2023. (H. Doe 2 nd Decl. (Doc. 78) ¶ 6.)

36. The registration occurs online and involves the submission of registration forms and supporting documents, such as a physical report signed by a doctor. (*Id.*)

37. Typically, a student's registration takes at least two to three days to process after it is submitted. (*Id.*)

38. The first practice for cross country is on July 31, 2023, and the first cross-country competitive meet will occur the week of August 14, 2023. (*Id.* ¶ 7.)

39. Jane is excited to participate and compete on the girls' teams with her friends and peers. (J. Doe Decl. (Doc. 6) ¶¶ 8–9.)

40. If not for the Act, the Kyrene School District would permit Jane Doe to play on girls' sports teams. (Kyrene/Toenjes Stip. (Doc. 59) ¶ 1.)

41. However, if the Act is applied to Jane, she will not be able to play on the girls' soccer and basketball teams or compete with the girls' cross-country team. (*Id.*)

42. Plaintiff Megan Roe is a 15-year-old transgender girl who attends TGS. (Megan Roe ("M. Roe Decl.") (Doc. 8) ¶¶ 2, 5.)

43. Megan has always known she is a girl. (Kate Roe ("K. Roe Decl.") (Doc. 9) ¶ 3.)

44. Megan has lived as a girl in all aspects of her life since she was seven years old. (M. Roe Decl. (Doc. 8) ¶ 3; K. Roe Decl. (Doc. 9) ¶¶ 4–5.)

45. Through a court order, Megan has changed her name to a more traditional female name and her gender to female. (Pls.' Ex. 14 (Doc. 90-2).) She also has a female gender marker on her passport. (Pls.' Ex. 16 (Doc. 90-4).)

46. Megan was diagnosed with gender dysphoria when she was ten years old. (K. Roe Decl. (Doc. 9) ¶ 6.)

47. Before starting school at TGS, Megan's parents shared with administrators and teachers at the school that Megan is a transgender girl. (M. Roe Decl. (Doc. 8) ¶ 5.) TGS has been very supportive of Megan and her identity. (*Id.*; Defendant TGS Motion to Dismiss ("TGS Mot. to Dismiss") (Doc. 37) at 3.)

48. Megan has been taking puberty blockers since she was 11 years old as part of her medical treatment for gender dysphoria. (M. Roe Decl. (Doc. 8) ¶ 6; K. Roe Decl. (Doc. 9) ¶ 6.) This prevented Megan from undergoing male puberty. (K. Roe Decl. (Doc. 9) ¶ 6.)

49. Megan began receiving hormone therapy when she was 12 years old. (M. Roe Decl. ¶ 6; K. Roe Decl. (Doc. 9) ¶ 6.)

50. As a result of the puberty blockers and hormone therapy, Megan has not experienced the physiological changes that increased testosterone levels would cause in a pubescent boy. (K. Roe Decl. (Doc. 9) ¶ 6; Shumer Decl. (Doc. 5) ¶ 47; Budge Decl. (Doc. 4) ¶ 29.)

51. The hormone treatment that she has received has caused Megan to develop many of the physiological changes associated with puberty in females. (Shumer Decl. (Doc. 5) ¶ 47; see also Budge Decl. (Doc. 4) ¶ 29.)

52. Sports have always been a part of Megan's life. (M. Roe Decl. (Doc. 8) ¶ 4.)

53. When she was about seven years old, Megan joined a swim team. (K. Roe Decl. (Doc. 9) ¶ 7.)

54. The coach of the swim team was supportive of Megan and her gender identity. (*Id.*)

55. Megan intends to try out for the girls' volleyball team at TGS for this year's fall season. (M. Roe Decl. (Doc. 8) ¶ 7.)

 **\*6**  56. Volleyball is an important part of the TGS community and many students attend the games. (M. Roe Decl. (Doc. 8) ¶ 8; K. Roe Decl. (Doc. 9) ¶ 8.)

57. Megan is excited to play on the girls' volleyball team with her friends. (M. Roe Decl. (Doc. 8) ¶ 7; K. Roe Decl. (Doc. 9) ¶ 8.)

58. Megan's teammates, coaches, and school are highly supportive of her and would welcome her participation on the girls' volleyball team. (M. Roe Decl. (Doc. 8) ¶ 5; K. Roe Decl. (Doc. 9) ¶ 5; TGS Mot. to Dismiss (Doc. 37) at 3; Dr. Julie Sherrill ("Sherrill Decl.") (Doc. 37-1) ¶ 5.)

59. If not for the Act, TGS would permit Megan to play on the girls' volleyball team. (Sherrill Decl. (Doc. 37-1) ¶ 5.)

60. If the Act is applied to Megan, she will not be able to compete with the girls' volleyball team. (*Id.*)

C.**Prior to enactment of A.R.S. § 15-120.02, Plaintiffs would have been allowed to play on girls' sports teams**.

61. Defendant AIA sets rules for governing interscholastic sports, grades 9-12, and cutoff age of 19, for member schools, with membership being voluntary, but compliance with AIA rules being mandatory for all membership schools. (AIA Constitution; Article 2. Membership (Doc. 51-1).)

62. Each school or school district set its own rules on transgender students' participation in intramural sports. (*Id.* ¶¶ 2.5.2–3 (vesting "[f]inal authority and ultimate responsibilities in all matters pertaining to interscholastic activities of each school shall be vested in the school principal," with school administration assuming responsibility for verification of all student eligibility rules).)

63. Prior to the enactment of the Act, A.R.S. § 15-120.02, transgender girls in Arizona were permitted to play on girls' sports teams, under the AIA Constitution, Bylaws, Policies and Procedures § 41.9, as follows: "[A]ll students should have the opportunity to participate in Arizona Interscholastic Association activities in a manner that is consistent with their gender identity, irrespective of the sex listed on a student's eligibility for participation in interscholastic athletics or in a gender that does not match the sex at birth." (AIA Resp., Ex. 1 (Doc. 51-1).)

64. By December 2018, the AIA formalized its policy to permit transgender students to play on teams consistent with their gender identity so long as they had a letter of support from their parent or guardian explaining when they realized they were transgender. (Compl. (Doc. 1) ¶ 21; AIA Answer (Doc. 50) ¶ 21; AIA Transgender Policy § 41.9 (Doc. 51-1).)

65. Under the AIA policy, a student request to play on a team consistent with his or her gender identity is reviewed by a committee of medical and psychiatric experts, and consistent with AIA health and safety policy and if not motivated by an improper purpose, the request is approved or denied. (AIA Resp., Ex. 1 (Doc. 51-1) § 41.9.3; Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. on Judiciary, Jan. 20, 2022, 55th Leg., 2d Reg. Sess. 50:12–52 (Ariz. 2022).)

66. In the past 10 to 12 years, the AIA fielded approximately 12 requests consistent with their policy and approved seven students to play on a team consistent with their gender identity. Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. on Judiciary, Jan. 20, 2022, 55th Leg., 2d Reg. Sess. 52:10 (Ariz. 2022).

**\*7** 67. The parties do not provide the Court with a breakdown of the gender identity for these seven transgender students but even assuming they were all transgender girls, the Court finds that seven students over 10 to 12 years is not a substantial number, particularly when compared to the "roughly 170,000 students playing sports in Arizona." (Preliminary Injunction, Oral Argument: July 10, 2023).[3]

68. Less than one percent of the population is transgender, with male and female transgender people being roughly the same in number. *Hecox*, 479 F. Supp. 3d at 977–78. "Presumably, this means approximately one half of one percent of the population is made up of transgender females. It is inapposite to compare the potential displacement allowing approximately half of the population (cisgender [4] men) to compete with cisgender women, with any potential displacement one half of one percent of the population (transgender women) could cause cisgender women. It appears untenable that allowing transgender women to compete on women's teams would substantially displace female athletes." *Id.* at 977-978.

69. The Arizona Bill Summary for the Act, SB 1165 transmitted to the Governor on May 11, 2022, expressly cites the AIA's "policy allowing transgender students to participate in activities in a manner consistent with their gender identity. (AIA Policies and Procedure, Art. 41 § 9)." (2022 Reg. Sess. S.B. 1165, Bill Summary).

70. Despite enactment of the Act, the AIA has not changed its transgender policy. (AIA Resp. (Doc. 51) at 5.) Yet, organizations like the AIA do not have discretion to disregard validly enacted laws of the State of Arizona. (AIA Resp. (Doc. 51) at 4.)

71. The Act prohibits "any licensing or accrediting organization or any athletic association or organization," including the AIA, from "entertain[ing] a complaint, open[ing] an investigation or tak[ing]any other adverse action against a school for maintaining separate interscholastic or intramural athletic teams or sports for students of the female sex." A.R.S. § 15-120.02(D).

72. The Act creates a private cause of action for students or schools to sue schools or organizations like the AIA if the school or organization violates the ban or retaliates in response to the reporting of a violation of the Act. A.R.S. § 15-120.02(F)-(G).

**D. A.R.S. § 15-120.02 prevents Plaintiffs from playing on girls' sports teams at their schools.**

73. On March 30, 2022, Arizona enacted the Act (S.B. 1165), with an effective date of September 24, 2022. Ariz. Rev. Stat. § 15-120.02.

74. As of the effective date of the Act, School Year 2022-23, first quarter (July-September) sports, including volleyball, were almost over. Second quarter (October-December) girls' sports are softball and soccer. The Third quarter (January-March) sports for girls, includes basketball. The Fourth quarter (March-May) sport is track and field.

 **\*8**  75. In School Year 2022-23, Megan was allowed to practice as a member of the team, but not allowed to participate in TGS interscholastic competitions (games). (TGS Mot. to Dismiss (Doc. 37) at 3, n3.)

76. In School Year 2022-23, Jane played soccer but not at her elementary school because it did not have a school team; she will attend Kyrene Middle School for the first time this year. (Preliminary Injunction, Oral Argument: July 10, 2023).

77. The Court finds that the challenged conduct, passage of the Act precluding transgender girls from playing on girls' sports teams, occurred at a time when the Plaintiffs had an opportunity to play on girls' sports teams consistent with their gender identity.

78. Unlike the prior case-by-case basis used to approve a transgender girl's request to play on a team consistent with her gender identity, which considered among other things the age and competitive level relevant to the request, the Act categorically bans all transgender girls' participation by requiring each team that is sponsored by a public school or a private school team that competes against a public-school team to be designated as "male," "female," or "coed," based on the "biological sex of the students who participate." Ariz. Rev. Stat. § 15-120.02(A).

79. The Act applies equally to kindergarten through college teams although the problems identified as being addressed by the Act-- opportunity and safety-- are limited to high school and college sports. *See e.g.* Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. on Judiciary, Jan. 20, 2022, 55th Leg., 2d Reg. Sess., 0:9:56 (Ariz. 2022) (Sharp testimony explaining problem being addressed is AIA policy that allows males in a matter of weeks to dominate a sport, break a girl's record, and cause a girl to lose her championship or scholarship opportunity); same at 1:24:00 (Sen. Burley explanation for vote "yea" to protect integrity of high school sports by preventing victimization of girls that are trying to compete for sports scholarships). [5]

80. "Biological sex" is not defined in the statute. Ariz. Rev. Stat. § 15-120.02. However, the S.B. 1165 Legislative Findings state that for purposes of school sports, a student's sex is determined at "fertilization and revealed at birth, or, increasingly, in utero." S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2022), § 2.

81. The Act states that "athletic teams or sports designated for 'females', 'women' or 'girls' may not be open to students of the male sex." Ariz. Rev. Stat. § 15-120.02 (B).

82. The Act was adopted for the purpose of excluding transgender girls from playing on girls' sports teams. *See, e.g.* Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. on Judiciary, Jan. 20, 2022, 55th Leg., 2d Reg. Sess., 1:17:32–39 (Ariz. 2022) (statement of Sen. Vince Leach, Member, S. Comm. on Judiciary) (explaining his vote for the bill by stating, "if we allow transgenders to take over female sports, you will not have females participating"); 1:28:28–55 (statement of Sen. Warren Petersen, Chairman, S. Comm. on Judiciary) (questioning whether those opposing the bill would "be opposed to having just a trans league, so that they can all compete in their own league"); (Pls.' Ex. 25, Gov. Douglas Ducey Signing Letter) ("S.B. 1165 creates

a statewide policy to ensure biologically female athletes at Arizona public schools, colleges, and universities have a level playing field to compete….This legislation simply ensures that the girls and young women who have dedicated themselves to their sport do not miss out… due to unfair competition.")

**\*9**  83. Precluding transgender girls, who have not experienced male puberty, from playing girls sports, treats transgender boys and transgender girls differently and treats boys' and girls' sports differently, with only girls' teams facing potential challenges, including litigation, related to suspected transgender players. *Compare* Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. On Judiciary, Jan. 20, 2022, 55 [th] Leg., 2d Reg. Sess., 0:18:16 (inviting legislators to come see purported transgender girl on a team and describing need to challenge suspected transgender girls on opposing teams) *with Hecox*, 479 F. Supp. 3d at 988 (explaining all biological women are subject, in the event of a challenge, to the statutory verification process in order to play on a team, and this creates a different, more onerous set of rules for women's sports when compared to men's sports).

84. Contrary to the asserted safety goal, the Act does not protect transgender boys— identified by Defendant Horne and Intervenors as "biological girls." In fact, the Act allows "biological girls" to play on boys' sports teams, subjecting them to the alleged risks of that association. This is allowed prepuberty and without regard for whether the transgender boy is receiving testosterone enhancements.

85. The Act's creation of a private cause of action against a school for any student who is deprived of an athletic opportunity or suffers any harm, whether direct or indirect, related to a schools' failure to preclude participation of a transgender girl on a girls' team places an onerous burden on girls' sports programs, not faced by boys' athletic programs.

86. The record does not support a finding that prior to the Act's enactment, there was a problem in Arizona related to transgender girls replacing non-transgender girls on sports teams. Consideration of Bills: Hearing on S.B. 1165 Before S. Comm. on Judiciary, Jan. 20, 2022, 55th Leg., 2d Reg. Sess., 1:15:30–36 (Ariz. 2022) (statement of Sen. Warren Petersen, Chairman, S. Comm. on Judiciary) (acknowledging to another Senator that "we're not aware of a specific instance" where any cisgender girl had lost a place on a team to a transgender girl).

87. The record does not support a finding that during the 10 to 12 years prior to passage of the Act there was a risk of any physical injury to or missed athletic opportunity by any girl as a result of allowing seven transgender girls to play on sports teams consistent with their gender identity.

**E. Excluding Plaintiffs from school sports causes very serious injury to Plaintiffs**

88. School sports offer social, emotional, physical, and mental health benefits. (Budge Decl. (Doc. 4) ¶¶ 35–38.)

89. The social benefits of school sports include the opportunity to make friends and become part of a supportive community of teammates and peers. (*Id.* ¶ 35.)

90. School sports provide an opportunity for youth to gain confidence and reduce the effects of risk factors that lead to increases in depression. (*Id.* ¶ 36.)

91. Students who play school sports have fewer physical and mental health concerns than those that do not. (*Id.* ¶ 37.)

92. Students who participate in high school sports are more likely to finish college and participation in high school sports has a positive impact on academic achievement. (*Id.* ¶ 38.)

93. It would be psychologically damaging for a transgender girl to be banned from playing school sports on equal terms with other girls. (*Id.* ¶ 39; Budge Decl. (Rebuttal) (Doc. 65-1) ¶ 10.)

94. Transgender girls will internalize the shame and stigma of being excluded for a
personal characteristic (being transgender) over which they have no control and which already subjects them to prejudice and social stigma. (Budge Decl. (Doc. 4) ¶ 40.)

95. For transgender girls who are already playing on girls' teams, a law that requires them to be excluded from continued participation on girls' teams would have a further negative impact on their health and well-being, causing them to feel isolated, rejected, and stigmatized, and thereby putting them at high risk for severe depression and/or anxiety. (*Id.*)

**\*10**  96. For transgender girls, who are gender transitioning to address gender dysphoria, the benefits from playing sports on teams compatible with their gender identity is important because to be clinically effective, gender transitioning must be respected consistently across all aspects of her life.

**F. Transgender girls who have not undergone male puberty do not have an athletic advantage over other girls.**

97. The Plaintiffs' experts' opinions are based on the scientific consensus that the biological cause of average differences in athletic performance between men and women is caused by the presence of circulating levels of testosterone beginning with male puberty. (Shumer Decl. (Rebuttal) (Doc 65-2) ¶ 8 (citing Brown Decl. ¶¶ 127–30 relying on Handelsman (2018) at 823 ("summarizing evidence makes it highly likely that the sex difference in circulating testosterone of adults explains most, if not all, of the sex differences in sporting performance.")); (Brown Hecox Decl. ¶¶ 20a, 25–28, 77–85).

98. A large part of the record created by the Defendants is not relevant to the question before the Court: whether transgender girls like Plaintiffs, who have not experienced male puberty, have performance advantages that place other girls at a competitive disadvantage or at risk of injury. For example, Defendants submit evidence that girls have more body fat than boys at birth. (Brown Decl. (Doc. 82-1; 92-1) ¶ 79.) Without more, this evidence is not relevant to the question before the Court.

99. Defendant Horne and the Intervenors submit expert declarations, including the declaration by Dr. James Cantor, which in large part are not relevant criticisms of medical treatments for gender dysphoria. The appropriateness of medical treatment for gender dysphoria is not at issue in this case. (Pls Ex. (Doc. 88-3) at 39-40 (dated March 30, 2022, describing purpose of Act to ensure a level playing by preventing unfair competition in women's sports).) Protecting transgender girls from any such risk is not a rationale or purpose of the Act.

100. Defendants' expert Dr. Brown admits that many of the specific male physiological advantages he describes are a result of testosterone levels in men post-puberty. This evidence is not relevant because the Plaintiffs have not and never will experience male puberty. The Court is not concerned with Dr. Brown's opinion that such advantages are not reversed by testosterone suppression after puberty or are reduced only modestly, leaving a large advantage over female athletes. Dr. Brown agrees it is well documented that the large increases in physiological and performance advantages for men result from increases in circulating testosterone levels that males experience in puberty, "or generally between the ages of about 12 through 18." (Brown Decl. (Doc. 82-1; 92-1) ¶¶ 163-164.) [6]

**\*11** 101. Defendants rely on school-based fitness testing of boys and girls, comparisons between $10^{th}/50^{th}/90^{th}$ percentile scores for girl and boy students ages 6 through 11 reflecting, for example, that 50% of 6-year-old boys completed more laps in the 20-meter shuttle (14) than girls (12). (Brown Decl. (Doc. 82-1; 92-1) ¶ 84.) Other fitness data reflects differences between 9 through 17-year-old boys and girls, with 9-year-old boys always exceeding girls' running times by various percentages ranging from 11.1-15.2%, *id.* ¶ 89; arm hang fitness scores (7.48 boys, 5.14 girls), *id.* ¶ 92; standing broad jump (128.3 boys, 118.0 girls), *id.* ¶ 99. (*See also* Brown Decl. (Doc. 82-1; 92-1) ¶106 (quoting Thomas 1985 study at 266) ("Boys exceed girls in throwing velocity by 1.5 standard deviation units as early as 4 to 7 years of age..." and throwing distance by 1.5 standard deviation units as early as 2 to 4 years of age).) [7] (*But see* Shumer Decl. (2nd Rebuttal) (Doc. 65-2) ¶12 (opining clear scientific consensus that athletic ability does not diverge significantly until puberty (citing e.g., David Handelsman, *Sex Differences in Athletic Performance Emerge Coinciding with the Onset of Male Puberty*, 87 Clinical Endocrinology 68, 70–71 (2017) ("The gender divergence in athletic performance begins at the age of 12–13 years"); Ps Motion for PI, Jonathon W. Senefeld et al., *Sex Differences in Youth Elite Swimming*, 14 PLOS ONE 1, 1–2 (2019) (Doc. 88-2) at 42-43 (studying child and youth swimmers and concluding that the data suggests "girls are faster, or at least not slower, than boys prior to the performance-enhancing effects of puberty"); M.J. McKay, *Normative reference values for strength and flexibility of 1000 children and adults* (Doc. 88-3) at 12 (finding no significant (p<0.05) differences between the strength measures of boys or girls aged 3-9, except for shoulder internal rotators where boys were stronger).

102. The World Rugby Transgender Women's Guidelines 2020 , which Dr. Brown cites throughout his declaration, allow transgender girls and women to participate in women's rugby if they did not experience endogenous male puberty, stating: "Transgender women who transitioned pre-puberty and have not experienced the biological effects of testosterone during puberty and adolescence can play women's rugby." (Pls.' Ex. 24 (Doc. 88-3); Shumer Decl. (2nd Rebuttal) (Doc. 113) ¶ 35.)

103. The physical fitness data relied on by Defendant Horne and Intervenors merely observes phenomena across a population sample in isolated areas and does not determine a cause for what is observed. There is no basis for these experts to attribute those small differences to physiology or anatomy instead of to other factors such as greater societal encouragement of athleticism in boys, greater opportunities for boys to play sports, or differences in the preferences of the boys and girls surveyed. (Dr. Linda Blade ("Blade Decl.") at 7–9; Hilton Decl. (Doc. 92-8) ¶¶ 7.3–7.5; Shumer Decl. (2nd Rebuttal) (Doc. 113) ¶¶ 21, 46.) The Court finds that transgender girls, who are being raised in conformance with their gender identity, will be subject to the same social/cultural factors that girls face that correlates to lower physical fitness scores.

104. There is no evidence to support Dr. Hilton's opinion that girls have "delicate brain structures" making them prone to injury; brain MRIs reveal no differences based on sex, except for size. (Shumer Decl. (2nd Rebuttal) (Doc. 113) ¶ 40.) Evidence suggests the difference between male and female sports' concussions occurs because girls, post-puberty, have weaker neck muscles than boys. (Shumer Decl. (2nd Rebuttal) (Doc. 113) ¶ 41 (citing Abigail C. Bretzin et al., Association of Sex with Adolescent Soccer Concussion Incidence and Characteristics, 4 JAMA Network Open 4, 6 (2021); Ryan T. Tierney et al., Gender Differences in Head-Neck Segment Dynamic Stabilization During Head Acceleration, 37 Med. & Sci. Sports & Exercise 272, 272 (2005)).

**\*12**  105. The Court rejects Dr. Hilton's idea that "sporty-girls" will be "as well-trained as their male peers" and, therefore, higher win scores at Kyrene Middle School for boys cannot be explained by social cultural factors and must be biological. (Hilton Decl. (Doc. 92-8) (citing Thomas and French, 1985, *Gender differences across age in motor performance a meta-analysis:* Psychol Bull 98(2): 260-282)).

106. Height differences in babies are negligible, with differences disappearing altogether between ages 6 and 8 but reappearing when girls enter puberty and overtake boys in height and weight for a few years until boys experience puberty and grow taller on average than girls/women. (Shumer Decl. (2nd Rebuttal) (Doc. 113) ¶¶ 12-15.)

107. The Plaintiffs do not challenge the existence of separate teams for girls and boys. Defendants do not explain why the minor differences in physical fitness scores for prepuberty boys compared to girls reflect a significant athletic advantage of boys over girls, prepuberty. There are many other reasons why boys' and girls' sports teams are separated:

(1) women historically were deprived of athletic opportunities in favor of men; (2) as a general matter, men had equal athletic opportunities to women; and (3) according to stipulated facts, average physiological differences meant that "males would displace females to a substantial extent" if permitted to play on women's teams. See *Hecox*, 479 F. Supp. 3d at 976 (distinguishing *Clark by and Through Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126 (9th Cir. 1982) finding these factors do not apply for transgender women).

108. Defendants ask the Court to rely on evidence they allege supports separating sports teams by sex to conclude that transgender girls, who have not experienced puberty, should not play on girls' teams solely because they are boys, regardless of whether they have experienced puberty.

109. The Court will not make this leap because Plaintiffs present expert evidence that any prepubertal differences between boys and girls in various athletic measurements are minimal or nonexistent. (Shumer Decl. (Rebuttal) (Doc. 65-2) ¶ 5) (citing Alison McManus & Neil Armstrong, *Physiology of elite young female athletes*, 56 Medicine & Science Sports & Exercise 23, 24 (2011) ("Prior to 11 years of age differences in average speed are minimal"); *id.* at 27 ("[S]mall sex difference in fat mass and percent body fat are evident from mid-childhood"); *id.* at 29 ("[B]one characteristics differ little between boys and girls prior to puberty"); *id.* at 32 ("There is little evidence that prior to puberty pulmonary structure or function limits oxygen uptake"); *id.* at 34 ("[N]o sex differences in arterial compliance have been noted in pre- and early- pubertal children")).

110. Based on the evidence, transgender girls' physical characteristics, especially in terms of height, weight, and strength, overlap with those of other girls. In other words, some girls may be taller than average, and some transgender girls may be taller than average. The rationale for excluding transgender girls with above average physical characteristics is equally applicable to excluding taller than average girls, but height, weight, or strength factors are not used at any level of competition to protect girls or women athletes. (Shumer Decl. (2nd Rebuttal) (Doc. 113) ¶¶ 42-43; *see also Hecox*, 479 F. Supp. 3d at 980 (describing evidence of similar bell curve differences for transgender women, who have gone through

male puberty and are using gender affirming interventions, including lowering testosterone as "a transgender woman who performed 80% as well as the best performer among men of that age before transition would also perform at about 80% as well as the best performer among women of that age after transition.")

**\*13**   111.  The categorical preclusion of transgender women, especially girls who have not experienced male puberty, appears unrelated to the interests the Act purportedly advances. A "justification must be genuine, not hypothesized." *United States v. Virginia,* 518 U.S. 515, 533 (1996). The proponents of the Act fail to provide persuasive evidence of any genuine, not hypothesized problem. *Hecox,* 479 F. Supp. 3d at 979.

112. Before puberty, there are no significant differences in athletic performance between boys and girls. (Shumer Decl. (2 $^{nd}$ Rebuttal) (Doc. 113) ¶ 16; Shumer Decl. (Rebuttal) (Doc. 65-2) ¶¶ 9–13; Shumer Decl. (Doc. 5) ¶ 38; Pls.' Exs. 19–20, 22–23 (Doc. 88-2).)

113. After puberty, adolescent boys begin to produce higher levels of testosterone, which over time causes them to become, on average, stronger and faster than adolescent girls. (Shumer Decl. (Doc. 5) ¶ 39; Pls.' Exs. 18–19 (Doc. 88-2).)

114. The biological driver of average group differences in athletic performance between adolescent boys and girls is the difference in their respective levels of testosterone, which only begin to diverge significantly after the onset of puberty. (Shumer Decl. (Rebuttal) ¶¶ 4, 8; Shumer Decl. (Doc. 5) ¶ 39; Pls.' Exs. 18–19.)

115. Transgender girls who receive puberty-blocking medication do not have an athletic advantage over other girls because they do not undergo male puberty and do not experience the physiological changes caused by the increased production of testosterone associated with male puberty. (Shumer Decl. (Rebuttal) (Doc. 65-2) ¶¶ 15–16; Shumer Decl. (Doc. 5) ¶¶ 35, 38–42.)

116. Transgender girls who receive hormone therapy after receiving puberty-
blocking medication will develop the skeletal structure, fat distribution, and muscle and breast development typical of other girls. (Budge Decl. (Doc. 4) ¶ 29; Shumer Decl. (Rebuttal) (Doc. 65-2) ¶ 22; Shumer Decl. (Doc. 5) ¶¶ 35–36.)

117. A transgender girl who receives hormone therapy will typically have the same levels of circulating estrogen and testosterone as other girls. (Shumer Decl. (Doc. 5) ¶ 36.)

118. Knowing that a girl is transgender, if she has not gone through male puberty, reveals nothing about her athletic ability. (Shumer Decl. (2 $^{nd}$ Rebuttal) (Doc. 113) ¶ 31, 48; Shumer Decl. (Rebuttal) (Doc. 65-2) ¶¶ 26–27; Shumer Decl. (Doc. 5) ¶ 42.)

119. Similarly, transgender girls who have not yet undergone male puberty or who have received puberty-blocking medication at the onset of puberty do not present any unique safety risk to other girls. (Shumer Decl. (2 $^{nd}$ Rebuttal) (Doc. 113) ¶¶ 25, 36; Shumer Decl. (Rebuttal) ¶ 41.)

120. In short, transgender girls, who have not experienced male puberty, play like girls. There is no logical connection between prohibiting them from playing on girls' sports teams and the goals of preventing unfair competition in girls' sports or protecting girls from being physically injured by boys.

**G. Plaintiffs cannot play on boys' sports teams**.

121. Jane cannot play on boys' teams or compete with the boys because she is a girl, with athletic capabilities like other girls her age and different from boys her age who are beginning to experience puberty and increased testosterone levels. Jane will not experience male puberty and will experience female puberty. Assuming there are safety issues created if girls compete with boys, Jane would be subjected to such risks by playing on boys' teams.

**\*14**   122. Jane's medical health depends on her ability to live her life fully as a girl, and playing on a boys' sports team and competing against boys would directly contradict her medical treatment for gender dysphoria and jeopardize her health. (H. Doe Decl. (Doc. 7) ¶ 15; Budge Decl. (Doc. 4) ¶¶ 33–34.)

123. "Participating in sports on teams that contradict one's gender identity 'is

equivalent to gender identity conversion efforts, which every major medical association has found to be dangerous and unethical.' " *Hecox,* 479 F. Supp. 3d at 977.

124. Jane would find it humiliating and embarrassing to play on a boys' team because everyone at school knows her as a girl. (J. Doe Decl. (Doc. 6) ¶ 11; H. Doe Decl. (Doc. 7) ¶ 15.)

125. If she is not allowed to play sports on a girls' team, Jane will be very upset. (J. Doe Decl. (Doc. 6) ¶ 10; H. Doe Decl. (Doc. 7) ¶ 16.)

126. Jane will not participate in sports at all if she is forced to be on a boys' team. (J. Doe Decl. (Doc. 6) ¶ 11; H. Doe Decl. (Doc. 7) ¶ 15.) The last thing she wants to do is draw attention to herself by drawing into question her gender identity. She wants to go to school like other girls. (Jane Decl. (Doc. 6) ¶ 11.)

127. Jane will also lose the opportunity to receive the physical, social, and emotional benefits that school sports provide. (H. Doe Decl. (Doc. 7) ¶ 16).

128. Megan cannot play on boys' teams or compete with the boys because she is a girl, with athletic capabilities like other girls her age and different from boys her age, who have experienced puberty and increased testosterone levels. Megan has not experienced male puberty and has experienced female puberty. Assuming there are safety issues created if girls compete with boys, Jane would be subjected to such risks by playing on boys' teams.

129. Playing on a boys' team would directly conflict with Megan's medical treatment for gender dysphoria, and her medical health depends on her ability to live her life fully as a girl. Playing on a boys' team would be emotionally painful and humiliating for her. (M. Roe Decl. (Doc. 8) ¶ 9; K. Roe Decl. (Doc. 9) ¶ 10.)

130. "Participating in sports on teams that contradict one's gender identity 'is equivalent to gender identity conversion efforts, which every major medical association has found to be dangerous and unethical.' " Hecox, 479 F. Supp. 3d at 977.

131. If she is not allowed to play on the girls' volleyball team, Megan will not compete on the boys' volleyball team. (M. Roe Decl. (Doc. 8) ¶ 9; K. Roe Decl. (Doc. 9) ¶ 10.)

132. Megan will be distraught if she loses the opportunity to try out for the girls' volleyball team. (K. Roe Decl. (Doc. 9) ¶ 11.)

133. Megan will also lose the opportunity to receive the physical, social, and emotional benefits that school sports provide. (Id. ¶ 9.)

**II. Conclusions of Law**

To the extent these Conclusions of Law are also deemed to be Findings of Fact, they are hereby incorporated into the preceding Findings of Fact.

134. A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." Munaf v. Geren, 553 U.S. 674, 689-90 (2008) (citations omitted). Instead, in every case, the court must balance competing claims of injury and must consider the effect on each party of granting or withholding relief. Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008).

*15 135. A preliminary injunction may take one of two forms: 1) a prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits." Chalk v. United States Dist. Court, 840 F.2d 701, 704 (9th Cir. 1988). A mandatory injunction goes beyond simply maintaining the status quo and requires a heightened burden of proof and is particularly disfavored. Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir. 2009) (citing Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir. 1980)).

136. "Status quo" for the purpose of an injunction "refers to the legally relevant relationship between the parties before the controversy arose." Arizona Dream Act Coal. v. Brewer, 757 F.3d 1053, 1061 (9th Cir. 2014) (emphasis in original); see also Regents of Univ. of California v. Am. Broad. Companies, Inc., 747 F.2d 511, 514 (9th Cir. 1984) (for purposes of injunctive relief, the status quo means "the last uncontested status which preceded the pending controversy") (cleaned up).

137. For the purpose of issuing a preliminary injunction, the Court's findings that both Jane and Megan could have played on girls' sports teams last year prior to passage of the Act, cannot play on sports teams consistent with their gender identity now, and want to participate in girls' sports programs at Kyrene Middle School and TGS this year, warrant issuance of a mandatory prohibitory injunction to preserve the status quo.

138. The purpose of a preliminary injunction or temporary restraining order is to preserve the status quo if the balance of equities so heavily favors the moving party that justice

requires the court to intervene to secure the positions until the merits of the action are ultimately determined. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

139. A party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits of their claims; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

140. When the government is a party, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021).

A. **Likelihood of success on the merits.** Equal Protection Clause Claim

141. There is a strong presumption that gender classifications are invalid and the burden rests on the state to justify the classification. *Virginia*, 518 U.S. at 533. This burden tracks for purposes of considering the likelihood of the merits of the Plaintiffs' claim. Defendants must show that it is "more likely than not" that the Act is constitutional. *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 429–30 (2006) (finding evidentiary equipoise insufficient and issuing a preliminary injunction).

142. The Supreme Court has addressed the Defendants' concern that legislation must be written for the population generally, therefore, "most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Hecox*, 479 F. Supp. 3d at 972); (Preliminary Injunction, Oral Argument: July 10, 2023). There are three tiers of judicial scrutiny depending on the characteristics of the disadvantaged group or the rights implicated by the classification. *Hecox*, 479 F. Supp. 3d at 972.

**\*16**  143. When the state restricts an individual's access to a fundamental right, the policy must withstand the strictest of scrutiny. *San Antonio Indep. Sch. District. v. Rodriguez*, 411 U.S. 1, 16-17 (1973). Access to interscholastic sports is not a constitutionally recognized fundamental right. *Walsh v. La High Sch. Athletic Ass'n*, 616 F.2d 152, 159-60 (5th Cir. 1980). Strict scrutiny also applies if a government policy discriminates against a suspect class such as race, alienage, and national origin because government policies that discriminate based on race or national origin typically reflect prejudice. *City of Cleburn v. Cleburn Living Center*, 473 U.S. 432, 440 (1985).

144. The least stringent level of scrutiny is rational basis review, which is applied to laws that impose a difference in treatment between groups but do not infringe upon a fundamental right or target a suspect or quasi-suspect class. *Heller v. Dow,* 509 U.S. 312, 319-321 (1993).

145. Heightened scrutiny is an intermediate scrutiny, a slightly less stringent standard than strict scrutiny, but greater than rational basis review. *Craig v. Boren*, 429 U.S. 190, 197 (1976); *Virginia*, 518 U.S. at 533. Heightened scrutiny applies to statutes that discriminate on the basis of sex, a quasi-suspect classification. " 'The purpose of this heightened level of scrutiny is to ensure quasi-suspect classifications do not perpetuate unfounded stereotypes or second-class treatment.' " *Hecox*, 479 F. Supp. 3d at 973 (quoting *Latta v. Otter* (*Latta I*), 19 F. Supp. 3d 1054, 1073 (D. Idaho), *aff'd*, 771 F.3d 456 (9th Cir. 2014) (citing *Virginia*, 518 U.S. at 533)). To withstand heightened scrutiny, a classification by sex "must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig*, 429 U.S. at 197.

146. Laws that discriminate against transgender people are sex-based classifications and, as such, warrant heightened scrutiny. *See Karnoski v. Trump*, 926 F.3d 1180, 1200–01 (9th Cir. 2019) (analyzing a policy barring transgender people from military service as sex-based discrimination and applying heightened scrutiny); *see also D.T. v. Christ*, 552 F. Supp. 3d 888, 896 (D. Ariz. 2021) ("Discrimination against transgender people is discrimination based on sex; as such, heightened scrutiny applies.").

147. Defendant Horne's and Intervenors' argument that the Act does not mention transgender girls and, therefore, does not discriminate based on transgender status or gender identity fails. The Act's disparate treatment of transgender girls because they are transgender is clear on the face of the statute and makes it facially discriminatory even if the statute does not expressly employ the term "transgender". *See e.g. Hecox*, 479 F. Supp. 3d at 975 (rejecting defendants' argument that similar Idaho statute "does not ban athletes on the basis of transgender status, but rather on the basis of the innate physiological advantages males generally have over females"); *A.M.*, 617 F. Supp. 3d at 965–66 (holding that a virtually identical Indiana statute discriminated

against transgender individuals despite not using the term "transgender"); *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 353–54 (S.D. W. Va. 2021) (holding that a virtually identical West Virginia statute "discriminates on the basis of transgender status"), *B. P. J. v. W. Virginia State Bd. Of Educ.*, No. 2:21-CV-00316, 2023 WL 111875, at *6 (S.D.W. Va. Jan. 5, 2023) (cleaned up), *stayed pending appeal B.P.J. v. W. Virginia State Bd. of Educ.*, No. 23-1078, 2023 WL 2803113, at *1 (4th Cir. Feb. 22, 2023).

**\*17**  148. The Arizona legislature intentionally created a classification, specifically "biological girls," that necessarily excludes transgender girls, and expressly allowed only that exclusive classification to play girls sports to the exclusion of transgender girls.

149. The legislative history demonstrates that the purpose of the Act is to exclude transgender girls from girls' sports teams. Therefore, the Court applies heightened scrutiny to the Act, does not make a presumption of constitutionality, and does not defer to legislative judgment. *SmithKline Beecham Corp. v. Abbott Laboratories,* 740 F.3d 471, 483 (9 [th] Cir. 2014).

150. Plaintiffs Jane and Megan are transgender girls, members of a quasi-protected class. The Court applies heightened scrutiny in this case, placing the burden on the government to show "an exceedingly persuasive justification" for the alleged discriminatory treatment, *Virginia,* 518 U.S. at 531, which must not be based on "generalizations" or "stereotypes," *id.* at 549–50, 565. "The justification 'must be genuine, not hypothesized or invented post hoc in response to litigation,' and 'must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.'" *Karnoski,* 926 F.3d at 1200 (quoting *Virginia,* 518 U.S. at 533).

151. In applying heightened scrutiny review, the Court must examine the Act's " 'actual purposes and carefully consider any resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status.' " *Latta II,* 771 F.3d at 468 (quoting *SmithKline,* 740 F.3d at 483).

152. According to Defendants, the Act is to protect girls from physical injury in sports and promote equality and equity in athletic opportunities, which are, in addition to redressing past discrimination against women in athletics, considered legitimate and important governmental interests justifying rules excluding males from participating on female teams. *Clark,* 695 F.2d at 1131.

153. However, the well-established scientific consensus is that, before puberty, there are no significant physiological differences in athletic performance between boys and girls. Instead, there is overlap between the sexes, with some boys being better athletically than some girls and some girls outplaying some boys. There is also no evidence that transgender girls who do not undergo male puberty because they have taken puberty suppressing medication at the onset of male puberty have an athletic advantage over other girls. There are no studies that have documented any such advantage, and there is no medical reason to posit that any such advantage would exist. (*Id*. ¶ 26.)

154. The testimony by Drs. Brown and Hilton that boys have some biological advantages related to physical fitness before puberty does not support a conclusion that Plaintiffs, who have not experienced male puberty, have any athletic advantage over other girls or pose a safety risk to other girls by playing on girls' sports teams.

155. Defendant Horne and Intervenors discuss *Clark,* 695 F.2d at 1131, throughout their briefs but *Clark* strongly supports Plaintiffs. In *Clark*, the Ninth Circuit held that it was lawful to exclude boys from girls' volleyball teams because: (1) women had historically been deprived of athletic opportunities in favor of men; (2) as a general matter, men had equal athletic opportunities compared to women; and (3) according to the stipulated facts in the case, average physiological differences meant that males would displace females to a substantial extent if permitted to play on women's volleyball teams. *Hecox*, 479 F.Supp. 3d at 1131.

**\*18**  156. None of the *Clark* premises hold true for girls who are transgender: (1) far from being favored in athletics, "women who are transgender have historically been discriminated against;" (2) transgender women—unlike the boys in Clark—would not be able to participate in any school sports; and (3) based on the very small numbers of transgender girls in the population, "transgender women have not and could not 'displace' cisgender women in athletics 'to a substantial extent.' " *Hecox,* 479 F. Supp. 3d at 977 (quoting *Clark,* 695 F.2d at 1131). Hecox's analysis of *Clark* is more compelling here, where Plaintiffs have not experienced male puberty and will experience female puberty. *See Hecox,* 479 F. Supp. 3d at 981 (transgender girls who do not experience

male puberty "do not have an ascertainable advantage over cisgender female athletes").

157. Under *Clark,* the legislature need not pick the wisest alternative for addressing a problem, but it must show that the policy is "substantially related to the goals of providing fair and equal playing opportunities for girls and protections to ensure the safety of girls playing sports. *Clark,* 695 F.2d at 1132.

158. The Court finds that Defendant Horne and Intervenors fail to produce persuasive evidence at the preliminary injunction stage to show that the Act is substantially related to the legitimate goals of ensuring equal opportunities for girls to play sports and to prevent safety risks:

- There is no evidence in the record that transgender girls who have not experienced male puberty, have presented an actual problem of unfair

competition or created safety risks to other girls.

- There is no empirical evidence in the record that transgender girls who have not experienced puberty, have any physiological advantages over other girls that create unfair competition for positions on girls' sports teams and other athletic

opportunities, or pose a safety risk to other girls.

- The Act is overly broad, reaching sports at all grade levels, including grades

when athletes are prepuberty; it bans transgender girls, who have not experienced male puberty and who, instead, will or have experienced female puberty. "The Supreme Court has long viewed with suspicion laws that rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *B. P. J.* 2023 WL 111875, at *6. Laws that discriminate based on sex must be backed by an "exceedingly persuasive justification." *Virginia,* 518 U.S. at 531.

- The Act treats transgender boys and transgender girls and boys' and girls' sports

differently. Transgender boys who, according to Defendants' reasoning and classifications are "biological girls", are allowed to play on boys' sports teams, subject to the alleged risks of that association which the Act proports to address. The Act creates a private cause of action that burdens only girls' sports programs with transgender challenges, investigations, and litigation. The Act subjects only female athletes, transgender and otherwise, to gender challenges and investigations. Boys playing on boys' teams do not have to worry about any gender challenge or investigation.

159. Defendant Horne and Intervenors have not established that categorically banning all transgender girls from playing girls' sports is substantially related to an important government interest. *Virginia,* 518 U.S. at 524.

160. Defendant Horne's and Intervenors' argument that the Act is necessary to protect girls' sports by barring transgender girls, who purportedly have an unfair athletic advantage over other girls and/or pose a safety risk to other girls, is based on overbroad generalizations and stereotypes that erroneously equate transgender status with athletic ability. *See Hecox,* 479 F. Supp. 3d at 982 (holding that the asserted advantage between transgender and non-transgender female athletes "is based on overbroad generalizations without factual justification"). Therefore, the Act does not withstand heightened scrutiny. *Karnoski,* 926 F.3d at 1200 (citing *Virginia,* 518 U.S. at 533).

\*19  161. Because the Court's findings of fact reflect that the Act's categorical bar against transgender girls' participation on girls' sports teams is not a genuine justification, the Plaintiffs are likely to prevail on the merits. Heightened scrutiny requires more than a hypothesized problem. *Virginia,* 518 U.S. at 533.

162. In fact, the Act fails even under the rational basis test because it is not related to any important government interest. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *United States Dep't of Agric. v. Moreno,* 413 U.S. 528, 534 (1973).

**Title IX Claim**

163. Title IX provides, in relevant part, that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).

164. Defendants Kyrene School District (administered and overseen by Defendant Toenjes) and the AIA receive federal

financial assistance, and Defendant Horne is a grant recipient of federal funds. All Defendants must comply with Title IX's requirements. (See Compl. ¶¶ 9–13.)[8]

165. Discriminating against an individual on the basis of transgender status is discrimination based on sex. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020) ("[I]t is impossible to discriminate against a person for being...transgender without discriminating against that individual based on sex.").

166. The Ninth Circuit has held that discrimination based on transgender status also constitutes impermissible discrimination under Title IX. *See Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023) (holding that *Bostock* Title VII case applies to Title IX); *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022).

167. The Act discriminates against Plaintiffs based on their status as transgender girls by providing that for purposes of school sports a student's sex is fixed "at birth." S.B. 1165, 55th Leg., 2d Reg. Sess. (Ariz. 2002), § 2.

168. The Act's classification of all transgender girls as male and its prohibition of students who are "male" from playing on girls' teams, Ariz. Stat. § 15-120.02(B), intentionally excludes all transgender girls, including Plaintiffs, from participating on girls' teams.

169. Exclusion from athletics on the basis of sex is a cognizable harm under Title IX because it deprives Plaintiffs of the benefits of sports programs and activities that their non-transgender classmates enjoy. *See Grabowski*, 69 F.4th 1121–22 (holding that being removed from the team was an adverse action under Title IX); *see also A.M. by E.M. v. Indianapolis Pub. Sch.*, 617 F. Supp. 3d 950 (S.D. Ind. 2022), appeal dismissed sub nom. *A.M. by E.M. v. Indianapolis Pub. Sch. & Superintendent*, No. 22-2332, 2023 WL 371646 (7th Cir. Jan. 19, 2023) (granting a preliminary injunction of a similar Indiana law that banned transgender girls from playing on girls' sports teams based on Title IX).

*20 170. The Court rejects Defendant Horne's and Intervenors' arguments that Plaintiffs' schools offer teams for both boys and girls and, therefore, Plaintiffs are not excluded from participating in sports on teams consistent with their "biological sex." The Court's findings of fact reflect that Plaintiffs, who are transgender girls, cannot play on boys' teams because they are transgender girls who have not and will not go through male puberty and will go through female puberty. Moreover, playing on a boys' team would be shameful and humiliating for Plaintiffs as well as in direct conflict with ongoing treatment for gender dysphoria, a serious medical condition.

**B. Plaintiffs Will Suffer Irreparable Harm if Relief Is Not Granted.** 171. Plaintiffs face irreparable harm if this Court does not enjoin the Act as to them.

172. Enforcement of the Act in violation of the Equal Protection Clause in and of itself is sufficient to presume irreparable harm to justify a preliminary injunction. *Hernandez v. Sessions*, 872 F.3d 976, 994–95 (9th Cir. 2017) ("It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury.") (internal quotation marks and citation omitted); *Hecox,* 479 F. Supp. 3d at 987 (noting this "dispositive presumption").

173. A violation of Title IX also causes irreparable harm. *See Anders v. Cal. State Univ., Fresno*, 2021 WL 1564448, at *18 (E.D. Cal. Apr. 21, 2021) (finding irreparable harm under Title IX given the "presumption of irreparable injury where plaintiff shows violation of a civil rights statute" and in light of "the insult that comes from unequal treatment"); *Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 973 (D. Minn. 2016) ("Plaintiffs have a fair chance of succeeding on their Title IX claim, and Congress passed Title IX pursuant to its power to enforce the Fourteenth Amendment. Plaintiffs' expectation that they may be treated unequally in violation of Title IX's terms is an irreparable harm.") (cleaned up).

174. Plaintiffs will also suffer severe and irreparable mental, physical, and emotional harm if the Act applies to them because they cannot play on boys' sports teams. Playing on a boys' team would directly contradict Plaintiffs' medical treatment for gender dysphoria and would be painful and humiliating. Plaintiffs' mental health is dependent on living as girls in all aspects of their lives.

175. Enforcing the Act against Plaintiffs will effectively exclude Plaintiffs from school sports and deprive them of the social, educational, physical, and emotional health benefits

that both sides acknowledge come from school sports. This exclusion is a cognizable harm. *Grabowski*, 69 F.4th at 1121.

176. Plaintiffs will also suffer the shame and humiliation of being unable to participate in a school activity simply because they are transgender—a personal characteristic over which they have no control. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 625 (4th Cir. 2020) (explaining that the stigma of exclusion "publicly brand[s] all transgender students with a scarlet 'T' ") (internal quotation marks and citation omitted).

177. In addition, Plaintiffs will suffer the cognizable and irreparable "dignitary wounds" associated with the passage of a law expressly designed to communicate the state's moral disapproval of their identity, wounds that "cannot always be healed with the stroke of a pen." *Obergefell v. Hodges*, 576 U.S. 644, 678 (2015); *Hecox,* 479 F. Supp. 3d at 987 (finding such wounds constitute irreparable harm).

178. Plaintiffs have established that they will suffer irreparable harm if the Act is enforced against them.

### C. The Public Interest and Balance of Equities Favor Injunctive Relief.

179. When an injunction is sought against a governmental entity, the public interest

**\*21** and balance-of-the-hardships factors merge. *Nken*, 556 U.S. at 435–36.

180. As an initial matter, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

181. The balance of equities favors Plaintiffs as well. Defendant Horne and Intervenors "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Plaintiffs, however, face serious and ongoing harm if the Act is enforced against them.

182. The alleged harm to Defendants and Intervenors —"that biological girls will be forced to compete against transgender girls who allegedly have an athletic advantage"— is unsupported by the record. *A.M.,* 617 F. Supp. 3d at 968. Moreover, there is no evidence in the record "that allowing [Plaintiffs] to play on the girls' [teams] will make this [purported] harm a reality." *Id*. On the contrary, the record suggests the opposite. Based on the record for the preliminary injunction, the Court has found that Plaintiffs do not have a competitive advantage over other girls, and they do not pose a safety risk.

183. But for the Act, Defendants TGS, Kyrene School District, Superintendent Toenjes, and the AIA would all permit Plaintiffs to play on girls' teams.

184. There is no evidence that any Defendant will be harmed by allowing Plaintiffs to continue playing with their peers as they have done until now. *Hecox*, 479 F. Supp. 3d at 988 ("[A] preliminary injunction would not harm Defendants because it would merely maintain the status quo while Plaintiffs pursue their claims.").

185. Accordingly, the public interest and balance of equities favor a preliminary injunction.

### CONCLUSION

The Court's findings of fact support Plaintiffs' assertions that very serious damages will result from a change in the status quo, and as a matter of law and fact, this is not a doubtful case. *See Anderson*, 612 F.2d at 1114 (generally, mandatory injunctions require extreme or very serious damage and not issued in doubtful cases). Because Plaintiffs have satisfied all elements necessary to obtain a preliminary injunction, the Court grants Plaintiffs' motion for a preliminary injunction.

The Court has the discretion to determine whether the moving party is required to post a bond as a condition for the granting of a preliminary injunction. *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (citing *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)). Here, a bond is not required because "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

**Accordingly,**
**IT IS ORDERED** that the Motion for Preliminary Injunction (Doc. 3) is GRANTED.

**IT IS FURTHER ORDERED** that Defendant Horne is enjoined from enforcing A.R.S. § 15-120.02 as to Plaintiffs.

**IT IS FURTHER ORDERED** that the Act shall not prevent Plaintiffs from participating in girls' sports and, as agreed by Kyrene School District and Laura Toenjes, in her official capacity, pursuant to the Stipulation in Lieu of an Answer (Doc. 59), and by TGS in open Court at the hearing for the Preliminary Injunction, the Plaintiffs shall be allowed to play girls' sports at their respective schools.

**\*22** **IT IS FURTHER ORDERED** that the AIA transgender policy, § 41.9, complies with the terms of this preliminary injunction.

Dated this 20th day of July, 2023.

**All Citations**

Slip Copy, 2023 WL 4661831

## Footnotes

1. By stipulation, the parties offer proof by way of expert declarations filed in advance of the hearing and by supplement thereafter. Accordingly, the Court references the evidence herein by CM/ECF document number, not as a trial exhibit.

2. From a medical perspective, the terms "biological sex," "biological male," and "biological female" are imprecise terms because a person's sex encompasses several different biological attributes, including sex chromosomes, certain genes, gonads, sex hormone levels, internal and external genitalia, other secondary sex characteristics, and gender identity, which may or may not be in alignment. (Shumer Decl. (2nd Rebuttal) (Doc. 113) ¶44 (citing Joshua D. Safer, *Care of Transgender Persons*, 381 N. Engl. J. Med. 2451 (2019)).

3. The record is missing the relevant number of participants in girls' sports and in sports generally over this same 10-to-12-year period. Based on its independent research, the Court accepts the 170,000 number as representing the total number of students playing sports per year because in 2018-19, there were 52,817 girls and 68,520 boys playing sports in Arizona. https://www.statista.com/statistics/202219/us-high-school-athletic-participation-in-arizona.

4. "The term 'cisgender' refers to a person who identifies with the sex that person was determined to have at birth." *Hecox*, 479 F. Supp. 3d at 945 (relying on *Doe v. Boyertown*, 897 F.3d 518, 522 (3rd Cir. 2018)).

5. http: https://www.azleg.gov/videoplayer/?clientID=6361162879&eventID=2022011057

6. A categorical bar to girls and women who are transgender stands in "stark contrast to the policies of elite athletic bodies that regulate sports both nationally and globally—including the National Collegiate Athletic Association ("NCAA") and the International Olympic Committee ("IOC")—which allow transgender women to participate on female sports teams once certain specific criteria are met," primarily specified levels of circulating testosterone. *Hecox*, 479 F. Supp. 3d at 944.

7. The Court does not know whether Dr. Brown's opinion that hormone and testosterone suppression cannot fully eliminate physiological advantages once an individual experienced male puberty has been revised since the peer review of the Handelsman study. See *Hecox* 479 F. Supp. 3d at 980 (criticizing Brown's opinion because not updated subsequent to peer review and noting some of the studies Dr. Brown relied on "actually held the opposite").This evidence, relating to transgender girls/women who have experienced male puberty, is not directly relevant in this case, except to the extent the Court might extrapolate that if testosterone suppression in transgender females who have experienced male puberty, can bring them into athletic alignment with other girls/women, then preventing transgender girls from experiencing male puberty

in the first place would result in even greater equity. The Court does not draw such a conclusion for purposes of deciding the request for preliminary injunction.

8 TGS has filed a motion to dismiss on the basis that it does not receive federal financial assistance and therefore is not required to comply with Title IX requirements. The Court will address this motion by separate order.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.